UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,    )
                             )
              Plaintiff,     )
                             )
      vs.                    )        File No. 1:17-cr-16
                             )
Redfawn Fallis,              )
                             )
              Defendant.     )




PARTIAL TRANSCRIPT OF
DIGITALLY RECORDED PRELIMINARY HEARING




Taken at
United States Courthouse
Bismarck, North Dakota
December 12, 2016




BEFORE THE HONORABLE CHARLES S. MILLER, JR.
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

APPEARANCES

MR. DAVID D. HAGLER
U.S. Attorney's Office
220 E. Rosser Ave.
P. O. Box 699
Bismarck, North Dakota 58502-0699

                                        FOR THE UNITED STATES


- - - - - - - - - -


MR. CHRISTOPHER P. BELLMORE
Assistant Federal Public Defender
Federal Plaza
324 North Third Street, Suite 1
Bismarck, North Dakota 58501

                                        FOR THE DEFENDANT


- - - - - - - - - -

GOVERNMENT WITNESS

                                                          Page No.

Agent Derek Hill
  Direct Examination by Mr. Hagler                            5
  Cross-Examination by Mr. Bellmore                          16
  Redirect Examination by Mr. Hagler                         23


- - - - - - - - - -


EXHIBITS

| No. | Description | Offered | Received |
|-----|-------------|---------|----------|
| 1 | Colorado Judgment of Conviction | 7 | 7 |
| 2 | Video of Incident | 13 | 13 |
| 3 | Photograph of Revolver | 14 | 14 |
| 4 | Photograph of Ammunition | 15 | 15 |


- - - - - - - - - -


Certificate of Transcriptionist - Page 24


- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2    Honorable Charles S. Miller, Jr., United States District Court

3    Magistrate Judge, presiding, commencing at 11:00 a.m.,

4    December 12, 2016, in the United States Courthouse, Bismarck,

5    North Dakota.  The following partial proceedings were had and

6    made of record by digital recording in open court with the

7    defendant present.)

8               - - - - - - - - - - -

9          THE COURT:  Okay.  We'll go on the record in

10   Magistrate's Number 1-16-359, *United States of America versus*

11   *Redfawn* -- is it Fallis, ma'am?

12         MS. FALLIS:  Yes.

13         THE COURT:  Okay.  Ms. Fallis is present.

14   Mr. Bellmore from the Federal -- Federal Public Defender's

15   Office is present.  Mr. Hagler is present.

16          (The following partial proceedings herein are

17   excluded pursuant to the request of the ordering party.)

18         THE COURT:  All right.  United States may proceed.

19         MR. HAGLER:  Thank you, Your Honor.

20         THE COURT:  Oh, as another housekeeping matter, since

21   we're recording this today, I need to have both attorneys

22   remain seated rather than stand and then speak loudly and

23   clearly into the mikes.

24         MR. HAGLER:  Very good, Your Honor.  Your Honor, the

25   United States would call ATF Agent Derek Hill.

4

1                          AGENT DEREK HILL,

2     having been first duly sworn, was examined and testified as

3     follows:

4                          DIRECT EXAMINATION

5     BY MR. HAGLER:

6     Q.    Agent Hill, please identify yourself for the record.

7     A.    My name is Derek Hill.  I'm a special agent with the

8     Bureau of Alcohol, Tobacco, Firearms and Explosives out of the

9     Bismarck satellite office.

10    Q.    How long have you been a special agent with ATF?

11    A.    I've been a special agent with ATF since September of

12    2001.

13    Q.    Did your office have occasion to become involved in an

14    investigation regarding Redfawn Fallis earlier this year?

15    A.    Yes, we did.

16    Q.    How did you initially become involved?

17    A.    I was contacted on the night of October 27th of 2016,

18    after Ms. Fallis was taken into custody in rural Morton County.

19    Q.    And what -- just in real general terms, what was reported

20    to you at that time as to why they wanted ATF involved?

21    A.    It was reported to me that while she was being arrested by

22    law enforcement in Morton County, that she had in her

23    possession a handgun, and that handgun was fired three times

24    during her arrest.

25    Q.    And so who was the person identified as that was arrested

                                   5

1  on that occasion?

2  **A.**   Redfawn Fallis.

3  **Q.**   Were you familiar with Ms. Fallis prior to this incident?

