UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | File No. 1:17-cr-16 |
| | ) | |
| Redfawn Fallis, | ) | |
| | ) | |
| Defendant. | ) | |


<u>PARTIAL TRANSCRIPT OF DIGITALLY
RECORDED DETENTION HEARING</u>


Taken at
United States Courthouse
Bismarck, North Dakota
December 15, 2016


BEFORE THE HONORABLE CHARLES S. MILLER, JR.
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

APPEARANCES

    MR. DAVID D. HAGLER
U.S. Attorney's Office
220 E. Rosser Ave.
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES

- - - - - - - - -

    MR. CHRISTOPHER P. BELLMORE
Assistant Federal Public Defender
Federal Plaza
324 North Third Street, Suite 1
Bismarck, North Dakota 58501

FOR THE DEFENDANT

- - - - - - - - -

GOVERNMENT WITNESSES

Page No.

Officer Rusty Schmidt
  Direct Examination by Mr. Hagler          5
  Cross-Examination by Mr. Bellmore        11
  Examination by The Court                 16

Agent Derek Hill
  Direct Examination by Mr. Hagler         17
  Cross-Examination by Mr. Bellmore        21
  Examination by The Court                 22


          - - - - - - - - - -



DEFENSE WITNESS

Red Dawn Foster
  Direct Examination by Mr. Bellmore       23
  Cross-Examination by Mr. Hagler          27


          - - - - - - - - - -



EXHIBITS

No.   Description                    Offered   Received

 5    Photograph of Brass Knuckles      19        20

 6    Photograph of Raid Spray          19        20

 7    Photograph of Knife in Sheath     19        20


          - - - - - - - - - -


Certificate of Transcriptionist - Page 30


          - - - - - - - - - -

1            (The above-entitled matter came before the Court, The

2    Honorable Charles S. Miller, Jr., United States District Court

3    Magistrate Judge, presiding, commencing at 2:30 p.m.,

4    December 15, 2016, in the United States Courthouse, Bismarck,

5    North Dakota.  The following partial proceedings were had and

6    made of record by digital recording in open court with the

7    defendant present.)

8                    - - - - - - - - - - -

9            THE COURT:  Okay.  We'll go on the record in

10   Magistrate's Number 1-16-359, *United States of America versus*

11   *Redfawn Fallis*.  Ms. Fallis is present, along with her

12   appointed counsel, Mr. Bellmore.  Mr. Hagler is here on behalf

13   of the United States.

14           This is the time that the Court set for the hearing

15   on the issue of release or continued detention.  The Court has

16   received a copy of the pretrial services' report.  That will be

17   made a part of the record, and the parties can proffer any

18   additions or corrections.  Mr. Hagler, you may proceed.

19           MR. HAGLER:  Your Honor, before I do that, may I

20   inquire of the Court as to whether or not the Court will

21   consider the evidence that was presented at the preliminary

22   hearing in this matter?

23           THE COURT:  Yes, I will.

24           MR. HAGLER:  Your Honor, I would call Deputy Rusty

25   Schmidt to testify at this time.

1                      OFFICER RUSTY SCHMIDT,

2    having been first duly sworn, was examined and testified as

3    follows:

4                        DIRECT EXAMINATION

5    BY MR. HAGLER:

6    **Q.**    Please state your name.

7    **A.**    Rusty Schmidt.

8    **Q.**    And with whom are you employed, sir?

9    **A.**    Pennington County Sheriff's Office.

10   **Q.**    What position?

11   **A.**    A deputy sheriff.

12   **Q.**    How long have you been a deputy with Pennington County?

13   **A.**    Seven years.

14   **Q.**    Pennington County, Rapid City, South Dakota, is that

15   correct?

16   **A.**    That's correct.

17   **Q.**    All right.  You're a -- are you a licensed peace officer

18   in the state of South Dakota?

19   **A.**    I am.

20   **Q.**    Deputy Schmidt, were you in Morton County on October 27th

21   of 2016 assisting local law enforcement in some law enforcement

22   action that day?

23   **A.**    I was.

24   **Q.**    The Court has heard some testimony on Monday of this week

25   regarding some of the activity that occurred that day, and we

1  heard that there were a large number of law enforcement

2  officers present on that -- throughout that day, correct?