4  **A.**   Somewhat familiar with her from -- I worked in Rapid City,

5  South Dakota, for 11 years and primarily worked the Pine Ridge

6  Indian Reservation.  I knew that that's where she was from and

7  had some knowledge of Ms. Fallis at that time.  It was Redfawn

8  Janis that I knew her as.

9  **Q.**   Janis spelled J-A-N-I-S?

10  **A.**   That's correct.

11  **Q.**   And do you see that woman in the -- in the courtroom here

12  today in the orange seated next to Mr. Bellmore?

13  **A.**   Yes, I do.

14  **Q.**   What did your investigation show regarding whether the

15  defendant has a conviction which prohibits her from possessing

16  a firearm under federal law?

17  **A.**   We determined that she had a 2003 conviction out of

18  Arapahoe County District Court in Colorado for the felony --

19  Class 6 felony for accessory to a crime.  That -- that

20  particular felony conviction out of the state of Colorado

21  carries a punishment -- maximum punishment of greater than one

22  year.

23  **Q.**   Agent Hill, I'm going to hand you what has been marked as

24  Government's Exhibit Number 1.  What is that, Agent Hill?

25  **A.**   That is a copy of the Judgment of Conviction and sentence

1    out of District Court, Arapahoe County, State of Colorado, for

2    Redfawn Janis, also known as Redfawn Martin, for the crime of

3    accessory to a crime, a Class 6 felony, where she was sentenced

4    to 30 months of probation.

5    **Q.**   Agent Hill --

6          MR. HAGLER:  Well, I would offer Exhibit Number 1,

7    Your Honor.

8          THE COURT:  Mr. Bellmore?

9          MR. BELLMORE:  No objection.

10         THE COURT:  Exhibit 1 is received.

11   **Q.**   (MR. HAGLER CONTINUING)  Agent Hill, what is an NCIC

12   criminal history report?

13   **A.**   NCIC is abbreviation for the National Crime Information

14   Center.  It's a database -- a nationwide database that keeps

15   criminal histories.  The way it works is if an individual is

16   arrested and fingerprinted, their fingerprints are sent to the

17   FBI, where they're entered into the National Crime Information

18   Center, and they're at times given both a state identification

19   number for their state arrest, as well as an FBI number, where

20   it's an individual number that will identify them for any

21   future arrests they get.

22         So if individuals are arrested multiple times in

23   different jurisdictions, their fingerprints are all matched to

24   the same, so thereby they're not creating multiple FBI numbers

25   for the same individual.  So when you have an FBI number for an

7

1    individual that lists various arrests, you know that those

2    fingerprints have already been examined and submitted and

3    identified them as being the same individual.

4    **Q.**   Even if different names have been used on different

5    occasions, correct?

6    **A.**   Correct.

7    **Q.**   So in this instance, does the NCIC criminal history report

8    for Ms. Fallis include the aliases Redfawn Janis and Redfawn

9    Martin?

10   **A.**   It does.

11   **Q.**   And, therefore, that criminal history report reflects the

12   fact that this Colorado conviction in Exhibit 1 is affiliated

13   with Ms. Redfawn Fallis, correct?

14   **A.**   That is correct.

15   **Q.**   The incident that has been reported where she was

16   possess -- in possession of the firearm, where did that take

17   place?

18   **A.**   That took place on Highway 1806 south of Mandan, North

19   Dakota, in rural Morton County, within the District of North

20   Dakota.

21   **Q.**   Now, there were a large number of law enforcement officers

22   present on that occasion, correct?

23   **A.**   That's correct.

24   **Q.**   And in general terms, what were they doing there that day?

25   **A.**   Law enforcement that day was responsible for moving

1    protesters that had set up a camp on private property that was
2    at this time owned by the Dakota Access Pipeline.  They had set
3    up a camp.  Dakota Access Pipeline wanted them removed from the
4    camp as they were trespassing on their property, so on this day
5    law enforcement was in the process of evicting or moving
6    protesters from this private property when this particular
7    incident occurred.
8    Q.    And some people were arrested that day that were not
9    complying with law enforcement directives, is that correct?
10   A.    That is correct.
11   Q.    Many people that day, however, were compliant and were not
12   arrested, correct?
13   A.    That's correct.
14   Q.    Regarding the defendant on this occasion, she was
15   initially identified how?  I mean, by -- what was she wearing
16   when the officers first noted her activity?
17   A.    They noted that she had a jacket on, blue jeans.  She had
18   a backpack, looked to be maybe carrying a fire extinguisher,
19   and was also wearing a gas mask.  And during this time law
20   enforcement had a couple of armored vehicles that they were
21   using loudspeakers to announce to the protesters at this point
22   that they were to retreat or move back to the camps where they
23   had originally set up camp and that they were trespassing, and
24   so a majority of them did leave the area at that time and
25   followed the commands or direction of law enforcement.