3  **A.**   Yep, that's correct.

4  **Q.**   And in particular, Deputy Schmidt, what we're going to

5  talk about here this afternoon is the incident where the

6  defendant, Ms. Fallis, was found to be in possession of a

7  firearm.  And you're familiar with that incident, correct?

8  **A.**   I am.

9  **Q.**   Just prior to that incident occurring, what were you

10  doing?

11  **A.**   I was a part of arrest teams, so throughout the day we

12  were -- we were tasked with the protesters that were throwing

13  stuff at law enforcement, refusing to move off the private

14  property.  There was agitating in the riot, screaming, getting

15  in the faces of law enforcement.  We were tasked to arrest them

16  if we could do so.

17  **Q.**   Okay.  And was an individual identified to be arrested

18  that was later identified as Redfawn Fallis?

19  **A.**   Yes.

20  **Q.**   And you were involved in that, correct?

21  **A.**   I was.

22  **Q.**   And you have reviewed a video of -- actually, Government's

23  Exhibit Number 2 from the preliminary hearing that shows some

24  of what happened during that time, correct?

25  **A.**   Correct.

1  **Q.**   I think before we show the video, I'm going to ask you to

2  describe what your involvement was with the takedown and the

3  arrest of Ms. Fallis that day.

4  **A.**   Okay.  I was -- again, I was kind of behind the skirmish

5  line of law enforcement.  As an arrest team you stay behind

6  that skirmish line until you went to arrest somebody.  Deputy

7  Thad Schmitt approached me and told me that there was a female

8  subject with a gas mask on who was getting in the face of law

9  enforcement, screaming at them, refusing to move right away as

10  they directed, and they wished her to be arrested if we could

11  do so.  Thad pointed her out.  I saw her.

12          It was a few minutes later -- a few moments later

13  that the subject later identified as Redfawn Fallis, she kind

14  of separated from the other group of protesters.  She started

15  walking east of 1806, the highway, and at that point, that's

16  when Deputy Thad Schmitt went through the line.  I followed

17  him.  He went and he ran down the line, wrapped up -- I would

18  say wrapped up the subject.  And I ran around, and it appeared

19  she was already on the ground.

20          And at that point I just tried to get control over

21  her.  She resisted us the whole time.  We tried to -- our goal

22  is to try to pull them back behind the skirmish line of law

23  enforcement, and she was pulling away from us.  At one point

24  she had my -- my leg tied up.  She wrapped her legs around one

25  of my legs.  I pulled that free.

1          We were able to get her on her stomach, and I -- at
2     that point I -- I was able to get a hold of her -- I believe it
3     was her right arm, and get that into a handcuffing position.
4     And just shortly before it was handcuffed, I still recall
5     seeing somebody with a flex cuff, about to put it on her wrist,
6     and -- when I heard a couple of gunshots ring out.
7          At that point I looked down, and there's another
8     gunshot rang out, and I could actually see the round impacting
9     the ground right next to my knee.  At that point I could see
10    the gun.  She kind of -- it was underneath her stomach.  She
11    kind of rolled over to the side.  I could see the revolver
12    poking out, so I grabbed onto that revolver and her hand, and I
13    struggled with -- I struggled for control of that for -- for it
14    felt like forever, but 10 to 15 seconds we struggled for that
15    handgun.
16         Let's see.  While we were struggling with the
17    handgun, several things happened.  I believe it was -- another
18    law enforcement officer ran around to assist, ran around to the
19    left side of me, the east side.  And while I was still
20    struggling with it, the gun, I had -- I told him to move
21    because the actual firearm was still -- was pointed at him just
22    from underneath her stomach, so he moves back.
23         I still didn't have a great grip on the firearm.  I
24    told Thad Schmitt to -- the exact verb -- I'm not positive of
25    the exact verbiage.  I told him to get his gun on her.  I was

1  afraid that I was losing -- going to lose control of that gun

2  and she was going to continue shooting at us.  Shortly after

3  that I was able to get -- get the gun free and hand it off.