1  **Q.**   You were not present there that day on this occasion, were

2  you?

3  **A.**   I wasn't.  I was present down there, but not at this

4  specific location when this occurred.

5  **Q.**   As a part of your investigation with the ATF, you have

6  reviewed law enforcement reports of other officers that were

7  present right in that area, correct?

8  **A.**   That's correct.

9  **Q.**   Now, there were two -- there were two Pennington County,

10  South Dakota, deputies that were involved, is that correct?

11  **A.**   That's correct.

12  **Q.**   What were their names?

13  **A.**   Their name was Rusty Schmidt with -- S-C-H-M-I-D-T, and a

14  Thad Schmitt, which I think was S-C-H-M-I-T-T, so both last

15  names Schmidt.

16  **Q.**   At some -- shortly before the shooting incident, was Ms.

17  Fallis identified -- the female that you've described wearing

18  the backpack, the gas mask, was she identified as a person who

19  was to be arrested due to her conduct?

20  **A.**   Yes, she was.

21  **Q.**   And then who engaged in that activity specifically?

22  **A.**   Both Deputy Schmidts from Pennington County.  They -- she

23  was identified as an individual to be arrested.  They

24  determined that she was an instigator or agitator in that she

25  would walk up, get in the face of law enforcement and start

1   swearing at them and yelling at them.  And then she would kind

2   of get the rest of the protesters in that area fired up as

3   well, and so rather than try to deal with her when she's got a

4   group of protesters around her, they -- they wait until she's

5   kind of separate from the group, and then they attempt to take

6   them into custody.

7   **Q.**   Okay.  And so describe what happened with her that day

8   then.

9   **A.**   So as far as with Ms. Fallis, Deputies Schmidt ended up

10  grabbing her in an attempt to arrest her.  She ends up on --

11  fell to the ground, was taken to the ground, and she began

12  resisting the two -- two Pennington County deputies, along with

13  other law enforcement that were trying to take her into

14  custody.  She locked around one of their legs with her legs and

15  would not -- was not giving up her arms to law enforcement

16  despite the commands that they were giving.

17          They were able to get her right arm up and were

18  attempting to get her into flex cuffs.  However, she had her

19  fingers kind of splayed open, which makes it difficult for the

20  flex cuffs to be placed around her wrist, so one of the

21  deputies decided to let up some pressure on her right arm in

22  hopes that that would allow them to get her left arm out from

23  underneath her.  As soon as they let up pressure is when the

24  two shots were fired from underneath Ms. Fallis into the ground

25  right at the -- right at the deputies, and then a third shot

11

1    was fired shortly after that.

2    **Q.**   And then after those shots were fired, what happened?

3    **A.**   After those shots were fired, more law enforcement joined

4    in in controlling her, and a revolver was removed from her left

5    hand and was turned over to law enforcement, and she was taken

6    into custody.

7    **Q.**   When the gun was seized, what did an officer note about

8    any ammunition?

9    **A.**   An officer opened the cylinder to the Ruger revolver and

10   determined that there had been three shots fired out of it, so

11   there were two live rounds and three spent casings still in the

12   cylinder of the revolver at that time.

13   **Q.**   Agent Hill, you have reviewed a video that has been marked

14   as Government's Exhibit Number 2, correct?

15   **A.**   That is correct.

16   **Q.**   And it's a video of approximately two-and-a-half minutes

17   of some of what you just described here, correct?

18   **A.**   That's correct.

19   **Q.**   Now, again, you were not present at that location to

20   verify the accuracy of this video, correct?

21   **A.**   That's correct.  I was not.

22   **Q.**   Have you -- are you aware that -- whether either of the

23   Deputy Schmidts have reviewed the video and can attest as to

24   whether or not it's a fair and accurate depiction of what

25   happened that day?

1  **A.**   Yes, Pennington County Deputy Rusty Schmidt has reviewed

2  the video, and I guess his terms were that's spot on to what

3  occurred down there.

4         MR. HAGLER:  I would offer Government's Exhibit

5  Number 2 at this time, Your Honor.

6         THE COURT:  Mr. Bellmore?

7         MR. BELLMORE:  No objection, Your Honor.

8         THE COURT:  Okay.  Government's Exhibit 2 is

9  received.