4          And after that a law enforcement officer asked if

5  anyone was hit, and I -- I said I had to check my legs.  I

6  wasn't sure.  And they pulled me back and checked my legs and

7  checked my torso and --

8  Q.   Okay.  I'm going to show you this particular video now,

9  Deputy Schmidt.

10          (Exhibit 2, the video, is played in open court.)

11  Q.   (MR. HAGLER CONTINUING)  All right.  Can you see yourself

12  in that video now?

13  A.   I can.

14  Q.   And are you in the black helmet, black shirt, bent over?

15  A.   Yes.

16  Q.   Okay.

17          (Exhibit 2, the video, is again played in open

18  court.)

19  Q.   (MR. HAGLER CONTINUING)  So at this point are you still

20  struggling to get the gun away from her?

21  A.   I am.

22          (Exhibit 2, the video, is again played in open

23  court.)

24  Q.   (MR. HAGLER CONTINUING)  And then can you see here the

25  backside of an individual who is essentially wearing all

1  camouflage?

2  **A.**   Yes.

3  **Q.**   Okay.  And he picked -- he picks up the gun in just a few

4  seconds here, if we watch closely, correct?

5  **A.**   That's what it appears, yes.

6  **Q.**   Okay.

7           (Exhibit 2, the video, is again played in open

8  court.)

9  **Q.**  (MR. HAGLER CONTINUING)  Okay.  Now, Deputy Schmidt, is

10  that -- is that you again in the all black?  We see your right

11  -- your right arm and shoulder at that point?

12  **A.**   Yes.

13  **Q.**   Okay.  And what were -- what were you doing now, at that

14  point that the gun had been taken away and she had been

15  subdued?

16  **A.**   I was getting checked out, more or less.  They wanted to

17  -- I said I had to check my legs because they were -- those

18  rounds impacted right there, so just inches from my knee, so

19  they laid me down here shortly afterwards and they --

20           (Exhibit 2, the video, is again played in open

21  court.)

22  **Q.**  (MR. HAGLER CONTINUING)  And now we lose sight of you

23  there behind all the other officers, but you're laying down,

24  and other officers are checking to see if you had been shot,

25  correct?

1   **A.**   Yes.

2           MR. HAGLER:  Your Honor, that's all the questions I

3   have for this witness.

4           THE COURT:  Mr. Bellmore?

5           MR. BELLMORE:  Thank you, Your Honor.

6                        CROSS-EXAMINATION

7   BY MR. BELLMORE:

8   **Q.**   Deputy Schmidt, so I'm clear on what direction everyone is

9   facing here, it's my understanding that part of this

10  Highway 1806, law enforcement was facing to the south?

11  **A.**   I believe that's accurate.

12  **Q.**   They were north of -- north of this line that was moving,

13  this --

14  **A.**   Yeah, the law enforcement, I believe, were facing to the

15  south.  And, yeah, the -- the struggle and all that is north of

16  the line, I believe.

17  **Q.**   And the paused video right now at a minute and 29 seconds,

18  to the right of the screen we see a fence line.  Would that be

19  to the east?

20  **A.**   As far as I'm aware, I believe that's to the east, yes.

21  **Q.**   Okay.  And you testified that at some point Ms. Fallis was

22  tackled to the ground?

23  **A.**   Yeah, wrapped.  I saw him wrap up around her and --

24  **Q.**   And that was from a law enforcement officer other than

25  yourself.

1  **A.**   Correct.  I saw him wrap up, and as I ran around him, I

2  believe she's already on the ground or going to the ground.

3  **Q.**   The office -- the officer or officers who were involved in

4  that pulled her out of the -- she's walking back to the protest

5  side of the line?

6  **A.**   She was -- are you talking about prior?

7  **Q.**   Yeah, prior to.

8  **A.**   She was paralleling the law enforcement line and walking

9  to the east, I believe.

10  **Q.**   And she's taken to the ground, and there's several

11  officers surrounding her, correct?

12  **A.**   Yes.

13  **Q.**   You describe that as she was resisting, right?

14  **A.**   Correct.

15  **Q.**   How many officers would you say were involved in that

16  directly?

17  **A.**   I don't know for sure initially.  Eventually just -- I

18  mean, Deputy Thad Schmitt and I, and then more came in quickly

19  afterwards, so I would have to -- I could only rely on that to

20  gauge, you know, how many were actually there, five or six or

21  if -- I'd have to rely on the video because at that point I was

22  pretty focused on what I was doing.