10        MR. HAGLER:  May I play it at this time, Your Honor?

11        THE COURT:  Yes, you may.

12        (Exhibit Number 2, the video, is played in open

13  court.)

14        MR. HAGLER:  There -- there is audio with this.

15        THE CLERK:  I think there should be audio on.

16        MR. HAGLER:  Okay.

17        (Exhibit Number 2, the video, is again played in open

18  court.)

19  **Q.**   (MR. HAGLER CONTINUING)  Now, Agent Schmidt (sic), as

20  we're viewing this video here, we see someone on the ground

21  wearing blue jeans, correct?

22  **A.**   That's correct.

23  **Q.**   Is that Ms. Fallis?

24  **A.**   It is.

25        (Exhibit Number 2, the video, is again played in open

1  court.)

2  **Q.**   (MR. HAGLER CONTINUING)  All right.  So, now, as you

3  testified earlier, after the gunfire there, then the gun was

4  seized from Ms. Fallis and taken by law enforcement, correct?

5  **A.**   That's correct.

6  **Q.**   Handing you what have been marked as Government's

7  Exhibits 3 and 4, those are photographs, correct?

8  **A.**   That is correct.

9  **Q.**   What is Government 3?

10 **A.**   Three is a picture of the revolver that was taken from Ms.

11 Fallis on the day, along with the three spent casings that were

12 in the cylinder and the two live rounds that were in the

13 cylinder.

14             MR. HAGLER:  Would offer Government's Exhibit 3, Your

15 Honor.

16             THE COURT:  Mr. Bellmore?

17             MR. BELLMORE:  No objection.

18             THE COURT:  Government's Exhibit 3 is received.

19 **Q.**   (MR. HAGLER CONTINUING)  And what is in Government's

20 Exhibit 4?

21 **A.**   Government Exhibit 4 is -- was also taken off Ms. Fallis's

22 pockets -- taken out of her pockets at the time of her arrest.

23 Those are what we refer to as speed strips, two speed strips

24 containing six live rounds of ammunition each.  Those are just

25 a means of loading revolvers more efficiently, a little quicker

1    than doing it one by one with your hand.

2            MR. HAGLER:  All right.  The firearm displayed in --

3    I would offer Number 4, Your Honor.

4            THE COURT:  Mr. Bellmore?

5            MR. BELLMORE:  No objection.

6            THE COURT:  Government's Exhibit 4 is received.

7    Q.    (MR. HAGLER CONTINUING)   In Government's Exhibit 3, the

8    firearm, Agent Hill, exactly what type of firearm is that?

9    A.    That is a Ruger, Model LCR, .38-caliber Special revolver

10   with a serial number of 543-47899.

11   Q.    Did your investigation show that that firearm had traveled

12   in interstate commerce at some time prior to this date?

13   A.    Yes, on November 9th an interstate nexus expert for us

14   located out of the Rapid City satellite office took a written

15   description or a description of the gun, and he determined that

16   that firearm was, in fact, manufactured in a state other than

17   North Dakota.  And, further, a trace request was done on the

18   firearm to try to trace who the initial purchaser was of it,

19   and the trace showed that the firearm was sent to a gun shop in

20   Mobridge, South Dakota, so in order for that firearm to end up

21   in North Dakota, it would have traveled in interstate commerce

22   as well.

23   Q.    After the incident happened, did any of the officers

24   report any statements or comments that the defendant made

25   relative to the gun?

                                    15

1   A.    A North Dakota Highway Patrolman -- last name I believe

2   it's Buehre, Beray (ph) or something similar to that, he was

3   part of controlling Ms. Fallis at the time of her arrest, and

4   she -- he described her as kind of laughing it off and saying,

5   "Everyone has a right to a firearm, and if I wanted to shoot or

6   kill you -- you law enforcement, I would have."

7   Q.    And then after she was arrested, she was, of course, going

8   to be transported, correct?

9   A.    That's correct.

10  Q.    And what happened during that process?

11  A.    At that time she was being -- parole and probation --

12  North Dakota State Parole and Probation was responsible for a

13  lot of the transports, and a parole agent and a BCI agent from

14  the North Dakota BCI were securing her in the van, and she made

15  the comment that she was trying to remove the gun from her

16  pocket.  And her words were, basically, you know, "Those --

17  those fuckers tackled me, and had" -- you know, "had they not,

18  I would have shot more of those fuckers," or something along

19  those lines.