23  **Q.**   And with Ms. Fallis on the ground during the struggle,

24  where directionally were you positioned?

25  **A.**   I was just -- I was on her side initially when I gained

1  control of her arm.  I believe it was her right arm.  I was

2  directly on her right side.

3  **Q.**    From -- from behind?

4  **A.**    I guess I don't know exactly what you're talking about.

5  From where they are now -- prior to when we're struggling, you

6  see me go over there.  I'm -- when we get her on her stomach to

7  get her in a handcuffed position, I am on her right side.  I

8  guess it would be to the east, I believe.

9  **Q.**    And which direction would you be facing at that point?

10  **A.**    I probably -- you know, I can only assume I was facing

11  west because I was looking across her as I'm holding her arm.

12  **Q.**    And my understanding and from viewing the video is that

13  Ms. Fallis is -- her head is faced to the north, her feet to

14  the south or in that general direction?

15  **A.**    I could say in that general direction.

16  **Q.**    Okay.  And she's -- she's on her -- she's face down when

17  she's on her --

18  **A.**    Yep, she's on her stomach at this point.

19  **Q.**    And the -- when the -- when the shots are fired -- and you

20  noticed the third particularly or visually.

21  **A.**    Yeah.  Yep, striking next to my knee.

22  **Q.**    What direction would that have been going?

23  **A.**    At that point I believe that would have been towards

24  the -- towards the east is where that would have been because I

25  was on the east side of her.

1  **Q.**  So my understanding is she's on her belly shooting behind

2  her.

3  **A.**  She'd be on her belly shooting to the side of her.

4  **Q.**  And during the first -- first two shots that we heard --

5  well, let me go back.  When did you -- when did you first

6  notice the revolver?

7  **A.**  I believe it was after the third round.

8  **Q.**  So you were right there on her, trying to manage her right

9  arm, correct?

10  **A.**  Correct.

11  **Q.**  And you didn't notice or see the revolver at that time.

12  **A.**  No, I believe it was under her stomach.

13  **Q.**  So it's fair to say that it wasn't trained on any

14  particular officer?

15  **A.**  I couldn't tell you.  It was under her stomach.

16  **Q.**  Now, there were other officers in the video.  Did you

17  observe any of them, you know, using any sort of physical

18  tactic to get her to ease the resistance?

19  **A.**  I couldn't see any that -- I was pretty -- again, I was --

20  I was pretty focused on just trying to gain control of her arm.

21  I knew there was another officer about to have a flex cuff on

22  her.

23  **Q.**  I think I saw in the video, and it was -- it wouldn't have

24  been a view of -- of an officer with his knee to the back of

25  Ms. Fallis's leg.  Did you -- did you notice any officers

1   employing tactics such as that?

2   **A.**   I can't say I did.

3   **Q.**   Are you trained in those tactics?

4   **A.**   Am I trained in like defensive tactics and things?  Yes.

5   **Q.**   And that would be to apply a lot of pressure to get the

6   suspect, the defendant to comply with law enforcement

7   directive?

8   **A.**   I guess I can't speak for the training of whatever officer

9   you saw.

10  **Q.**   But with all those officers around, you weren't the only

11  one that had a physical hold of Ms. Fallis, correct?

12  **A.**   I don't know.  I mean, again, I'm very focused in trying

13  to control this arm.  I know there's other officers around me,

14  and I'm sure they're trying to gain control of her.  Again, she

15  was resisting the whole time, but I can't speak for how they

16  were doing that.

17  **Q.**   You weren't able to observe what the other officers were

18  doing, is what you're saying, more or less.

19  **A.**   Correct, especially after the gunshots rang out.  I -- and

20  the struggle for the gun, I was pretty focused there.

21          MR. BELLMORE:  That's all the questions I have for

22  now.

23          THE COURT:  Sir, I have a couple of questions.

24  ///

25  ///

1                              <u>EXAMINATION</u>

2    <u>BY THE COURT</u>:

3    **Q.**   From the perspective that you were at, what hand did she

4    engage with the weapon?  Was it her right or her left, if you

5    know?