20          MR. HAGLER:  That's all the questions I have, Your

21  Honor.

22          THE COURT:  Mr. Bellmore?

23                    <u>CROSS-EXAMINATION</u>

24  <u>BY MR. BELLMORE</u>:

25  Q.    Agent Hill, just to be clear, those last statements, they

16

1  were related to you directly through those parole agents?

2  **A.**    They were -- they put them in their reports, a Heidbreder

3  from North Dakota Parole and Probation and BCI Special Agent

4  Scott Voeltz.

5  **Q.**    And so at some stage of this investigation you're relying

6  on notes from law enforcement agents?

7  **A.**    It's their reports, not -- not handwritten notes.  It's

8  their actual reports.

9  **Q.**    Correct.

10 **A.**    Correct.

11 **Q.**    So you didn't speak to those law enforcement officers

12 directly?

13 **A.**    I did not.  I've read their reports.

14 **Q.**    And, of course, you didn't hear Ms. Fallis make those

15 statements.

16 **A.**    That's correct.

17 **Q.**    And you haven't heard any recordings or video --

18 **A.**    I have not, no.

19 **Q.**    -- involving those statements?

20 **A.**    That's correct.

21 **Q.**    Same goes for much of what you relayed about what happened

22 in Morton County on October 27th, correct?

23 **A.**    That's correct.

24 **Q.**    You weren't present at the protest site.

25 **A.**    I was present down there.  I was not at this specific

1    location when the incident occurred.

2    **Q.**   So when the video was played to the Court, you didn't take

3    that video?

4    **A.**   No.  That video is all over the Internet now.  That was

5    taken by an individual who would have been on the protesters'

6    side of the line there.

7    **Q.**   And as per your prior comment, you don't appear anywhere

8    in that video.

9    **A.**   I do not.

10   **Q.**   You mentioned that there were two particular officers from

11   Pennington County who were assisting that day?

12   **A.**   That's correct.

13   **Q.**   Both had the last name of Schmidt?

14   **A.**   Yes.

15   **Q.**   One was Thaddeus and the other was Rusty?

16   **A.**   Correct.

17   **Q.**   And they were, you said, primarily responsible for seizing

18   Ms. Fallis?

19   **A.**   They were part of a mobile field force that was then

20   transitioned to an arrest team, so when individuals at the

21   front of the line identified individuals that would need to be

22   arrested, the arrest team would then make the attempt to make

23   the arrest.

24   **Q.**   And they provided you with written -- written reports?

25   **A.**   Yes, they did.

1  Q.   Did you speak with them directly?

2  A.   I have not.

3  Q.   When Ms. Fallis was brought down to the ground by the two

4  Pennington County officers, where was she at that moment?  Was

5  she in the line, or was she crossed the line on the law

6  enforcement side, or was she back behind the line on the

7  protesters' side?

8  A.   They -- she was at the front of the line, and then what

9  they do is they get them back behind the line.

10  Q.   Which -- and I'm sorry.  Which direction, so we're clear?

11  A.   To the north they would have gone.

12  Q.   On the law enforcement side.

13  A.   On the law enforcement side.

14  Q.   That's where they would -- that's where they would and did

15  conduct the arrest.

16  A.   Yeah.  Well, the arrest began on the other side, but it --

17  by the time she was on the ground, she was behind the law

18  enforcement line.

19  Q.   So she had moved from in front of the line, back behind

20  the protesters, and that's where the officers --

21  A.   Whether --

22  Q.   -- pulled her away?

23  A.   Whether she moved or the line moved forward, either way

24  she ended up behind law enforcement at the time.

25  Q.   We talked about the two officers from Pennington County.

1   Were they the only two involved in taking Ms. Fallis down to

2   the ground?

3   **A.**   No, there were several other officers around there.

4   **Q.**   And "several," how many do you mean specifically?

5   **A.**   You could -- there's probably six or eight right there

6   around her in the video.

7   **Q.**   And if I -- you completed a written affidavit.

8   **A.**   That's correct.

9   **Q.**   And to your knowledge that's been filed with the Court?

10  **A.**   Yes.

11  **Q.**   And to be clear, that was dated November 9, 2016?

12  **A.**   If that's what you're looking at, yes.