6    **A.**   Your Honor, I believe it would have been her left arm that

7    was under her stomach that was -- that was doing the shooting.

8    **Q.**   Because you were controlling the right arm?

9    **A.**   Yep.  I believe so, yep.

10   **Q.**   And in response to Mr. Hagler's questions, you used the

11   words or the phrase, "continue shooting at us."  Is that -- did

12   you reach the conclusion, if you were able to reach a

13   conclusion, that she was purpose -- purposefully discharging

14   the weapon with the intent of shooting or scaring someone as

15   opposed to it accidentally going off?

16   **A.**   Oh, I have no doubt, Your Honor, that it was intentional,

17   and especially after I saw the gun and was able to try to -- I

18   had to struggle with her for a long period of time.  She

19   wouldn't let go of it.

20   **Q.**   During -- during the period of time from when you first

21   saw the gun or first became aware of a weapon because of the

22   discharge of the shots, was there any communication between you

23   and her or from other officers to her, directing her not to use

24   the firearm or to stop, or whatever?

25   **A.**   I -- I yelled -- I said "gun" when I saw it.  Again,

1    the -- it was all pretty quick together, the quick two

2    succession shots, and then there's a little break, and then the

3    third shot.  And then I saw it and I yelled -- I said "gun."

4    And when I grabbed on it, was struggling with her for it, I

5    told Deputy Thad Schmitt to put his gun on her, however I

6    verbalized that, because, again, I was concerned I was going to

7    lose grip.  And I believe at that point I recall him saying

8    something like, "You need to let go of the gun or you're going

9    to get shot," something of that nature.

10                   THE COURT:  Mr. Hagler?

11                   MR. HAGLER:  I have no further questions, Your Honor.

12                   THE COURT:  Mr. Bellmore, anything further?

13                   MR. BELLMORE:  No, Your Honor.

14                   THE COURT:  Okay.  You may be excused.  Thank you,

15   sir.

16                   THE WITNESS:  Thank you, sir.

17                   MR. HAGLER:  Your Honor, I would call ATF Agent Derek

18   Hill at this time.

19                            DEREK HILL,

20   having been first duly sworn, was examined and testified as

21   follows:

22                        DIRECT EXAMINATION

23   BY MR. HAGLER:

24   Q.   Agent Hill, you're employed with which agency?

25   A.   I'm a special agent with the Bureau of Alcohol, Tobacco,

1   Firearms and Explosives out of the Bismarck satellite office.

2   **Q.**   You testified at the preliminary hearing on this matter on

3   December 12th, correct?

4   **A.**   Yes, I did.

5   **Q.**   And you testified as to her Colorado 2003 conviction for

6   accessory to a crime that was admitted as Preliminary Hearing

7   Exhibit 1, correct?

8   **A.**   That's correct.

9   **Q.**   What crime was she an accessory to?

10   **A.**   Attempted first degree murder.

11   **Q.**   In your review of the other law enforcement officers'

12   reports in this incident that were involved -- that were in the

13   area at the time that the shooting occurred, did other officers

14   report that they felt they were either hit from debris due to

15   the gunshots or felt a concussion from the gunshots?

16   **A.**   Yes, there were.

17   **Q.**   Do you know how many officers reported that?

18   **A.**   I think approximately three.  I know a North Dakota

19   trooper -- I'm not sure of pronunciation of his last name,

20   maybe Buehre or Beree (ph).  He said he could feel the

21   concussion from the shots that went off.  And then there was

22   another trooper, Mogan (ph) or Mugan, who said he could feel

23   the dirt from the shot hit his pant legs, but at the time when

24   the dirt hit it, he wasn't sure if it was actually from the

25   dirt or a round hitting his pant legs.  And I believe there was

1 another one or two that talked about feeling the concussion or

2 seeing -- I think one in particular said that they could see

3 maybe some light smoke rising up from underneath Ms. Fallis's

4 stomach from when the shot went off -- the shots went off.

5 Q.   Okay.  I'm going to just show a short portion of this

6 video again, and at about 1:25 we'll see one of the officers

7 check his leg.

8            (Exhibit 2, the video, is again played in open

9 court.)