13  **Q.**   And it was the indication from one of the Deputies Schmidt

14  that the firearm was perhaps in Ms. Fallis's left hand?

15  **A.**   Correct.

16  **Q.**   Then when we watched the video, to be clear, we heard

17  popping sounds?

18  **A.**   Correct.

19  **Q.**   And you would agree that those are perhaps the

20  aforementioned gunshots?

21  **A.**   Yes.

22  **Q.**   Do -- any time in this video, do we see the firearm?

23  **A.**   We do not.  I do not see the firearm in this video, no.

24  **Q.**   We don't see it on the ground?

25  **A.**   No.

1   **Q.**   And we don't see it on Ms. Fallis?

2   **A.**   I did not see it on Ms. Fallis on this video, no.

3   **Q.**   And do you recall seeing any officers retrieving the

4   firearm at that point?

5   **A.**   I'm not sure if the video shows that, but from the

6   statements, it was -- the firearm was handed to law

7   enforcement.

8   **Q.**   But not clear or not present in this video?

9   **A.**   Not in this video, no.

10   **Q.**   In any video that you've watched?

11   **A.**   Not that I'm aware of, no.

12   **Q.**   The Colorado conviction from 2003 is what's being used as

13   a predicate conviction.

14   **A.**   That's correct.

15   **Q.**   You mentioned that that was a Class 6 felony out of the

16   State of Colorado?

17   **A.**   Yes.

18   **Q.**   You mentioned that that was punishable by over 12 months?

19   **A.**   Yes.

20   **Q.**   Do you recall what exactly the maximum penalty for a Class

21   6 felony in Colorado is?

22   **A.**   Eighteen months.

23   **Q.**   Now, the firearm, the -- the Ruger, how was that brought

24   before you?

25   **A.**   As far as -- I guess I'm not --

1    **Q.**   Did you have a chance to observe and inspect that firearm?

2    **A.**   That firearm has been in the possession of North Dakota

3    BCI since it was turned over to them, so I rely on written

4    description of the firearm and the photos that were provided to

5    me.

6    **Q.**   Do you recall who took those photos?

7    **A.**   Those photos, I'm not specific.  I know Joe Arenz from the

8    North Dakota BCI is the case agent on it.

9    **Q.**   Was there an agent who had tested the firearm since it was

10   seized?

11   **A.**   I don't believe the firearm has been tested yet.  There's

12   testing that will be ongoing, I believe, but not --

13   **Q.**   Not at this time.

14   **A.**   No.

15   **Q.**   Lastly, I asked about how many officers were directly

16   involved in arresting Ms. Fallis, but can you tell me how many

17   officers were present on scene at that -- at this particular

18   protest site at that time?

19   **A.**   One to two hundred total law enforcement down there.

20   **Q.**   And they weren't -- obviously were doing -- we've talked

21   about two Pennington County deputies, but there were also law

22   enforcement officers from other agencies outside of Morton

23   County?

24   **A.**   Yes, there were.

25   **Q.**   Outside of North Dakota?

1  **A.**   Correct.

2  **Q.**   And to your knowledge, they've provided written reports in

3  this matter?

4  **A.**   Those that were involved directly in this incident, it's

5  my understanding, have provided written reports or have been

6  interviewed by North Dakota BCI agents.

7          MR. BELLMORE:  That's all the questions I have.

8          THE COURT:  Mr. Hagler?

9          MR. HAGLER:  Just briefly, Your Honor.

10                      REDIRECT EXAMINATION

11  BY MR. HAGLER:

12  **Q.**   Agent Hill, the firearm depicted in Exhibit 3, in your

13  training and experience, does that meet the definition of a

14  firearm under federal law?

15  **A.**   Yes, it does.

16          MR. HAGLER:  That's all I have, Your Honor.

17          THE COURT:  Anything else, Mr. Bellmore?

18          MR. BELLMORE:  No, Your Honor.

19          MR. HAGLER:  I have no other witnesses, Your Honor.

20          (The digitally recording transcript is completed

21  herein pursuant to the request of the ordering party.)

22                    - - - - - - - - - -

23

24

<u>CERTIFICATE</u>

State of North Dakota    )

                         ) ss

County of Burleigh       )


        I, Sandra E. Ehrmantraut, do hereby certify that the
foregoing and attached typewritten pages contain an accurate
transcription, to the best of my ability, of said digital
recording made at the time and place herein indicated.

        Dated:  February 10, 2017


                        /s/ Sandra E. Ehrmantraut