10 Q.   (MR. HAGLER CONTINUING)  Do you see that right there --

11 A.   Yes, I do.

12 Q.   -- Agent Hill?  You testified at the preliminary hearing

13 and we admitted exhibits showing the gun and some .38-caliber

14 rounds that were on some speed strips or speed loaders,

15 correct?

16 A.   That's correct.

17 Q.   I'm going to hand you what have been marked as

18 Government's Exhibits 5, 6 and 7.  Are these photographs of

19 items that were also found on Ms. Fallis that day?

20 A.   Yes, they were items that were recovered from her backpack

21 that she was wearing.

22 Q.   And the photographs are fair and accurate depictions of

23 those items that were found in the backpack?

24 A.   Yes.

25            MR. HAGLER:  Your Honor, I would offer 5, 6 and 7.

1          THE COURT:  Mr. Bellmore?

2          MR. BELLMORE:  No objection.

3          THE COURT:  Exhibits 5, 6 and 7 are received.

4   **Q.**   (MR. HAGLER CONTINUING)  Exhibit 5 is what, Agent Hill?

5   **A.**   It's a set of what we refer to as brass knuckles.

6   **Q.**   What is Government's Exhibit 6?

7   **A.**   Six is a can of Raid wasp and hornet spray.

8   **Q.**   And what is Government's Exhibit 7?

9   **A.**   Seven is a small knife in a black plastic sheath.

10  **Q.**   Agent Hill, were -- are you aware of the fact that Ms.

11  Fallis was charged with criminal offenses in Morton County

12  prior to this incident on October 27th?

13  **A.**   Yes, I am.

14  **Q.**   And what did your investigation show in that regard?

15  **A.**   In August of this year, 2016, she was charged with a

16  disorderly conduct, and that disorderly conduct was related to

17  protest activities that occurred in Morton County.  She was

18  arrested, booked in, posted a bond and was released.

19          Then in September of this year, of 2016, she was

20  arrested again for criminal trespass -- or arrested for

21  criminal trespass.  This, again, was an activity related to

22  protest events that were going on.  She was booked into the

23  Morton County jail, posted a bond and was released.

24  **Q.**   So she had been released on bond on pending criminal

25  charges at the time that this alleged offense occurred,

1    correct?

2    **A.**   That is correct.

3          MR. HAGLER:   That's all the questions I have, Your

4    Honor.

5          THE COURT:   Mr. Bellmore?

6                      CROSS-EXAMINATION

7    BY MR. BELLMORE:

8    **Q.**   Agent Hill, you mentioned that there was a prior felony

9    conviction on Ms. Fallis's record, correct?

10   **A.**   That's correct.

11   **Q.**   You described that today as an accessory to attempted

12   first degree murder?

13   **A.**   That's what the original Complaint was on it, correct.

14   **Q.**   The original one, right, and that --

15   **A.**   Yes.

16   **Q.**   And the conviction was a Class 6 felony out of the state

17   of Colorado, right?

18   **A.**   That's correct.

19   **Q.**   We talked about that on the preliminary hearing.  That

20   Class 6 felony in Colorado carries a maximum term of

21   imprisonment of 18 months.

22   **A.**   That's correct.

23   **Q.**   And that's not the sentence she received, though, is it?

24   **A.**   That is not.

25   **Q.**   Do you recall what -- that sentence she received in that

1  case?

2  **A.**   I believe it was 30 months of supervised release,

3  probation.

4  **Q.**   Any term of imprisonment associated with that?

5  **A.**   No.

6       MR. BELLMORE:  That's all the questions I have.

7                                    EXAMINATION

8  BY THE COURT:

9  **Q.**   Do you know anything else about the circumstances of that

10  offense in terms of who was killed, how the person was killed,

11  whether a firearm was involved?

12  **A.**   I'm not aware.  I only had the Complaint information to go

13  by where it just spelled out in her charges to knowingly impede

14  and hinder the investigation into the individual that was

15  responsible for the crime.

16       THE COURT:  Anything further of this witness,

17  Mr. Hagler?

18       MR. HAGLER:  No, Your Honor.

19       THE COURT:  Mr. Bellmore, anything as a result of my

20  questioning?

21       MR. BELLMORE:  Nothing further, Your Honor.

22       THE COURT:  You may be excused.  Thank you, sir.

23       MR. HAGLER:  I have no further evidence to present,

24  Your Honor.

25       THE COURT:  Mr. Bellmore?

1          MR. BELLMORE:  May we have a moment, Your Honor?

2          THE COURT:  Sure.

3          MR. BELLMORE:  Your Honor, I have one witness.

4          THE COURT:  Okay.

5          MR. BELLMORE:  Ms. Red Dawn Fallis (sic).

6                          RED DAWN FOSTER,

7  having been first duly sworn, was examined and testified as

8  follows:

9                        DIRECT EXAMINATION

10  BY MR. BELLMORE:

11  Q.   Excuse me.  I'm sorry, Red Dawn.  I think I misspoke

12  referring to your name.  Could you state the name for the

13  record, please?

14  A.   Oh, Red Dawn Foster.

15  Q.   Foster?

16  A.   F-O-S-T-E-R.

17  Q.   Thank you.  And what is your address?

18  A.   3719 Arizona Street, Rapid City, South Dakota 57701.

19  Q.   And you know the defendant?

20  A.   Yes.

21  Q.   How do you know her?

22  A.   She is my first -- my first cousin; in Lakota way, my

23  little sister.

24  Q.   How long have you known Redfawn?

25  A.   Since she was born.

1    **Q.**    And you live in Rapid City.  Who do you live with there?

2    **A.**    I live with our other relative, Arrow Banks.

3    **Q.**    She go by another name?

4    **A.**    Arrow Garnier.  Sorry.

5    **Q.**    What's the difference between those two names?

6    **A.**    Her married name.

7    **Q.**    Okay.  Is that a home -- a house?  Excuse me.

8    **A.**    Yes, it is.

9    **Q.**    And how many people live in that house?

10   **A.**    Three.  Oh, and two children.

11   **Q.**    And that's the residence with you that Redfawn would --

12   **A.**    Yes.

13   **Q.**    -- be requesting to the Court?

14   **A.**    Mm-hmm.

15   **Q.**    Yes?

16   **A.**    Yes.

17   **Q.**    And that's something you're in agreement with?

18   **A.**    Yes.

19   **Q.**    Can you tell -- Arrow is not in the court -- courtroom

20   today, is she?

21   **A.**    No, she is not.  She had -- had to work, but she is in

22   agreement, and we're both looking forward to it.

23   **Q.**    And how old are you?

24   **A.**    I am 42.

25   **Q.**    And how old is Arrow?

1  **A.**   Forty-two.

2  **Q.**   Are there -- who else lives in the house?

3  **A.**   She has another nurse that rents one of the rooms in the

4  basement, and I believe she's 26 years old.  Her name is

5  Angelique.

6  **Q.**   Angelique, to your knowledge, have a criminal history?

7  **A.**   No, she does not.

8  **Q.**   Does Arrow have a criminal record?

9  **A.**   No.

10  **Q.**   Do you?

11  **A.**   No.

12  **Q.**   Are there any firearms in the home?

13  **A.**   No.

14  **Q.**   Are you employed?

15  **A.**   Yes, I am.  I'm an independent consultant.  I work for the

16  Oglala Sioux Tribe in economic development.

17  **Q.**   And what do you do there?

18  **A.**   I -- business solutions.  I'm creating their

19  (unintelligible) sovereignty program for the tribe, as well as

20  other economic development projects.

21  **Q.**   Essentially grant writing?

22  **A.**   Grant writing is a part of it.  Strategic planning and --

23  is the main component of it.

24  **Q.**   And what's your educational background?

25  **A.**   I have my undergrad from University of Colorado in

1   political science and my MBA from the University of Notre Dame

2   and with an emphasis on economic development.

3   **Q.**   And what does Arrow do for a living?  You mentioned she

4   worked.

5   **A.**   Yes, she is a registered -- RN, and she also has her

6   Master's.  She works at the IHS hospital in Rapid -- or in Pine

7   Ridge.

8   **Q.**   Okay.  Do you have transportation?

9   **A.**   Yes, I do.

10  **Q.**   Do you own a vehicle?

11  **A.**   Yes, I do.

12  **Q.**   Does Arrow own a vehicle?

13  **A.**   Yes.

14  **Q.**   You came from Rapid City today.

15  **A.**   I actually came from Denver today.

16  **Q.**   Okay.  So you have a car.  You have the ability to

17  transport Redfawn if she has to make court appearances.

18  **A.**   Yes, I do.

19  **Q.**   And if I didn't ask, there's -- there's room for her in

20  the home?

21  **A.**   Yes, there is.  It's -- it's a large home.

22  **Q.**   And I think you mentioned to me that there was possibility

23  that Redfawn could spend her time working for you?

24  **A.**   Yes.  As I'm -- was actually looking for an assistant to

25  work on the strategic (unintelligible) for the tribe, and I

1    would like her to work on that project with me.

2    **Q.**   Okay.  You were down on Standing Rock during the -- say

3    the height of the protest, correct?

4    **A.**   So I've -- I was running for state legislature in our

5    district in South Dakota, so I would come during the weekends

6    and, you know, bring just support and supplies like sleeping

7    bags and tents, so my time was spent going back and forth.

8    **Q.**   And your time at Standing Rock was spent peacefully,

9    correct?

10   **A.**   Absolutely.

11   **Q.**   Okay.  And if there's a condition or if Redfawn agreed

12   that she wouldn't go to Standing Rock, she wouldn't engage in

13   any protests associated with the -- with the pipeline, you'd be

14   able to help -- help her abide by that?

15   **A.**   Yes.  Chairman Dave Archambault has asked everybody to

16   leave, and I have not been back to the camp since he's

17   requested that, you know, people leave, and we've -- we do not

18   have plans to go back.

19               MR. BELLMORE:  That's all the questions I have.

20               THE COURT:  Mr. Hagler?

21                         CROSS-EXAMINATION

22   BY MR. HAGLER:

23   **Q.**   So in what timeframes were you at Standing Rock during

24   this protest time?

25   **A.**   I was there in June, back and forth, July, September, just

1   throughout the -- you know, any time I had free time.

2   **Q.**   Were you there in October?

3   **A.**   I was there during October, yes.  I went there on the

4   28th, so after I heard that -- I got a phone call saying that

5   my little sister had been like attacked and that I needed to

6   get down there because they were worried that she was injured,

7   and so when I came back, I started looking for her, and I

8   couldn't -- I couldn't find her.  And I called a couple of the

9   police stations looking for her, and there was no information,

10   and so I sat three days there looking.

11           THE COURT:  Could you pull the microphone up to you

12   just a little bit?  Thank you, ma'am.

13   **Q.**   (MR. HAGLER CONTINUING)  So were you -- were you aware in

14   any way of any -- the activity that she was engaging in at this

15   timeframe?

16   **A.**   She worked -- she was certified as a medic.  She went

17   through the medic training there, and I know that she was

18   working with the International Youth Council there.  And

19   whenever I'd go, we'd help cook and just do different support

20   things and just assist with the kids.  She's very empowering

21   with a lot of the youth, and I also work with youth, so I had

22   some of my former students from the high school there, and so

23   just looking out for them.  I work for the tribe, so part of my

24   duties was to come and look at the Oglala camp and make sure

25   that everyone's, you know, needs were being met and everyone

1   was in, you know, good spirits and --

2   **Q.**   What about any of the other protest activity that she was

3   engaged in?  Were you aware of any of that?

4   **A.**   I know that she was helping people on the front line

5   during -- during this time as a medic, and so -- and I had, you

6   know, taken water during some of the -- the direct action, you

7   know, prayer movements and --

8          MR. HAGLER:  Okay.  I have no other questions, Your

9   Honor.

10         THE COURT:  Mr. Bellmore?

11         MR. BELLMORE:  No further questions.

12         THE COURT:  Okay.  You may be excused.  Thank you,

13  ma'am.

14                    - - - - - - - - - -

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

State of North Dakota   )

                           ) ss

County of Burleigh     )


       I, Sandra E. Ehrmantraut, do hereby certify that the foregoing and attached typewritten pages contain an accurate transcription, to the best of my ability, of said digital recording made at the time and place herein indicated.

       Dated:  February 10, 2017


                           <u>/s/ Sandra E. Ehrmantraut</u>