UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,        )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )        File No. 1:17-cr-16
                                 )
Redfawn Fallis,                  )
                                 )
                Defendant.       )


TRANSCRIPT OF SUPPRESSION HEARING
VOLUME I
Pages 1-294


Taken at
United States Courthouse
Bismarck, North Dakota
December 8, 2017


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

APPEARANCES

MR. DAVID D. HAGLER
MR. GARY DELORME
U.S. Attorney's Office
220 E. Rosser Ave.
P. O. Box 699
Bismarck, North Dakota 58502-0699


                                        FOR THE UNITED STATES



                  - - - - - - - - - -



MR. BRUCE HENRY ELLISON
Attorney at Law
P. O. Box 2508
Rapid City, South Dakota 57709

            AND

MS. JESSIE A. COOK
Attorney at Law
400 Wabash Avenue, Suite 212
Terre Haute, Indiana 47807

            AND

MS. MOLLY ARMOUR
Attorney at Law
4050 North Lincoln Avenue
Chicago, Illinois 60618


                                    FOR THE DEFENDANT



                  - - - - - - - - - -

GOVERNMENT WITNESSES

Page No.

Trooper Bryan Niewind
    Direct Examination by Mr. Delorme          20
    Cross-Examination by Mr. Ellison           46


Officer Thadius Schmit
    Direct Examination by Mr. Hagler           96
    Cross-Examination by Ms. Cook             117


Trooper Jacob Jones
    Direct Examination by Mr. Delorme         182
    Cross-Examination by Ms. Armour           192


Officer Dan Kensinger
    Direct Examination by Mr. Hagler          216
    Cross-Examination by Ms. Cook             225


Trooper Jeremy Buehre
    Direct Examination by Mr. Delorme         246
    Cross-Examination by Ms. Cook             253


Trooper Bennett Bitz
    Direct Examination by Mr. Delorme         269
    Cross-Examination by Ms. Armour           276

- - - - - - - - -

1          (The above-entitled matter came before the Court, The

2    Honorable Daniel L. Hovland, United States District Court

3    Judge, presiding, commencing at 9:06 a.m., Friday, December 8,

4    2017, in the United States Courthouse, Bismarck, North Dakota.

5    The following proceedings were had and made of record in open

6    court with the defendant present.)

7                    - - - - - - - - - - -

8          THE COURT:  Good morning.  We'll open the record in

9    the case of *United States of America versus Redfawn Fallis.*

09:06   10    Why don't I have everybody identify themselves for the record.

11    I don't know all the counsel here.  Start with the government.

12          MR. HAGLER:  David Hagler, Assistant U.S. Attorney

13    for the United States.

14          MR. DELORME:  Gary Delorme, Assistant United States

09:07   15    Attorney for the United States.

16          MR. ELLISON:  Bruce Ellison, attorney for Ms. Fallis.

17          MS. COOK:  Jessie Cook, counsel for Ms. Fallis.

18          MS. ARMOUR:  And Molly Armour, attorney for Ms.

19    Fallis.

09:07   20          THE COURT:  All right.  Welcome to all of you.

21          MS. ARMOUR:  And Ms. Fallis is present as well.

22          THE COURT:  Okay.  This is scheduled as a suppression

23    hearing.  There was a motion to suppress -- actually, two

24    separate motions filed on October 23, 2017.  The government

09:07   25    filed a response on November 16th, and there was a reply by the

4

1    defendant on November 24, 2017.  I've read all the pleadings

2    twice.  I've read every exhibit and attachment to the

3    pleadings, all of the affidavits.

4              Are the parties ready to proceed, or is there a need

09:08    5    for a short statement?  I think I understand the issues, but if

6    either party is desirous of making some short statement, they

7    can do so.  Mr. Hagler?

8              MR. HAGLER:  We don't believe a statement is

9    necessary, Your Honor.

09:08   10              MS. ARMOUR:  And nor do we believe a statement is

11    necessary, Your Honor, but I do think that we have some brief

12    issues relating to discovery that we'd like to raise before the

13    hearing would begin.

14              THE COURT:  That's fine.

09:08   15              MS. ARMOUR:  If I may approach the Court, I'd like to

16    hand out some exhibits that I provided to the government today

17    relating to what I'd like to discuss regarding the discovery.

18              Your Honor, in this folder we have what's been marked

19    as defendant's discovery group exhibit with a number of other

09:09   20    subsidiary exhibits within it.  As Your Honor knows, we filed a

21    motion seeking discovery for this hearing, and Your Honor

22    denied that as moot.  Before doing so, we have reached out to

23    the government because despite the assertions, it's very clear

24    from the voluminous discovery we have here that there is

09:09   25    material information that is missing that bears on the issues

5

1    and events in question that Your Honor is to hear about today.

2         Specifically in this group exhibit we have evidence

3    that shows the existence of a number of body cameras that have

4    not yet been tendered.  We have examples of cell phone cameras,

5    an officer that is holding a handheld videocamera.  That's at

6    Exhibit Number 9.  We have some screen shots.

7         THE COURT:  Where are these exhibits marked?

8         MS. ARMOUR:  And I'm sorry, Your Honor.  We just put

9    this together this morning, so they're all in order here, and

10   we will mark it for the record formally, but they're in order

11   of 1, 2, 3, 4 and on --

12        THE COURT:  All right.

13        MS. ARMOUR:  -- down in the order assembled and

14   presented before you.

15        We have also, in addition to all this, screen shots

16   and information showing that there were numerous video cameras

17   on the scene depicting the events in question and assumingly

18   having audio that would have recorded statements of the officer

19   and Ms. Fallis at that time.

20        We also have screen shots showing that there were

21   video cameras affixed to a BearCat that was on the scene that

22   day and a Humvee that was on the scene that day.

23        At the very end of this pile of paper that we

24   provided, there's an e-mail to the government detailing where

25   this is and attaching some screen shots, as well as a discovery

6

1   letter which had sought such information in January of last

2   year -- of this year and a 17-page summary of the voluminous

3   discovery requests that we've tendered to the government to

4   date seeking this information.

09:11   5   We believe that there are outstanding materials,

6   notwithstanding the government's response, that are material to

7   the proceedings today.  And for that reason, we think that we'd

8   be prejudiced by moving forward without having those materials,

9   which is why we've been trying to get them since January of

09:12   10   this year.

11   We are all assembled here today and we are ready to

12   proceed, but, nevertheless, we want to make clear that without

13   these materials, we think that we cannot fairly cross-examine

14   the witnesses, nor do we have all the witness statements as we

09:12   15   are entitled to and as we've requested under the rules.

16   THE COURT:  Well, what witness statements are there

17   that you don't have?

18   MS. ARMOUR:  Well, we believe that these videos (sic)

19   that would be affixed to the officers during the arrest would

09:12   20   have taken in statements of these officers who were all part of

21   the scene.  We believe that the video cameras that were affixed

22   to the top of the BearCat and to the top of the armored Humvee

23   directly point down at the scene and would have recorded the

24   statements of the witnesses at the time.  And we believe, as

09:13   25   we've received in other videos, that such audio information

7

1    would contain those witness statements, so we're very concerned

2    that we do not have those.

3              THE COURT:  Mr. Hagler.

4              MR. HAGLER:  Your Honor, you just heard a lot of

5    speculation and assumption about the fact that there might be a

6    picture of someone holding a camera and, therefore, there is

7    video and audio of any -- any video or audio and, of course,

8    whether or not it's material to the matter at hand.

9              Here's what I can tell the Court, is since the outset

10   of this investigation we have sought every video, every audio,

11   every photograph, every witness statement, every law

12   enforcement report from the agencies involved in the

13   investigation, particular -- as the Court is well aware, this

14   all occurred in Morton County, and so we have sought through

15   Morton County and through some of the other particular agencies

16   that are, of course, mentioned throughout the report, Your

17   Honor.

18             And to date we have turned over in discovery just

19   short of 2,000 pages of paper discovery, which are essentially

20   the law enforcement reports.  There's a lot of duplication

21   there, Your Honor, because as we make these requests and we get

22   more, we just turn over everything we get.  So, you know, we

23   might have one officer's report three different times, but

24   there's approximately 2,000 -- just short of 2,000 pages of

25   paper discovery and reports.  There are over 4,000 photographs

8

1   that have been provided.  There are four to five hundred videos

2   that have been disclosed.  Everything that we have been able to

3   obtain, we have turned over, Your Honor.

4         One thing to keep in mind in particular on the point

5   of, oh, we have a photograph of an officer with a Go -- what

6   appears to be a GoPro on his chest at the scene of the shooting

7   incident, the shooting incident occurred just short -- just

8   prior to 6:00 p.m. on October 27th, Your Honor.  A majority of

9   the officers that day had been out there since approximately

10  noon.  Some had actually been on an overnight shift the night

11  before, had been out even longer.

12        What we're hearing from some of the officers is that,

13  you know, the battery life on those GoPros is not six hours,

14  and so what we're finding is that at the scene of the actual

15  shooting incident, there is virtually no video.  There's the

16  YouTube video that the parties are submitting to the Court here

17  today at this hearing.  There's another video that the defense

18  has just recently provided to us this week showing Ms. Fallis

19  at the scene, but there are no other videos that we have been

20  able to find or obtain, Your Honor.

21        Now, on the two particular vehicles that they

22  reference at the scene, the -- the Humvee they talk about, Your

23  Honor, the picture they've provided is not clear as to what

24  that is, and we don't believe that there is a camera on the

25  Humvee.

9

1    Now, on the BearCat, what happened, Your Honor, is
2  they made a specific request about video from -- video or
3  pictures from the camera on the BearCat.  We made inquiry to
4  law enforcement, in particular the Bismarck Police Department
5  because it's their vehicle, as to whether or not there is a
6  camera system on the BearCat.  And the response was, no,
7  there's not, so that's how we responded to their motion.

8    Subsequently they sent us a particular picture that
9  shows what appears to be a GoPro on the top of that BearCat,
10  and so I followed that up again with the Bismarck Police
11  Department, the officer who was in the BearCat that day, and he
12  said, "Yeah, it sure looks like there's a camera there," and
13  that was just -- I forget now if that was late last week, I
14  believe, Your Honor, and we're following up on that to see if
15  there is anything more from that particular vehicle, but to
16  date we do not believe there is.

17    Again, just because there's a camera doesn't mean
18  it's recording or doing anything or that there is anything
19  material from it.  So, again, Your Honor, I can tell you we
20  have made multiple efforts to obtain everything we can from the
21  law enforcement agencies.  And everything we have obtained has
22  been turned over to the defense.

23    THE COURT:  Anything more, Ms. Armour?

24    MS. ARMOUR:  Yes, Judge.  Your Honor will note that
25  the government has an obligation to seek these materials --

10

1          THE COURT:  Right.

2          MS. ARMOUR:  -- not just to rely on what comes into

3     their possession.  This is a unique matter where there are an

4     enormous number of law enforcement agencies.  And we appreciate

09:18      5     the enormity of this task, but, nevertheless, it is the

6     Constitutional obligation of the government to seek these

7     materials.

8          And I think it's telling that we focus in on these

9     particular videos and we see these things, and first the

09:19     10     government says, "We're being told there's nothing there."

11     Then we show them a video.  "Oh, now there is something there.

12     We will try and go get it."

13          Regarding the BearCat, that is Discovery Exhibit 13.

14     It is this image here (indicating).  And, again, I apologize

09:19     15     for not marking this clearly.  And then exhibit --

16          THE COURT:  Well, it's not marked at all, so I've got

17     to figure out which one it is.

18          MS. ARMOUR:  If I may, it is this image here

19     (indicating).

09:19     20          THE COURT:  This one (indicating)?

21          MS. ARMOUR:  Yes.

22          THE COURT:  Okay.

23          MS. ARMOUR:  To the --

24          THE COURT:  Who took this picture?

09:19     25          MS. ARMOUR:  This is a still shot from a video.

11

1          THE COURT:  But who took it?

2          MS. ARMOUR:  It was a bystander video.

3          THE COURT:  Okay.

4          MS. ARMOUR:  And it's clear to the right hand, off --

5    next to the right hand of the person atop from the BearCat

6    there's a GoPro video affixed there.  This is directly pointing

7    down at the scene of the alleged offense.

8          And this photograph here (indicating) -- and this is

9    to which the government had first responded that there was no

10   video.  When we provided the still shot of the armored Humvee

11   in a personal conference with the government, the government

12   related that there was a long rifle that was affixed to the top

13   of the armored Humvee and that it was not, in fact, a camera

14   that we saw.  However, in this image it's very clear that it is

15   not a rifle, but it is a -- some sort of camera.  And this is

16   at an angle directly above and pointing down at the scene of

17   the arrest.

18         Presumably these videos were affixed there so that it

19   would capture the scene in question.  And we believe that both

20   of these, because they are affixed high and depicting the

21   scene, would show the probable cause that we are trying to deal

22   with in this hearing, would show the substance of the material

23   in this hearing.

24         And while I understand that a GoPro video might run

25   out, we have at -- detailed at Discovery Exhibit Number 8,

12

1  which is -- a female officer is holding a videocamera and

2  directly -- and this is from a still shot from a video,

3  directly pointing down at the scene of the arrest.  She's

4  looking into the videocamera while she's recording the incident

09:21   5  that's happening with Ms. Fallis.  Certainly she's doing that

6  because she believes it's recording.

7       So while we believe that the government has asked for

8  these materials, it's clear -- and as we've made clear in the

9  many, many discovery requests that we have submitted to date,

09:22  10  providing exhibits and detailed examples of where this material

11  would be and what county these materials would be -- we've

12  looked at all of these badge -- badges to try and help the

13  government pinpoint where exactly they should go for these

14  materials.  It's unclear to me why we have no answer where they

09:22  15  are; whether, in fact, they ever existed; whether, in fact, the

16  battery ever ran out, and all we're left with is the assertion

17  that perhaps it didn't record.

18       THE COURT:  Of course, you haven't -- neither party

19  has been able to identify in that particular photo with the

09:23  20  woman holding a videocamera, which agency she works for.  So, I

21  mean, all that I can order the government to do is undertake

22  their best good-faith efforts to identify who that officer is

23  and what was -- and locate the video that was being shot, but

24  what more can I order?

09:23  25       MS. ARMOUR:  We believe that she is with Cass County.

13

1          THE COURT:  Well, you --

2          MS. ARMOUR:  I don't know what more, Your Honor --

3          THE COURT:  Your -- your discovery group exhibit says

4     "unknown agency."

09:23   5          MS. ARMOUR:  And since printing this we've had

6     someone who believes that the shape of the badge and the color

7     of the uniform is consistent with Cass County.

8          THE COURT:  So maybe we know more today than we did

9     yesterday about who the officer is.

09:23   10          MS. ARMOUR:  Which concerns us because what will we

11     know tomorrow, after this hearing is concluded?

12          THE COURT:  Right.

13          MR. HAGLER:  Your Honor, may I respond to specific

14     the picture of the woman with --

09:24   15          THE COURT:  Disk 8 is what it is, I guess.

16          MR. HAGLER:  Your Honor, I believe that that is a

17     Cass County deputy named Tonya Jahner, and she was at the

18     scene.  But she's been interviewed and has indicated that she

19     was not recording at the time of the incident.

09:24   20          One thing that the Court will hear today at this

21     hearing is that shortly before the shooting incident occurred

22     is that there had actually been a report of a possible shooting

23     in another area that they were moving toward, so things had

24     kind of ceased for a few minutes.  And some of the law

09:24   25     enforcement were telling us that it was almost like a little

14

1   bit of a break.  Some people went and got a bottle of water,

2   and so there was this kind of cease in time, and Ms. Jahner

3   indicated that she did the same.  And when the shooting

4   incident actually occurred, she was not recording anything.

09:25

5          So again, Your Honor, we have all these pictures.  We

6   don't know when exactly in time these pictures are captured.

7          Again, going back to the Humvee, the item that they

8   speculate is a camera we believe to be a light, Your Honor.  We

9   have asked for every video, and every video that we have

09:25

10  received, we have turned over.

11         THE COURT:  All right.  Well, I'm simply going to

12  order today that with respect to the defendant's discovery

13  group exhibit that I was just handed this morning that

14  identifies 17 different problem areas relative to the photos,

09:26

15  video cams, officer video cams, videos that may have been

16  located on the BearCat and the armored Humvee, I'm ordering

17  that the government file a formal written response to each one

18  of those items and that they file such a response by no later

19  than Friday, December 15, 2017, at the end of the workday.

09:26

20         And I want the government to specifically respond to

21  who's identified in the photo, outline their exhaustive efforts

22  to find out whether there was photos or videos that were

23  actually being taken at that time by the officer depicted, and

24  then we'll have to go from there.

09:26

25         If there's a need to recall witnesses to

1   cross-examine them, if there's some new video or picture that

2   evolves from now until then, then that's what we'll have to do.

3   But if we have to recall witnesses, it's going to be on very

4   short notice.

09:27   5   This case is scheduled for trial on January 29th.  I

6   want to get this case tried, so if we've got to hold another

7   continued hearing of this suppression matter, it's going to

8   be -- the parties are going to have short notice.  You're going

9   to have to squeeze it in what time I have to get around the 15

09:27   10   to 20 criminal cases I have on my docket every week, but we'll

11   do it.  But I want to continue with the hearing today.  We've

12   got everybody here, and it doesn't make much sense to continue

13   the hearing.

14   Anything else we can handle with respect to the group

09:27   15   exhibit -- defendant's discovery group exhibit that Ms. Armour

16   just outlined here for us?

17   MR. ELLISON:  May I just add something, Judge?

18   THE COURT:  Sure.

19   MR. ELLISON:  I think the record also needs to add,

09:28   20   Your Honor, that understanding what the government is trying to

21   do in terms of finding all this discovery for us, two things.

22   One is there are still some major discovery issues outstanding

23   that have not yet been resolved that we will be bringing to the

24   attention of the Court.

09:28   25   But we just received a packet of photographs of Ms.

16

1    Fallis's clothing at the -- that were taken at the Morton

2    County jail.  That request was made last January.  We got it a

3    couple of days ago, so clearly there's a drag.  And I'm not

4    blaming counsel, because the agencies may not be going forward.

09:29    5    We don't know where exactly the problem is.

6         But if we're getting photographs that we requested

7    last January that were taken the previous October just two days

8    before this hearing, it does suggest to me at least that

9    despite whatever efforts counsel have made -- from the

09:29    10    government has made so far, there's stuff that's very, very

11    slowly coming in that can be very, very material not only in

12    this hearing, but also to the trial.

13        And so I just wanted to give the Court also a little

14   heads-up that we do have a discovery issue that is going to be

09:29    15   coming, and it's going to be fairly substantial, we feel.

16   Thank you.

17        THE COURT:  When is it coming?

18        MR. ELLISON:  It's hopefully in the next couple of

19   weeks.  I mean, what we've been trying to do and -- try and to

09:29    20   resolve issues with counsel, discovery, informally.  And

21   there's been a lot of cooperation, and we appreciate that.

22   What we're trying to do is identify the areas of discovery that

23   are still outstanding.  And we think we're now pretty much at

24   the point where we've gone about as far as we can informally,

09:30    25   and that's why it has taken this long, and so we're just

17

1   getting stuff that we asked for 11 months ago.  Thank you, Your

2   Honor.

3           THE COURT:  All right.  Thank you.

4           Mr. Hagler, you may call your first witness.

5           MR. HAGLER:  Your Honor, before we do that, the

6   parties both have exhibit lists for the purpose of this

7   hearing, and I think the parties have stipulated to foundations

8   on all those exhibits.  So we would like to essentially

9   pre-admit those, Your Honor, at this time.  I've provided the

10  deputy clerk with a copy of our exhibit list.  It contains 16

11  exhibits and copies of all the paper exhibits.  Two of them are

12  videos, Your Honor, and 14 paper exhibits.  Most of them are

13  photographs.  So we would move for admission of Government's

14  Exhibits 1 through 16 at this time, Your Honor.

15          MS. ARMOUR:  And we have no objection.

16          THE COURT:  Very well.  Government's Exhibits 1

17  through 16 will be received in evidence.

18          MS. ARMOUR:  And, Your Honor, we have likewise

19  tendered to your deputy clerk the defendant's exhibit list.  We

20  at this time would move in Defendant's Exhibit A; Defendant's

21  Exhibit B; Defendant's Exhibit E, which has subsidiary

22  photographs 1 through 3; Defendant's Exhibit F, which has

23  subsidiary photographs 1 through 10; and Exhibit G, subsidiary

24  photographs 1 through 5.  We will not be seeking to admit

25  Exhibit C or Exhibit D.

09:30

09:30

09:31

09:31

09:31

18

1          THE COURT:  Run those by me again.  I've got a list

2     here.  You're not offering all of these exhibits?

3          MS. ARMOUR:  A, not C and D.  Everything else on the

4     list we are seeking to admit without objection, I understand,

09:32   5     from the government.

6          MR. HAGLER:  Correct, Your Honor.  No objections to

7     what they've offered.

8          THE COURT:  And that includes all of the numbered

9     items related to Exhibit F and G?

09:32  10          MS. ARMOUR:  And E as well.

11          THE COURT:  Very well.  Then Defendant's Exhibit A

12     will be received in evidence, along with Defendant's Exhibit E,

13     F and G, along with the corresponding numbers reflected on the

14     defendant's exhibit list.  All of those items are received in

09:32  15     evidence for purposes of this hearing.

16          MS. ARMOUR:  And we did prepare a thumb drive to

17     provide to the Court to -- with all of those electronically

18     submitted for ease of the record.

19          THE COURT:  All right.  Let's plod ahead.

09:32  20          MR. DELORME:  Your Honor, the United States would

21     call Captain Bryan Niewind of the North Dakota Highway Patrol.

22                    CAPTAIN BRYAN NIEWIND,

23     having been first duly sworn, was examined and testified as

24     follows:

09:33  25          ///

19

1                          <u>DIRECT EXAMINATION</u>

2      <u>BY MR. DELORME</u>:

3      **Q.**   Captain Niewind, you're currently with the North Dakota

4      Highway Patrol, correct?

09:33      5      **A.**   I'm employed by the North Dakota Highway Patrol, correct.

6      **Q.**   And how long have you been with them?

7      **A.**   A little over 18 years.

8      **Q.**   And what are your normal duties in a standard business

9      day?

09:33     10      **A.**   Currently I'm the commander of the southeast region of our

11      agency, which is -- the region encompasses the Jamestown and

12      Fargo office location.  It's the -- roughly the southeast

13      quarter of North Dakota.  I supervise approximately 28 other

14      sergeants and troopers on day-to-day operations that our agency

09:34     15      works on in that area.

16      **Q.**   Okay.  And since you've been with the highway patrol for

17      18 years, safe to say you were with the highway patrol on

18      October 27th of 2016?

19      **A.**   Yes, I was.

09:34     20      **Q.**   What were your particular duties on that day?

21      **A.**   On that day I was a part of a response to some activities

22      that were occurring in southern Morton County.  I was part of a

23      mobile field force, and I was in charge of that mobile field

24      force that day.

09:34     25      **Q.**   And what are the activities that you're talking about that

20

1   were occurring in southern Morton County -- or Mandan County --

2   Morton County?

3   A.   The activities that were occurring in southern Morton

4   County, there was an illegal blockade of Highway 1806 right

09:34   5   around that Mile Marker 37 location, and there was also some

6   property on the east side of Highway 1806, just south of that

7   blockade.  It was private property, and there was individuals

8   that were criminally trespassing on that property.

9   Q.   So you were part of this mobile field force.  What is a

09:35   10   mobile field force?

11   A.   A mobile field force is -- it's a group of law enforcement

12   officers that respond to protest-related activities.  We're a

13   team of individuals that work together to handle any type of

14   protest activities, so if -- that's to move people in a

09:35   15   direction that we need to move them.  It's to maybe hold a line

16   and give access to a location, and ultimately if we need to

17   make arrests, we can make arrests as well.

18   Q.   Did you have a leadership role in that particular mobile

19   field force?

09:35   20   A.   I did that day, yes.

21   Q.   And what was your leadership role?

22   A.   I was in charge of the mobile field force that day, so I

23   was coordinating the efforts of the law enforcement that was a

24   part of the mobile field force that day.

09:35   25   Q.   And what specifically was the mobile field force's

21

1    operation for that particular day?

2    **A.**    For that particular day, again, there was an illegal

3    blockade of Highway 1806 that consisted of a bunch of debris

4    and vehicles that were actually blocking the road.  There was

09:36    5    people that were blocking the road as well that were illegally

6    present and as a part of that block -- illegal blockade.  So

7    our goal to begin with was to clear the road, clear that

8    blockade and get people moving in the direction back to the

9    south, back to a location where they could legally and --

09:36    10    legally protest, had been given them the right by the federal

11    government.

12    **Q.**    Okay.  And when you say that, you're talking about there

13    was a camp that was just north of the Cannonball River,

14    correct?

09:36    15    **A.**    Correct.

16    **Q.**    Just off to the east of Highway 1806?

17    **A.**    Yes, it was on some Army Corps of Engineer property.

18    **Q.**    And that would be just north of the Standing Rock Indian

19    Reservation as well.

09:36    20    **A.**    It was just into Morton County, on the north side of the

21    Cannonball River, just on the east side of Highway 1806.

22    **Q.**    So your job in the mobile field force was to move people

23    south and get 1806 opened up.

24    **A.**    That was -- to start with, that was our job.  It is also

09:37    25    to remove the people that were criminally trespassing on the

22

1    private property eventually east of Highway 1806 as well.

2    **Q.**   Okay.  And elaborate a little bit more on that.

3    **A.**   There was a blockade set up on Highway 1806, again, right

4    around that mile marker, Mile Marker 37.  A little bit further

5    south than that there was a location where the pipeline was

6    going to cross Highway 1806, and there was an approach there.

7    And throughout August, September and into October there was a

8    camp that grew around that approach.  And then it encroached

9    onto the private property that was east of Highway 1806, into

10   some pasture land.  There was teepees, tents, campers and a

11   bunch of items that were placed onto that private property

12   without the permission of the landowner.

13   **Q.**   So a two-part mission then is to push people off the

14   private property and then clear up 1806.

15   **A.**   Correct.

16   **Q.**   And the status of 1806 is -- what you're saying is it was

17   blockaded without allowing normal traffic?

18   **A.**   Correct.  It was blockaded with debris, vehicles on

19   Highway 1806 around that Mile Marker 37 location.  And then

20   there was also people that were present at that location as

21   well that were blocking the road, so it was -- the roadway was

22   not open.  It was closed illegally by a group of individuals.

23   **Q.**   So moving forward that day as the mobile field force, what

24   was your intent, I guess, as a law enforcement group with

25   regard to protesters?

1  **A.**   The goal was to have the individuals move on their own,

2  remove the debris from the roadway, or if they could not remove

3  them, we would help them remove them, get them off the road so

4  we could get the road reopened.  And it was for them to

09:38    5  physically remove themselves from that location, travel south

6  with their belongings, whether that was a car or if they had

7  other property.  We moved very slowly.  We stopped at times to

8  allow people to gather their items and head south to a location

9  where they could lawfully be.

09:39   10  **Q.**   Okay.  So when you say lawfully -- where they could

11  lawfully be, the locations then that you're moving them from,

12  is it your, I guess, contention that they were unlawfully

13  there?

14  **A.**   Yes.

09:39   15  **Q.**   Just so I know as we go forward here, Captain Niewind, at

16  the point that you guys kick off your operation on the 27th of

17  October, is it your understanding that everybody that's there

18  on 1806 or on the -- or on private property is unlawfully there

19  and subject to arrest?

09:39   20  **A.**   Yes.

21         MR. ELLISON:  Objection, lack of foundation.

22         THE COURT:  Overruled.

23  **Q.**   (MR. DELORME CONTINUING)  Now, prior to the operation

24  kicking off, did you guys do any training as part of the -- as

09:39   25  the mobile field force?

1  A.   We did.

2  Q.   Did you guys discuss any North Dakota Century Code laws or

3  any laws that people might be in violation of in that area?

4  A.   There was a discussion at the training.  There was also

09:40   5  discussion at a gathering of law enforcement prior to the

6  training as well.

7  Q.   So there was -- there was discussion of what people could

8  be arrested for on that particular day.

9  A.   Correct.

09:40   10        MR. DELORME:  May I approach, Your Honor?

11        THE COURT:  You may.

12  Q.   (MR. DELORME CONTINUING)  I'll show you a copy of what's

13  been marked as Government's Exhibit 16.  You've seen this

14  document before?

09:40   15  A.   Yes.

16  Q.   What is -- just a general summary, what is this document?

17  A.   This document is several pages of North Dakota Century

18  Code, laws -- specific laws, several of them.  It has the

19  Century Code number with the definition -- the name of that

09:40   20  actual Century Code and then the explanation of what the

21  Century Code is.

22  Q.   And with these laws and this packet that's encompassed in

23  Government's Exhibit 16, would they have all been laws under

24  North Dakota Century Code that people could have been in

09:41   25  violation of on that particular day?

25

**A.**   Yes.

**Q.**   Could I just briefly have you go through each one, identify what law it is, the section number, and then just a short -- very short summary of why -- why a person would be in violation of that?

**A.**   The first one is North Dakota Century Code 42-01-01, nuisance, and basically a nuisance is an unlawful doing or act where somebody is blocking a street or a highway.

**Q.**   Okay.  So all these individuals that are on 1806 in their individual capacity are blocking that road?

**A.**   Correct.

**Q.**   How about the next one?

**A.**   North Dakota Century Code 12.1-08-01, physical obstruction of a government function, and basically this is just where somebody impedes, hinders, interferes with law enforcement when they're trying to do some sort of government function.  And in this case it was to open a roadway that was illegally blocked.

**Q.**   And 1806, that is a state highway, correct?

**A.**   It is a North Dakota state highway, correct.

**Q.**   How about the next section?

**A.**   North Dakota Century Code 12.1-08-02, preventing arrest or discharge of other duties, and this basically is if somebody is preventing a public servant, like in this case law enforcement, from effecting the arrest of somebody or not allowing us to discharge our official duties and they create a risk to us

26

1    while they're doing that.

2    **Q.**   Okay.  So on that particular day your official duty was to

3    go down and clear 1806 and that private property, correct?

4    **A.**   Yes, it was.

09:43   5    **Q.**   And you were obstructed in that process?

6    **A.**   We were.

7    **Q.**   And we'll get more into the detail of what causes the

8    obstruction in a minute, but just briefly, so we have a fair

9    understanding of what the laws are, let's go on to the next

09:43   10   one.

11   **A.**   North Dakota Century Code 12.1-25-01, inciting a riot, and

12   this is an offense that if somebody incites or urges five or

13   more persons to engage -- or create a riot, and there's a

14   definition of what riot is in the Century Code here.

09:43   15   **Q.**   And what is that definition?

16   **A.**   It means a public disturbance involving an assemblage of

17   five or more persons which might -- which by tumultuous or

18   violent conduct creates grave danger or damage or injury to

19   property or persons or substantially obstructs law enforcement

09:43   20   or other government function.

21   **Q.**   Okay.  And the next section?

22   **A.**   North Dakota Century Code 12.1-25-03, engaging in a riot.

23   **Q.**   So that would at least be an individual engaging in what

24   -- in what the inciting person would have caused.

09:44   25   **A.**   Correct.  It'd be somebody engaging in what the definition

27

1   of a riot was.

2   **Q.**   And the next one?

3   **A.**   North Dakota Century Code 12.1-25-04, disobedience of

4   public safety orders under riot conditions, and this is

09:44   5   basically a law that if somebody is present during a riot and

6   they disobey reasonable public safety orders to move or

7   disperse or to head in a direction that law enforcement has

8   asked them to go to.

9   **Q.**   And the final one?

09:44   10   **A.**   North Dakota Century Code 12.1-31-01, disorderly conduct,

11   and this is -- this section of law, there's several -- there's

12   multiple different violations inside this law.  And the one

13   that particularly would have applied on this specific date

14   would have been obstructs vehicular or pedestrian traffic or

09:45   15   the use of a public facility, so the obstructing the vehicular

16   and pedestrian traffic.

17   **Q.**   Okay.  With that now as our basis, let's go into what you

18   personally observed on that day.  October 27th, what time did

19   you go -- you kick off the operation to remove individuals on

09:45   20   1806?

21   **A.**   It was around that noontime frame, about 12:00 p.m. or

22   roughly about that timeframe is when we moved as a mobile field

23   force to that location of the blockade.

24   **Q.**   Okay.  And as a mobile field force, are you guys moving

09:46   25   like in a line with all the officers online, or --

28

1   **A.**   We were transported to that location by buses and

2   vehicles, and then when we got to that location, we got out of

3   the vehicles and we established what we call a skirmish line

4   that involved law enforcement officers on foot, like in a line

09:46   5   from fence line to fence line across Highway 1806 facing south.

6   And then there was a couple law enforcement vehicles that were

7   a part of that skirmish line as well.

8   **Q.**   And what kind of --

9        MR. ELLISON:  Excuse me, counsel.  I'm going to

09:46   10   object to any evidence regarding anything that occurred at noon

11   on October 27th unless the witness can establish the knowledge

12   or presence of Ms. Fallis at that time.  Her arrest occurred

13   around 6:00 p.m., Your Honor, and we would submit that anything

14   that occurred that was not in -- other than what was going on

09:46   15   at the time immediately before leading up to her arrest would

16   be irrelevant to any of the proceedings before this Court

17   today.

18        THE COURT:  Well, for purposes of this hearing I will

19   overrule the objection.  It's just a suppression hearing.  It's

09:47   20   not the trial, but let's try to focus on the relevant timeframe

21   here that's the subject of this hearing.

22   **Q.**   (MR. DELORME CONTINUING)  Captain Niewind, just briefly,

23   as you established this skirmish line, indicate to us what

24   transpired as you begin moving forward.

09:47   25   **A.**   As we started moving forward, there was debris, vehicles

1    that were abandoned in the vehicle (sic).  There was fires that

2    were set.  The debris included wood and logs and plywood and

3    all kind of different things that were impeding our progress,

4    and that continued throughout the day.  As we were able to

09:47    5    remove one barricade, another barricade would be set up or a

6    vehicle would be disabled in the roadway.  Multiple fires were

7    set that had to be put out before law enforcement could

8    continue moving south in the direction that we wanted to move.

9         We encountered, you know, hundreds of individuals.

09:48    10    Numerous arrests were made.  And then we had to also clear that

11    private property and search every tent and structure that was

12    inside of that private property to make sure everybody was

13    moving and there was nothing that was going to harm law

14    enforcement.

09:48    15         MR. ELLISON:  Your Honor, so I don't have to make an

16    objection with each question, can I have a continuing objection

17    to any such testimony prior to Ms. Fallis's arrival on the

18    scene?

19         THE COURT:  Understood.

09:48    20         MR. ELLISON:  Thank you, sir.

21    Q.   (MR. DELORME CONTINUING)  Now, you said numerous arrests

22    were made.  Was it law enforcement intent to make arrests that

23    day?

24    A.   It was not.

09:48    25    Q.   And as far as explaining that to the individuals on the

30

1   ground blocking 1806 or the trespassers, were there some sort

2   of a announcements going on?

3   **A.**   There were announcements being made all day long.

4   **Q.**   Okay.  And what -- just give us a gist of what some of the

09:48   5   announcements would have been.

6   **A.**   There was announcements being made over like a loudspeaker

7   system.  Lieutenant Glen Ternes of the Bismarck P.D. was doing

8   that.  And then individual officers all up and down the line

9   were giving basically the same instructions, and it was head to

09:49   10   the south, head back to the camps.  If you head back to the

11   camps, you will not be arrested.  Just keep heading south.

12   Take your stuff with you, so if you have a vehicle, whatever it

13   is, take it with you.  You won't be arrested if you head to the

14   south.

09:49   15   **Q.**   And what was the distance between where you guys started

16   the push that day to where you guys wanted to end by the end of

17   the day?

18   **A.**   A little over two miles.

19   **Q.**   A little over two miles?  Now, you get started, and I

09:49   20   believe there was that trespass area that's relatively close to

21   where you guys kicked off, correct?

22   **A.**   There was some private property where there was criminal

23   trespassing occurring, correct.  That was probably a half of a

24   mile from the initial block -- blockade of the roadway until we

09:49   25   encountered that, maybe -- maybe a little bit less than that.

31

1  **Q.**   Is it -- is it taking you guys some time then to move

2  forward?

3  **A.**   It takes several hours to move forward, and, I mean, it's

4  a slow -- a slow process.

09:50   5  **Q.**   And you said that throughout that day, as you guys are

6  moving south, people are throwing things at you.  What kind of

7  things are being thrown at law enforcement?

8  **A.**   We had logs thrown at us, logs that had been on fire, logs

9  that hadn't been on fire.  We had tent poles thrown at us.  We

09:50   10  had sign poles thrown at us.  I found a spear out there that

11  was thrown at us.  There was water bottles, nuts, like a --

12  like a nut for a bolt they were throwing at us, locks, Master

13  Locks, feces.  I mean, there's all kinds of things that were

14  thrown at us.  I can't name everything, but those are some of

09:50   15  the things that I recall.

16  **Q.**   Were you struck by anything on that particular day?

17  **A.**   I was.

18  **Q.**   And what were you struck by?

19  **A.**   Feces.

09:50   20  **Q.**   Where were you struck with that?

21  **A.**   I saw it come over the top of the crowd, and I put my hand

22  up, and it struck me in my hand.

23  **Q.**   Do you know approximately how many arrests were made on

24  that particular day?

09:51   25  **A.**   I believe it was a little over 140 arrests.  I don't have

32

1    the exact number.

2    **Q.**   And was it your job as this mobile field force on the

3    line, your skirmish line, to make arrest?

4    **A.**   It was our job as a mobile field force to make arrests.

5    Arrest teams were a part of our mobile field force, so the

6    individual officers that were a part -- on the front lines, the

7    skirmish line, if they saw individuals that were committing a

8    criminal violation, they could pull them through the lines, and

9    arrest teams would then effect the arrest and go through the

10   processing and transport.

11   **Q.**   So let's go ahead and jump a little forward then to just

12   prior to when the shooting incident occurred.  How far down the

13   road have you made it?

14   **A.**   It's probably about a mile-and-a-half, or so, from our

15   initial jump-off point, maybe a little bit more than that.  I

16   don't have the exact -- exact amount.

17   **Q.**   Do you know what -- approximately what time of day it was

18   when you get to this point just prior to shooting?

19   **A.**   From what I recall, it was just right before 6 o'clock.

20   And the way I got that timeline was just from a timeline that a

21   scribe had put together for the events of that day.  I didn't

22   look at my watch or -- that's the only way I kind of know what

23   -- what time it was.

24   **Q.**   So by this point I take it you have some five,

25   five-and-a-half hours to get to -- to get to a distance of

33

1   one-and-a-half miles?

2   **A.**   Correct.

3   **Q.**   Do you know how many officers were involved in this

4   operation on that day, just a guesstimate?

09:52

5   **A.**   We started the day with over 200, and there was more

6   officers that came, so I'm guessing over 300, maybe three to

7   four hundred.

8   **Q.**   So just prior to then the shooting incident, what was the

9   status of the -- of the, I guess, law enforcement mobile field

09:52

10  force?

11  **A.**   Just prior to the shooting incident we were just north of

12  some power lines that cross Highway 1806, and there was a

13  report from -- we heard through our radio, I think it was, our

14  aircraft saw or somebody reported that there was a shooting

09:53

15  that was occurring out in front of us about a half mile,

16  three-quarters of a mile, so we stopped our push.  We had all

17  of our law enforcement officers get behind cover.  So there

18  were some armored vehicles out there that we utilized for

19  cover.

09:53

20       We visited with the protesters that were still

21  present, let them know this is what's going on potentially out

22  in front of us.  We don't want you to go that way.  Stay here.

23  If you want to be transported out of here, we will not arrest

24  you and we will transport you out of here to get you someplace

09:53

25  safe.  And the protesters that were still present did not want

34

1   to get transported out of there.  They just stayed where they

2   were at.

3   Q.   So am I safe to say that there was a lull then between law

4   enforcement and protesters at this point?

09:53   5   A.   There was a lull at that point in time just because of we

6   didn't know what was going on out ahead of us.

7   Q.   And how long did that lull in the action last?

8   A.   I don't -- I don't remember exactly how long, 15 minutes,

9   20 minutes, maybe half-hour.  I don't -- the time -- time was

09:54   10   really difficult that day to kind of remember.

11   Q.   Sure.  I'm sure you weren't taking time to look at your

12   watch every couple minutes.

13   A.   I was not.

14   Q.   Now, just prior to the shooting, was there anything that

09:54   15   caused the line to start responding again or coming back into a

16   skirmish line?

17   A.   Yes.  BIA had responded to where this potential shooting

18   was at, let us know what was going on, that there was not a

19   shooting that was occurring.  But there was somebody that had

09:54   20   been down there with a weapon, and they removed them from that

21   location.  And, again, our goal was to continue pushing south,

22   so at that point in time we felt it was safe to start that push

23   again.

24   Q.   Okay.  Then what happened?

09:55   25   A.   Once we set back up, we got back into a skirmish line

35

1    basically from fence line to fence line perpendicular to the

2    road facing south, and there was a -- there was a vehicle that

3    pulled up and then an ATV or OHV that pulled up to the scene as

4    well right after -- right after we had reestablished our

09:55    5    skirmish line.

6    Q.    Now, just so I understand now, just prior to you reforming

7    the line, there's kind of a lull between the protesters and the

8    law enforcement, correct?

9    A.    Correct.

09:55    10    Q.    So nothing really going on, no pushing, no shoving?

11    A.    No, and just prior to that lull even, like the people that

12    were present weren't -- there wasn't a lot of resistance.  It

13    was -- they were just kind of just continually moving.  They

14    were moving with us, not really putting up any like very

09:55    15    defensive resistance, more of a passive resistance, being in

16    our way, but continually moving as we moved.

17    Q.    And as long as they were moving, they weren't subject to

18    arrest.

19    A.    As long as they kept moving and they weren't trying to

09:55    20    instigate something or, you know, committing a more serious

21    violation, we were allowing them to continue to move south to

22    get -- to head south.

23    Q.    And what happened after that?

24    A.    After that OHV showed up and the car showed up, I was

09:56    25    standing on the east side of Highway 1806, like on the top of

36

1   the ditch.  I was like in the grass shoulder portion of the

2   roadway, and I saw a skirmish behind our skirmish line.  I saw

3   something going on to my left, so I walked down there to

4   investigate what was going on.

09:56   5   **Q.**   Okay.  And what did you observe?

6   **A.**   When I was walking down there, I observed that there were

7   several law enforcement officers that had an individual on the

8   ground, proned out on the ground, and they were struggling with

9   that individual, what I thought was trying to effect an arrest

09:56   10   of her, get her hands behind her back and get her -- get the

11   person arrested.

12   **Q.**   Then what happened?

13   **A.**   As I was approaching that location to kind of investigate

14   what was going on, I heard two loud gunshots.  And I kept going

09:57   15   towards that location, and then I heard a third gunshot.

16   **Q.**   So three gunshots?

17   **A.**   Three gunshots.

18   **Q.**   What did you do after that?

19   **A.**   When I -- when I heard the third gunshot, I drew my duty

09:57   20   weapon because I wasn't sure who was shooting.  It was apparent

21   that it was coming from the location where this skirmish was

22   going on with the law enforcement officers and the individual

23   they were trying to arrest.  I drew my duty weapon.  Then I saw

24   that there was a weapon pulled from that individual.  And then

09:57   25   I put my weapon back away because the threat was gone.

37

1   Q.   Did you have an opportunity to observe this individual?

2   A.   I did.

3   Q.   And what did you -- what do you recall of that?

4   A.   What I recall is she had -- the individual was a female.

5   She had jeans on.  She was wearing like a dark sweatshirt, and

6   she had pockets like in the front of it.  And when they started

7   -- when they got her handcuffed, they started searching her.

8   There was a nylon -- black nylon holster that was pulled out of

9   the left front pocket of her sweatshirt.  And she had a -- she

10  had a mask on, so at that point in time she was not -- I

11  couldn't tell who -- exactly who it was.

12  Q.   And after the gun was removed from this individual's

13  possession, was she placed under arrest?

14  A.   She was placed under arrest.  She was successfully

15  handcuffed.  And then, you know, she was searched on scene at

16  that location yet and then removed from that location and

17  placed into a transport area.

18  Q.   Okay.  Now, I know in preparation for today's hearing, we

19  watched a couple videos, correct?

20  A.   Correct.

21  Q.   One of them was a video listed as coming from an unmanned

22  aerial system, correct?

23  A.   Correct.

24  Q.   I'm going to show you part of that video, Captain Niewind.

25       MR. DELORME:  And that is actually marked as

38

1   Government's Exhibit 14, Your Honor.  That's a 26-minute,

2   4-second video, but for sake of brevity, I'm going to have my

3   paralegal play just from 9:20 to 16:10, which is the time

4   period around the arrest.

09:59   5        THE COURT:  So that's 7 minutes?

6        MR. DELORME:  Yes, Your Honor.

7        THE COURT:  All right.

8   Q.   (MR. DELORME CONTINUING)  Now, there's no audio to this

9   video, Captain Niewind, but can you tell us a little bit about

09:59   10  what we're seeing here?

11  A.   This would be the lull in the -- the lull we talked about

12  earlier.  This is where law enforcement is behind cover, the

13  different armored vehicles that we had back there, while we

14  thought there was a shooting that was occurring further south

09:59   15  on the road.

16  Q.   Now, the term "BearCat" has come up.  Which of these

17  vehicles is the BearCat?

18  A.   The BearCat is -- if you look on the roadway there, it's

19  the right -- the black vehicle that's on the -- on the right

10:00   20  side of the road, the southbound lane.

21  Q.   And what are we seeing in this particular shot?

22  A.   We can see the vehicle that pulled up.  There's an OHV

23  that pulled up.  There's protesters that are still present.

24  There's some law enforcement that are out in front of the

10:00   25  BearCat, and the MRAP that are there.  I don't know what MRAP

39

1    stands for, but I think it's a -- it's the tan-colored vehicle

2    that's on the screen there in the northbound lane, and they're

3    visiting with some of the protesters that are present.

4    Q.   And, again, there was not much going on between law

5    enforcement and the protesters just prior to this?

6    A.   There was not.  Again, we had actually offered for -- to

7    get them out of there because we thought there was a serious

8    incident that was occurring out in front of us, and they were

9    not going to be placed under arrest.

10   Q.   Now, you testified earlier that you got word everything

11   was clear upfront, your line starts forming.  Is this what

12   we're seeing here?

13   A.   This is what you see here, correct.

14   Q.   And just for the Court's information, Captain Niewind,

15   around where would you be at this time?

16   A.   At this point in time I would be someplace either in that

17   east ditch -- you can see there's the tan MRAP that's in the

18   northbound lane.  There's a Humvee that's parked just to the

19   east of that, to the left of it.  I'd be somewhere in that

20   location, or I would have been close to where the BearCat was

21   visiting with Lieutenant Glen Ternes at this particular time.

22   I don't know exactly where I would be, but someplace in that

23   location.

24   Q.   Now, what are we starting to see here?

25   A.   Law enforcement is beginning to move south again, again,

10:01

10:01

10:02

10:03

10:03

1  giving all those same commands that -- move to the south.  If

2  you move to the south, you won't be arrested.  And you can see

3  the protesters are still present, and for the most part they're

4  either standing still or are not moving or moving forward.

10:04  5  Q.   Now, just -- so just prior to that we saw somebody come

6  out from the law enforcement line and grab somebody.  What is

7  that process?  Is that part of arrest team kind of process?

8  A.   It can be.  If one of the officers that's on the skirmish

9  line sees an individual that is committing a criminal offense

10:04  10  outside of what we could already arrest them for or if they're

11  trying to agitate, if they're an agitator or trying to get the

12  crowd riled up.  Obviously they're all illegally present there

13  anyways.  They can be arrested.  They would pull that

14  individual through the -- through the line to be arrested.

10:04  15  Q.   Because this kind of goes quick -- so right about here --

16  we went back just a little bit again.  You know, we see the

17  line here in a second coming forward and getting more, I guess,

18  in line with everybody else.  Pay particular attention to that

19  left side, where you would have been standing.  And that moment

10:05  20  right there, what are we seeing, Captain Niewind?

21  A.   There's a law enforcement officer that's broken from our

22  line to grab somebody that's ahead of our line to place them

23  under arrest.

24  Q.   Do you know who that is being placed under arrest?

10:05  25  A.   Redfawn Fallis.

41

1   Q.   And right here now we see the -- is the line moving

2   forward.  Is that pretty standard?

3   A.   The line moving forward as in like --

4   Q.   Law enforcement is down, and then the line moves forward.

10:06   5   A.   Yes, the line would move around where that arrest is being

6   -- taking place to keep the integrity of our line, so we don't

7   have any gaps that people can take advantage of.

8   Q.   And how far were you from where Redfawn Fallis is being

9   arrested when you heard the two -- the two gunshots going off?

10:06   10   A.   I was making my way down towards her from like the

11   shoulder area, so I would have been, you know, feet -- feet

12   away from her, like two to eight feet away from her, I suppose.

13   And then when the third shot went off, I was at -- like at by

14   where her feet were.

10:06   15   Q.   So pretty close to then where the shots took place.

16   A.   Yes.

17   Q.   So as we see this -- and at some point we're going to see

18   everybody kind of scramble.  Would that correspond to when the

19   first shots started ringing out, Captain Niewind?

10:07   20   A.   The first two shots or at least the third shot.  At some

21   point in time there people were scrambling.  I know after the

22   third shot, I think more officers realized what was occurring,

23   and that's when a lot of the officers began to move.

24        MR. ELLISON:  Objection, speculation, beyond the

10:07   25   witness's knowledge.

42

1        THE COURT:  I'm sorry.  I didn't hear the whole --

2        MR. ELLISON:  Sorry.  Objection, speculation.  He

3   says he believes, so I object to anything that's not part of

4   his personal knowledge.

10:07   5        THE COURT:  I'll overrule for purposes of this

6   hearing.  It's not a trial on the merits.  It's just a

7   suppression hearing, and I can sort that out.

8        MR. ELLISON:  Just so the record can be clear, if the

9   witness could identify timestamps so it's clear as to when he's

10:08   10   referring to the video.

11        THE COURT:  Sure.  If you could do so, Officer, when

12   we're -- Mr. Delorme is focusing on a specific item and

13   stopping the tape, if you could just identify for the record

14   what the -- what timeframe that is.

10:08   15        THE WITNESS:  So, Your Honor, the timeframe on the

16   bottom right corner here is --

17        THE COURT:  Correct.

18        THE WITNESS:  -- is what you're referring to?  Okay.

19   Thank you, Your Honor.

10:08   20   Q.   (MR. DELORME CONTINUING)  Okay.  And right now, Captain

21   Niewind, we're talking about the dispersion after the shots

22   being fired.  What's the timestamp on the lower right-hand

23   corner?

24   A.   It's 13:39.

10:08   25   Q.   Okay.  And we're just going to jump back real quick again,

43

1  Captain Niewind, so we can get the timestamps for you.  Okay.
2  So we see the line moving up now.  We talked about the line,
3  getting -- getting online with each other as far as the
4  integrity of the line.  What's the timestamp now?

10:09
5  A.   We're reestablishing our line here at 12:52.

6  Q.   Okay.  Now we see an officer moving forward in the line to
7  effect an arrest on an individual.  What's the timestamp on the
8  video?

9  A.   This arrest is taking place at 12:59 on this video.

10:09
10  Q.   Now, just so we understand for the record for when we get
11  this thing printed out in preparation for trial, Captain
12  Niewind, that timestamp at the bottom, that's not the time of
13  day, right?  We're -- you had already indicated the time of day
14  was around just shy of 6:00 p.m.?

10:10
15  A.   Correct.  This is not the time of the day.  This is just
16  the time on the -- from this video.

17  Q.   Okay.  So this is just the length into the video.

18  A.   Correct.

19  Q.   Now, the shots occur.  You're a couple feet away.  What
10:10
20  happens after that?

21  A.   Should I give the time that that happened on here?

22  Q.   Yes.

23  A.   That was approximately 13:37 on the -- on the video here.
24  And what occurred was, after I had drew and re-holstered my
10:10
25  weapon, there was a continued struggle on the ground with

1  the -- with Ms. Fallis.  And eventually she was placed into

2  flexi-cuffs, plastic handcuffs, and then searched on the scene

3  there at that location where the arrest was being -- taking

4  place.  And then she was moved from there to where the

5  transport was taking place for people that were being arrested.

6  Q.   Now, you said continued resistance.  How many officers

7  were in that area trying to effect this arrest?

8  A.   There was at least four that I recall that were on --

9  right in the vicinity of her.  It could have been more, but I

10 recall at least four that were struggling with her.

11 Q.   And then at some point you also attempted to assist or aid

12 and help.

13 A.   From what I recall, I just drew my duty weapon and I -- it

14 seemed like they were -- there didn't need to be another body

15 on top of what was going on on the ground there, but I did

16 stand there and observe while the arrest was still taking

17 place.

18 Q.   Okay.  And did you -- at any point in time when you're

19 observing this arrest taking place, did you hear Redfawn Fallis

20 say anything or make any statements?

21 A.   I don't recall any.

22 Q.   Okay.  And after the arrest is effected and she's moved

23 from the line area, just give us a -- just a brief summary of

24 what the remainder of your day was like.

25 A.   After she was removed from that area, again, we -- they

45

1   had continued to establish and keep that skirmish line, and we

2   continued to move south, pushing the individuals that were

3   still present there all the way down to where the Backwater

4   Bridge area is.  From what I recall is our skirmish line went

10:12   5   to about the location of County Road 134 and Highway 1806, and

6   that's really where we stopped because there was no more

7   resistance.  And then some of the armored vehicles continued to

8   the Backwater Bridge.

9   Q.   It's a pretty long day for you then.  What time did you

10:12   10   end up, I guess, going off shift that day?

11   A.   I would have to look at my daily, but I'm guessing

12   sometime after midnight.

13          MR. DELORME:  That's all the questions I have, Your

14   Honor.

10:13   15          THE COURT:  Mr. Ellison.

16          MR. ELLISON:  Thank you, Your Honor.  I'm going to

17   use the podium as well.

18          THE COURT:  That's fine.

19                      CROSS-EXAMINATION

10:13   20   BY MR. ELLISON:

21   Q.   Good morning, Captain Niewind.

22   A.   Good morning.

23   Q.   You described yourself, sir, as the commander, I believe,

24   of the -- kind of the ground forces that day?

10:14   25   A.   I was in charge of the mobile field force.

1   Q.   And how many members are part of the mobile field force?

2   A.   When we started, around 200.

3   Q.   And when you said when you started, that was about what

4   time?

10:14   5   A.   We began our operation about noon, 12:00 p.m.

6   Q.   Prior to starting that operation, there was a meeting of

7   law enforcement and others for a daily briefing and -- was

8   there not?

9   A.   There was.

10:14   10   Q.   Were you part of that?

11   A.   I was present.

12   Q.   And did that just include law enforcement officers?

13   A.   I know law enforcement was there.  I'm not sure of other

14   individuals that would have been present.

10:15   15   Q.   You weren't aware of DAPL security presence?

16   A.   I wasn't aware of any, no.

17   Q.   Were you aware of the role that DAPL security was playing

18   and providing intelligence and planning for daily operations of

19   law enforcement?

10:15   20   A.   I know that law enforcement had visited with the private

21   security individuals that were out there.  I don't know to the

22   level of daily intelligence that were received.  That wasn't a

23   part of my role.

24   Q.   Well, every day there were operational orders which were

10:15   25   e-mailed out from Tom Doering.  And who is he?

47

1   **A.**   I think Tom Doering is emergency manager for Morton

2   County, if I recall.

3   **Q.**   And you were one of the recipients, were you not?

4   **A.**   I received some documentation through e-mail.

10:15    5   **Q.**   Have you disclosed that to the United States?

6   **A.**   I -- our agency would -- any discovery requests would go

7   through our agency, and if it was something through e-mail, it

8   would have been provided to them.  I don't take care of those

9   requests.

10:16   10         MR. ELLISON:  I would call for disclosure of the

11   operational order for that day, Your Honor.  We have previously

12   requested it, but I will move on.  I just want to make a record

13   of that.

14   **Q.**   (MR. ELLISON CONTINUING)  There were also briefing packets

10:16   15   that were issued every day during these daily briefings?

16   **A.**   Yes.  Can you explain what a briefing packet is?  If --

17   I'm not sure what that means.

18   **Q.**   Okay.  Well, were you given documents at the morning

19   briefing?

10:16   20   **A.**   There were times that we handed out maps at briefings.

21   There was not daily briefing notes or something that was handed

22   out that I recall, maybe it's potentially that -- a time or two

23   that that did happen for specific things.  I don't recall on

24   this day, that occurring, but I do recall that there were times

10:17   25   when maps needed to be handed out for individual -- individuals

1   that were part of whatever was going on on a particular day or

2   week or month.

3   **Q.**   What about operational -- something called an operational

4   order?

10:17  5   **A.**   There were times that -- for different things we had

6   operational orders.  I don't recall that operational order was

7   handed out this day.

8   **Q.**   Would you go back and check after this hearing and

9   determine whether or not there were any for this day, and if

10:17  10  so, disclose them to the United States?

11  **A.**   I can, yes.

12  **Q.**   And if not, then do so in writing either way?

13  **A.**   I can take a look and see, and I'll visit with the U.S.

14  Attorney's Office and let them know if there is anything.

10:17  15  **Q.**   Okay.  Thank you.  Now, you -- you wrote reports in

16  connection with your conduct that day, correct?

17  **A.**   I completed a report of my own, and then I attached a

18  narrative to another trooper's report.

19  **Q.**   And what is the purpose of writing those reports?

10:18  20  **A.**   It's to document the items that occurred that day for our

21  recollection at a later timeframe for court purposes or

22  whatever it might be.

23  **Q.**   And you try and do this as contemporaneously as you can so

24  that your memory is as fresh as possible.

10:18  25  **A.**   We try and document the things that we need to document

49

1  that are prudent to whatever occurred that day and to -- for

2  recollection for our memory.  Not everything always gets

3  included, but we try and do the best job we can.

4  **Q.**   And you go back and review it, do you not, to make sure

5  it's accurate?

6  **A.**   It's reviewed before it's submitted, and then we'll review

7  it before like a court hearing like today.

8  **Q.**   Okay.  Did you make any changes in your report since you

9  wrote it?

10  **A.**   I have the report here.  I can -- it was reviewed on

11  November 8, 2016, so there hasn't been any changes since then.

12  **Q.**   Did you make changes -- you wrote the report on November

13  1st, did you not?

14  **A.**   I don't know which day I wrote it.  I'd have to actually

15  go into our system and look that identifies exactly when I made

16  a change or when I began the case and added narrative or

17  whatever it might be.

18  **Q.**   Well, you said you had your report in front of you.  Isn't

19  it dated?

20  **A.**   Not all those dates are located on the report.  It's

21  actually in our computer system.

22  **Q.**   Okay.  Now, you mentioned, sir, that -- that there was an

23  illegal blockade of 18 -- Highway 1806 that day, is that

24  correct?

25  **A.**   Correct.

50

Q.   I think police and National Guard and other units had
already closed Highway 1806 to the north, had they not?

A.   At one point in time it was closed, yes.

Q.   It was closed prior to October 27th.

A.   It was closed for the safety of the traveling public.

Q.   For whatever reason, it was a closed road, correct?

A.   It was closed -- it was closed by law enforcement at a
previous location, yes.

Q.   And that was to the north, correct?

A.   To the north.

Q.   And it was -- basically prevented anyone who was not a law
enforcement officer or DAPL security connected with law
enforcement, prevent anyone from traveling south through that
blockade -- or north through that blockade, is that correct?

A.   For their safety it did not allow them to do that,
correct.

Q.   Did I ask you what the purpose of it was, sir?

     MR. DELORME:  Objection, Your Honor, argumentative.

     MR. ELLISON:  I'd move to strike.  Nonresponsive.

     THE COURT:  Let's move on.

Q.   (MR. ELLISON CONTINUING)  Okay.  So on this day and for at
least some time before that, this road was already closed for
regular vehicular or individual travel to the north of the
location where we've seen on the video.  I think it was
Government's Exhibit 14?

51

1   **A.**   It was only closed because of the protest activities that

2   were occurring on that road and the illegal blockade of that

3   road.

4   MR. ELLISON:  Your Honor, I would ask, would you

10:21   5   please instruct the witness to answer the question and not add

6   gratuitous remarks afterward?

7   THE COURT:  The response calls for a yes or no.  Try

8   to answer it in a yes-or-no fashion, but --

9   THE WITNESS:  Sorry, Your Honor.

10:21   10  **Q.**   (MR. ELLISON CONTINUING)   How far north of the line that

11  we saw in Government's Exhibit 14 was the road block -- police

12  road block?

13  **A.**   It was at the junction of County Road 138A, I believe, or

14  County Road 138.  I remember there's two different 138s in

10:21   15  Morton County.  It was at that location, so it's 20 -- 20 or

16  more miles.

17  **Q.**   Okay.  When we saw the blockade that was -- the police

18  blockade that was just shown on Government's Exhibit 14, it's

19  true, is it not, that from that day, October 27th, and days

10:22   20  subsequent to that, that travel was restricted further and

21  further south, including -- by police, including the -- further

22  south of the area that we saw on --

23  MR. DELORME:  Objection, Your Honor, relevance.

24  THE COURT:  Overruled.

10:22   25  THE WITNESS:  Highway 1806 was closed at -- I believe

1    it was County Road 138A except for local traffic.  Local

2    traffic was allowed to head basically to the Fort Rice area,

3    but there was no traffic south of the Fort Rice area.

4    Q.   (MR. ELLISON CONTINUING)  And how far north of -- how far

10:22   5    north of where we saw Government's Exhibit 14 is Fort Rice?

6    A.   Three miles.  No, I take that back.  It was three miles

7    from where we initially started, so about four-and-a-half

8    maybe, maybe five miles, somewhere in there.

9    Q.   So the road had been blockaded by the police prior to,

10:23  10   during and after October 27th.

11   A.   Yes.

12   Q.   You mentioned, sir, that you were trying to drive -- when

13   I say "you," I meant law enforcement officials.  You were

14   trying to drive people back to an area that had been given by

10:23  15   the federal government to protest.  Do you recall those -- your

16   testimony, sir?

17   A.   Yes.

18   Q.   Okay.  And what area was that?

19   A.   It was the U.S. Army Corps of Engineers' property that was

10:23  20   east of Highway 1806, north of the Cannonball River.

21   Q.   And it was your understanding that there was a camp there,

22   is that correct?

23   A.   There was a camp established there.

24   Q.   And you understood that was a camp for protesters.

10:24  25   A.   It was a camp that protesters were present, and the

53

1   federal government was allowing them to be there.  They were

2   not saying that they could not be there.

3   Q.   Okay.  So you're saying that people's presence in the camp

4   was lawful at that point.

10:24   5   A.   At that point in time in that camp, yes.

6   Q.   Was there any order that was given, or is this just --

7   well, what -- what did you base that upon?

8   A.   From what I recall is that the federal government was

9   asked if these people could be there, and they were -- they

10:24   10   said that that -- they didn't have a permit to be there, but

11   they weren't going to remove them.  It was a free speech area

12   that they could be in.

13   Q.   And was there an order to that effect?

14   A.   I don't recall.

10:24   15   Q.   You will agree, sir, that on the activities that you've

16   been describing today, that you have testified occurred on

17   October 27th, that this was a protest.

18   A.   It was -- it was a -- there's several different aspects of

19   that day.  Part of it was protest, but there were other aspects

10:25   20   of it as well where it was a riot.  There was people criminally

21   trespassing on private property.  There was an illegal blockade

22   of the roadway, so there's many different aspects.  Were there

23   people out there that were protesting legally?  Most likely,

24   yes, but not everybody was doing that.

10:25   25   Q.   Okay.  Now, you, sir, not too long after these events put

54

1    a video out on the sheriff's -- sheriff of Morton County's

2    website describing what you say occurred on October 27th with

3    regard to Ms. Fallis?

4    A.   I have never published a video.

10:26    5    Q.   Did you make a video?

6    A.   I've never made a video.

7    Q.   Do you know how the sheriff's department got one?

8    A.   I remember doing a press conference.  I don't know of any

9    video I've ever made or put out there to the public.

10:26    10    Q.   Okay.  When you did the press conference, is it your

11    testimony that everything you said in that press conference is

12    the same as you have testified to today?

13    A.   I don't recall everything I said in that press conference,

14    so I can't answer that question.

10:26    15    Q.   But if you were telling the truth, it would be, would it

16    not, sir?

17    A.   Again, I -- I'm not able to watch that video, so until I

18    watch it, I can't explain to you what was said.  I don't recall

19    it.

10:26    20         MR. ELLISON:  Can I have a moment, Your Honor,

21    please?  May I approach the witness, Your Honor?

22         THE COURT:  You may.

23    Q.   (MR. ELLISON CONTINUING)  Sir, I'm going to hand you a

24    number of still shots from videos that the United States has a

10:27    25    copy of and which the Court will be seeing today.  Were you

55

1    present in the courtroom earlier when there was discussion

2    about body mikes?

3    **A.**    I was not.

4    **Q.**    Okay.  I will represent to you that these are still

10:27   5    photographs from these videos of officers, and I would ask

6    since you are the mobile field force incident commander, if you

7    could please help us, including the United States, to be -- to

8    be able to identify each of the officers who are depicted, and

9    if you could give the exhibit number that you are referring to

10:28   10    when you do either the identification or whatever you're able

11    to do.

12          THE COURT:  And these are part of the defendant's

13    exhibits that were received here in evidence already?

14          MR. ELLISON:  Yes, sir.

10:28   15          THE COURT:  All right.

16          THE WITNESS:  Can I get some clarification?  I don't

17    understand what --

18          MR. ELLISON:  I'm sorry.  I have to correct that,

19    Your Honor.  It's part of a group discovery -- exhibits for

10:28   20    discovery.

21          THE COURT:  So none of those are marked, so how is

22    he --

23          MR. ELLISON:  Well, they're marked now.

24          THE COURT:  Okay.

10:28   25    **Q.**    (MR. ELLISON CONTINUING)  All right.  Let's back up.

1   What's the first photograph that you have in front of you?

2   What is that marked?

3   A.   D-I-S-C-8, defense exhibit.

4   Q.   Okay.  And do you recognize the individual in that

10:28   5   photograph?

6   A.   I do not.

7   Q.   And do you recognize the agency that that individual is

8   from?

9   A.   I do not.

10:29   10   Q.   Who would?

11   A.   It's a sheriff's department employee for some sheriff's

12   department, so -- that's a sheriff's -- a sheriff's uniform.

13   Q.   Okay.  And you can't tell who?

14   A.   I can't tell from this photo, no.

10:29   15   Q.   All right, sir.  What about the next one?

16       THE COURT:  The next one is what number?

17       MR. ELLISON:  I believe the witness is going to -- is

18   just going to say.

19       MR. DELORME:  Your Honor, for the purposes of the

10:29   20   hearing, can we get counsel to use the Elmo so that we can all

21   see what picture he's on?  I can't follow exactly which one

22   he's getting on.

23       MR. ELLISON:  Sure.  Thank you, counsel.

24   Q.   (MR. ELLISON CONTINUING)  Okay.  This was the Discovery

10:30   25   Exhibit 8 that you have previously discussed, sir?

57

1   **A.**   Yes.

2   **Q.**   And during the -- it looks like a woman?

3   **A.**   Excuse me?

4   **Q.**   It looks like a woman?

10:30   5   **A.**   I can't hear your question.

6   **Q.**   It looks like a woman?

7   **A.**   A woman?

8   **Q.**   Yes, with the camera.

9   **A.**   I don't -- I don't know.

10:30   10   **Q.**   You -- you did not see this woman at the time of Ms.

11   Fallis's arrest standing over the immediate scene of her being

12   arrested on the ground when ostensibly the struggle took place?

13   **A.**   I don't know who this is.  I don't even know if it's a

14   woman.

10:30   15   **Q.**   Okay.  What about this individual?  This is Discovery 1.

16   Do you recognize that individual, sir?

17   **A.**   It appears to be a North Dakota state trooper.

18   **Q.**   And that's what you are, is that not?

19   **A.**   It is.

10:31   20   **Q.**   And who is this individual?

21   **A.**   I can make a guess, but I don't want to guess if it's not

22   that person, so I can't definitively say it's somebody.

23   **Q.**   Is it someone under your immediate command that day?

24   **A.**   Again, I'm not sure exactly who it is, so I can't say if

10:31   25   they're underneath my command that day.

1   Q.    This was taken from a video that day.  Wouldn't they be

2   under your command?

3   A.    Again, there was individuals that began the day with us

4   that were under my command.  And then there was officers that

10:31   5   responded after the fact, and I don't know what exactly all

6   their assignments were.  So this individual officer has a

7   helmet on and has a baton.  It would appear that he's a part of

8   the mobile field force.  I don't know exactly where this

9   photograph was taken, and I don't know exactly who it is.

10:32   10   Q.    Okay.  If, again, so that we're clear, these are still

11   photographs made from video that will be in evidence today

12   before this Court of the events taking place on October 27th

13   around 6:00 p.m., would that person be under your command?

14   A.    If they are part of the mobile field force, yes, but I

10:32   15   can't identify from this picture who that is.

16   Q.    Okay.  What about Defendant's Discovery 2?  What agency is

17   that gentleman from?

18   A.    The North Dakota State Patrol.

19   Q.    And who is that, sir?

10:32   20   A.    I recognize the face.  I'm just trying to place a name

21   with it.  There are over a hundred of us in the agency, and I'm

22   just drawing a blank on the name just for a second here, so

23   give me -- give me a second.

24   Q.    Whatever time you need, sir.

10:33   25   A.    I'm drawing a blank.  I know the face.  He's a state

1    trooper for us.  I just -- I can't think of the name right now.

2    **Q.**   For any officers that you are not able to identify, would

3    you be willing to get a copy of these photographs from the

4    United States and obtain their identification and provide that

10:33  5    to the United States?

6    **A.**   Yeah, if they provide me the pictures, I can -- this one

7    at least I could identify.

8    **Q.**   Okay.  Discovery Exhibit 3, who is this gentleman?

9    **A.**   That appears to be Sergeant Darcy Aberle with the North

10:34  10   Dakota State Patrol.

11   **Q.**   When a person gets a body cam to wear, whose

12   responsibility is it to make sure that it's working?

13   **A.**   It was their responsibility to make sure it was working

14   that day --

10:34  15   **Q.**   The individual officer?

16   **A.**   -- when it was issued to them.

17   **Q.**   Okay.

18   **A.**   It was issued with batteries.  GoPro, it was issued with a

19   harness to wear across their chest, and they all had like a

10:34  20   memory card in them because from what I understand, GoPros

21   don't have like an internal memory in them.

22   **Q.**   And the purpose of these GoPros is what?

23   **A.**   It was to record activities that were occurring on

24   whatever day that they were being worn.

10:34  25   **Q.**   So if there's any question about whether something

1    occurred or not, there would be video and perhaps audio

2    evidence of exactly what was occurring as depicted within the

3    video.

4    **A.**   As long as the video is recording and there's not

10:35    5    something that interrupts that, dead battery or something else.

6    **Q.**   And officers can turn that -- these cameras on and off,

7    can they not?

8    **A.**   They do have on and off or like a record or -- you know,

9    record button.

10:35    10   **Q.**   And what are -- what were the instructions that day to

11   officers in terms of who was wearing a body cam both in terms

12   of making sure their batteries were working and making sure

13   that they -- their equipment was continually working?

14   **A.**   Their instructions were to place fresh batteries in the

10:35    15   GoPro prior to deployment, and once they were deployed along

16   the lines, to turn those on.  Obviously if they were sitting on

17   a bus or sitting in a recuperation area, it didn't necessarily

18   need to be on at that point in time.

19            MR. DELORME:  Your Honor, I'm going to object to this

10:35    20   line of questioning right now, because, I mean, right now we're

21   really talking about discovery.  You've already made -- you

22   issued your order on discovery and you've had us respond.  We

23   will respond next week.  We're not even remotely close to him

24   testifying about what we're here to talk about today, which was

10:36    25   the arrest of Redfawn Fallis and statements she made

61

1    thereafter.  So, Your Honor, I object and ask that the Court

2    direct counsel to narrow the focus to what the issue is of the

3    day.

4                MR. ELLISON:  Since these were witnesses, Your Honor,

10:36    5    of that day and since these witnesses seem to have a recording

6    device to record statements of those around -- events going on

7    around them -- this is all from the timeframe that we are

8    talking about regarding the arrest of Ms. Fallis.  It is

9    certainly relevant.  There will be --

10:36    10                THE COURT:  I'm going to overrule the objection.

11                MR. ELLISON:  All right.  Thank you, sir.

12                THE COURT:  But, you know, we need to --

13                MR. ELLISON:  But I will move on.

14                THE COURT:  -- move along because we have the day

10:36    15    committed, and we're not moving at a -- better than a snail's

16    pace right now.

17                MR. ELLISON:  No, I understand.  I will try and move

18    as quickly as I can.  This witness, I will say, Your Honor,

19    will take a fair amount of time with regard to cross.

10:37    20                One other point I would just like to briefly make,

21    based upon counsel's representation the only matter that is

22    relevant are the circumstances around Redfawn Fallis's arrest,

23    I renew my objection and move to strike all testimony prior to

24    Ms. Fallis arriving on the scene and the circumstances under

10:37    25    her arrest.

62

1          THE COURT:  Overruled.

2    Q.   (MR. ELLISON CONTINUING)  Okay.  Showing you what's been

3    marked as Discovery 4, these are officers from what

4    jurisdiction, sir?

10:37   5    A.   Excuse me.  You're --

6    Q.   Oh, I'm sorry.  Did I cut out?

7    A.   Yeah, I didn't quite hear it.

8    Q.   Sure.  On Discovery Exhibit 4 that's in front of you,

9    could you please identify the agencies that these officers are

10:37   10   from?

11   A.   I don't know.

12   Q.   Okay.  None of them state troopers?

13   A.   They don't appear to be, no.

14   Q.   Okay.  If someone was part of a mobile field force, that

10:38   15   was more than state troopers, was it not?

16   A.   It was multiple different agencies.

17   Q.   It included county sheriffs?

18   A.   It included police department personnel, sheriff's

19   deputies and state -- state law enforcement.

10:38   20   Q.   Okay.  Discovery Exhibit 5, can you identify this

21   gentleman, sir?

22   A.   No.

23   Q.   Do you know what agency he's from?

24   A.   I don't.

10:38   25   Q.   Discovery Exhibit 6, the gentleman that I'm pointing at

63

1   with my finger, do you know who that is, sir?

2   A.   I do not.

3   Q.   Discovery Exhibit 7, could you identify the officer with

4   this camera?

10:39   5   A.   The one with the yellow taser?

6   Q.   Yes, sir.

7   A.   No, I cannot.

8   Q.   Is he a state trooper?  Here, I'll put it back.  I don't

9   want to --

10:39   10   A.   His clothing doesn't appear to be, no.

11   Q.   Okay.  Discovery Exhibit 8?  Excuse me.  This individual

12   right here (indicating), who in another picture shows has a

13   camera, do you know who that is?

14   A.   I do not.

10:39   15   Q.   All right.  What about on Discovery 9?  What about this

16   gentleman (indicating)?

17   A.   The gentleman with the glasses?

18   Q.   Yes, sir.

19   A.   That's Charles Kelly.  He's a state trooper in North

10:40   20   Dakota.

21        THE COURT:  And that's Exhibit 10 rather than 9.

22        MR. ELLISON:  I'm sorry?

23        THE COURT:  That's Exhibit 10 in the packet of

24   information that I have, identified as Defendant's Exhibit Disk

10:40   25   10.

64

1          MR. ELLISON:  Well, apparently -- thank you, Your

2     Honor, for pointing that out on the record.  The next one may

3     be Disk 11, and if it is, if the Court could please let me

4     know.

10:40   5     Q.   (MR. ELLISON CONTINUING)  This gentleman, do you know --

6     A.   It's a state trooper, but with the glare I can't tell who

7     it is.

8     Q.   Okay.  Discovery 11 on my sheet, but it may be 12 on the

9     Court's, who is this gentleman?

10:40  10     A.   The one on the left?

11     Q.   Yes, sir.

12     A.   That's Joe Gress with the Cass County Sheriff's Office.

13     Q.   Okay.  Thank you.  This is a picture of the Humvee that

14     was right by the line when this incident occurred.  Whose

10:41  15     vehicle is that, sir?  Do you know?  Is that National Guard?

16     A.   It's a military vehicle.  I don't know which branch of the

17     military it belongs to.

18     Q.   It does look like a camera, does it not?

19     A.   It does not.

10:41  20     Q.   It does not look like a camera?

21     A.   It does not.

22     Q.   What does it look like to you, sir?

23     A.   It looks like a spotlight.

24     Q.   Okay.  And what about the BearCat?

10:41  25     A.   That looks like a thermal imaging unit.

65

1   Q.   What about this right here (indicating)?  It looks like a

2   camera, does it not?

3   A.   Potentially.

4   Q.   And is this Lieutenant Ternes (indicating)?

10:41   5   A.   Lieutenant Glen Ternes was in the front passenger's seat

6   of the BearCat.

7   Q.   Do you know who that officer was (indicating)?

8   A.   I don't.

9   Q.   If a camera is placed on a -- and this was, again, right

10:42   10   where any issues of probable cause for Ms. Fallis would have

11   been occurring, right in front of this vehicle, would it not,

12   sir?

13   A.   I mean, you've identified these still photos are from that

14   timeframe.

10:42   15   Q.   Yes, sir.

16   A.   I didn't see the skirmish that happened out in front of

17   the lines.  I just saw the skirmish behind the lines, so I

18   don't know if that camera would have caught what was going on.

19   Q.   Who was in charge of collecting all of the camera

10:42   20   information once the day was over?

21   A.   All the camera information was sent to the tactical

22   operations center.  I don't recall who exactly was the one that

23   processed it all.

24   Q.   Would there be a record of that, sir?

10:42   25   A.   I don't know.

1    Q.    Who would know?

2    A.    Somebody that was at the tactical operations center.

3    Q.    Okay.  You mentioned, sir, in your earlier testimony,

4    which we objected to --

10:43    5         MR. ELLISON:  And by my questions I do not waive our

6    objections, Your Honor, but just something to allow for

7    cross-examination.  I will proceed.

8    Q.    (MR. ELLISON CONTINUING)  You mentioned, sir, that there

9    were fires prior to the incident involving the arrest of Ms.

10:43    10   Fallis?

11   A.    Yes.

12   Q.    Do you know what time those fires were?

13   A.    The fires were initially started right as law enforcement

14   began to set up our initial skirmish line near Mile Marker 37.

10:43    15   It was at the first blockade that there were fires set.

16   Q.    Was that in the area of Ms. Fallis's arrest?

17   A.    No.

18   Q.    Was she present?

19   A.    I don't know.

10:43    20   Q.    Do you have any evidence she was present?

21   A.    I don't have any evidence.

22   Q.    You mentioned, sir, that logs were thrown at officers.

23   Could you please tell us approximately when that was?

24   A.    I recall a lock (sic) coming across the -- through the

10:44    25   crowd when we were near the approach at Access Point 128.  I

67

1    don't know how long that was into the day, but as we got to

2    that north approach to where the camp was set up to the east of

3    Highway 1806.

4    **Q.**   How far was that from where Ms. Fallis was arrested?

10:44    5    **A.**   Three-quarters of a mile, a mile.

6    **Q.**   Any evidence she was there?

7    **A.**   I don't have any evidence.

8    **Q.**   You mentioned that there was feces that were thrown that

9    you ended up getting the blunt end of?  Do you -- where was

10:44    10    that, sir?

11    **A.**   That was just south of the north approach.

12    **Q.**   Okay.  Again, any evidence Ms. Fallis was there?

13    **A.**   I don't know.

14    **Q.**   And how long before her arrest was that, approximately?

10:45    15    **A.**   Her arrest was around that 6 o'clock timeframe, and I

16    don't recall exactly when that happened, but it would -- a few

17    hours maybe.

18    **Q.**   Okay.  Any of the items that you described as being

19    thrown, do you have any evidence that Ms. Fallis was present or

10:45    20    in any way involved in that?

21    **A.**   I don't have any evidence.

22    THE COURT:  Mr. Ellison, I'm going to have to give my

23    court reporter a break here.

24    MR. ELLISON:  That'd fine, Your Honor.  We're -- we

10:45    25    will attempt to move on as quickly as we can when we get back.

68

1          THE COURT:  So we're going to recess for

2    approximately 15 minutes, no more than that.  We'll reconvene

3    around 11 o'clock.

4          (A recess was taken from 10:45 a.m. to 11:01 a.m.,

11:01    5    the same day.)

6          THE COURT:  We are back on the record.  And, Mr.

7    Ellison, you may continue.

8          MR. ELLISON:  Thank you, Your Honor.

9    Q.    (MR. ELLISON CONTINUING)  Captain, you mentioned to the

11:01   10    Court with regard to Government's Exhibit 16, a series of

11    statutes that I believe -- they were what?  They were part of

12    the briefing that officers received?

13    A.    These were all North Dakota Century Codes that would apply

14    to some of the violations that were occurring on October 27th

11:02   15    and it was a part of the briefings that were -- had taken

16    place.

17    Q.    That included the officers who were present on October

18    27th?

19    A.    Yes.

11:02   20    Q.    And do you know when it occurred for them?

21    A.    There was a briefing when they -- when the out-of-state

22    officers arrived, there was a brief for them held in Bismarck.

23    There was a briefing held on Wednesday.  There was a briefing

24    held on Tuesday, and there was a briefing held on Thursday.

11:02   25    Q.    Of that --

69

1   **A.**   So Tuesday, Wednesday and Thursday.

2   **Q.**   Of that same week?

3   **A.**   That same week, correct.

4   **Q.**   Thank you.  You mentioned, sir, that officers were

11:02   5   instructed about arresting people who were either committing

6   crime or who were agitators.  Do you remember your testimony to

7   that effect?

8   **A.**   Yes.

9   **Q.**   Could you show me where on Government's Exhibit 16 it is a

11:02   10   crime to be an agitator?

11   **A.**   It's in the riot section of law.

12   **Q.**   Okay.  And a riot is defined as a public disturbance

13   involving five or more persons which by tumultuous and violent

14   conduct creates a grave danger.  You mentioned, did you not,

11:03   15   sir, that there had been a lull prior to Ms. Fallis being

16   seized?

17   **A.**   There had been a lull prior to Ms. Fallis being arrested,

18   yes.

19   **Q.**   And, in fact, in the video that was played by the United

11:03   20   States --

21          MR. ELLISON:  I can't remember the number, counsel.

22   Do you?

23          MR. HAGLER:  Fourteen.

24          MR. ELLISON:  Fourteen.  Thank you.

11:03   25   **Q.**   (MR. ELLISON CONTINUING)  Government's Exhibit 14, you saw

1    that four-wheeler that came up after the white car came up.  Do

2    you recall that, sir?

3    **A.**    Yes.

4    **Q.**    And do you understand that Ms. Fallis was on that vehicle?

11:03    5    **A.**    I don't know if she was or not.

6    **Q.**    If we assume for purposes of these proceedings that she

7    was, when she came up there, what violent and tumultuous

8    conduct was going on?

9    **A.**    I don't know when she arrived.

11:04    10    **Q.**    If we assume that she was on that four-wheeler, what

11    tumultuous and violent behavior or conduct was going on?

12    **A.**    When there was a lull during our activities out there,

13    there wasn't a lot of verbal back and forth or any physical

14    resistance that was going on.

11:04    15    **Q.**    There was not, did you say?

16    **A.**    There was not at that point in time, when there was a

17    lull.  And then as we reestablished our skirmish line, the

18    crowd that was out there became agitated again, and there was

19    some confrontations on the roadway, and there was individuals

11:04    20    in the crowd there that were trying to incite a riot again,

21    what we thought was a riot again because we had experienced

22    riot conditions that day.

23    **Q.**    And who were those individuals?

24    **A.**    Which individuals?

11:05    25    **Q.**    The ones that you just said were trying to incite a riot.

1   **A.**   I didn't observe them, but one of them was Redfawn Fallis,

2   and that's why she was pulled through the lines.

3   **Q.**   And she wasn't -- she was -- how was she -- was she

4   inciting violent conduct?

11:05   5   **A.**   You'll need to ask the officer that effected her arrest.

6   **Q.**   Weren't you right in front of the armored vehicles

7   immediately prior to her being seized?

8   **A.**   I was somewhere in the vicinity of those vehicles.  I

9   don't know exactly where.  When she was pulled through the

11:05   10   line, I remember that I was standing in the east ditch.  I

11   wasn't at the front of the group.

12          MR. ELLISON:  I can do this later, but we'll do it

13   now.  Your Honor, I'm going to show the witness a brief portion

14   of what is marked as Defendant's Exhibit A, and it is --

11:06   15          THE COURT:  A bystander video.

16          MR. ELLISON:   -- bystander video at 2:37.

17   **Q.**   (MR. ELLISON CONTINUING)  Okay.  Who's that gentleman with

18   the captain's bars?

19   **A.**   I'm in the upper left-hand corner of that video.

11:06   20   **Q.**   Okay.  And this is like within how much time before -- if

21   you recall, before Ms. Fallis was seized?

22   **A.**   I don't recall.  I don't know where this exactly is at.

23   **Q.**   Okay.  You don't know -- what do you mean, you don't know

24   where that's at?

11:06   25   **A.**   I have no idea the location on the roadway or where we are

1    when this video was taken.

2    **Q.**   Okay.  If you would assume, because the Court is going to

3    see the whole video, that this is within moments before her

4    arrest, you were not in the east ditch, were you not, sir?

11:07   5    **A.**   I was in the vicinity of that area, and when there was a

6    skirmish going on in the east ditch, I walked down to her --

7    **Q.**   Okay.

8    **A.**   -- where she was.

9    **Q.**   So you walked down to that area after she had already been

11:07   10   seized.

11   **A.**   I saw a skirmish in our -- like we call it a skirmish

12   line, so when I use "skirmish" here a couple times, it's a

13   little confusing.  I understand that, but there -- we had a

14   line set up, and there was an individual that was pulled

11:07   15   through that line, which was Ms. Fallis.  And I observed that

16   there was a commotion going on down in the ditch.

17           At this location here, it would be to the right on

18   the screen is the ditch.  This -- you can see the BearCat in

19   the background, which is in the southbound lanes.  The MRAP is

11:07   20   in the northbound lanes.  Again, I don't know exactly where

21   this video was taken or what -- the location or the time, but

22   it would have been off to our -- to the right on the screen,

23   off to my left.

24   **Q.**   Well --

11:07   25   **A.**   And where I'm at here, I would not be able to see a

73

1   skirmish down there, so I saw a skirmish, a commotion going on

2   in the ditch, and I walked down there.

3   Q.   And so if this video continues on and there -- we should

4   hopefully be able to see you walking down towards the ditch?

11:08   5   A.   I was -- I walked down in the ditch.

6   Q.   Okay.  You mentioned, sir, also about -- again, going back

7   for a moment about the laws and the arrests that were made that

8   day, would you agree -- I think you said about 140 arrests?  Is

9   that what you said?

11:08   10   A.   From what I recall, it was approximately 140.

11   Q.   Okay.  And you're aware that of those, already 126 have

12   been either dismissed or there have been acquittals?

13   A.   I'm not aware of that.

14   Q.   And Ms. Fallis no longer faces any state charges.  They

11:08   15   were dismissed too, were they not?

16   A.   I don't know.

17   Q.   Now, you mentioned, sir, that -- you talked about logs and

18   other things that were being thrown at an earlier time at

19   officers.  In your report you cover, do you not, a series of

11:09   20   what you called less lethal munitions that were deployed that

21   day?

22   A.   Can I review my report?

23   Q.   Sure, page 2 of 4.

24   A.   It's on page 3 of my version here.

11:09   25   Q.   Okay.  Tasers?

74

1   **A.**   A taser was utilized.

2   **Q.**   Twelve-gauge beanbag rounds?

3   **A.**   Yes.

4   **Q.**   What are in those beanbags?

11:09   5   **A.**   I'm not sure what makes up the beanbag.  There's -- it's a

6   cloth bag that has a tail -- a stabilized tail on the end of

7   it, and I'm not sure exactly what's actually in that cloth.

8   **Q.**   You mean you're not aware of the -- what is in munitions

9   that your officers are using against protesters?

11:10   10   **A.**   I don't have the specific beanbag round spec sheet in

11   front of me, so I can't explain to you exactly what is inside

12   of the beanbag round.

13   **Q.**   Rubber bullets?

14   **A.**   I don't see in my report here rubber bullets.

11:10   15   **Q.**   I know, but they were -- had already been used, had they

16   not?

17   **A.**   I don't know if rubber bullets were used.  We had sponge

18   rounds that were utilized.

19   **Q.**   Wasn't there a 14-year-old shot off a horse a short

11:10   20   time --

21        MR. DELORME:  Objection, Your Honor, relevance.

22        THE COURT:  Overruled.

23   **Q.**   (MR. ELLISON CONTINUING)  A 14-year-old who was shot off a

24   horse with rubber bullets?

11:10   25   **A.**   I don't know if a 14-year-old was shot off a horse with

75

1    rubber bullets, no.

2    **Q.**   Isn't that the -- what the woman in the white car came up

3    to yell at officers about?

4    **A.**   I don't know.

11:11   5    **Q.**   You didn't witness any of that when you were up by -- as

6    shown in Government's Exhibit A, when you were up by --

7    **A.**   Is this Government's Exhibit A here (indicating)?

8    **Q.**   Yes, sir.  Yeah, I'm not trying to trick you with that.

9              MR. HAGLER:  It's Defendant's Exhibit A for --

11:11   10             MR. ELLISON:  Oh, I'm sorry.

11             MR. HAGLER:  -- purposes of the record.

12             MR. ELLISON:  I'm just confused.  It's Defendant's

13   Exhibit A.  Thank you.

14             THE WITNESS:  So what -- what's the question about

11:11   15   Defendant's --

16   **Q.**   (MR. ELLISON CONTINUING)  So you're -- where you're at,

17   were you witnessing anything that was going on, what would have

18   been to your right, with a woman who came out of the white car?

19   **A.**   I don't recall.

11:11   20   **Q.**   Now, specifically it was not only agitators, it was also

21   leaders that were targeted for arrest, isn't that right?

22   **A.**   I'm not sure what you mean by "leaders."

23   **Q.**   Well, it's in your report from October 22nd, so -- of

24   events, and so you tell me what leaders are.

11:12   25   **A.**   My report from October 22nd?

76

1    **Q.**   Yes, sir.  It says protest leaders and agitators were

2    targeted for arrest.

3    **A.**   I don't have a report from October 22nd here.

4    **Q.**   All right.  Assuming you used those words -- I'll show it

5    to you if you want.  You are Badge Number 294?

6    **A.**   I am.

7              MR. ELLISON:  May I approach the witness, Your Honor?

8              THE COURT:  You may.

9    **Q.**   (MR. ELLISON CONTINUING)  Look on page 2, please.  I'm

10   sorry, the next page.

11   **A.**   So page 3?

12   **Q.**   Yes, sir.

13   **A.**   What's your question?

14   **Q.**   My question is, you wrote in there, did you not, that

15   protest leaders and agitators were targeted for arrest?

16   **A.**   That is in this report, yes.

17   **Q.**   And it is your report.

18   **A.**   This is my report, correct.

19   **Q.**   All right.  Thank you, sir.  What did you mean by "protest

20   leaders"?

21   **A.**   Individuals that were basically the ones that were causing

22   the issues for us out there, whether it's a riot condition or

23   the ones that are leading the people to commit criminal

24   violations.

25   **Q.**   How's that different from an agitator?

1   **A.**   It's the same thing.

2   **Q.**   But you used two different words because you said "protest

3   leaders and agitators," not who were agitators.

4   **A.**   It's a word that we utilize.   It means the same thing when

11:13   5   we're talking about a protest event that turns into, let's say,

6   a riot or an unlawful protest.

7   **Q.**   Okay.   And you already agreed that at the time Ms. Fallis

8   arrived on that four-wheeler, everything was nice and peaceful

9   and calm at that point.

11:14   10   **A.**   Prior to her arrival, yes.

11   **Q.**   Do you know who ordered Ms. Fallis's arrest?

12   **A.**   I don't.   I don't think there was an order for somebody to

13   arrest her.   I wasn't the one that ordered it.   I don't know

14   who ordered -- if there was an order for somebody to arrest

11:14   15   her.

16   **Q.**   Now, when you saw Government's Exhibit 14, the aerial

17   video --

18   **A.**   Yes.

19   **Q.**   -- if the Court looks at that entire video from the time

11:14   20   that four-wheeler moves up until the time Ms. Fallis is seized,

21   is it your testimony that officers were trying to move forward

22   down that road?

23   **A.**   We were beginning the process of moving forward.

24   **Q.**   Were you actually moving forward?

11:15   25   **A.**   I don't know if we were actually taking any -- taking any

1    ground, but that's what our goal was, was to start moving

2    forward.

3    Q.   Okay.  But there is a difference at least in terms of

4    moving forward or getting ready to move forward, correct?

11:15    5    A.   We had moved all of our people forward to establish a line

6    again and with the process of starting to move forward, but

7    people can get in your way where you can't move.  And our goal

8    is not to have two different sides of the line moving at

9    different timeframes, so if one side of the line is meeting

11:15    10    resistance, the other side will not move until we can all move

11    together.

12    Q.   You described in your testimony on direct, sir, did you

13    not, that Lieutenant -- I want to get his name right --

14    Ternes --

11:15    15    A.   Lieutenant Ternes.

16    Q.   Ternes.  Lieutenant Ternes was giving commands for people

17    to move south over a loudspeaker.

18    A.   He was doing it over a loudspeaker.

19    Q.   And that officers were giving commands verbally.  Front

11:16    20    line officers were telling people to move south.

21    A.   Yes.

22    Q.   Okay.  Is it your testimony that from the time that

23    four-wheeler came up through the time of Ms. Seizure -- Ms.

24    Fallis's seizure, were there any such loudspeaker announcements

11:16    25    by the lieutenant?

79

1   **A.**   I don't know.

2   **Q.**   Okay.  And if the video doesn't -- any of the videos --

3   and, in fact, if there are no videos which cover those events

4   which show such a loudspeaker, you would agree that such a

11:16   5   command was not given through a loudspeaker at that time?

6   **A.**   I don't recall, and I haven't seen a video of that

7   timeframe, so --

8   **Q.**   And similarly, if the videos the Court is going to see

9   show no officers -- or we hear no officers even though the

11:16   10   video such as this one, Government's Exhibit A close to the

11   line, that no officers are saying, "Move back, move south" --

12   the videos would speak for themselves that if that was given at

13   another time, it wasn't at this time, prior to Ms. Fallis's

14   arrest.

11:17   15   **A.**   Again, I don't -- I don't recall.

16   **Q.**   When -- at the briefings that officers were given as to

17   what you would expect as their commander as well as -- well,

18   any of the officers that were out there, is it generally a

19   practice and were people advised that officers to approach

11:17   20   behind a person they want to arrest and -- rather than walking

21   up to them and -- to arrest them in an obvious way?

22   **A.**   It was -- we just utilize our training and our experience

23   when we arrest people, so I guess a specific description on how

24   we wanted people arrested was not covered.  We -- we effect the

11:18   25   arrest in the most safe way possible for the law enforcement

80

1   officer and also for the suspect.  And in certain circumstances

2   the safety of the law enforcement officers is more paramount at

3   some times, so I -- you know, at times people get arrested from

4   behind.  At times people get arrested from the front, so it's

11:18   5   -- there's no set-in-stone way that somebody gets arrested.

6   Q.   Did you see Ms. Fallis get arrested from behind?

7   A.   I did not observe her getting arrested.  I saw the

8   commotion after she had been pulled through the line.

9   Q.   Did you hear any of the officers telling her, "Stop,

11:18   10   you're under arrest"?

11   A.   I don't recall that, no.

12   Q.   Or any similar type of command to her prior to being

13   grabbed and thrown to the ground?

14   A.   I wasn't a part of her arrest, so I don't know.

11:19   15   Q.   Going back for just one brief question, is it a crime to

16   yell at police officers during a protest?

17   A.   No.

18   Q.   Is it a crime to curse during a protest?

19   A.   No.

11:19   20   Q.   Is it a crime to point your finger at an officer during a

21   protest?

22   A.   No.

23   Q.   In fact, some of the statutes you talked about -- at least

24   the disorderly conduct there's a specific exemption for

11:19   25   exercise of rights, is there not?

81

1    A.    I believe there is under disorderly conduct, I think you

2    said.

3    Q.    Okay.  You hear the commotion or see the commotion, and

4    you move over to that area, is that correct, sir?  And I'm

11:20    5    talking, just so we're clear, the commotion involving Ms.

6    Fallis.

7    A.    When I saw the commotion occurring behind our line, yes, I

8    moved to that area.

9    Q.    And how far away were you, sir, when the -- you heard the

11:20    10    first two shots?

11    A.    I was feet, you know, two to eight, ten feet, somewhere in

12    there.  I was in that proximity.  That would have been to --

13    like where she was down on the ground, to her west, walking

14    towards the east.

11:20    15    Q.    And at the time that you heard the first two shots, how

16    many officers did you say were on top of or around Ms. Fallis?

17    A.    I recall -- I don't recall exactly how many people were on

18    top of her at that point in time, but I recall there was at

19    least approximately four people that were trying to control her

11:21    20    after the gun -- the gunfire.

21    Q.    And if in your report you talk about several people

22    attempting to control a female prior to the shots, does that

23    refresh your recollection at all?

24    A.    It says in my report that, observed several officers

11:21    25    attempting to control an individual that was laying on her

82

1    stomach on the ground.

2    Q.    Okay.  So the person you later learned was Ms. Fallis is

3    lying on her stomach on the ground, and there were several

4    officers trying to control her, according to your words?

11:22    5    A.    That's what it says in my report, and that's what

6    occurred, yes.

7    Q.    And nearly all were on her upper body?

8    A.    Yes, her legs were -- the majority of her legs were

9    exposed.  I remember seeing her light-colored jeans.

11:22    10   Q.    And this is prior to the shots.

11   A.    I saw the commotion.  I started heading that way.  I saw

12   people were trying to control her, and then the shots rang out.

13   And when I say "people," I mean law enforcement officers.

14   Q.    Sure.  Thank you.  I'm going to hand you what for

11:22    15   illustrative purposes is marked as Niewind Exhibit 1.  There's

16   a pen over there.  I hope it works.  I guess that's not a pen.

17   A.    I have a pen.

18   Q.    Oh, you do.  Thank you, Captain.  Would you please draw on

19   that diagram, prior to the shots, where -- maybe put a circle

11:23    20   where each of the several officers who were all near her upper

21   body were positioned on top of her.

22   A.    So if she -- she's laying facedown here?

23   Q.    Yes, sir, that's a back.

24   A.    Okay.  I don't recall how many officers were on top of her

11:23    25   when I was initially walking down there, so -- but they were

83

1   generally up in her upper body area.

2   **Q.**   If I were to say to you that one officer was pinning her

3   head and neck to the ground, and upper back, would that be an

4   accurate description?

11:24   5   **A.**   I wasn't a part of that.  I don't -- I don't know exactly

6   what was all occurring.

7   **Q.**   Okay.  In other words, you're saying you couldn't really

8   see?

9   **A.**   There was several officers there.  It was hard to see.  I

11:24   10   just recall seeing her light-colored jeans, her pants, that her

11   legs were not covered with officers.

12   **Q.**   Would it be fair to say that your officers weighed about,

13   with gear, equipment at least, about 200 pounds each?

14   **A.**   I don't know exactly who was there, so, I mean, it depends

11:24   15   upon the officer, how much they weigh.

16   **Q.**   Did you recognize any of the officers on top of Ms.

17   Fallis?

18   **A.**   I can't recall that I recognize somebody specifically.

19   **Q.**   Were any of them state troopers?

11:24   20   **A.**   Yes.

21   **Q.**   Is it that you don't remember now, or what -- I just want

22   the record to --

23   **A.**   I just don't recall when I was walking down there,

24   recognizing and processing who these -- exactly who these

11:25   25   officers were.  I recognize that there were state trooper

84

1    uniforms that there were, but again, there was a lot of law

2    enforcement officers out there that day.  I don't exactly

3    recall who was all trying to control her.

4    Q.   So just for the record, you have drawn circles on

11:25   5    Defendant's Exhibit -- Niewind Exhibit 1 where you observed --

6    where you believe the officers were positioned as you walked up

7    prior to the shot.

8    A.   I have three circles on here.  It doesn't necessarily

9    depict there's three officers, but that's the general locations

11:25   10   where I recall officers being.

11   Q.   Okay.  And if you could please add to that diagram and put

12   your initials where you were when you testified that the third

13   shot occurred.

14   A.   It'd be off the paper here because there's no room on the

11:25   15   bottom.

16   Q.   Oh, okay.  You weren't by her feet?

17   A.   I was by her feet, but I was a couple feet away, so this

18   -- her feet are right on the bottom of this piece of paper.

19   Q.   Okay.  Now, you describe for us that she was wearing a

11:26   20   sweatshirt, is that right, sir?

21   A.   Yes.

22   Q.   And I believe it was your testimony about a holster in

23   that sweatshirt?

24   A.   A nylon holster.

11:26   25   Q.   And where did you -- where was your testimony that this

85

1   nylon holster came from?

2   A.   It was removed from a left front pocket.

3   Q.   And this was a hooded sweatshirt, was it not?

4   A.   From what I recall, it was a dark-colored sweatshirt.  I'm

11:26   5   pretty -- if I could look at my report just real quick.

6   Q.   Sure.  I have it as page 3 of 4, but I was wrong a page

7   before, so by all means.

8   A.   Dark blue or black hooded sweatshirt I have in my report.

9        MR. ELLISON:  Okay.  I'm going to -- may I approach

11:27   10   the witness, Your Honor?

11        THE COURT:  You need not ask.

12        MR. ELLISON:  I'm sorry, sir?

13        THE COURT:  You need not ask for --

14        MR. ELLISON:  Oh, okay.

11:27   15        THE COURT:  -- purposes of this hearing.

16        MR. ELLISON:  I'm just trying to be appropriate.

17        THE COURT:  Thank you.

18        MR. ELLISON:  Thank you, sir.

19   Q.   (MR. ELLISON CONTINUING)  I'm going to hand you Niewind

11:27   20   Exhibits 2, 3 and 4.  Do you recognize what's depicted there,

21   sir?

22   A.   These are pictures of three jackets -- or one jacket three

23   times.

24   Q.   Opened, closed, back, front?

11:28   25   A.   Correct.

1  **Q.**   Okay.  Is that the clothing that you -- the jacket -- the

2  sweatshirt that you saw Ms. Fallis wearing that day?

3  **A.**   I don't -- I don't know.

4  **Q.**   There's no hood on there, is there?

11:28  5  **A.**   I don't see a hood on it, no.

6       MR. ELLISON:  Your Honor, I would move for the

7  admission of Niewind Exhibit 1 for substantive purposes, and at

8  this point exhibits -- Niewind Exhibits 2, 3 and 4 for

9  illustrative purposes.

11:28  10       MR. DELORME:  No objection, Your Honor.

11       THE COURT:  Niewind Exhibits 2, 3 and 4 will be

12  received -- or 1, 2, 3 and 4, I guess.

13       MR. ELLISON:  One, two, three and four, yes, sir.

14  **Q.**   (MR. ELLISON CONTINUING)  What was Ms. Fallis -- was she

11:29  15  wearing anything on her face when you first saw her?

16  **A.**   She was wearing a bandana.

17  **Q.**   Okay.  What color was it?

18  **A.**   I don't recall.  My report says a bandana or other item,

19  so something like a bandana.

11:29  20  **Q.**   Okay.  When the shots were first fired, you were not sure

21  who fired those shots, were you?

22  **A.**   When I heard the first two shots, I was not -- it wasn't

23  clear exactly where -- who they came from.  You could tell the

24  general area, but not exactly who they came from.

11:29  25  **Q.**   Now, I think earlier in your testimony -- your direct

1    testimony, referring to Government's Exhibit 14, the aerial

2    photograph, you mentioned -- you described how officers went

3    behind the armored vehicles because there was a report of shots

4    fired to the south?

11:30    5    A.    Yes.

6    Q.    Okay.  Now, you later learned that there were no shots

7    fired, isn't that correct, sir?

8    A.    Correct.

9    Q.    But that was an area -- I think you described a person

11:30    10    with a rifle, did you say?

11    A.    Yes.

12    Q.    And that was a DAPL security officer, was it not?

13    A.    I don't know.

14    Q.    That's not important for you to know or to learn?

11:30    15    A.    It's not something that I investigated.

16    Q.    Were you aware that there were people dressed like water

17    protectors who were DAPL security who were armed that day?

18         MR. DELORME:  Objection, Your Honor, again,

19    relevance.  We're getting far astray of what the subject matter

11:31    20    of the day is.

21         THE COURT:  Overruled.

22         THE WITNESS:  Can you repeat the question?

23         MR. ELLISON:  Can the reporter read it back, please?

24         (The last question was read back by the court

11:31    25    reporter.)

88

1          THE WITNESS:  No, I wasn't aware.

2  **Q.**    (MR. ELLISON CONTINUING)  Were you aware that DAPL

3  security -- armed DAPL security people dressed like water

4  protectors assisted in arrests that day?

11:31  5  **A.**    I was not aware, no.

6  **Q.**    Wasn't there a concern that day of -- your forces were,

7  would it be fair to say, equipped for war?

8  **A.**    Our law enforcement officers were equipped to keep them

9  safe that day.

11:31  10  **Q.**    They were dressed, a lot of them -- some of them in combat

11  gear with combat assault weapons.

12  **A.**    The majority of our officers were wearing a normal uniform

13  with a -- what we considered a riot helmet and carrying a baton

14  with their normal gear that they carry.  There were some

11:32  15  officers that were issued less lethal munitions.  Some of them

16  were wearing a normal uniform with a riot helmet.  There were

17  some SWAT or SORT or whatever type of law enforcement officers

18  that as a part of their uniform, they wear something that

19  doesn't look like what I'm wearing today, so it could be a

11:32  20  camouflage-type uniform or a different-color uniform that looks

21  tactical.

22  **Q.**    And it's your testimony that at your briefing that

23  morning, you were not apprised that there were armed security

24  people dressed like water protectors.

11:32  25  **A.**    No.

89

1   Q.   Okay.  I'll move on.  Were you aware that DAPL security

2   had infiltrated water protectors with the idea of creating

3   insolence to blame on protesters?

4   A.   No.

11:33   5   Q.   When the third gunshot occurred, sir, you actually -- did

6   you see or feel the concussion of that?

7   A.   I saw the concussion of it.  There was dust that kicked

8   up.  I saw an individual -- one of the troopers that was

9   standing there -- it was Trooper Don Neumann.  His pant leg

11:33   10   ruffled from the concussion of the round being fired off.  And

11   obviously you could hear the round going off, so I was looking

12   in that direction when that happened.

13   Q.   And, in fact, it stirred up the grass and dirt.

14   A.   Yes.

11:33   15   Q.   A little later, Trooper Newind (ph) -- or is it Newind

16   (ph)?  I'm sorry.

17   A.   I'm Niewind.

18   Q.   You're Niewind.  I'm sorry.  And I apologize if I

19   mispronounced your name.  Ness, is he a straight trooper or

11:34   20   BCI?

21   A.   Ness?

22   Q.   Yes.

23   A.   There's no Trooper Ness.

24   Q.   All right.  So he must be BCI.  Did you later meet with --

11:34   25   there was a -- were you aware that there was a group of

90

1    officers who got together with Trooper Ness right after this

2    incident and a circle being painted in the area where the

3    incident took place?

4    A.   I know there was a location that was kind of marked off.

11:34   5    I don't recall if it was with paint or -- it had to have been

6    paint.  There's nothing else that we would have had out there,

7    but it was marked off in some fashion in the location where we

8    thought the incident had occurred or the travel of the bullet

9    had went.

11:34   10   Q.   Did you show Agent Ness where you saw something stir up

11   the dirt and grass?

12   A.   I did not meet with Agent Ness, no, from what I -- from

13   what I recall.  I don't remember visiting with him.

14   Q.   Ms. Fallis was charged with a very serious offense by

11:35   15   state authorities as a result of this incident, was she not?

16   A.   I think she was initially charged with attempted murder.

17   Q.   Pretty serious.

18   A.   Very serious.

19   Q.   And you did not feel it was important to show an

11:35   20   investigating agent at the scene immediately thereafter --

21   shortly thereafter, where it was that you saw a potentially

22   bullet go into the ground?

23   A.   Again, we marked the area where the incident took place.

24   Q.   And you're --

11:35   25   A.   We secure that for the agents to come in and process.

91

1  Q.   Now, when you -- when a bullet skims the ground, then goes

2  into the ground, you'd kind of expect a trail to be in the

3  grass and dirt leading up to the point of impact, would you

4  not, sir?

11:36  5  A.   Just from my hunting experience, I would say if you miss

6  something, that that can happen, yes.

7  Q.   Well, if it stirs up dirt and grass, you'd expect that to

8  -- you'd expect you'd see something there.

9  A.   Well, the concussion of a weapon going off can cause the

11:36  10  grass and the dirt to move, and that bullet could be traveling

11  downrange at an angle.  But the concussion of a bullet going

12  off can cause that, not necessarily the bullet is causing that

13  grass and dirt to be stirred.

14  Q.   You're not aware of a claim by some of the officers

11:36  15  present, are you, that the bullet went into the ground pretty

16  much right in that area?

17  A.   I don't know.

18  Q.   Okay.  Now, when you heard or whatever you may have

19  observed regarding the third shot, could you tell us where

11:37  20  you -- what you observed in terms of which side of the pile of

21  bodies this blast came from?

22  A.   So Ms. Fallis was on the ground with some law enforcement

23  officers on top of her.  Her legs were exposed.  I can't say

24  that a hundred percent of her legs were exposed, but I do

11:37  25  remember the good majority of her legs were exposed.  I was

92

1    standing.  She was facing -- basically laying in the ditch on

2    her stomach facing like northwest-southeast.  Her feet were

3    southeast.  Her head was towards the northwest.  I was standing

4    near her feet.  It would be like her left foot as she's laying

11:37    5    down on the ground, and I was looking down to see what was

6    occurring because the two shots had gone off.  I was looking to

7    see what was going on with the officers and Ms. Fallis on the

8    ground, and I saw the third round -- or the concussion from the

9    third round go off and could tell that it came from underneath

11:38    10    her body.

11    Q.   When she was on her stomach and prone to the ground.

12    A.   She had rolled.  She was able to roll a little bit like

13    onto her left side, and her stomach would have been exposed

14    some.

11:38    15    Q.   Did you write in your report that she was on her stomach

16    and prone to the ground when that shot went off?

17    A.   I'd have to look at my report to exactly see what I have

18    here.  Above in the paragraph I have that she was laying on her

19    stomach on the ground.  And then further down is when the third

11:38    20    round goes off, but there's nothing about how she was prone at

21    that time.

22    Q.   Okay.  Her face was against the ground?

23    A.   I don't recall.  I don't recall seeing her face when the

24    round went off.

11:38    25    Q.   And you told us she was facing northwest.  That's the

93

1   opposite direction the shots went?

2   A.   Her face was laying -- she was facedown.  Her face was

3   laying towards the northwest, her feet to the southeast, and

4   when she -- when she rolled, the round would have went off like

11:39   5   in a northeast or an east -- like an east -- easterly type

6   direction.

7   Q.   So with three or four men -- good-size men and equipment

8   on top of her, you're saying she's rolling around, upper body.

9   A.   That's what occurred, yes.

11:39   10   Q.   Okay.  Do you know how much she weighed?

11   A.   I have no idea how much she weighs.

12   Q.   Now, you claim -- or you testified that you saw the nylon

13   holster being pulled from the left front sweatshirt pocket,

14   correct, sir?

11:39   15   A.   Correct.

16   Q.   And who -- who removed that holster?

17   A.   I don't know.

18   Q.   Could you give us the agency?

19   A.   No.

11:40   20   Q.   What happened in your presence to that holster after it

21   was moved -- as you say, removed from the clothing?

22   A.   I don't know what happened to it.

23   Q.   Now, you were pretty close when this occurred, right, sir?

24   A.   To what occurred?

11:40   25   Q.   To when the holster was removed.

1          MR. DELORME:  Objection, Your Honor, asked and

2     answered.  He said he was two feet away from her feet.

3          MR. ELLISON:  No, that was when the shot was fired.

4     This is when the holster was removed.

11:40     5          THE COURT:  Overruled.

6          MR. ELLISON:  Thank you.  I'm sorry.

7          THE WITNESS:  I was in the same general location near

8     her feet.

9     Q.   (MR. ELLISON CONTINUING)  Did -- did you see any other

11:40    10    items ostensibly removed from Ms. Fallis?

11    A.   None that I recall, no.

12    Q.   The gun that was later seized, did you see who -- who

13    seized it?

14    A.   I don't recall.

11:41    15         MR. ELLISON:  If I could have just a moment, Your

16    Honor, I think I'm done.

17         THE COURT:  All right.

18         MR. ELLISON:  Thank you, Your Honor.  I pass the

19    witness.

11:41    20         THE COURT:  Very well.  Well, the rules don't allow

21    for redirect or recross.  In the broad exercise of my

22    discretion, I'm not going to allow it, so we'll move on to the

23    next witness.

24         THE WITNESS:  Where would you like these, Your Honor,

11:41    25    these exhibits?

95

1          THE COURT:  Yeah, we'll just leave them with the

2    clerk.

3          MR. DELORME:  Your Honor, may we release this

4    individual from their subpoena for today's suppression hearing?

11:42    5    We don't intend to recall him.

6          MR. ELLISON:  No objection.

7          THE COURT:  You are excused, sir.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  Free to leave or free to stay.

11:42   10          MR. HAGLER:  Your Honor, our next witness is

11    Pennington County Deputy Thadius Schmit.

12                    DEPUTY THADIUS SCHMIT,

13    having been first duly sworn, was examined and testified as

14    follows:

11:42   15                    DIRECT EXAMINATION

16    BY MR. HAGLER:

17    Q.   Deputy Schmit, with whom are you employed?

18    A.   Pennington County Sheriff's Office in South Dakota.

19    Q.   In what position?

11:43   20    A.   A deputy sheriff.

21    Q.   And what do you generally do in your deputy sheriff duties

22    with Pennington County?

23    A.   Law enforcement function, patrol, respond to disturbances,

24    that type stuff.

11:43   25    Q.   Okay.  Make sure you speak right into that microphone,

1    sir.

2    **A.**    Sorry.

3    **Q.**    That's all right.  How long have you been employed with

4    Pennington County Sheriff's Office?

11:43    5    **A.**    I started in 2008 and then came over to actual patrol in

6    2010.

7    **Q.**    Do you have any law enforcement -- any military

8    experience?

9    **A.**    I do.

11:43    10    **Q.**    What is that?

11    **A.**    I joined the National Guard in South Dakota in 2003 as a

12    military police soldier, went and became an officer in 2005,

13    and have been in the Guard since.

14    **Q.**    So it was a military police?

11:44    15    **A.**    Correct.

16    **Q.**    And what timeframe?

17    **A.**    Timeframe from 2003, when I joined, to 20 -- roughly '14

18    or '15.  Now I'm logistics.

19    **Q.**    Are you a licensed peace officer in the state of South

11:44    20    Dakota?

21    **A.**    I am.

22    **Q.**    Were you in Morton County, North Dakota, on October 27,

23    2016, helping out with the North Dakota law enforcement during

24    the DAPL protests that week?

11:44    25    **A.**    I was.

97

1   Q.   When did you first come to North Dakota?

2   A.   We came that Sunday prior to.

3   Q.   So October 27th was a Thursday, so you're talking again

4   about approximately five days prior to that?

11:45   5   A.   Correct.

6   Q.   Did you undergo some training upon your arrival in North

7   Dakota before being -- going out and doing any actual work?

8   A.   Correct.  That Sunday when we showed up, it was just a

9   very brief in-briefing.  They showed us videos of what to

11:45   10   expect in the coming couple days, and it took roughly an

11   hour-and-a-half to two hours.  Then we went and checked into

12   our hotels.  That next morning we met at a convention center,

13   where it was all sit down, covered some -- do you want me to

14   just keep going, or --

11:45   15   Q.   Yes, please.

16   A.   Okay.  Covered some laws, covered kind of a game plan,

17   orientation of what was going on, a lot of just sit down and

18   listen type of stuff.  And then we were sworn in that day as

19   well.

11:45   20   Q.   And was that then on that Monday?

21   A.   Correct.

22   Q.   When you said went over some laws, were there some

23   particular North Dakota Century Code statutes that were

24   displayed to you and talked about?

11:46   25   A.   Correct, there were.  Initially they indicated that they

98

1  felt anyone that was there technically had been violating the

2  law, but to -- they weren't interested in arresting everyone,

3  obviously, so to look for these specific statutes, such as

4  rioting, and there was like a disorderly conduct type of stuff,

11:46  5  things in that nature so that if there was someone that was

6  acting more aggressive than normal, you know, we could

7  potentially use those.

8  Q.   All right.  So then what happened on that Tuesday of that

9  week?

11:46  10  A.   Tuesday we met at a National Guard hangar -- I believe

11  it's close to the airport -- and we went through -- to get

12  everyone on the same page, we went through mobile field force

13  training, how you line up, how you march, what the arrest team

14  was responsible for, how you break through the line to arrest

11:46  15  people, moving forward, staying in unison and that type of

16  stuff for a vast majority of the day.  And then after that we

17  went down to where the actual -- where our camp was set up down

18  there and then just patrolled for the rest of the day.

19  Q.   That was still on that Tuesday?

11:47  20  A.   Correct.

21  Q.   Okay.  And then what happened on Wednesday?

22  A.   Wednesday we were under the understanding that we were

23  going to be going to remove the protesters, so we were to show

24  up early that morning.

11:47  25  Q.   And did that happen that day?

1   A.   It did not.

2   Q.   It got postponed?

3   A.   It did indefinitely.  We had no idea when we would be

4   going.

11:47   5   Q.   Okay.  And then ultimately it did occur then on that

6   Thursday, October 27th, correct?

7   A.   Correct.

8   Q.   Now, you -- I think you testified earlier -- I just want

9   to make sure I understood correctly.  You said one of those

11:47   10   particular days of your training you were sworn in as a Morton

11   County deputy sheriff, is that correct?

12   A.   Correct, so that we could uphold the laws in Morton

13   County.

14   Q.   All right.  So let's -- let's focus now on October 27,

11:48   15   2016.

16   A.   Okay.

17   Q.   And so what were you tasked to do on that particular day?

18   A.   So initially I was just a mobile field force member for

19   Cass County.  So that day we rode in the buses out to -- with

11:48   20   all of the Cass County members, and then we just stood by

21   waiting for direction on the bus.

22   Q.   Do you recall approximately what time of the day you went

23   out on the bus?

24   A.   So we arrived -- we arrived at the initial checkpoint on

11:48   25   the buses at approximately 11:00, 11:30, somewhere around

1  there, I believe.

2  **Q.**   That morning?

3  **A.**   Correct.

4  **Q.**   And then were you bussed out to an area on Highway 1806?

11:48   5  **A.**   Correct, we were.

6  **Q.**   You were involved from that point of arriving there --

7  correct me if I'm wrong -- between 11:30 and noon, you were

8  involved in your mobile field force duties throughout that

9  entire day?

11:49  10  **A.**   Correct.  So when we arrived, initially we were on the

11  buses.  Well, the main body of the mobile field force, like the

12  center got out and they set up their line.  There were some

13  barricades and stuff on fire, so a fire truck came up, put all

14  that out.

11:49  15         And then as they started moving forward, DAPL

16  protesters started moving up the hill to the west, and so they

17  hurried us off of the buses and asked us to run up the hill to

18  the west to prevent protesters from getting to the DAPL

19  bulldozers and equipment that were sitting up there -- that

11:49  20  were sitting up there so that they weren't tampered with.

21  **Q.**   All right.  Deputy Schmit, now I'm going to jump forward

22  with you that day until shortly before the shooting incident,

23  okay?

24  **A.**   Okay.

11:50  25  **Q.**   So what's your recollection as far as the approximate time

1   of the day that the actual shooting incident occurred?

2   **A.**   It was dusk.  I would say probably around 5:45, 6 o'clock,

3   somewhere around that timeframe.

4   **Q.**   And so, again, let's talk about the minutes leading up to

11:50   5   when you first observed anything to do with the woman that was

6   later identified as Redfawn Fallis, okay?

7   **A.**   Okay.

8   **Q.**   All right.  So where do you recall that you were located

9   when you first noticed anything to do with the defendant?

11:51   10   **A.**   So initially they came over the loudspeaker and asked all

11   mobile field forces to step back behind the armored vehicles

12   because there -- at the time we didn't know.  Once we got

13   behind the vehicles, we were told because there were shots

14   fired ahead, and they were really concerned the entire time

11:51   15   about people shooting at law enforcement from far away with

16   rifles.

17           So as I'm standing back there, we were all kind of

18   taking a break.  I was right at the end of the MRAP, the

19   military vehicle sitting there, when I saw some of the guys in

11:51   20   the camouflage uniform -- we call them SRT members -- start to

21   step forward, so I started to step forward to see what was

22   going on.  At that time I saw an incident going on with a lady

23   that had pulled up in a white car.  I attempted to do what I

24   could to help, which wasn't an awful lot.  And then my

11:51   25   attention was drawn to an officer that was on the mobile field

1   force line screaming, "Get back," and a lady was right there in

2   his face.

3           MR. HAGLER:  Your Honor, if I may display

4   Government's Exhibit 14, the video that we saw a portion of

11:52   5   earlier with the other witness, and if I could go to

6   approximately the 10-minute mark.

7   **Q.**   (MR. HAGLER CONTINUING)  All right.  Deputy Schmit, you

8   see there -- you made reference to a white car.  Do you see

9   that white car there depicted here?

11:52   10  **A.**   I do.  It's sitting right in front of the MRAP.

11  **Q.**   Okay.  And is it your testimony you saw that white vehicle

12  pull up?

13  **A.**   I did not see it pull up, but I stepped forward to see

14  what was going on because all the people had started moving

11:52   15  forward, and that's when I noticed the white car.

16  **Q.**   Okay.

17  **A.**   So at the time I was right at the tailgate of the MRAP and

18  I was talking with other deputies.

19  **Q.**   Okay.  And so when you then took notice of what was

11:53   20  occurring in this general timeframe, what -- what did you see?

21  **A.**   I saw an altercation going on between the lady that was in

22  the white car and law enforcement.  It was just verbal.  She

23  was yelling at people.  They were basically telling her, "You

24  can't leave your white car there.  You need to move it," and

11:53   25  trying to calm her down.

1   **Q.**   Okay.  Now, that was not Ms. Fallis, correct?

2   **A.**   Correct, that was not.

3   **Q.**   When -- when that white car pulled up and the woman got

4   out and -- I'm sorry.  What did you say she was doing?

11:53   5   **A.**   She was yelling at law enforcement, members of the mobile

6   field force.  I don't know what she was saying.

7   **Q.**   Okay.  Did -- well, what were the other protesters in the

8   area doing when that woman pulled up?

9   **A.**   So prior to, everyone was kind of standing back because

11:54   10   they didn't know what we were doing.  Like we had stopped, and

11   so when she pulled up, some of the protesters -- because there

12   was a much larger gap between us and the protesters.  When she

13   pulled up and started yelling, some of the protesters started

14   moving forward as well, trying to figure out what was going on.

11:54   15   **Q.**   Did things become a little more tense with the woman in

16   the white car?

17   **A.**   Yes.  I mean, law enforcement was trying to calm her down,

18   trying to get her to move the car.

19   **Q.**   As far as you know, was that woman arrested?

11:54   20   **A.**   She was not.

21   **Q.**   All right.  So now, again, tell us after that occurred,

22   when you first saw Ms. Fallis.

23   **A.**   So I was trying to figure out how we were going to get

24   that white car moved when I heard someone screaming, "Get

11:54   25   back."  It would have been to the east of where we were, so I

1   turned and looked over and I see a -- I believe he was a

2   Hennepin County officer standing along the lines screaming,

3   "Get back."  And he had his baton in the port-arms position or

4   across his body, and he was pushing towards somebody that was

5   pushing into him that had a gas mask on, a puffy coat,

6   backpack, pants, shoes, all that.

7   Q.   Is that person the person that was ultimately identified

8   as Ms. Fallis?

9   A.   It is.  And what initially drew my attention to was the

10   alarm in his voice.  Like he was screaming.  I mean, it was

11   getting -- starting to get pretty loud up there, so for me to

12   hear him screaming "get back" when he's turned and faced away

13   from me, it was pretty loud.

14   Q.   And when --

15   A.   He's giving loud verbal commands for her to move.

16   Q.   And when he yelled "get back," what did she do?

17   A.   She -- it was muffled because of the gas mask, but she

18   continued to stand there and scream and yell and point with her

19   finger and continued to move towards the officer.

20   Q.   And what did the officer do at that point?

21   A.   Again, screamed "get back" and tried to push her away with

22   his baton.

23   Q.   And did she voluntarily comply?

24   A.   No.

25   Q.   Then what did you see happen?

105

**A.**   So the entire day there were peaceful protesters that were
there that, I guess, were their security.  A couple of those
gentlemen, they would try and keep order between us and the
other protesters.  A couple of them came over and tried to
usher her back away from the line.

**Q.**   And what did she do?

**A.**   Continued to yell and scream and was hesitant to go with
them, but they were, you know, kind of pushing her away from
law enforcement.

**Q.**   And then what happened?

**A.**   So as she's yelling and screaming, other people are coming
up and starting to yell and scream.  And there was a gentleman
in a red and black flannel jacket that was up there starting to
yell and scream, so they drew their attention away from -- the
security people for the protesters, their attention was drawn
towards him, so they kind of stepped more towards him to keep
him back.  And as that happened, Redfawn turned and started to
kind of parallel the line of officers towards the east and
walked down towards the ditch continuing to yell and scream.

**Q.**   And how was she dressed at this point that you recall?

**A.**   She had a gas mask on, a puffy coat and a backpack.

**Q.**   Now, just prior to this point where she was seized, you
indicated you observed the conduct of some of the other
protesters, correct?

**A.**   Correct.

106

1   **Q.**   And did you say that they were ramping up their conduct

2   and activity because of what she was doing?

3         MS. COOK:   I'm going to object to the form of the

4   question as leading.   I think we've had a good deal of leading

5   questions.

6         THE COURT:   Overruled.

7         THE WITNESS:   So as she's yelling and screaming,

8   there's other protesters starting to step forward and starting

9   to yell and scream.   I don't know what she was saying, but

10  obviously other protesters were screaming obscenities at us as

11  well.

12  **Q.**   (MR. HAGLER CONTINUING)   Did you know who the woman was at

13  that time?

14  **A.**   I had no idea.   She was completely covered.   Her face was

15  completely covered from the mask.   I could just hear it was a

16  female's voice.

17  **Q.**   Okay.   So what -- what then happened that led to her

18  seizure?

19  **A.**   So when I'm hearing the alarm in the officer's voice

20  screaming "get back" and as the protest -- as the security guys

21  come over and kind of usher her away, I walk up to the officer

22  that was there because I was concerned for his safety.   I was

23  like, "Hey, are you okay?   Do you want me to try and grab her?"

24  And he's like, "Absolutely, if you can."

25        So from that point I turned around and I grabbed

107

1   Rusty Schmidt -- I'll refer to him as Rusty since we're both

2   Deputy Schmidt -- and then another deputy that was with us,

3   Myron Canales, and had them come up to the front.  I pointed

4   her out to them and I said, "Hey, we need to try and apprehend

5   her if possible."

6        So we were standing there trying to figure out how we

7   were going to go about doing that because at the time she was

8   still between us and the security.  And then when she broke

9   away and started walking down the ditch, she isolated herself.

10  There was no one else really in that general area, so I smacked

11  Rusty and said, "Hey, let's go."

12       From that point I ran down the embankment towards

13  her, attempted to wrap my arms around her and bear-hug her,

14  basically, because our goal is to pull them behind the lines so

15  that we don't have any protesters at our back or anyone else

16  joining in.  So I attempted to pull her behind the lines to

17  effect an arrest.

18  Q.   So are you saying you ultimately had made the decision to

19  seize her before she walked down the ditch?

20  A.   Correct.  It was -- it was right after I saw her

21  interaction with the officer.

22  Q.   And is it -- are you saying then you waited until she

23  separated from the others to safely secure her?

24  A.   Correct.  We didn't want to harm any -- any of the

25  security guys or anyone else that was in that immediate area.

108

1    We were trying to look for the best opportunity to keep

2    everyone else safe while still effecting an arrest.

3            MR. HAGLER:  All right.  We're currently at 12:29 on

4    the video, Exhibit 14, so if you could play it, please, at that

12:00    5    point.  Okay.  Stop it there, please.

6    Q.  (MR. HAGLER CONTINUING)  All right.  We see we're at

7    12:57, Deputy Schmit.  Do you see that timestamp?

8    A.  I do.

9    Q.  And then do you see the individual that has now just

12:01   10   walked down into the ditch area there?

11   A.  I do.

12           MR. HAGLER:  Okay.  Play again, please.  All right.

13   Stop it.

14   Q.  (MR. HAGLER CONTINUING)  We're right at the 13-minute mark

12:01   15   now.  And what do we see there, Deputy Schmit?

16   A.  That is me running down the embankment, trying to grab

17   Redfawn to pull her behind the lines and effect an arrest.

18           MR. HAGLER:  Okay.  Play it, please.  All right.  Can

19   you stop it, please?

12:02   20   Q.  (MR. HAGLER CONTINUING)  All right.  Deputy Schmit, so

21   obviously as you described, she went down to the ground,

22   correct?

23   A.  Correct.

24   Q.  And then what happened?

12:02   25   A.  As I run behind her to grab her to pull her behind the

1   lines, she basically tries to sit straight down, which it's an

2   embankment.  It looks a little steeper than what it is there.

3   I fall over.  Deputy Schmidt falls over the top of me because

4   he was right behind me coming.  I fall to her back half.  He

12:02   5   falls to the front.  She wraps two of her legs around one of

6   Deputy Schmidt's legs.  I sit up.  I'm at her back.  I'm trying

7   to push her over -- her over onto her stomach.  Deputy Schmidt

8   is able to pull his leg out from between hers and rotate

9   towards the front half of her.  I'm pushing her towards her

12:02   10   stomach.

11       Other law enforcement officers then get into the

12   fray, because as you can see, the mobile field force line moved

13   forward past us.  Now we don't have to worry about other

14   protesters, so as we're -- as we're trying to effect an arrest,

12:02   15   I see Deputy Schmidt -- or Deputy Rusty Schmidt has one of her

16   right hands (sic) he's starting to pull back behind her body.

17   She still has her leg up underneath her, making it hard for us

18   to get her over onto her stomach.  As I am -- as they're trying

19   to get their right hand behind her back, I'm pulling on her

12:03   20   left hand because I'm at her back, so I'm pulling on her left

21   hand.

22       I see that they get her right hand behind her back

23   and they're trying to get flexi-cuffs on her hand.  She's got

24   her fingers spread, though, which makes it hard to get the

12:03   25   flexi-cuffs on because they don't detach like regular

110

1    handcuffs.  So at that point I stopped pulling on her left arm

2    and I just kind of pushed on her to keep her pinned to the

3    ground and trying to get her onto her stomach while they

4    attempted to get the flexi-cuffs on her hand.

12:03   5    **Q.**   Continue to describe what happened.

6    **A.**   And so as I'm sitting there trying to just push her to the

7    ground to prevent -- you know, to hold her still, all of a

8    sudden I hear a pop and then a pop, pop.  I'm sitting there

9    directly across from Deputy Rusty Schmidt and I see the ground

12:04   10   after the initial pop near his left knee, like dirt chunks kind

11   of fly and the grass kind of lay flat.

12          My initial thought was that was muffled, so my

13   original thought was that sounded like a less lethal shotgun,

14   but it didn't make sense to me.  And then I heard the other two

12:04   15   pops.  I hear Rusty scream, "She's got a gun."  I see the black

16   tip of a pistol come out from underneath Redfawn.  Rusty

17   Schmidt shoves his hands in underneath her, trying to control

18   the gun, pushing down.

19          My initial reaction was I leapt to my feet and I drew

12:04   20   my service weapon.  But because now there were a lot more law

21   enforcement officers and heads everywhere, I didn't want to

22   accidentally shoot someone, you know, with everyone jumping

23   around and, you know, bumping my pistol.  So I re-holstered my

24   weapon, and by that time there was nowhere for me to get back

12:04   25   down on because other law enforcement had moved there, so I

1    just kept my knee on her so I knew where she was at.

2         Shortly after Deputy Rusty Schmidt said, "Schmit, get

3    a gun on her.  I don't have a good grasp on the gun," so I

4    withdrew my duty weapon again and I forced it down between

5    everyone and I stuck it on her ribs.  I told her, "You better

6    drop that F'ing gun or I'm going to shoot you," and shortly

7    after that she dropped -- or Rusty said, "Don't shoot her.

8    I've got the gun."

9         And so then Rusty indicated that, "Hey, someone take

10   my spot.  I might have been shot."  So he gets up, steps back

11   when someone takes his place.  And I walk over to where he was

12   at because I wanted to check and make sure that, you know,

13   there were no holes in him that weren't supposed to be there.

14   Q.   Okay.  So when you attempted to seize and secure the

15   individual, did she resist your arrest?

16   A.   Yes, she did.

17   Q.   And in resisting the arrest and firing the gun, do you

18   feel she committed additional criminal offenses?

19   A.   Yes, she did.

20   Q.   Now, is it fair to say that this was a rather tense few

21   minutes?

22   A.   Yes, extremely.

23   Q.   And as you indicate, you didn't -- you didn't know for

24   sure at that point whether you had been shot?

25   A.   Deputy Rusty Schmidt did not know if he had been shot.

**Q.**   Okay.

**A.**   I was towards her back, so, I mean, I saw the rounds -- or the dirt move away from me.  I was concerned about Rusty.

**Q.**   Okay.  After she was secured, did -- did you say anything to her?

**A.**   So after she was secured, obviously I felt like I had almost just got one of my good friends shot, so I was a little frustrated.  So I went back and I was like what -- more of a what are you doing?  I asked her, "Was all this worth it?  Was this worth getting an attempted murder on law enforcement charge?"

**Q.**   And how did she respond to that?

**A.**   She laughed.  She didn't respond.  She just laughed.

**Q.**   Did you ask a question -- ask that question to elicit a response from her?

**A.**   No, it was more of me being bewildered and frustrated and just trying to get it off my chest, like what are you doing.

**Q.**   Now, again, you described that after her arrival or at least after you observed her conduct and the other protesters around her at that time, some of the other protesters were yelling and shouting and engaging in verbal conduct, is that correct?

**A.**   Correct.

**Q.**   And were any of those persons identified to be arrested?

**A.**   No.

113

1   **Q.**   Was it just Ms. Fallis's verbal conduct that led you to

2   arrest her?

3   **A.**   No, it was her active -- it was her actions leading up to

4   it, her aggressive stance, standing in the face of an officer

12:08   5   pointing, him having to push -- push her away from him.  She

6   was going above and beyond what the normal protester was doing.

7   **Q.**   Was the way she was dressed and what she was wearing have

8   anything to do with that, Deputy Schmit?

9         MS. COOK:  Objection, leading.

12:08   10         THE COURT:  Sustained.

11   **Q.**   (MR. HAGLER CONTINUING)  Did you see any other protesters

12   at that immediate area wearing a gas mask?

13   **A.**   No, not at the time.  There had been a cease in hostility,

14   so most people, if they had a gas mask, had taken it off

12:09   15   because --

16   **Q.**   All right.  So at that time then prior -- well, just prior

17   to you seizing her for arrest, Deputy Schmit, do you -- is it

18   your testimony that the defendant engaged in tumultuous or

19   threatening behavior?

12:09   20         MS. COOK:  Objection, leading.

21         THE COURT:  Sustained.

22   **Q.**   (MR. HAGLER CONTINUING)  Do you feel she had violated any

23   North Dakota statutes that you had become familiar with?

24   **A.**   Yes, disorderly conduct.

12:09   25   **Q.**   Was she complying with law enforcement directives?

114

1   **A.**   No, she was not.

2          MR. HAGLER:  Your Honor, I would like to show

3   Government's Exhibit 15 at this time, which is a video of the

4   arrest and shooting.

12:10   5          THE COURT:  How long does it last?

6          MR. HAGLER:  It's approximately two-and-a-half

7   minutes long.

8          THE COURT:  All right.  Well, then we'll take a lunch

9   break after that.

12:10   10          MR. HAGLER:  Thank you, Your Honor.  Stop it there,

11   please.

12   **Q.**   (MR. HAGLER CONTINUING)  All right.  Deputy Schmit, we're

13   23 seconds into the videos and we see a -- we see a person on

14   the ground there, correct?

12:10   15   **A.**   Correct.

16   **Q.**   You see a leg with a light blue pant on it, correct?

17   **A.**   Correct.

18   **Q.**   And who was that?

19   **A.**   That's Redfawn.

12:10   20          MR. HAGLER:  All right.  Stop it there, please.

21   We're at 35 seconds.

22   **Q.**   (MR. HAGLER CONTINUING)  The shots have just rang out,

23   correct?

24   **A.**   Correct.

12:11   25   **Q.**   So where are you in this?  Can you -- can we see you in

115

1   this?

2   A.   Yes, I'm the only one wearing the -- that you can see

3   wearing a tan t-shirt.  I have my hand on my gun, putting my

4   duty weapon back in its holster.

12:11   5   Q.   All right.  So we're looking at your side -- side profile

6   there, correct?

7   A.   Correct.

8          MR. HAGLER:  All right.  Go ahead and play, please.

9   You can stop it there, please.

12:12   10   Q.   (MR. HAGLER CONTINUING)  You've seen this video before,

11   correct?

12   A.   Correct.

13   Q.   And as far as the limited portion that it shows there,

14   Deputy Schmit, does that appear to be an accurate

12:13   15   representation of what happened that day?

16   A.   Yes.

17          MR. HAGLER:  That's all the questions I have for this

18   witness, Your Honor.

19          THE COURT:  Well, then we'll take a short noon recess

12:13   20   here.  We'll reconvene at 1 o'clock, and at that time I'll

21   allow this witness to be cross-examined.  And who's going to be

22   doing that?

23          MS. COOK:  I am, Your Honor.

24          THE COURT:  All right.  So have a pleasant lunch

12:13   25   break.  We'll see everyone back at 1 o'clock.

116

1          (A lunch recess was taken from 12:13 p.m. to

2    1:02 p.m., the same day.)

3          THE COURT:  We're back on the record in case of

4    *United States versus Redfawn Fallis*.  The witness is where?

01:04   5    Ms. Cook, you may proceed.

6          MS. COOK:  Thank you, Your Honor.

7                         CROSS-EXAMINATION

8    BY MS. COOK:

9    **Q.**   Officer Schmit, you came to North Dakota from the

01:04   10   Pennington County Sheriff'S Department?

11   **A.**   Correct.

12   **Q.**   In Rapid City?

13   **A.**   Yes.

14   **Q.**   And are you a graduate of the South Dakota state law

01:04   15   enforcement academy?

16   **A.**   I am.

17   **Q.**   When did you graduate from the academy?

18   **A.**   It would have been August, September timeframe of 2010, I

19   believe.

01:04   20   **Q.**   And did you graduate from the academy after completing the

21   general curriculum offered by the academy?

22   **A.**   Yes.

23   **Q.**   Since 2010 have you returned to the academy for any

24   specialized training?

01:04   25   **A.**   Yes, off and on.

1   **Q.**   And what specialized training have you received?

2   **A.**   Oh, boy.  Through the academy I've done interview

3   interrogation classes, some NIBRS classes.  There's multiple

4   classes either through the academy in Pierre or through our

01:05   5   sheriff's office that I've been to, so --

6   **Q.**   The academy offers specialized training in the handling of

7   firearms?

8   **A.**   Not unless you're going to some kind of instructor course.

9   We do the general firearm safety -- or I mean the general

01:05   10   firearm qualification, and then -- at Pierre so that we get

11   certified there, and then everything is done through our

12   sheriff's office after that.

13   **Q.**   And did you complete the program in the general firearms

14   handling and safety --

01:05   15   **A.**   Yes.

16   **Q.**   -- class?

17   **A.**   Yes.

18   **Q.**   Did you also complete the program that's offered in

19   pressure point control tactics?

01:05   20   **A.**   Yes.

21   **Q.**   What year did you complete that program?

22   **A.**   Everything -- the pressure point control tactics is part

23   of the original curriculum we learn when we're at the academy

24   for the initial training, and then we go through it annually.

01:06   25   **Q.**   So your answer is that you completed it in 2010?

1   **A.**   And then every year after.

2   **Q.**   So each year after 2010 you have recertified in pressure

3   point control tactics?

4   **A.**   Right.  It's called defensive tactics.

01:06   5   **Q.**   All right.  And how did it come about that you were

6   assigned to come to North Dakota to participate in the

7   assistance rendered Morton County?

8   **A.**   So from my understanding, Morton County put out a request

9   for additional officers.  And then our LT for patrol got five

01:06   10   others of us off of -- out of the sheriff's office and said,

11   "Hey, we want you guys to go with the LT," and --

12   **Q.**   The LT being the lieutenant?

13   **A.**   Correct.

14   **Q.**   So was this a volunteer assignment?

01:07   15   **A.**   It was one of those where we were hand-selected and asked,

16   but we were not -- like if we couldn't go, that was fine.  They

17   would find somebody else.

18   **Q.**   And was there extra pay for this assignment?

19   **A.**   No.

01:07   20   **Q.**   You arrived in North Dakota on October the 22nd?

21   **A.**   If that's what Sunday was, yes.

22   **Q.**   Before arriving in North Dakota, did you receive any

23   training in the work that you were to do here?

24   **A.**   No, it was basic law enforcement work, is what we were

01:07   25   told.

1  Q.    But you received specialized training after you arrived in

2  North Dakota.

3  A.    So the training -- if what you're asking is, we don't have

4  -- we didn't have at the time an established mobile field force

01:07   5  down in South Dakota.  We did, however -- we've all been

6  through a very brief training there, and then I've had several

7  trainings in the military prior to as a military police

8  soldier.

9  Q.    And did that training include dealing with persons who

01:08   10  were involved in protest activity?

11  A.    Yes.

12  Q.    So on October the 23rd, the first day after you had

13  arrived, you attended a meeting where you were shown a video,

14  and the topic of that meeting was also dealing with protesters

01:08   15  in public activity?

16  A.    Correct.  It was basically this is what we've -- this is

17  kind of the tactics that they're using at this point, and this

18  is some of the things -- the different scenarios that we've

19  dealt with.

01:08   20  Q.    And you saw a video during that meeting?

21  A.    Either Sunday when we -- Sunday when we were there, we

22  definitely saw videos, and I think they showed the same exact

23  videos again Monday.

24  Q.    Did you receive handouts of printed material that would

01:08   25  also assist you in the work you were to do here?

1   **A.**   Yes, but I don't have any of those.

2   **Q.**   What happened to them?

3   **A.**   Got thrown away.

4   **Q.**   Okay.  But you did receive printed materials?

01:09   5   **A.**   Yes.

6   **Q.**   And from whom did you receive those materials?

7   **A.**   I don't know.  As we were sitting there, a large group,

8   they handed them down the aisles.

9   **Q.**   "They" being the people who were running the meeting?

01:09   10   **A.**   I would assume Morton County and whoever else was in

11   charge, yes.

12   **Q.**   And did the whoever-else-was-in-charge include agents or

13   employees of the Dakota Access Pipeline Corporation?

14   **A.**   Not that I'm aware of, no.

01:09   15   **Q.**   Do you know whether they were there or not?

16   **A.**   No idea.  For the most part, everyone I saw there was in

17   uniform.

18   **Q.**   Were you aware that DAPL had security officers on the

19   ground during the protest activity?

01:09   20   **A.**   We were informed that there were protest -- or DAPL -- or

21   not -- sorry, but there were officers there, but I don't recall

22   ever seeing them.  Like we were told they were kind of off back

23   protecting the equipment, so --

24   **Q.**   Were you told that there were persons hired by DAPL

01:09   25   security who were dressed similarly to the protesters and who

121

1   were moving among the protesters?

2   **A.**   No.

3   **Q.**   Were you told that there were agents of law enforcement

4   agencies who were also moving among the protesters?

01:10   5   **A.**   I know of one person.  I don't know who he is or what his

6   name was, but I knew that there was one person that was, yes.

7   **Q.**   And how did you come to know about that person?

8   **A.**   I don't remember.  I'm guessing it must have been that

9   Monday meeting, but he was -- he showed up and was kind of

01:10   10   giving us a briefing of what he'd experienced so far down in

11   the camps and things to watch out for.  Like we call it

12   military TTPs that the -- that the protesters were going to be

13   using, so --

14   **Q.**   Was he identified to you?

01:10   15   **A.**   I don't recall if his actual name was given to us just for

16   his security, but we were told that that's who this was.

17   **Q.**   And did you understand that he was an employee of the

18   pipelines or an employee of a law enforcement agency who was

19   undercover?

01:11   20   **A.**   It was my understanding he was law enforcement.

21   **Q.**   Do you know whether there were other law enforcement

22   agents also working undercover among the protesters?

23   **A.**   I have no idea.

24   **Q.**   There might have been.  You just don't know.

01:11   25   **A.**   Correct.

122

1  Q.    Now, you testified on direct examination that during these

2  initial meetings where you were given information about how you

3  were to conduct yourself during your law enforcement

4  activities, that technically everyone was violating the law.

01:11   5  A.    Correct.  There were certain statutes, such as the

6  blocking of the roadway and shutting down an entire highway,

7  that they -- they felt everyone that was down there doing that

8  was participating in that activity and potentially could be

9  arrested, yes.

01:11   10  Q.    And who is "they"?

11  A.    Everyone that was down there shutting down the highway and

12  lighting things on fire.

13  Q.    So you said "they thought," "they said."

14  A.    Oh, whoever was giving the presentation at the time.

01:11   15  Q.    So whoever was giving a presentation was telling the law

16  enforcement officers who were gathered there that technically

17  all of the protesters were violating the law.

18  A.    I believe it was the sheriff at the time.

19  Q.    The sheriff of Morton County?

01:12   20  A.    If you showed me a picture of him, I could tell you.  It

21  was either the Morton County sheriff or the other sheriff that

22  was kind of running around when --

23  Q.    That would have been the Cass County sheriff?

24  A.    That could be, yeah.

01:12   25  Q.    And so it was their position that all of the protesters

123

1    were technically violating the law and could be arrested.

2    **A.**   Yes.

3    **Q.**   And you believe that was because the road was blocked

4    somehow?

01:12   5    **A.**   That was part of it, yes.  They were -- they shut down a

6    road so no -- no one could get through.  There were a lot of

7    other things discussed like eating the farm -- the ranchers'

8    animals that were down there, many different things, but that

9    was --

01:12  10    **Q.**   In terms of the road being blocked, you understood that

11    law enforcement had blocked the road, didn't you?

12    **A.**   That was -- from my understanding, that was after they had

13    already done so.  I mean, when we showed up, there were

14    barriers and things lit on fire preventing anyone from getting

01:13  15    through there, so --

16    **Q.**   Well, I'm not talking about October the 27th.  Prior to

17    October the 27th you understood that regular traffic wasn't

18    moving freely --

19    **A.**   I know there was --

01:13  20    **Q.**   -- through 1806.

21    **A.**   I know there was a checkpoint set up right out in front of

22    our camp, that they were screening.  Like if you were a rancher

23    or a farmer, you were allowed to go down in there.

24    **Q.**   If you lived in the immediate area, you could get to your

01:13  25    home or your ranch, is that correct?

124

1   **A.**   My understanding, yes.

2   **Q.**   But generally speaking, there was no regular traffic on

3   1806.  It's not being used as a thoroughfare to go from one

4   place to another.

01:13   5   **A.**   My understanding was that was because the protesters had

6   -- protesters had it shut down farther up the -- up the road.

7   **Q.**   So you don't know whether or not law enforcement actually

8   had that road closed.

9   **A.**   Just to the point where you weren't supposed to go back

01:13   10   through there.

11   **Q.**   I guess I'm not understanding your answer.

12   **A.**   It was shut down at that --

13   **Q.**   Let me ask the question again, and maybe I can ask it more

14   clearly.  Do you know as you sit here today whether or not

01:14   15   before October 27th of 2016, law enforcement officers had

16   closed 1806 to regular thorough traffic?

17   **A.**   Yes, it was closed to regular through traffic.

18   **Q.**   Okay.  Thank you.  Now, in the course of this training

19   that you received during these briefing sessions, I believe you

01:14   20   testified that you were trained to identify agitators.

21   **A.**   I don't know there was so much we were trained to identify

22   agitators.  We were trained on what to do if one was

23   identified.

24   **Q.**   And what was your definition of an "agitator"?

01:14   25   **A.**   Someone showing aggression towards law enforcement,

125

1   someone throwing the logs that were being thrown at us, someone

2   throwing bike locks that were being thrown at us, someone

3   getting into the immediate circumference trying to pick a fight

4   with a law enforcer, someone that was basically there trying to

01:15   5   do more than just stand there and protest.

6           MS. COOK:  If I could have just a minute, Your Honor.

7   **Q.**   (MS. COOK CONTINUING)  Was it your understanding that part

8   of the responsibility of the arrest teams was to arrest

9   individuals that members of the mobile field force had deemed

01:15   10   to be agitators?

11   **A.**   That was part of it, yes.  If someone that was on the line

12   tapped their helmet, we would go over and ask them, "Hey, what

13   do you need?"  And they would identify someone that they felt

14   was acting out or needed to be taken into custody.

01:15   15   **Q.**   Acting out?

16   **A.**   Correct, throwing things.

17   **Q.**   Does acting out mean something more than throwing things?

18   **A.**   Basically anyone that was more aggressive than everyone

19   else.

01:16   20   **Q.**   Verbally aggressive?

21   **A.**   No, not so much verbally.  I mean, insults were being

22   hurled from every direction, and we just were ignoring those

23   for the most part.

24   **Q.**   But you understood that the protesters had a

01:16   25   Constitutional right --

1   **A.**   Yes.

2   **Q.**   -- to articulate their grievances --

3   **A.**   Freedom of speech.

4   **Q.**   -- grievances, right?

01:16   5   **A.**   Freedom of speech, yeah.

6   **Q.**   Yeah.  So when you say "aggressive," you mean something

7   more than verbally aggressive.

8   **A.**   Yeah, like throwing logs.

9   **Q.**   Okay.  And other than physically attacking law

01:16   10   enforcement, you were trained to understand and recognize that

11   there was a Constitutional right to vocally and loudly and even

12   profanely express your grievances at law enforcement officers.

13   **A.**   There were several hundred of them there doing that, yes.

14   **Q.**   And they had a right to do that.

01:17   15   **A.**   Correct.

16   **Q.**   So when you say that if a member of the mobile field force

17   tapped their helmet, that was an indication to you that they

18   wanted somebody arrested?

19   **A.**   Correct.  They had probably observed something that I did

01:17   20   not.

21   **Q.**   But you don't know whether they did or not.

22   **A.**   Well, generally when we went up there, they would tell us,

23   hey, this is what the person did and this is who needs to be

24   arrested.

01:17   25   **Q.**   I'm not asking about generally.

127

1   **A.**   All right.

2   **Q.**   But what your understanding was, if the mobile field

3   officer tapped his helmet, you would arrest the person.

4   **A.**   Yes, if they pointed someone out and said, "Hey, that

5   person needs to go."

6   **Q.**   All right.  And you didn't make any independent

7   determination about whether that person who in the officer's

8   words needs to go had actually committed a crime or not.

9   **A.**   No, I took the -- I took the word of the officer that was

10  there.

11  **Q.**   Well, the word that you're telling us you took is just

12  that person needs to go, right?

13  **A.**   Well, for whatever violation they committed.

14  **Q.**   That you didn't see, correct?

15  **A.**   Some officer did.  Another law enforcement officer did.

16  **Q.**   But you didn't make an inquiry about that.  It was enough

17  that they tapped their helmet and said this person needs to go.

18  **A.**   When I walked up to find out what was going on, they would

19  tell us this person did this, so they need to be taken into

20  custody.

21  **Q.**   So you had a conversation with that mobile field officer

22  to find out exactly what was going on before you participated

23  in making an arrest?

24  **A.**   About five seconds worth, if that.

25  **Q.**   Okay.  And when you were outfitted to go out in the area

1   where the protesters were, were you given a camera to wear on

2   your uniform?

3   **A.**   I was not, no.

4   **Q.**   Some of the officers were?

01:18   5   **A.**   I have since seen pictures, but at the time I wasn't aware

6   of any.

7   **Q.**   You weren't aware of any officers who were wearing GoPro

8   cameras?

9   **A.**   We all have uniforms on.  We're all out there focusing on

01:18   10   what's going on out in front of us.  I wasn't issued one, so I

11   didn't know other officers did.

12   **Q.**   Did you photograph portions of the activity with your own

13   cell phone camera?

14   **A.**   Several hours prior to, yes, I had my cell phone and I

01:19   15   would open my pocket, turn it on, stick it in my pocket so it

16   was recording out, record about anywhere from 1 minute to 15

17   minutes of footage and then turn it off.

18   **Q.**   Did anybody instruct you to do that?

19   **A.**   No, it was more for my own personal records,

01:19   20   documentation.

21   **Q.**   Documentation of what?

22   **A.**   Yeah, of what was going on out there.

23   **Q.**   For yourself?

24   **A.**   Yes.

01:19   25   **Q.**   And did you tell any of the officers who were in charge of

1   the group that you were with that you were doing that?

2   A.   No, because at the time -- for the most part, at the time

3   when I started, I was standing up on the flank as a part of the

4   mobile field -- or as a part of the actual line, itself, just

5   recording all of the chaos going on in the middle.

6   Q.   So you could turn the cell phone on or off as you chose.

7   A.   As I pull it out of my pocket and hit the button, yes.

8   Q.   Okay.  And what kind of things did you choose to record?

9   A.   It was just the general chaos of the -- of the moment.  I

10  mean, there was nothing in particular that I would say, "Oh,

11  hey, look, that's going on," and pull it out and start

12  recording.

13  Q.   You were at the north camp earlier on October the 27th?

14  A.   Yes, where -- wherever we started from.

15  Q.   And you recorded while you were at the north camp.

16  A.   While I was standing up on the side, yes, in -- not

17  initially while I was a part of the mobile field force, if I

18  remember.  It was mostly while I was standing up on the side.

19  Q.   While you were observing people being arrested?

20  A.   I don't know so much at that time that anyone was really

21  being arrested.  I think it was more we were standing there

22  waiting to continue through the north camp -- north camp

23  because it was taking them a while to clear buildings and

24  tents, and it was a very slow, methodical process to make sure

25  we were moving everyone out.

1  **Q.**   And during at least a portion of that time you were

2  recording.

3  **A.**   Correct.

4  **Q.**   And there were individuals who were arrested during the

01:21   5  time the north camp was being cleared?

6  **A.**   I don't -- I would assume so.  I don't know.

7  **Q.**   You didn't see anyone being arrested?

8  **A.**   Not that I remember.

9  **Q.**   You didn't participate in pointing out somebody to be

01:21   10  arrested during that period of time?

11  **A.**   No, because I was -- I was up on the flank, so, no.

12  **Q.**   All right.  When did you turn over to the government

13  copies of the cell phone videos that you did take?

14  **A.**   I came here two, maybe three weeks ago, and that was one

01:21   15  of the questions they asked, is, "Hey, did you have any camera

16  footage?"  I was like, "Well, yeah."  And so they asked if I

17  would make them copies of it, and I did.

18  **Q.**   Okay.  And were there portions of the cell phone that --

19  recordings that you chose not to copy?

01:21   20  **A.**   No, everything was sent.

21  **Q.**   Were there other officers in your immediate vicinity who

22  were also recording the events of October the 27th?

23  **A.**   Not that I'm aware of.

24  **Q.**   Were you aware of cameras that were being used that were

01:22   25  affixed to some of the military equipment?

131

A.   It would have -- from all of my knowledge of military
equipment, it would have had to have been put on there by law
enforcement, so I did not see any cameras recording anything on
any of the military vehicles.

01:22    Q.   Did you look?

A.   No.  I'm used to --

Q.   Okay.

A.   -- military vehicles not having cameras, so --

Q.   So you don't know whether they did or not.

01:22    A.   From my observations of the vehicles, they did not.

Q.   But you just said that you didn't look.

A.   Right.  So as far as I know, they did not have any cameras
on them.

Q.   All right.  And what about the equipment?  For example,

01:22    the BearCat that was in the area on October the 27th, do you
know whether it had a camera on it?

A.   I do not.

Q.   And you didn't look.

A.   No.

01:22    Q.   Okay.  So were you basically relying on other officers to
record the events that were going on around you?

A.   As I said before, I didn't know if any law enforcement
officers had any other cameras on them.

Q.   Well, during this period of time when you were

01:23    participating in arrest activities and you were watching

132

1  arrests, did you think that it was significant to record that

2  activity?  You can say no if you don't think it was

3  significant.

4  **A.**   I guess it never crossed my mind, actually.

5  **Q.**   Okay.  So you didn't think that the state, for example,

6  which was prosecuting individuals whose arrests you had seen

7  needed to have your input in terms of any recorded material.

8  **A.**   I'm sorry.  Say that one more time.

9  **Q.**   Yep, that was kind of convoluted.  You knew that the

10 people who were being arrested were going to be prosecuted,

11 right?

12 **A.**   That's my assumption, yes, but I don't know.

13 **Q.**   Well, that's usually what happens after somebody gets

14 arrested, right?

15 **A.**   Usually, yes.

16 **Q.**   And the individuals that were getting arrested at the

17 north camp, for example, were being prosecuted by the state's

18 attorney here in North Dakota --

19 **A.**   Sure.

20 **Q.**   -- correct?

21 **A.**   Correct.

22 **Q.**   Did you think it was important to provide any information

23 to the State about your observations during the clearing of the

24 north camp, for example?

25 **A.**   You mean my video recordings?

1   **Q.**   Yes.

2   **A.**   I didn't have -- I didn't think I had anything on there

3   that was worth giving to them, no.  I mean, it was just, like I

4   said, me taking recordings of just general commotion going on.

5   **Q.**   No arrests, if you remember.

6   **A.**   I don't remember.

7   **Q.**   You don't remember --

8   **A.**   No.

9   **Q.**   -- when you looked at it three weeks ago if it depicted

10  arrests.

11  **A.**   I didn't watch them.  I just copied them onto a disk and

12  sent them because they --

13  **Q.**   Okay.

14  **A.**   It was -- it was kind of a really quick, spur of the

15  moment, hey, we need these things right now, so I didn't -- I

16  went home from -- copied them, sent them quick, so I didn't

17  watch them, no.

18  **Q.**   Directing your attention to October the 27th, was there a

19  special briefing to prepare you for the activities that were

20  going to take place on October the 27th?

21  **A.**   There was a briefing, but it basically just covered what

22  we had talked about the day before when we thought we were

23  going, but the plan had completely changed, so --

24  **Q.**   In what way had the plan changed?

25  **A.**   The way that we were going to go -- like there were

certain buildings that they were talking about securing right

away, and there was a much more intricate plan done the day

before.  And then that morning of the -- had just -- the

portion that we were going to be involved with, they basically

said, "Here's how -- you know, this is still kind of the same

plan, but just go out there, get on the line, and we're going

to go."

Q.   So you regrouped on the morning of October the 27th?

A.   Yeah, to get on buses.

Q.   And you heard that the plan that you had been advised of

the previous day had been changed.

A.   There were just certain portions of it that were a little

different, but, I mean, it wasn't a thorough briefing by any

means.  It was just, "Hey, today is go day.  Here's what we're

going to go do, so let's go do it."

Q.   And what was your understanding of what go day was or what

it was that you were supposed to accomplish on that day?

A.   Move the protesters from the north camp down 1806 to the

bridge or the federal land that they were told they could be on

and hold them there.

Q.   And hold them there?

A.   Yep.

Q.   What do you mean by "hold them there"?

A.   Prevent them from coming back up and reestablishing a

north camp.

135

1  **Q.**   So confine them to that area.

2  **A.**   To the land that they were allowed to be on, yes.

3  **Q.**   What was your understanding of what your own role was to

4  be on October the 27th?

5  **A.**   A member of the Cass County mobile field force.

6  **Q.**   And what was the mobile field force's assignment on that

7  day?

8  **A.**   To move the people to the -- out of the north camp.

9  **Q.**   And did there come a time when you were moved to the

10  arrest team?

11  **A.**   Yes.

12  **Q.**   When did that occur?

13  **A.**   As things were starting to get more crazy in the center, I

14  guess, on the main part of the road, they started coming and

15  grabbing people, asking them, "Hey, we need you to be a mobile

16  field force," and so they grabbed three people and send us to

17  the middle.

18  **Q.**   You mean they asked you to be a part of the arrest team.

19  **A.**   Correct.

20  **Q.**   And was that arrest team composed of members of various

21  law enforcement agencies?

22  **A.**   This one was myself, Deputy Rusty Schmidt, Deputy Scott

23  Sites (ph) from Pennington County, all Pennington County

24  people.  So they grabbed like the four of us from Pennington

25  County and said, "We want you guys to go into the middle and be

1   an arrest team."

2   **Q.**   And Rusty Schmidt is someone whom you know.

3   **A.**   Yes, I went to the academy with him.  I had never met him

4   before then.

01:28   5   **Q.**   But you're friends now?

6   **A.**   Well, yeah, we spent time at the academy together and

7   worked together.

8   **Q.**   Okay.  And everyone else on that particular arrest team

9   was from Pennington County.

01:28   10   **A.**   Correct.

11   **Q.**   Were you the team leader of that arrest team?

12   **A.**   No, I was not.

13   **Q.**   Who was the team leader?

14   **A.**   I couldn't say we specifically had a team leader.  We just

01:28   15   were a team that functioned and operated together.

16   **Q.**   Was there someone who gave commands if there was an arrest

17   to be made?

18   **A.**   No.  If one of us observed a mobile field force member tap

19   their helmet, or whatever, we'd go up there, talk to them and

01:28   20   come back and say, "Hey, this person has this to say, and we

21   need to arrest this person."

22   **Q.**   So you have kind of a meeting of these other members of

23   the arrest team.

24   **A.**   Right there behind the line, within a couple feet of the

01:28   25   line, yeah.  It would just be a turn and talk and go.

137

1   **Q.**   And how many members of that team were there other than

2   Rusty Schmidt?

3   **A.**   Two, Scott Sites (ph) and Myron Canales.

4   **Q.**   I'm sorry.  I couldn't understand the last one.

01:29   5   **A.**   Scott Sites (ph) and Myron Canales.

6   **Q.**   Both from Pennington County.

7   **A.**   At the time, yes.  Myron has since moved on.

8   **Q.**   So your push that day began at the north camp?

9   **A.**   Correct.

01:29   10   **Q.**   And did you participate in some of the arrests that were

11   made at the north camp?

12   **A.**   As we started moving through the north camp, yes.

13   **Q.**   Approximately how many arrests did you participate in?

14   **A.**   Oh, gosh.  Probably somewhere between seven and ten the

01:29   15   whole day.

16   **Q.**   And were those arrests -- what kind of activity was the

17   basis for those arrests at the north camp?

18   **A.**   Anywhere from being identified as someone throwing objects

19   at law enforcement -- I would say a majority of them were

01:29   20   people throwing objects at law enforcement, or as we were

21   moving forward, they wouldn't move out of the way of the line,

22   so the line would just envelope them and then they would be

23   taken into custody.

24   **Q.**   And during that push at the north camp there were quite a

01:30   25   number of protesters who were wearing gas masks?

1  **A.**   There were some that I saw, but I don't remember there

2  being a lot.

3  **Q.**   There were officers who were wearing gas masks.

4  **A.**   I never observed any wearing gas masks.

01:30  5  **Q.**   You didn't see any officers wearing gas masks --

6  **A.**   Not that I --

7  **Q.**   -- at the north camp?

8  **A.**   Not that I remember, no.  We weren't shooting gas.

9  **Q.**   As you moved out of the north camp area, what time do you

01:30  10  think that was?

11  **A.**   Oh, gosh.  We were there for several hours at the north

12  camp area, so my guess -- I couldn't even guess.  Three o'clock

13  maybe, maybe earlier, maybe later.

14  **Q.**   Three o'clock when you left the north camp area?

01:30  15  **A.**   Started moving out of the north camp, up the road, yes.

16       MS. COOK:  Okay.  If I could have just a minute.

17  **Q.**   (MS. COOK CONTINUING)   And you arrived at the area where

18  Ms. Fallis was later arrested around 5:30 in the evening?

19  **A.**   Yeah, roughly.  In that general timeframe, yeah.

01:31  20  **Q.**   A couple hours after you were finished at the north camp?

21  **A.**   Correct.

22  **Q.**   And when you arrived at that area, you arrived with

23  tactical vehicles?

24  **A.**   There were, I mean, yeah, the same vehicles that were

01:31  25  there at the north camp.

139

1    Q.   Including the armored vehicles and a BearCat.

2    A.   The MRAP, the Humvees and the BearCat, yes.

3    Q.   And those vehicles were equipped with loudspeakers?

4    A.   The BearCat was.

01:31    5    Q.   Who was primarily using that loudspeaker?

6    A.   I don't know.   It was attached to the vehicle, and whoever

7    was sitting in the passenger's seat was using it.

8    Q.   Do you know Lieutenant Ternes?

9    A.   No.

01:32    10    Q.   Were the loudspeakers on the BearCat being used to warn

11    the officers when there was rifle fire heard in the area of the

12    Cannonball Bridge?

13    A.   The loudspeakers came across just asking all mobile field

14    force members to step back behind the armored vehicles.   It was

01:32    15    not put out over the loudspeaker that there was any rifle fire.

16    Q.   But you learned that someone was concerned about that

17    apparent report of rifle fire.

18    A.   So the whole week they had briefed that they were

19    concerned about it the entire time, and then when we got back

01:32    20    behind the vehicles, that's when they -- like somebody

21    addressed the group without a loudspeaker saying, "There's been

22    reports of rifle fire.   We just want you guys to stay here

23    until we figure out what's going on."

24    Q.   And that would have taken place around 5:50 p.m.?

01:32    25    A.   Roughly, yeah.   Well, no, that probably would have been

1    more like 4:40 -- or 5:40.  Sorry.

2    **Q.**   5:40?

3    **A.**   Probably, because we were back there -- we were paused

4    before everything happened with Redfawn for, I'm guessing, at

5    least 10 to 15 minutes.

6    **Q.**   And you never heard any rifle fire, yourself.

7    **A.**   No.

8    **Q.**   Never heard any confirmation that there was any rifle

9    fire.

10   **A.**   It was pretty loud on the front line, so there's -- I

11   don't think we would have heard it.

12   **Q.**   Well, my question to you was, you never heard any

13   confirmation that there had been any either, did you?

14   **A.**   If another law enforcement officer tells me there's been

15   rifle fire, I'm going to believe him, so that's my confirmation

16   that there was.

17   **Q.**   That's all you need.

18   **A.**   Right.

19   **Q.**   So around 5:40 then the officers were behind the armored

20   vehicles?

21   **A.**   Roughly, yeah.  Yep.

22   **Q.**   And was there a period of time when officers were just

23   taking a break too?

24   **A.**   It was that time.

25   **Q.**   Time to take a break?

**A.**   Yeah, they told us to just hang out and relax.

**Q.**   And in front of the armored vehicles, that's where the protesters were.

**A.**   Correct.  They had backed off because they had no idea what we were doing.

**Q.**   And there was kind of a buffer zone between the front of the armored vehicles and the location of the protesters?

**A.**   At that point, yes, there was.

**Q.**   So when this break was over, how -- and let me just ask you this.  Would it then have been ten until 6:00 when the break was over?

**A.**   I don't know.  It sounds about right.

**Q.**   Sometime shortly before 6:00 p.m.?

**A.**   Right.

**Q.**   And after the break was over, the officers began to return to their previous positions?

**A.**   Well, the reason why officers began to return to their previous positions was because a lady in a white car pulled up, and so everyone moved forward trying to figure out what was going on, because when she moved up and started yelling, the protesters starting -- started moving forward again, and so the mobile field force started coming back up online.

**Q.**   So if she hadn't driven up, what, the officers would have just stayed behind the armored vehicle?

**A.**   Probably continued to take a break until -- until we were

142

1    told otherwise.

2    **Q.**   Did you see the woman drive up in the white vehicle?

3    **A.**   No, I observed other law enforcement get down out of the

4    vehicles and start moving forward, so I stepped forward to see

5    what was going on.

6    **Q.**   And when you stepped forward to see what was going on,

7    where were you standing?

8    **A.**   I was standing right at the end of the MRAP, between --

9    the MRAP was, I believe, on the left.  The BearCat was on the

10   right.  I was standing kind of between them at the tailgate

11   looking back away from the line as we were standing kind of

12   around that tailgate of the MRAP.

13   **Q.**   And from that vantage point could you see the white

14   vehicle?

15   **A.**   Not pull up, no.  I mean, there were a lot of bodies in

16   the way, and the doors to the two vehicles were kind of open,

17   so I walked up between all that to see what was going on.

18   **Q.**   And when -- after you walked up to that area, could you

19   see the white vehicle?

20   **A.**   Yes.

21   **Q.**   And what did you observe?

22   **A.**   That it was parked in front of the MRAP and blocking the

23   way.

24   **Q.**   Blocking what way?

25   **A.**   The way of the MRAP.  Like the MRAP could not continue

143

1   down the road because the white vehicle was in the way.

2   **Q.**   And it was stopped anyway.  It was parked, right?

3   **A.**   Correct.

4   **Q.**   And the law enforcement vehicles were parked completely

01:36   5   across the highway.

6   **A.**   There's only two lanes, so it would have been the MRAP and

7   the BearCat, yes.

8   **Q.**   So they were blocking the highway.

9   **A.**   Correct.

01:36   10   **Q.**   And did you see the woman who got out of the white

11   vehicle?

12   **A.**   I saw the lady standing there screaming and yelling that

13   I'm assuming got out of the vehicle.

14   **Q.**   Could you hear what she was screaming or yelling?

01:36   15   **A.**   No idea.

16   **Q.**   Did you go closer to find out what was going on?

17   **A.**   No, I didn't.  I mean, I was up there, but I wasn't --

18   like I wasn't directly dealing with her.  I was just seeing

19   kind of what the commotion was about.

01:36   20   **Q.**   Did you hear someone order that she should be arrested for

21   screaming and yelling?

22   **A.**   No, she was not arrested.

23   **Q.**   Well, I know she wasn't arrested, but did you hear someone

24   say that she should be arrested?

01:37   25   **A.**   No.

144

**Q.**   Did you think she had been arrested for screaming and
yelling?

**A.**   Initially I thought she had been arrested.

**Q.**   What's initially?

**A.**   So as I was standing up there and she was screaming and
yelling, right before my attention was turned to Redfawn -- I
guess after that it was my assumption that she had been
arrested, but as it turns out, I was wrong.

**Q.**   When did you find out that you were wrong?

**A.**   When I came up here, I think, for the -- our last meeting.

**Q.**   So up until you came up here on or about November the 16th
of 2017, you thought that the women in the white vehicle had
been arrested because she was yelling or screaming.

**A.**   I didn't know what the reason for her being arrested was.
I just thought that she had been arrested.

**Q.**   Okay.   In fact, your report that you authored back in
November of 2016 affirmatively states that she was taken into
custody.

**A.**   Right, because I thought she had been arrested.

**Q.**   And so you put it in your report without knowing it.

**A.**   Correct.   It was my assumption.

**Q.**   Okay.   So was it after the point in time when you thought
that the woman from the white vehicle had been arrested that
you saw Ms. Fallis for the first time?

**A.**   Yes.

1          MS. COOK:  Could we take a look at the bystander

2     video?  This is -- this is Exhibit A, Your Honor.

3     **Q.**   (MS. COOK CONTINUING)  All right.  Do you see Ms. Fallis

4     in this video?

01:39  5     **A.**   Yeah, she's got the backpack with the red fire

6     extinguisher on it.

7     **Q.**   Okay.  And, incidentally, the fire extinguisher is somehow

8     secured onto the side of that backpack, correct?

9     **A.**   Appears to be.

01:39  10    **Q.**   All right.  And would you agree with me that standing in

11    front of Ms. Fallis is a gentleman with a red bandana?

12    **A.**   Yeah, he would be the guy I was referring to earlier as

13    the security.

14    **Q.**   Security for the protesters.

01:39  15    **A.**   Correct.

16    **Q.**   And he's standing with his back to the area where the

17    officers are standing?

18    **A.**   Yes.

19    **Q.**   No officer immediately behind him?

01:39  20    **A.**   This is well after she was in the face of whatever -- of

21    when I identified that she needed to be taken into custody.

22    **Q.**   Okay.  So at this point in time you've already decided

23    that she should be arrested.

24    **A.**   Yes.

01:40  25          MS. COOK:  Could we run it back then from the

146

1   beginning?

2   **Q.**   (MS. COOK CONTINUING)   And you stop me, sir -- stop me

3   when you --

4   **A.**   It's not on the video.

5   **Q.**   Pardon?

6   **A.**   It's not on the video.

7   **Q.**   All right.   So prior to this point you've already decided

8   she should be arrested.

9   **A.**   Right, because the main infraction that had taken place is

10   not on this video.

11   **Q.**   In fact, she's not near any of the law enforcement

12   officers on this video, is she?

13   **A.**   At this point, no.

14   **Q.**   And she's been coming -- she's been approaching the

15   BearCat and the MRAP from the rear of the white vehicle,

16   correct?

17   **A.**   Earlier in the video she had, yes.

18   **Q.**   Well, I mean, that's what we've just seen on the video,

19   right?

20   **A.**   Before the video.

21   **Q.**   She's walking towards the police line, correct?

22   **A.**   I don't remember seeing her in the video walking towards

23   the police line.

24            MS. COOK:   Let's move it back again then.

25            MR. HAGLER:   I'm sorry to interrupt.   May I try to

147

1    clarify something for the record here about this exhibit?

2              MS. COOK:  Sure.

3              MR. HAGLER:  Deputy Schmit has observed the other --

4    the YouTube video --

01:41    5              MS. COOK:  Okay.

6              MR. HAGLER:  -- that we had previously.

7              MS. COOK:  Then we'll take a look at that too.

8              MR. HAGLER:  This is -- this is a different video

9    than that video.

01:41   10              MS. COOK:  We understand that.

11              MR. HAGLER:  So I'm not sure -- and this is the point

12    of clarification that I have, whether Deputy Schmit has seen

13    this video before today.

14              MS. COOK:  Well, he's testified that he was present

01:42   15    at the scene, so I'm assuming he could recognize --

16              MR. HAGLER:  No, I understand correctly, but when he

17    said -- when he made a comment about something not being on

18    this video, I'd like to clarify that he's testifying about what

19    he has seen here today on this video and not some -- a video

01:42   20    he's previously looked at.

21              THE WITNESS:  I'm sorry.  I assumed this was the

22    video I was shown yesterday.

23    Q.   (MS. COOK CONTINUING)  Well, regardless of which video it

24    is, you recognize Ms. Fallis in this video, don't you?  You

01:42   25    identified her a minute ago.

148

**A.**   Right.  And I think right now I see she's kind of standing

off to the right a little bit.

**Q.**   Well, why don't we take this one back and then we'll see

when she comes into the video.  Okay.  You didn't see her in

01:43   close proximity to any of the law enforcement officers here,

did you?

**A.**   Not on this video, no.

**Q.**   Okay.  We're at 32 seconds here.

MR. HAGLER:  She was -- she was present on that video

01:43   earlier than this, though.

MS. COOK:  Not on this video.  She was present

walking up toward that area.

THE COURT:  Let's move on and let's --

MS. COOK:  Okay.

01:43   THE COURT:  -- play the video.  We can argue about

who was present at what time forever, but we all saw her near

the back of the vehicle walking towards the line, so let's move

on.

**Q.**   (MS. COOK CONTINUING)  So when did you first observe Ms.

01:44   Fallis?

**A.**   The first time I observed Ms. Fallis was when she was

standing in the face of an officer screaming and pointing.

**Q.**   And you think that was minutes prior to the time that

you've observed her in this video standing pretty quietly

01:44   without being in close proximity to an officer, correct?

149

1  **A.**   I believe so, yes.

2  **Q.**   Okay.  So if you saw her in close proximity to an officer

3  and then that yelling, that screaming, whatever it was that

4  concerned you ceased, there wasn't any basis for thinking that

01:44  5  the officer was in any danger, was there?

6  **A.**   It doesn't mean she's going to stop that behavior, though.

7  **Q.**   And that behavior would be her yelling and her screaming.

8  **A.**   No, the behavior that I referenced earlier where she was

9  in the face of the officer screaming and yelling.  He was

01:44  10  having to scream "get back" and push her away from him.

11  **Q.**   Well, she didn't have anything in her hands, did she?

12  **A.**   No.

13  **Q.**   She didn't physically touch anyone, did she?

14  **A.**   In this video, no.

01:45  15  **Q.**   Well, she didn't physically touch anyone at the site.

16  **A.**   From what I remember, she was in his face, and he was

17  having to push her away from him.

18  **Q.**   My question to you was, she didn't touch anybody, did she?

19  **A.**   Not here, no, not on the video.

01:45  20  **Q.**   What do you mean "not here"?

21  **A.**   Not on the video, she did not, no.

22  **Q.**   I'm asking what you saw.

23  **A.**   What I saw --

24  **Q.**   He can --

01:45  25           THE COURT:  Can we hold on here?  The court reporter

150

1    can't take down everybody --

2            MS. COOK:  I apologize.

3            THE COURT:  -- talking over one another, so let Ms.

4    Cook finish her question, and, Deputy Schmit, wait until she's

01:45   5    done with her question until you respond, but let's avoid

6    talking over one another, please.

7    **Q.**   (MS. COOK CONTINUING)  We can all agree that this video

8    doesn't depict her touching anyone.

9    **A.**   Correct.

01:45   10   **Q.**   But you didn't see her touching anyone at any time when

11   she was out at that site, did you?

12   **A.**   When I was out at the site, yes, she was in the face of

13   the officer, forcing him to push her away from him.

14   **Q.**   Maybe you don't understand my question.  My question to

01:46   15   you is, you didn't see her ever touch anyone, did you?

16           MR. HAGLER:  Objection, asked and answered.

17           MS. COOK:  He hasn't --

18           THE COURT:  Overruled, but let's just let him --

19           MS. COOK:  It's a yes or no --

01:46   20          THE COURT:  -- answer the question and then we'll

21   move on to the next question.

22           MR. HAGLER:  He answered it yes.

23           THE COURT:  I overruled the objection.  Let him

24   answer the question.

01:46   25          THE WITNESS:  State your question again.

1   **Q.**   (MS. COOK CONTINUING)  Yes or no, did you ever see her

2   touch anyone?

3   **A.**   Yes, there was body contact.

4   **Q.**   Well, that would be an important fact for you, wouldn't

01:46   5   it?

6   **A.**   I don't know about that.  It's what I observed.

7   **Q.**   Well, I'm just saying if you saw a protester touching a

8   law enforcement officer, that would be significant.

9   **A.**   Yes.

01:46   10   **Q.**   It was significant to you, apparently, if that is what

11   you're testifying was the basis for making a decision to arrest

12   her --

13   **A.**   Yes.

14   **Q.**   -- correct?

01:46   15   **A.**   Yes.

16          MS. COOK:  May I approach the witness, Your Honor?

17          THE COURT:  You may.

18   **Q.**   (MS. COOK CONTINUING)  And I'm looking at Bates Number 80.

19   Mr. Schmit, I'm handing you a copy of your supporting narrative

01:47   20   authored on or about November the 1st of 2016.  Is that the

21   narrative that you wrote?

22   **A.**   Yes.

23   **Q.**   And did you write that narrative report following your --

24   following the arrest of Ms. Fallis?

01:47   25   **A.**   Yes.

1    **Q.**   You wrote it for the purpose of providing it to the

2    state's attorney?

3    **A.**   Yes.

4    **Q.**   So that the state's attorney could use it in Ms. Fallis's

01:47    5    prosecution?

6    **A.**   Yes.

7    **Q.**   Well, that's what you knew would be -- it would be used

8    for, isn't it?

9    **A.**   Yeah.

01:47    10   **Q.**   And you knew that it was important to put into your

11   narrative all the important facts that you heard and observed

12   prior to her arrest.

13   **A.**   Right.  Yes.

14   **Q.**   Where in your narrative do you say that she physically

01:48    15   touched the officer?

16   **A.**   It doesn't.

17   **Q.**   It's not in there anywhere, is it?

18   **A.**   No, it does not.

19   **Q.**   Okay.  So you testified that you had watched an earlier

01:48    20   video.  Watched it with the government's attorneys?

21   **A.**   Yeah, I assumed it was this one, but I watched a video

22   similar to this one.

23   **Q.**   Okay.  So why don't we take a look at it.

24          THE COURT:  What exhibit number are we looking at?

01:49    25          MS. COOK:  This is B, am I correct?  Just a minute,

1    Your Honor.  I apologize.  So this will be --

2             THE COURT:  Well, before it's played, let's get it

3    marked as --

4             MS. COOK:  Yes.

01:49    5    THE COURT:  -- what exhibit we're looking at here so

6    the record is clear.

7             MS. COOK:  This is the government's YouTube video,

8    which is Exhibit 15 -- Government's Exhibit 15.

9             THE COURT:  All right.

01:50    10   MS. COOK:  Could we stop, Your Honor, for just a sec?

11   Q.   (MS. COOK CONTINUING)  What communication, if any, did you

12   have, Officer, with the mobile field force officer that you

13   believed wanted to have Ms. Fallis arrested?

14   A.   So after I observed what happened, I walked up and I just

01:51    15   -- my confirmation said, "Hey, do you want me to arrest her?"

16   And he said, "Yes, if you can, please do," or something to that

17   effect.

18   Q.   And what did you believe the basis for that arrest to be?

19   A.   Her aggressive nature, being in his face, screaming,

01:51    20   shouting, doing what she was doing.

21   Q.   And screaming is not a crime, correct?

22   A.   No.

23   Q.   Shouting at a law enforcement officer is not a crime?

24   A.   Nope.

01:51    25   Q.   You didn't hear her say anything of a threatening nature?

1  **A.**   It was more, like I said before, when she was -- she got

2  in his face and he was having to push her away from him, and

3  she was there making body contact with him, that that's what

4  drew my attention to --

01:51   5  **Q.**   That whole episode that you left out of your report,

6  apparently.

7  **A.**   Well, I didn't go into great detail on it, but it's there.

8  **Q.**   Well, you didn't go into any detail, right?

9  **A.**   Okay.

01:52   10  **Q.**   So when you saw her up in the officer's face, as you say,

11  she had nothing in her hands?

12  **A.**   No, not that I remember seeing.

13  **Q.**   And there was continuously a security person for the water

14  protectors who was standing between Ms. Fallis and the line of

01:52   15  law enforcement.

16  **A.**   No, he came over after.  He also observed what was going

17  on.  He came over and began ushering her away.

18  **Q.**   Well, he was standing there during the end of the video

19  that we just watched, right?

01:52   20  **A.**   Yes, on the video he was.

21  **Q.**   What's the name of the mobile field force officer with

22  whom you spoke?

23  **A.**   I have no idea.  He was a Hennepin County guy, I think,

24  but I don't know who he is.

01:52   25  **Q.**   And you didn't make any record of who he was?

155

1   **A.**   No.

2   **Q.**   Before deciding to arrest Ms. Fallis, did you ask the

3   advice of the other members of the -- your team -- your arrest

4   team?

01:53   5   **A.**   No, they had not witnessed what I had.

6   **Q.**   Well, I thought you testified earlier that if you thought

7   that someone should be arrested, you would go back and consult

8   with the other members of the team first.

9   **A.**   Correct.   I turned around to Rusty and I said, "Hey" -- I

01:53   10   told the other -- I think it was Rusty and Myron that were

11   standing right there.   I told them, "Hey, this is who we need

12   to go get.   This is what's going on."

13   **Q.**   You hadn't given any direction to Ms. Fallis to step back.

14   **A.**   I had not, no.

01:53   15   **Q.**   No voice had come over the loudspeaker telling her or any

16   of the other protesters to step back?

17   **A.**   Not on the loudspeaker.   There were other officers there,

18   again, telling them to get back.

19   **Q.**   You've listened to the video that we just played.   Do you

01:53   20   hear any of the law enforcement officers saying, "Get back"?

21   **A.**   Not on the video, no.

22   **Q.**   You basically let this mobile field force officer make the

23   decision about whether or not Ms. Fallis should be arrested?

24   **A.**   Based off of what I observed and his confirmation, yes.

01:54   25   **Q.**   And that observation was that she was yelling or screaming

156

1    at him.

2    A.    Again, it goes back to her level of aggression, being in

3    his face, screaming, yelling, forcing the body contact.

4    Q.    But the aggression was verbal aggression, if it was

01:54    5    aggression at all.

6    A.    Right.  She never took a swing at him, or anything.

7    Q.    Okay.  So after you made a decision that you were going to

8    arrest her, how long did you wait before you decided to do

9    that?

01:54    10    A.    I don't know how long it was between the time I decided to

11    arrest her and when it actually happened.  I waited for an

12    opportunity to present itself.

13    Q.    So she was quiet, she was standing back behind the

14    security officer when you decided --

01:55    15    A.    She was not.

16    Q.    -- to arrest her.

17    A.    No, she had continued screaming and yelling.  The security

18    guy moved her back.  As she got moved back, the gentleman that

19    you could see in the one video in the red and black flannel

01:55    20    stepped forward and he began screaming and yelling, so the

21    security guy moved towards him, trying to kind of keep him

22    back.

23          At that time Ms. Fallis turned and started walking

24    parallel to the line, down into the ditch, continuing to scream

01:55    25    and yell.  At that point she had isolated herself, so I ran

157

1   down into the field with Rusty, and Canales was behind me, and

2   attempted to effect an arrest.

3   Q.   And when you said she walked down, away from the main

4   group, she was walking in front of the line.

01:55   5   A.   Correct, parallel.

6   Q.   And the line was forming, right?

7   A.   I remember it being in place, but it might have been

8   forming.  I don't know.

9   Q.   Have you had an opportunity to look at the drone video?

01:56   10   A.   Yes.

11           THE COURT:  Which is what exhibit?

12           MS. COOK:  The drone exhibit is the government's --

13           MR. HAGLER:  Fourteen.

14           MS. COOK:  -- Exhibit 14.

01:57   15   Q.   (MS. COOK CONTINUING)  So you've watched this video

16   before?

17   A.   Yes, portions of it.

18   Q.   What are we looking at now?

19   A.   It looks like right now we are all standing behind the

01:57   20   vehicles.

21   Q.   And this would be during the period of time that you've

22   described as when officers were taking a break?

23   A.   Correct.

24   Q.   And do you see the white vehicle?

01:57   25   A.   I do, in front of the MRAP.

158

1   **Q.**   Okay.  Do you know how Ms. Fallis arrived on the scene?

2   **A.**   I do not.  I had never -- I hadn't seen her until I saw

3   her --

4   **Q.**   So what's going on now as we see the officers moving

01:58   5   around?

6   **A.**   I'm assuming they're talking with the lady from the white

7   car, and protesters are starting to move forward, and we're

8   starting to kind of move up online again.

9   **Q.**   Okay.  So as we're looking at the video, on the far left

01:58   10   we see the line forming.

11   **A.**   Correct.  People are starting to move back into position.

12   **Q.**   Okay.  And that would be before you decided to make an

13   arrest, that these -- that the line was already forming.

14   **A.**   Correct.  I assume so, anyway.  I don't know.

01:58   15   **Q.**   Okay.  So as this line was forming, do you know where you

16   were standing?

17   **A.**   Right now I'm in between the BearCat and the MRAP vehicle

18   or towards the front of it.

19   **Q.**   And just for the record, which vehicle is the MRAP?

01:59   20   **A.**   The tan one, the big tall one with the white vehicle in

21   front of it.

22         MS. COOK:  Stop it.  And can we show that -- the

23   timestamp as 12:30 for the record.

24   **Q.**   (MS. COOK CONTINUING)  Is there a point here where you can

01:59   25   tell if you are moving?

1  **A.**   No, I can't see myself amongst others sitting there.

2  Again, I think I'm towards the front of the MRAP, but I don't

3  know where.

4  **Q.**   When you did decide to arrest Ms. Fallis, would that have

02:00  5  been in the area which is now depicted as the far left of the

6  video?

7  **A.**   I'm sorry?  I don't --

8  **Q.**   That's where that took place?

9  **A.**   Yes, the upper left area in front of where the Humvee is

02:00  10  at.

11  **Q.**   All right.  So if you can just direct your attention

12  there, were you moving in that direction at some point?

13  **A.**   Eventually you see me come running out, but I don't

14  know -- I don't see myself right now.

02:01  15  **Q.**   Okay.  Do you see somebody walking out now?

16        MS. COOK:  Can we stop it?

17        THE WITNESS:  Yep, I see Redfawn right there.

18  **Q.**   (MS. COOK CONTINUING)  And what is the timestamp here,

19  12:58?  Okay.  Do you see Ms. Fallis in the video now?

02:01  20  **A.**   I do.

21  **Q.**   And what is she doing?

22  **A.**   She, as I had said earlier, is walking parallel to the

23  line, continuing to yell and scream.

24  **Q.**   And there's a -- there's a distance that you can see in

02:01  25  the video between her and the line.

160

1    **A.**    Yes.

2    **Q.**    Not getting up in the face of the people on the line.

3    **A.**    At this point, no.

4    **Q.**    Okay.  And what is the timestamp now, 13:00?  So is that

02:01   5    the point at which you tackle her?

6    **A.**    Yes, this is the point in which I'm trying to effect an

7    arrest on her.

8    **Q.**    And what was going on other than the fact that she was

9    walking in front of the line at that point?

02:02   10    **A.**    Just the yelling and screaming that I had mentioned.

11    **Q.**    Which you -- you agreed with me earlier she has a

12    Constitutional right to do.

13    **A.**    Right.

14    **Q.**    Okay.

02:02   15    **A.**    But at this point -- I mean, before I had already said

16    that we were going to attempt to effect an arrest but that

17    there was security in the way, so this is where she isolates

18    herself, walks away from that group of people and it was safe

19    to do so.

02:02   20    **Q.**    And you had an opportunity to look at the video that the

21    government had in addition to this drone video.

22    **A.**    Which video?

23    **Q.**    They showed you the -- did you see the YouTube video?

24    **A.**    The one depicting from the protesters' point of view, yes.

02:02   25    **Q.**    Well, from the view behind the protesters, toward the

1   police line?

2   **A.**   Yes.

3   **Q.**   Yes.  And you don't see anything in that video that would

4   depict what you are telling us happened, do you?

02:03   5   **A.**   No, because it's well after.

6   **Q.**   Well, you haven't seen any video that depicts what you're

7   telling us occurred earlier.

8   **A.**   No, I haven't seen anything.

9   **Q.**   You haven't seen any still photographs that depict what

02:03   10   you tell us happened earlier.

11   **A.**   No.

12   **Q.**   And you can't tell us the name of the officer that you

13   claim was involved and said that -- wanted to have her

14   arrested.

02:03   15   **A.**   No.

16   **Q.**   So when you came up -- when you decided to tackle Ms.

17   Fallis, she was walking away from you?

18   **A.**   Correct.

19   **Q.**   Not running, just walking?

02:03   20   **A.**   Correct.  She -- she didn't know I was coming, so --

21   **Q.**   She didn't have anything in her hands?

22   **A.**   Not that I remember, no.

23   **Q.**   And you tackled her from the back.

24   **A.**   Correct, because she was walking away from me, and it

02:04   25   wasn't my intention to tackle her.  My intention, like I said

162

1   before, was to grab her, pull her behind the line, effect an

2   arrest.

3   Q.   Well, I'm not asking you what your intention was, but what

4   you did was to tackle her from the back, correct?

02:04   5   A.   Well, she sat down.  I fell over the top of her, so, yes.

6   Q.   All right.  So this is Exhibit Number A, and while we're

7   waiting for this to queue up, Officer, how much do you weigh?

8   A.   About 235 pounds without gear on.

9   Q.   And with all the gear that you were wearing on October the

02:04   10   27th?

11   A.   Oh, gosh, 245, 250, I would guess.  I don't know.

12   Q.   So we see you tackling her at 2:54.  Can we run it back

13   again so you can have a look at that?  So can you identify

14   yourself in this video?

02:05   15   A.   Yes.

16   Q.   Please do.

17   A.   I am right there with the camouflage camelback on.

18   Q.   And this would -- this video is depicting the moment where

19   you hit her from the back?

02:05   20   A.   Well, when I tried to grab her from the back, yes.

21   Q.   But, in effect, when you hit her from the back.

22   A.   Sure.  Yes.

23   Q.   And took her down.

24   A.   Yes.

02:06   25        MS. COOK:  And this is at 2:53.  Let's go on then --

163

1   can we run it back once more?

2   **Q.**   (MS. COOK CONTINUING)  And tell us what we're seeing when

3   we run it back in terms of your action.

4   **A.**   So I'm running down the hill.  So I ran down the hill like

02:06   5   I said, wrapped my arms around her, tried to grab her.  You can

6   see me trying to pull her towards the line to get her behind

7   the line to effect the arrest.  We both fall on the ground.  I

8   think I fall to my left knee first, if you can -- I saw myself

9   fall to my left knee here before I fall on top of her.

02:06   10       MS. COOK:  And this next video will be Exhibit Number

11   B, and this will be a selection from Government's Exhibit 15 in

12   slower motion, if we might just have one minute, Your Honor.

13   **Q.**   (MS. COOK CONTINUING)  So Ms. Fallis would be wearing the

14   blue jeans that you see in the center of the video?

02:08   15   **A.**   Yes.

16   **Q.**   And the video depicts her on her back, is that correct?

17   She's on her back?

18   **A.**   From this position, yes, it looks like it.

19   **Q.**   Well, I mean, that's what we're seeing.  We're seeing --

02:08   20   **A.**   Right.

21   **Q.**   -- a leg up with a boot on the ground.

22   **A.**   Right.

23   **Q.**   Okay.  All right.  So let me -- what I'm going to show you

24   now is Defendant's Exhibit F-3.  Can you recognize yourself in

02:09   25   that video?

1   **A.**   Yes, I do.

2   **Q.**   And --

3          THE COURT:  Well, you said -- you said Defendant's

4   Exhibit F-3.  There is no such beast.

02:10   5          MS. COOK:  It's a still photo from the bystander

6   video that's on defendant's exhibit list.

7          THE COURT:  Well, are you referring to Exhibit 3?

8          MS. COOK:  It's labeled Defendant's Exhibit F-3.

9          THE COURT:  Okay.

02:10   10  **Q.**   (MS. COOK CONTINUING)  So, Officer, directing your

11  attention to what we've labeled Defendant's Exhibit F-3, do you

12  see yourself in this photograph?

13  **A.**   Yes.

14  **Q.**   And would this photograph be depicting the moment when you

02:10   15  have hit Ms. Fallis from the back --

16  **A.**   Yes.

17  **Q.**   -- immediately before taking her to the ground?

18  **A.**   Yes.

19  **Q.**   And if you look at your right arm in this photograph, can

02:10   20  you see that your arm is actually through the strap on her

21  backpack?

22  **A.**   It looks that way.  I couldn't tell you if that's how it

23  was, though, but, yes, it looks that way.

24  **Q.**   And there's a red object that appears to be on or near

02:11   25  that backpack.  Can you tell what that object is?

165

1   **A.**   It looks like a fire extinguisher.

2   **Q.**   And that would be, in your mind, the same fire

3   extinguisher that you saw affixed to her backpack in the

4   earlier video.

02:11   5   **A.**   Yes.

6   **Q.**   I'm now showing you what has been marked and admitted as

7   Defendant's Exhibit F-8, and this would be a still shot

8   depicting Ms. Fallis after she's landed on her back on the

9   ground, correct?

02:12   10   **A.**   Yes.

11   **Q.**   And if you look at the boots, those would be her boots,

12   correct?

13   **A.**   Yes.

14   **Q.**   And both feet are in the air.

02:12   15   **A.**   They appear to be, yes.

16   **Q.**   All right.  So it appears as though she would be laying on

17   her back, having landed on her back with her feet somewhat in

18   the air.

19   **A.**   Yes, it looks that way.

02:12   20   **Q.**   And, finally, I'm showing you what's marked as Defendant's

21   Exhibit G-2, a still shot from the YouTube video.  Can you see

22   Ms. Fallis in this photograph?

23   **A.**   Yes.

24   **Q.**   And, again, she would be wearing the blue jeans.  Yes?

02:13   25   **A.**   Yes.

166

1  **Q.**   Is that your knee that's pushing on the back of her thigh?

2  **A.**   No.

3  **Q.**   Do you know whose knee that is?

4  **A.**   I have no idea.  It's going to be a North Dakota trooper's

02:13  5  pant leg, it looks like.  I don't know, though.

6  **Q.**   And it looks as though the knee is pressing into the area

7  of her thigh immediately above the knee, is that correct?

8  **A.**   It looks that way.

9  **Q.**   Well, you don't have any reason to doubt --

02:13  10  **A.**   Right.

11  **Q.**   -- that that's what this photograph is depicting.

12  **A.**   Right.

13  **Q.**   And you'd be familiar with putting pressure on the back of

14  an individual's thigh or femoral nerve as a result of your

02:13  15  training in pressure point tactics, correct?

16  **A.**   Yes, the femoral -- or, I mean, the common peroneal sits

17  in that general area, as well as the femoral.

18  **Q.**   Okay.  And one of the ways to gain control of somebody is

19  to put pressure on one of those nerves, correct?

02:14  20  **A.**   Yes, that would be a way to get control of someone or to

21  get -- gain compliance.

22  **Q.**   And the reason that you do that is to cause pain to gain

23  compliance.

24  **A.**   Correct.  I can't speak, though, that that's what he's

02:14  25  doing.  That's what it looks like.

1   **Q.**   I understand that.  Well, I'm just asking you, you're

2   familiar with that kind of police tactic.

3   **A.**   Usually it's in strikes, though.  It's not usually a

4   constant pressure, but, yes.

02:14   5   **Q.**   But it can be a constant pressure, and that's one of the

6   things that you learned at the South Dakota police academy,

7   correct?

8   **A.**   We learned at the academy constant -- like strikes, not a

9   constant pressure on that femoral.  I could see how it could be

02:14   10   used that way, but that's not how we learned it.

11   **Q.**   You learned that if you apply pressure, whether it's a

12   strike or just pressure, to a nerve or a group of tendons, that

13   causes pain --

14   **A.**   Yes.

02:14   15   **Q.**   -- and assists you in gaining control of someone.

16   **A.**   Yes.

17   **Q.**   And if the subject to whom you are applying that pain is

18   not completely stabilized, their initial reaction is to move

19   away.

02:15   20   **A.**   Yes.

21   **Q.**   And they make that movement away from you consciously or

22   subconsciously.

23   **A.**   Right.  I mean, you get -- try and get away from the pain.

24   **Q.**   Sure.  And another effect of the application of pain in

02:15   25   that manner is that the subject that you're trying to control

1    has a decreased ability to hear verbal commands.

2    A.    I don't know that, but, I mean --

3    Q.    Would you be surprised if that's in your training

4    materials?

02:15    5    A.    No.

6    Q.    Okay.  So after you hit Ms. Fallis from the back and

7    knocked her down on the ground, other officers immediately

8    rushed to help you.

9    A.    Correct, because she was resisting.

02:15    10    Q.    And Rusty Schmidt was probably the first officer who

11    arrived there.

12    A.    He followed me out of the group -- or out behind the line

13    and was right behind me, yes.

14    Q.    In fact, he went to the ground together with you and Ms.

02:16    15    Fallis.

16    A.    Correct.  I went down to her back.  He fell over the top

17    of us and landed on her front side.

18    Q.    What do you mean "on her front side"?

19    A.    So eventually she's over on her left-hand side.  He would

02:16    20    be on the front of her.  I would have been on the back of her.

21    Q.    And as you struggled with her, there were additional

22    officers who came to the area.

23    A.    Correct.

24    Q.    And as Ms. Fallis was laying on the ground, where were you

02:16    25    positioned?

1   A.   The entire time I would have been towards the road of her,

2   so as she's --

3   Q.   Towards what?  I'm sorry?

4   A.   Towards the road, on that side of her, so she would have

02:16   5   been laying there.  I'd have been on the side of the road.

6   Rusty would've been on the side of the fence because, I mean,

7   you can't really -- because as you saw, she looks like she's at

8   one point on her back.  Then we flip her, so how do you say

9   what side she's on.

02:17   10   Q.   So when she's flipped, you mean she's on her stomach.

11   A.   She's on her left side.  She --

12   Q.   And there are periods of time when she's on her stomach as

13   well, right?

14   A.   Correct.

02:17   15   Q.   She's got both -- at some point she's got both hands

16   pinned underneath her.

17   A.   At the very beginning, yes.

18   Q.   And when she's on her stomach with both hands pinned

19   underneath her, you were trying to pull her left hand out from

02:17   20   under her.

21   A.   Correct.

22   Q.   And Rusty Schmidt is trying to pull her right hand from

23   under her.

24   A.   Correct.

02:17   25   Q.   And there are other officers who are in the immediate

170

1   vicinity trying to assist you.

2   **A.**   Correct.

3            MS. COOK:  May I approach, Your Honor?

4            THE COURT:  You may.

02:18   5   **Q.**   (MS. COOK CONTINUING)  So I'm going to hand you what I've

6   marked as Defendant's Exhibit Schmit 1.  Can you take a look at

7   that profile?  Assume that it's a female laying facedown on the

8   ground, and put a mark on that diagram where you believe you

9   were positioned.

02:18   10  **A.**   So this is her laying down?

11  **Q.**   Yes, facedown on the ground, if you could show us where

12  you were positioned.

13  **A.**   Obviously she's not laying flat like this, but I put where

14  I'm on -- about on her abdomen/arm area I would have been.

02:18   15           THE COURT:  So this is a new --

16  **Q.**   (MS. COOK CONTINUING)  And put your --

17           THE COURT:  This is a new numbering system now that

18  we're in, or --

19           MS. COOK:  We're just designating the diagrams by the

02:18   20  name of the witness who has marked on the diagrams, Your Honor.

21           THE COURT:  Do you intend to offer this, or --

22           MS. COOK:  I do.

23  **Q.**   (MS. COOK CONTINUING)  So would you put your initials

24  beside the place where you've indicated that you were on her or

02:19   25  near her body?

171

1   A.   Sure.  I did so.

2   Q.   And you're aware of the fact that Rusty Schmidt was also

3   there.

4   A.   Correct.

02:19   5   Q.   Can you indicate on the diagram where you believe he was?

6   A.   Okay.

7   Q.   And there was an -- also an officer who was near Ms.

8   Fallis's head, was there not?

9   A.   Yes, there was one to my left.  I don't know exactly where

02:19   10   he was.

11   Q.   Would you indicate as best you can remember where that

12   officer was?

13   A.   (Indicating.)

14   Q.   Do you know who that officer was who was closer to her

02:19   15   head area?

16   A.   I have no idea.

17   Q.   Was there also an officer who was applying pressure to her

18   legs?

19   A.   There was one to my right, yes.

02:20   20   Q.   And would that have been Officer Bitz?

21   A.   I have no idea.

22   Q.   Would it have been Officer Mugan?

23   A.   I have no idea.

24   Q.   How many officers were applying pressure to Ms. Fallis's

02:20   25   body as you were trying to pull her left arm out from under

1  her?

2  **A.**   I only remember seeing Rusty directly across from me, one

3  officer to my left and one officer to my right.  I wasn't

4  really focused on who was around me.  I was focused on trying

02:20   5  to get her left arm out.

6  **Q.**   So you're recalling four officers?

7  **A.**   I know there was one to my left, one to my right, one

8  straight across from me.  I don't have -- I don't remember if

9  there was anyone else sitting right there.

02:20   10  **Q.**   And you remember the officer who was close to Ms. Fallis's

11  head.

12  **A.**   I remember them being there, yes.

13  **Q.**   Okay.  And you remember --

14  **A.**   I couldn't tell you who it was.

02:21   15  **Q.**   I'm sorry.  And you remember there were officers who were

16  close to her feet.

17  **A.**   Yeah, there was one to my right, yes.  I don't know what

18  his -- what he was doing, though.

19        MS. COOK:  I'd move the admission of Defendant's

02:21   20  Hearing Exhibit Schmit 1, Your Honor.

21        MR. HAGLER:  No objection, Your Honor.

22        THE COURT:  Defendant's Exhibit -- or Schmit 1 will

23  be received then.

24  **Q.**   (MS. COOK CONTINUING)  So as I understand it, you were

02:21   25  pulling on Ms. Fallis's left arm to try to get that out from

173

1   under her.

2   **A.**   Correct.

3   **Q.**   And Rusty Schmidt was pulling on her right arm.

4   **A.**   Right, trying to get it behind her back.

02:21   5   **Q.**   Okay.  And when you say "trying to get it behind her

6   back," he was trying to cuff her right hand?

7   **A.**   Correct, with flexi-cuffs.

8   **Q.**   And at one point he had pulled her right arm out from

9   underneath her?

02:22   10  **A.**   Correct.

11  **Q.**   Bent it backwards and was pulling up on the arm in order

12  to attempt to cuff her.

13  **A.**   I know it was behind her back, and he was trying to cuff

14  her.  I don't know about pulling up on it, or anything.

02:22   15  **Q.**   Well, in order to get it behind her back and cuff her, he

16  would have been pulling on the arm, wouldn't he?

17  **A.**   Yes.

18  **Q.**   And at that point you eased up on the left arm.

19  **A.**   Correct, because as I'm pulling on it, her right arm is

02:22   20  moving, making it harder for them to get the flexi-cuff on.

21  **Q.**   But when you eased up on the left arm, you applied

22  pressure to her back and held her down.

23  **A.**   Correct, because she was still struggling, so I put my

24  hands on her back and pushed down, trying to get her to hold

02:22   25  still.

174

1   Q.   Okay.  And you put your weight on her to push her down to

2   get her to hold still so that Rusty Schmidt could pull up on

3   her right arm behind her back.

4   A.   I put some weight on her.

02:22

5   Q.   And there was a point at which you were transitioning

6   between pulling on her left arm and pushing down on her back.

7   A.   Right.  I let go of the left arm and put my hands on her

8   back and --

9   Q.   And pushed down.

02:23

10   A.   Right.

11   Q.   And that was the same time when there -- these other

12   officers were also having hands on her body.

13   A.   Correct.

14   Q.   That's when you first heard the shots.

02:23

15   A.   Yeah, it was shortly after I let go of her that I heard

16   the shots.

17   Q.   And she wasn't struggling at all at that point.

18   A.   Yes, she still was not complying and she was still

19   struggling.

02:23

20   Q.   Complying with what?

21   A.   People telling her to give us your hands, stop struggling.

22   Q.   Well, you didn't say that to her.

23   A.   I don't remember if I did or didn't.

24   Q.   And you didn't see a gun at that point?

02:23

25   A.   No.

1   **Q.**   In fact, you never saw a gun in her hand.

2   **A.**   I saw the barrel of a gun come out from underneath her

3   after the -- after, I believe, the third shot.

4   **Q.**   And -- but that's when Rusty Schmidt was pulling the gun

02:24   5   out.

6   **A.**   No, that's when he lunged his hands in to try and gain

7   control of it.

8   **Q.**   Well, you didn't see her hand on the gun, did you?

9   **A.**   No, it was underneath her.

02:24   10   **Q.**   And in none of the reports that you've authored have you

11   ever said that you saw the gun in Ms. Fallis's hand.

12   **A.**   I don't know.  I don't -- I don't remember if I --

13   **Q.**   Well, as you sit here today --

14   **A.**   Right.

02:24   15   **Q.**   -- you didn't see the gun in her hand.

16   **A.**   No.

17   **Q.**   You saw the gun when Rusty Schmidt pulled it out.

18   **A.**   Right.

19   **Q.**   And when he pulled the gun out, he threw it or handed it

02:24   20   to someone.  What did he do with it?

21   **A.**   I think he tossed it off to the side.

22   **Q.**   Okay.  Who picked it up?

23   **A.**   I don't know.  Off of the video I could -- I could make a

24   guess, but I don't know.

02:25   25   **Q.**   Was this your first involvement ever in a shooting

1   incident?

2   **A.**   Yes.

3   **Q.**   Among the years that you've worked for -- worked in

4   Pennington County, you've never been involved in a shooting

02:25   5   incident?

6   **A.**   Nope.

7   **Q.**   So you knew immediately that this was something out of the

8   ordinary.

9   **A.**   Yes.

02:25   10   **Q.**   Meaning that if someone was charged in this offense, it

11   would be a serious charge.

12   **A.**   Yes.

13   **Q.**   And it would be important for you to do whatever you could

14   to assist other officers in preserving the scene, if it was

02:25   15   going to be a scene of a crime.

16   **A.**   I wasn't focused on that at the time.  I was focused on

17   ensuring Rusty was fine.  But, yes, I mean, that's standard

18   procedure, trying and preserve the scene.

19   **Q.**   Well, you were able to assure yourself that Rusty was fine

02:25   20   pretty quickly, weren't you?

21   **A.**   Yes.

22   **Q.**   And after you knew that he was fine, did you turn your

23   attention back to the police work?

24   **A.**   I walked back over to where she was handcuffed and was

02:26   25   being searched.

177

1   **Q.**   The officers who were surrounding Ms. Fallis were wearing

2   gloves, weren't they?

3   **A.**   I don't know.

4   **Q.**   Were you wearing gloves?

02:26   5   **A.**   I don't remember.  If I was, they would've been black.

6   **Q.**   Okay.  Well, whatever color they were, that was kind of

7   part of the uniform, wasn't it?

8   **A.**   It's a part of the uniform, but it's not required to be

9   worn, so --

02:26   10   **Q.**   Yeah, but you were wearing.

11   **A.**   I don't know.  If you showed me a picture with me wearing

12   them, then I was.

13   **Q.**   Okay.  Well, let -- let me just move on from that.  You

14   would agree with me that it was important to try to preserve

02:26   15   the evidence from that scene.

16   **A.**   Yes.

17   **Q.**   And that means to preserve the gun in condition so that it

18   could be tested?

19   **A.**   Yes.

02:27   20   **Q.**   And you're aware of the fact that guns can be tested for

21   fingerprints?

22   **A.**   Yes.

23   **Q.**   And that they can be tested for gunshot residue?

24   **A.**   Yes.

02:27   25   **Q.**   As can the hands of persons who are suspected of being

178

1  shooters?

2  **A.**   Yes.

3  **Q.**   And you knew that it would be important to locate the

4  bullets that had been fired from that gun?

02:27    5  **A.**   Yes.

6  **Q.**   Or protect any evidence that was in the immediate

7  vicinity?

8  **A.**   Yes.

9  **Q.**   Did you participate in any way in trying to protect that

02:27    10  scene?

11  **A.**   No, I -- I did not.

12  **Q.**   Did you participate in any way in the search of the

13  immediate area to collect the bullets that would have been

14  discharged from that gun?

02:27    15  **A.**   No, as soon as this was over with, we went up to the

16  buses.

17  **Q.**   And just left the scene as it was.

18  **A.**   Yes.

19  **Q.**   Neither you nor anybody else in your immediate vicinity

02:28    20  did anything to locate the bullets or try to locate the bullets

21  at that point in time.

22  **A.**   I did not, no, but they had the area marked off so, I

23  mean, somebody eventually, I'm assuming, came out to do that.

24  **Q.**   You're assuming.

02:28    25  **A.**   Yeah.

1   **Q.**   And you're assuming that somebody handled the gun in a

2   manner that it could have been tested later.

3   **A.**   I don't know.  Yeah, I don't know.

4   **Q.**   And that it would have been tested later.

02:28   5   **A.**   If it was ordered to be, I don't know.

6   **Q.**   Well, it would be standard procedure, wouldn't it?

7   **A.**   I don't know.  I'm not an investigator.  I don't know what

8   they normally do after that.

9   **Q.**   Don't know that -- whether it would be important to try to

02:28   10   preserve the evidence that was collected at the scene of a

11   police shooting?

12   **A.**   It would be important to preserve that evidence, but I

13   don't know what they did to do so.

14   **Q.**   But it wasn't your job.

02:28   15   **A.**   No.

16         MS. COOK:  No further questions.

17         THE COURT:  All right.  Thank you, sir.  You may step

18   down.  May this witness be excused?

19         MR. DELORME:  Yes.  Yes, Your Honor.

02:29   20         MR. HAGLER:  Yes.  May he, please, Your Honor?

21         THE COURT:  Any objection?

22         MS. ARMOUR:  No objections, Your Honor.

23         THE COURT:  All right.  So before we start the next

24   witness, how many witnesses does the government have?

02:29   25         MR. HAGLER:  Well, Your Honor, in the interest of the

180

1   timing, we're probably going to not call a couple we had

2   intended to, but we probably have four or five more.

3           THE COURT:  And how long are they going to take on

4   direct examination?

02:29    5            MR. DELORME:  I would say with respect to the three

6   witnesses I have remaining, Your Honor, I'm going to try to

7   keep it at 15 to 20 minutes max.

8           THE COURT:  And how long are we going to take on

9   cross-examination?

02:29   10          MR. ELLISON:  We don't know which three they are or

11   four.

12          MS. COOK:  If we knew which ones they were, we might

13   be able to approximate that.

14          MR. DELORME:  Jacob Jones, Your Honor, Dan Kensinger,

02:30   15   Jeremy Buehre, Bennett Bitz, and possibly Dan Heidbreder.

16          THE COURT:  All right.

17          MR. ELLISON:  Some of them could be lengthy, Your

18   Honor.

19          THE COURT:  Well, I was told we needed one day for

02:30   20   this hearing, and that's what I allocated for this hearing.

21   But obviously we're not going to get done, so we'll talk about

22   that at the end of the day.

23          Please call your next witness.

24          MR. DELORME:  United States would call Trooper Jacob

02:30   25   Jones, Your Honor.

1                       TROOPER JACOB JONES,

2    having been first duly sworn, was examined and testified as

3    follows:

4                       DIRECT EXAMINATION

02:30   5    BY MR. DELORME:

6    Q.    Trooper Jones, how long have you been a highway patrol

7    trooper?

8    A.    Just over six years.

9              THE COURT:  Is that microphone on?

02:31   10             MR. DELORME:  Maybe get a little closer, Your Honor.

11             THE COURT:  All right.

12   Q.    (MR. DELORME CONTINUING)  You said just over six years?

13   A.    Yes, sir.

14   Q.    Okay.  So you were a trooper on October 27, 2016?

02:31   15   A.    Yes.

16   Q.    Did you take part in an operation in south Morton County

17   involving protesters?

18   A.    Yes.

19   Q.    What was your -- your assigned duties on that day?

02:31   20   A.    On that day -- I had actually been working the day before.

21   I was held over as kind of an extra person that day.  I had

22   been over on a different county road dealing with a different

23   situation and then been called over to Highway 1806 to assist

24   the officers that were there.

02:32   25   Q.    And what county road was that?

                                182

1    A.    County Road 134, I believe.

2    Q.    You started your day off on County Road 134?

3    A.    At one point during the day we ended up at County Road

4    134, on the -- at that bridge.

02:32    5    Q.    But you weren't there all day.

6    A.    No.

7    Q.    At some point in time you moved to 1806?

8    A.    Yes, sir.

9    Q.    Do you know -- do you recall what -- about what time that

02:32    10   was?

11   A.    It would have been later in the afternoon, maybe around

12   like 4:00 p.m., or so, somewhere in there.

13   Q.    Now, after you moved to 1806, do you recall a protester

14   involved in discharge of a firearm?

02:32    15   A.    Yes, sir.

16   Q.    Were you involved in that particular matter?

17   A.    I was very nearby, yes.

18   Q.    When you say "very nearby," explain to me what you mean by

19   "nearby."

02:32    20   A.    I was holding onto the right hand of the individual that

21   discharged the firearm.

22   Q.    Let's take one stop back.

23   A.    Okay.

24   Q.    Just prior to this individual coming into the -- I guess,

02:33    25   being taken into custody by law enforcement, what were you

183

1  doing?

2  A.   At that time I was part of the line of officers that went

3  across the highway and into the ditches, and I was down on the

4  -- it would be the left side or the east side of the highway on

02:33   5  the front line.

6  Q.   When you say "line," is that the individuals -- the very

7  front line of the officers that would push people south?

8  A.   Yes, sir.

9  Q.   And how is it that you first came into contact then with

02:33   10  this -- this particular protester?

11  A.   I came into contact with her after another officer had

12  identified her for arrest and they ended up on the ground, and

13  then I moved in to assist them.

14  Q.   Okay.  And where are you at when you see this transpire?

02:33   15  A.   It was at -- them going to the ground was right in front

16  of me.

17  Q.   So them going to the ground -- did you have any kind of

18  observation of this protester prior to her being taken into

19  custody or being -- I guess going to the ground with an

02:34   20  officer?

21  A.   Yes, sir, just a short -- a very short, brief time.  I saw

22  the individual approach from my right over across towards the

23  front of our line.

24  Q.   Okay.  So if that line was spread from east to west across

02:34   25  1806, when you say from your right, she was coming down from

184

1   the west?

2   A.   Correct, from the road down to the east ditch where I was

3   standing.

4   Q.   And what did you observe of her?

02:34

5   A.   I remember she had a gas mask on.  That drew my attention

6   the most primarily because I didn't have a gas mask, I guess.

7   It was something that -- it was out of the ordinary.  And I

8   remember her carrying like a fire extinguisher and just -- I

9   could hear her shouting, but I couldn't make out any words.  I

02:34

10  mean, I had a helmet on.  She had the mask on, and it was

11  concerning watching her come down towards our line.

12  Q.   Do you recall anything else that she was wearing on that

13  particular date?

14  A.   I believe she had a backpack on of some sort and she had

02:34

15  like full clothing, like a coat and pants on, and stuff.

16  Q.   I'll show you what's been marked as Government's

17  Exhibit 8.  Does this particular item look familiar to you?

18  A.   Yes, that appears to be the gas mask that she was wearing.

19  Q.   I want to show you what's been marked as Government's 01.

02:35

20  Does this particular item look familiar to you?

21  A.   I believe that was the backpack that she was wearing.

22  Q.   Now, you observed this individual walking down from your

23  right to your left.  She's got a gas mask on, backpack, draws

24  your attention to her.  Did you know this officer was going to

02:35

25  move forward in the line and try to take her into custody?

1   **A.**   I heard somebody say that protester needs to be arrested.

2   And then at that point I saw a deputy go through the line, and

3   then that's when the struggle ensued.

4   **Q.**   Okay.  And by "struggle," what do you mean?

02:36   5   **A.**   They ended up going to the ground, and I remember another

6   protester coming up towards them, and that was concerning to us

7   because they were out in front of us.  And typically we want

8   everybody either in a line or behind us, and so a group of us

9   or kind of the whole line moved forward to keep them from being

02:36   10   vulnerable to other people.

11   **Q.**   Okay.  So you moved forward initially then to help secure

12   the officer that was trying to effect this arrest.

13   **A.**   Correct.

14   **Q.**   Okay.  Then what happened?

02:36   15   **A.**   At that time then they were basically just kind of right

16   at my feet, so I went down with them to help try to secure her

17   because they were struggling.

18   **Q.**   And when you say you went down to try to help secure her,

19   where on her body did you go down and try to help secure?

02:36   20   **A.**   I was down near her legs.  Initially she was on her back,

21   and I was by her legs, which were kind of kicking, and stuff.

22   And she ended up getting rolled onto her stomach, and I was

23   still by her legs kind of sitting, kneeling on her legs so she

24   couldn't kick anybody, and then I ended up assisting with her

02:37   25   right hand.

1   **Q.**   Okay.   Now, just so we have a clear understanding, when

2   you're on her legs, are there other officers around or on this

3   individual?

4   **A.**   Yeah, she was pretty much totally surrounded with people

02:37   5   trying to get her under control because she was resisting so

6   much.

7   **Q.**   And when you say "resisting so much," are you talking

8   about kicking, pulling?

9   **A.**   Just -- yeah, just squirming around, just being

02:37   10   noncompliant.   People were telling her to stop and to put her

11   hands behind her back, and she just kept pulling, and stuff.

12   And like I said, I'd -- the right hand was out kind of in my

13   face.   Another officer to my right had that arm and was -- he

14   was kind of struggling to get his zip cuff over her hand, and

02:37   15   so I assisted him in sliding that over her right hand.

16   **Q.**   And how did you assist him?

17   **A.**   Just helped him.   I grabbed it, put it over her hand, and

18   then we both just kind of -- I think we were holding onto her

19   hand to keep it secure, and the left hand was unaccounted for

02:37   20   at that point.

21   **Q.**   So you had the right hand.   Left hand is unaccounted for.

22   **A.**   Correct.

23   **Q.**   So then what happened?

24   **A.**   At that point then, while I was, you know, holding onto

02:38   25   her, just right up to my right, maybe three fight away, or so,

187

1   the ground exploded with -- with a gunfire.

2   Q.   And by "gunfire," how many shots are you talking about?

3   A.   I remember three shots.

4   Q.   Were all -- all pretty quick in succession?

02:38   5   A.   To my memory, yeah, it was -- I just remember the dirt and

6   the ground -- kind of like a percussion wave and the dirt

7   spraying.

8   Q.   And at that point did you know where those shots came

9   from?

02:38   10   A.   I did not know at that point.  It was kind of

11   disorienting.

12   Q.   What happened after that?

13   A.   At that point I remember other officers yelling, "Gun,

14   gun, she's got a gun."  And I remember standing up at that

02:38   15   point kind of disengaging.  I did draw my firearm, but there

16   were so many other officers around.  And then right in quick

17   succession somebody said that they had the gun secured.

18   Q.   So right after the gun went off, somebody yelled, "Gun."

19   You stood up and drew your -- withdrew your firearm from your

02:39   20   holster?

21   A.   Yes, sir.

22   Q.   And then the gun was secured by somebody else.

23   A.   Correct.

24   Q.   What did you after -- what did you do after that?

02:39   25   A.   At that point, once the gun was secured, she was still

1   resisting.  She wasn't secured.  I moved back down towards her,

2   and we got -- we were having trouble tightening the zip cuffs.

3   They were kind of jammed up.  They were eventually tightened.

4   And then when other officers began searching her, I moved

02:39   5   around towards her head and just kind of held her head, made

6   sure she was breathing because people were around her, and I

7   was making sure she was okay, that, you know, I wasn't hit,

8   that other officers weren't hit, and I just -- I stayed up

9   there by her head.

02:39   10   Q.   Would you say it took a lot of force from the officers to

11   effect this -- the arrest due to the resistance?

12   A.   Yeah, it was -- it was the most -- the biggest struggle

13   that I've been in in my six years.

14   Q.   Now, you're up by her head, and you're trying to make sure

02:40   15   she's safe, but helping to secure her as well.  Do you hear

16   anything from her at all during this struggle?

17   A.   I remember her saying that she was Oglala, and then she

18   did kind of like a war whoop cry, I guess you'd call it.  It's

19   kind of hard to describe.

02:40   20   Q.   Is it something similar to what you heard earlier in the

21   day or throughout the day?

22   A.   Yes.

23   Q.   Now, taking one step back real quick, when you saw her to

24   your right coming down from the road into the -- down into the

02:40   25   ditch in front of you, you said it had caught your attention.

1    **A.**    Yes, sir.

2    **Q.**    She had a gas mask on.  She had a backpack, a fire

3    extinguisher, so you're alert at that point.

4    **A.**    Yeah, it was -- we had kind of been doing nothing for a

02:40    5    short time.  There had been kind of a lull in activity, you

6    could say.  And there were people up by the road, but there was

7    really nobody in front of us.  And all of a sudden she just

8    kind of came out of nowhere or up from the road.  I hadn't

9    really seen her before that and just was -- she was coming

02:41    10    straight down at our line, which was -- that was the first time

11    anybody had really done that that day when I had been on that

12    road.

13    **Q.**    And her coming down and the conduct that she was involved

14    in, did that have any -- did that have any, I guess, effect on

02:41    15    the other protesters around the area?

16    **A.**    I was -- at that point I was focused.  I guess you could

17    say I almost had tunnel vision.  I was staring straight at her

18    because she caught my attention the way, you know, she was

19    aggressively kind of coming down at us, and I was just really

02:41    20    focused on what she was doing being that she had a gas mask on.

21    I didn't have a gas mask.  None of my other fellow officers had

22    gas masks on, so it made me feel a little bit like I was at a

23    disadvantage, so, I mean, I was focused on her and what she was

24    doing.

02:41    25    **Q.**    Now, I know you came -- you'd come over from County Road

190

1    134, correct?

2    **A.**   Yes, sir.

3    **Q.**   And would that be after the north camp was already

4    cleared?

02:42    5    **A.**   I think they were in the process of clearing it or it had

6    been cleared.  We had gone over to County Road 134, and there

7    was kind of a standoff, I guess you could say, at the bridge.

8    And vehicles ended up getting lit on fire, and stuff, so I

9    wasn't -- we were standing there in a field while the main

02:42    10    stuff was going on up by the camp on 1806.

11    **Q.**   Okay.  But when you came to 1806 to assist, most of that

12    had been completed.

13    **A.**   Correct.

14    **Q.**   Did you have any further contact with the individual that

02:42    15    was arrested after she was secured?

16    **A.**   Nope.

17    **Q.**   Didn't search her, or anything?

18    **A.**   Nope, I just stayed by her head, and then that was it.

19    **Q.**   After she was secured, she was taken away?

02:42    20    **A.**   Yes, by other officers.

21    MR. DELORME:  That's all the questions I have, Your

22    Honor.

23    THE COURT:  You may inquire.

24    MS. ARMOUR:  Thank you.

02:43    25    ///

1                <u>CROSS-EXAMINATION</u>

2  <u>BY MS. ARMOUR:</u>

3  **Q.**   Good afternoon, Trooper.

4  **A.**   Good afternoon.

02:43   5  **Q.**   My name is Molly Armour.  I'm going to ask you a couple

6  questions, okay?

7  **A.**   Okay.

8  **Q.**   You are a North Dakota Highway Patrol trooper, is that

9  correct?

02:43  10  **A.**   Yes, ma'am.

11  **Q.**   And your badge number is 249 --

12  **A.**   Yes, ma'am.

13  **Q.**   -- is that right?  And I want to turn your attention back

14  to how you began this day and how you got to this day, okay?

02:43  15  You had been on duty for 24 hours --

16  **A.**   Just --

17  **Q.**   -- at this point.

18  **A.**   Just under 24 hours, yep.

19  **Q.**   That's a long period of time, correct?

02:43  20  **A.**   Yes.

21  **Q.**   Who else on your team had been with you for that long?

22  **A.**   I believe everybody else that was also working the night

23  shifts.

24  **Q.**   And do you remember who those people are?

02:43  25  **A.**   I do not.

1   Q.   But they were also North Dakota Highway Patrol troopers?

2   A.   Yeah, there'd be North Dakota Highway Patrol and what

3   other -- what other -- other agencies were working with us at

4   that time.

02:44   5   Q.   Approximately how many people do you think worked the

6   night shift with you?

7   A.   I'd be guessing.  I don't remember.

8   Q.   You -- when you're in the middle of this 24-hour day, you

9   had received a briefing, correct, in the morning?

02:44   10   A.   I did not.

11   Q.   Okay.  When did you receive a briefing about what was

12   happening out in the field?

13   A.   I never did.

14   Q.   So you just -- no one ever gave you any instructions?  You

02:44   15   just went out into the field.

16   A.   Well, I was from the night before, and I was doing other

17   duties, I guess, when the main operations started, and we

18   weren't intended to be a part of that, so, yeah.  No, I was

19   never briefed.

02:44   20   Q.   And you were really honest when you wrote your report, and

21   you reported that you had been suffering from a high level of

22   stress that day, correct?

23   A.   I don't know if I used the word "suffering."  I'd have to

24   see my report.

02:45   25   Q.   You said that you had a high level of stress, correct?

1  **A.**   That's possible.

2  **Q.**   Would you like to look at your report to clarify?

3  **A.**   Sure.  Yeah.

4       MS. ARMOUR:  I'm going to mark Defendant's Exhibit

02:45    5  Jones 1.  May I approach, Your Honor?

6       THE COURT:  You may.

7  **Q.**  (MS. ARMOUR CONTINUING)  I'm handing you a three-page

8  report.  Do you want to look that over?

9  **A.**   Yes, I believe on the second page I said that my stress

02:45   10  level was pretty high.

11  **Q.**   And your fatigue level too, correct?

12  **A.**   Yes.

13  **Q.**   I want to turn your attention to the woman that you saw

14  that day who you now know to be Ms. Fallis, okay?

02:46   15  **A.**   Okay.

16  **Q.**   When you observed her, she was wearing a large coat,

17  correct?

18  **A.**   Yes.

19  **Q.**   And you believed it to be a heavy coat, correct?

02:46   20  **A.**   I believe so, yes.

21  **Q.**   And as you've testified, you also observed her wearing a

22  gas mask, right?

23  **A.**   Yes.

24  **Q.**   And you heard her screaming things, but you couldn't make

02:46   25  out what she was saying because you couldn't hear what she was

1    saying through the mask, right?

2    **A.**   Correct.

3    **Q.**   What you heard was muffled, right?

4    **A.**   You could say that, yes.

02:46    5    **Q.**   And that mask covered her whole mouth, right?

6    **A.**   Yes, her whole face.

7    **Q.**   Her whole face.  And you were also wearing a mask,

8    correct?

9    **A.**   I had a helmet on.

02:46    10    **Q.**   You had your visor down, right?

11    **A.**   I believe so, yes.

12    **Q.**   Your glass or plastic visor?

13    **A.**   I believe I had one on, yes.  Some of the helmets didn't

14    have them, but I believe that one did.

02:47    15    **Q.**   And in the time that you were out there, you knew that

16    there had been some OC spray that had been utilized, correct?

17    **A.**   That, I'm not sure.  I wasn't there for any of that.

18    **Q.**   You weren't there for when any of the pepper spray was

19    used on the protesters?

02:47    20    **A.**   I don't recall seeing any pepper spray.

21    **Q.**   Okay.  But you wrote in your report that you couldn't also

22    hear things because you had a mask down on you, correct?

23    **A.**   Correct.  It muffled the noise a little bit.

24    **Q.**   Okay.  I want to see if we can try and find a picture of

02:47    25    you --

1  **A.**   Okay.

2  **Q.**   -- for you to help us identify who you are in this scene,

3  so I'd like to pull up Defendant's Exhibit A, and we're going

4  to try and look at all these officers.  I want to see if you

02:47  5  can figure out where you are in that, okay?

6  **A.**   Okay.

7  **Q.**   And we're seeing at 4 seconds into this video, it's a

8  protester's perspective, and it's approaching the police line,

9  correct?  Can you see that there on your screen?

02:48  10  **A.**   Yeah, I'm watching.

11  **Q.**   I'm sorry, Trooper.  Can you see that there?

12  **A.**   I can see it, yeah.  I'm just watching.

13  **Q.**   Okay.  And off to the right-hand side I'm going to direct

14  your attention.  We see an armored Humvee on the far right-hand

02:48  15  side, correct?

16  **A.**   Correct.

17  **Q.**   And we see this large military-looking vehicle right

18  directly in front of us, right?

19  **A.**   Correct.

02:48  20  **Q.**   And parked right in front of that is a white four-door

21  sedan, correct?

22  **A.**   Correct.

23  **Q.**   And this is at timestamp -- can we see that there?  Maybe

24  if we start it again, you see that 20 seconds in?

02:48  25  **A.**   Okay.

**Q.**   Okay.  Do you see yourself anywhere in those officers off

to the left-hand side?

**A.**   No.

**Q.**   Okay.  I want to direct your attention to the middle of

02:48   that.  Do you see Ms. Fallis standing there?

**A.**   I don't see her face on any of those.

**Q.**   Okay.  Do you see a woman with a baseball cap on that has

camouflage?

**A.**   I do.  Wearing blue jeans?

02:49   **Q.**   Wearing light blue jeans.  And do you see that she's got a

gas mask on her face?

**A.**   Yes, it looks like she does.

**Q.**   And what do you see tucked into the backpack on her back

there?

02:49   **A.**   It looks to be a red fire extinguisher possibly.

**Q.**   And that's affixed there to the backpack, correct?

**A.**   I would assume so.

**Q.**   Because you don't see her hand on it, do you?

**A.**   I do not.

02:49        MS. ARMOUR:  All right.  Let's -- as we continue to

watch it, let's keep our eye on that.  Let's pause here and go

back just a tish.

**Q.**   (MS. ARMOUR CONTINUING)  You see that there?  Is that a

better image of that fire extinguisher in her backpack?

02:49   **A.**   Yes, it is in the backpack.  I see that.

197

1  **Q.**   Okay.  And can we see the timestamp?  That's at

2  22 seconds, right?  I'm sorry.  Can we see that again?  Can you

3  see that on your screen?  It's a fleeting moment.  Try --

4  **A.**   I see it.

02:50   5  **Q.**   -- and catch it.  Okay.  And do you see yourself in any of

6  the law enforcement there yet?

7  **A.**   No.

8  **Q.**   Okay.  Let's keep going, and you let us know if you see

9  yourself, okay?

02:50   10  **A.**   Okay.

11  **Q.**   And you see a woman that's in blue approaching a

12  protester, correct?  Did you hear what she said to him?

13  **A.**   I cannot hear, no.

14  **Q.**   Okay.  Let's take it back.  Did you hear her say, "Back

02:50   15  off"?

16  **A.**   Yes.

17       MS. ARMOUR:  Okay.  Let's keep going.  Let's stop.

18  **Q.**   (MS. ARMOUR CONTINUING)  Who do you see in this

19  photograph?

02:51   20  **A.**   Anyone in particular, or do you want me to --

21  **Q.**   Do you see Ms. Fallis?

22  **A.**   Yes.

23  **Q.**   Okay.  Is there someone in front of her?

24  **A.**   Yes.

02:51   25  **Q.**   Do you know who that person is?

1   **A.**   No.

2   **Q.**   Who do you think that person is?

3   **A.**   I don't know.

4   **Q.**   It's not a law enforcement officer, right?

02:51   5   **A.**   Correct.

6   **Q.**   Okay.  There's someone with a red bandana covering his

7   face, right?

8   **A.**   Yes.

9   **Q.**   And he's wearing goggles, right?

02:51   10   **A.**   Yes.

11   **Q.**   And behind him we see this kind of wall of law enforcement

12   officers also with these visors down, right?

13   **A.**   Some of them, yes.

14   **Q.**   There's one upfront that doesn't, but I think every other

02:51   15   officer we see in this photograph has their visors down, right?

16   **A.**   It appears so.

17   **Q.**   And this is the exact same -- it looks like a similar

18   model to what you have, standard issue as your helmet with

19   visor, correct?

02:51   20   **A.**   What do you mean by "standard issue"?

21   **Q.**   Well, you didn't go purchase that on the -- on the market,

22   did you, for your -- for the North Dakota Highway Patrol?

23   **A.**   I did not.

24   **Q.**   That was given to you as part of your job?

02:52   25   **A.**   I believe I picked it up a few minutes before I was on the

199

1  road there.

2  Q.   Okay.  So these were widely available for people to put

3  on, right?

4  A.   I wouldn't say "widely."  There were some officers that

02:52   5  didn't get them because there weren't enough.

6  Q.   But you see the people that we're looking at at timestamp

7  45, and they have these visors down, right?

8  A.   Correct.

9  Q.   Just like you did, right?

02:52  10  A.   Correct.  I believe I had it down.

11  Q.   And because you testified that muffled some of what --

12  your ability to hear, right?  Okay.  Let's go forward.  Do you

13  see yourself anywhere in these officers yet?

14  A.   No.

02:52  15  Q.   Okay.  You see Ms. Fallis still in this video, right?

16  A.   Yes.

17  Q.   Can you hear anything that she's saying there?

18  A.   I can't tell if she's saying anything, no.

19  Q.   Okay.  But there's someone between her and the law

02:53  20  enforcement line, right?

21  A.   Yes, I see that.

22  Q.   Okay.  Let's keep going, and you haven't seen yourself

23  yet?

24  A.   No.

02:53  25  Q.   Where do you think you're stationed right now?

1  **A.**   I'd be -- from this perspective, I'd be down to the right

2  of the Humvee that's on the right at an angle.

3        MS. ARMOUR:  Okay.  So let's stop here since you

4  think that you're going to be on the right side, and let's try

02:53   5  and fast forward to where we can see some images there.  Okay.

6  Let's stop here at 2 minutes and 46 seconds, and we'll press

7  play.  Now let's just pause for a second.

8  **Q.**   (MS. ARMOUR CONTINUING)  Do you recognize that gentleman

9  on the left-hand side right above the person's head who's

02:54   10  wearing the American flag bandana?

11  **A.**   That appears to be Captain Bryan Niewind.

12        MS. ARMOUR:  Okay.  Great.  Let's keep going.  Pause.

13  **Q.**   (MS. ARMOUR CONTINUING)  Do you know who that is in that

14  picture there?

02:54   15  **A.**   I believe that's the deputy that went out to effect the

16  arrest.

17  **Q.**   And do you see something red off in the corner there on

18  the right-hand side where -- where he's taking Ms. Fallis down?

19  **A.**   Are you talking like right above his baton?

02:54   20  **Q.**   Exactly.

21  **A.**   I see something.  I don't know what it is, though.

22        MS. ARMOUR:  Okay.  Let's take it back and see if we

23  can figure out what that is.  Pause.  Take it back just a

24  second.  It's not so easy to go back just a second.

02:55   25  **Q.**   (MS. ARMOUR CONTINUING)  Did you see that fire

1  extinguisher on her -- affixed to her backpack there?

2  A.    I can't see that it's affixed.

3  Q.    Okay.  I'm going to show you some still shots that are in

4  evidence because it's kind of hard, as you can see, for us to

02:55  5  pause it in the right place.

6        MS. ARMOUR:  May I approach, Your Honor?

7        THE COURT:  You may.

8  Q.    (MS. ARMOUR CONTINUING)  I'm going to show you what's been

9  marked Defendant's Exhibit F-1 and F-3, okay?  And I want you

02:55  10  to take a look at those, and do you recognize those as coming

11  from this video?

12  A.    Yeah, they appear consistent.

13  Q.    Okay.  I'm going to put those on the screen so we can all

14  see them, okay?  Thank you.  First I'm going to show you F-1.

02:56  15  You see that there?  Can you see that exhibit sticker?

16  A.    Yes, ma'am.

17  Q.    And we had already talked about this.  We've seen Ms.

18  Fallis right there, right?

19  A.    Correct.

02:56  20  Q.    This is her, and this is this fire extinguisher that's

21  attached to her backpack, right?

22  A.    Correct.  It looks like it's in a mesh pocket.

23  Q.    Great.  Now -- I'm sorry.  Were you going to add anything

24  else?

02:56  25  A.    I was saying like a -- like a water bottle mesh pocket, or

202

1    something, is what it looks like it's in.

2    **Q.**   Okay.  And now I'm going to show you F-3.  Do you see that

3    there on your screen?

4    **A.**   I do see it.

02:56    5    **Q.**   Okay.  What we see is the officer who's taking Ms. Fallis

6    down, correct?

7    **A.**   Yes.

8    **Q.**   And what we see there is this fire extinguisher, right?

9    **A.**   I see it, yes.

02:57    10    **Q.**   And it almost looks like his arm is through this strap on

11    her backpack, right, as he's taking her down?

12    **A.**   I can't agree with that.  I can't see that his arm is

13    through the strap.

14    **Q.**   What do you think that is there?

02:57    15    **A.**   What is?

16    **Q.**   What do you think this is right here (indicating)?

17    **A.**   I don't know.

18    **Q.**   Okay.  But you see that that fire extinguisher is not in

19    her hand, right?

02:57    20    **A.**   I can't see the entire fire extinguisher.

21    **Q.**   Okay.  Do you see her hand anywhere in that photograph?

22    **A.**   I do not.

23    **Q.**   Okay.  So she wasn't really carrying the fire extinguisher

24    in her hand, right?

02:57    25    **A.**   I can't tell from that picture.  From my memory, I

1   remember her carrying it.

2   Q.   Okay.  But you just watched this video, and it wasn't

3   there, was it?

4   A.   I looked at the still frames and watched the video, and I

02:58   5   couldn't see that it was affixed to a backpack, or anything.

6   Q.   Okay.  And you wrote a report really soon after this

7   incident, and that's the report I had marked and you have up

8   there, right?

9   A.   Correct.

02:58   10   Q.   And nowhere in that report do you mention this fire

11   extinguisher, do you?

12   A.   I could glance through it here.

13   Q.   We'd sure appreciate it.

14   A.   No, I did not mention the fire extinguisher in the report.

02:58   15   Q.   And you wrote that report on October 29, 2016, correct?

16   A.   I believe so.

17   Q.   That was the day -- two days after this incident, is that

18   right?

19   A.   Correct.

02:58   20   Q.   That's when everything would've been fresh in your mind,

21   right?

22   A.   Correct.

23   Q.   And you knew that there had been a weapon that had been

24   discharged, right?

02:59   25   A.   Yes.

1   **Q.**   And it would have been very important for you to

2   memorialize any detail about the person that you believed was

3   the suspect for firing that weapon, right?

4   **A.**   I would do my best to, yes.

02:59   5   **Q.**   And a protester approaching a line wielding a fire

6   extinguisher would be an essential fact to include in that

7   report, right?

8   **A.**   Yeah, I mean --

9   **Q.**   But you didn't, did you?

02:59   10   **A.**   That's possible I forgot.

11   **Q.**   I'm going to approach and take that back from you, okay?

12   **A.**   Okay.

13         THE COURT:   And I think we're going to take a break.

14         MS. ARMOUR:   Thank you, Your Honor.

02:59   15         THE COURT:   I've got a court reporter that's good,

16   but her carpal tunnel syndrome isn't going to keep up with

17   hours upon hours of testimony, so we'll take about a 15-minute

18   recess, and we'll reconvene and continue with the questioning

19   of Officer Jones.

03:00   20         (A recess was taken from 3:00 p.m. to 3:16 p.m., the

21   same day.)

22         THE COURT:   Welcome back.  We're back on the record

23   in the *United States versus Ms. Fallis*.  We can continue with

24   the cross-examination of Officer Jones.

03:17   25         MS. ARMOUR:   Thank you.

205

1    **Q.**   (MS. ARMOUR CONTINUING)  Officer Jones, I'd like to talk

2    to you -- I'd like to talk to you about what you'd observed of

3    Ms. Fallis that day, okay?

4    **A.**   Okay.

03:17   5    **Q.**   Prior to her being taken down.

6    **A.**   Okay.

7    **Q.**   You never saw her push anyone, did you?

8    **A.**   No.

9    **Q.**   You never saw her throw anything, did you?

03:17   10   **A.**   No.

11   **Q.**   You -- did you even see her up there at the line speaking

12   her mind?

13   **A.**   I saw her once she was on her way down towards us.

14          MS. ARMOUR:  Okay.  So I'd like to look at the

03:17   15   Government's Exhibit Number 14, which I believe is the drone

16   video, and we're going to pause it for a second.

17   **Q.**   (MS. ARMOUR CONTINUING)  We're looking at -- so we have a

18   timestamp.  You see that there, 12:53?

19   **A.**   I see it.

03:18   20          MS. ARMOUR:  Okay.  We're going to press play.  Let's

21   pause.

22   **Q.**   (MS. ARMOUR CONTINUING)  Do you see Ms. Fallis there

23   walking parallel to the line?

24   **A.**   I can't make her out on the video.

03:18   25          MS. ARMOUR:  All right.  Let's keep going and see if

1  there's anything that helps us identify her.  Press play.

2  **Q.**   (MS. ARMOUR CONTINUING)  All right.  You see her being

3  tackled now?

4  **A.**   Yes, I see her now.

5  **Q.**   Okay.  So we know that that's Ms. Fallis, right?

6  **A.**   Correct.

7       MS. ARMOUR:  All right.  Let's take it back and watch

8  what she's doing as she walks out onto the line, so taking it

9  back to about 12:55 -- it looks like it's time for me to get a

10  new computer.  All right.  We'll start there.  We're looking at

11  12:27.

12  **Q.**   (MS. ARMOUR CONTINUING)  And as we're watching this drone

13  video, on the left-hand side you're over somewhere in that mass

14  of people on the shoulder of the road, right?

15  **A.**   Correct, on the left side.

16  **Q.**   Okay.  So what we see here is the road in the middle, and

17  we see the shoulder of the road on both sides, right?

18  **A.**   Yes.

19  **Q.**   And that's the curtilage of the road, right?

20  **A.**   I guess I would call it the ditch.

21  **Q.**   The ditch.

22  **A.**   Yep.

23  **Q.**   And you see that line now forming on the left-hand side?

24  And you see Ms. Fallis with her right hand extended.  Do you

25  see that?

1   A.   I see her, yes.

2   Q.   Okay.  Let's continue to watch her, and she just got

3   tackled there around 13:00, correct?

4   A.   That's what I saw, yes.

03:19   5   Q.   And what she was doing is she was walking parallel to the

6   line with her right hand extended, correct?

7   A.   That's what it looked like, yes.

8   Q.   And she's waving that right hand off to the side, right?

9   A.   Yes.

03:20   10   Q.   Okay.  So she wasn't coming towards the line.  She was

11   walking parallel to the line, correct?

12   A.   Correct.  From the video, that's what it looks like, yes.

13   Q.   And you were told that she was to be arrested, correct?

14   A.   I wasn't told.  I heard somebody say she needs to be

03:20   15   arrested or something similar to that.

16   Q.   So someone said she needs to be arrested.

17   A.   Yes.

18   Q.   Do you know why?

19   A.   I do not know why, no.

03:20   20   Q.   Do you know who said that?

21   A.   I do not.

22   Q.   Okay.  But what we do know is when she was alone walking

23   away from anyone, she was tackled by an officer, right?

24   A.   I saw her on the video get taken to the ground, yes.

03:20   25   Q.   And they went right down to the ground, right?

1  A.   Yes.

2  Q.   And then your line, the line that you were part of, moved

3  up and swallowed them, correct?

4  A.   We went up past them, yes.

03:21  5  Q.   And that was so that the arrestee would be on the law

6  enforcement side of that line and not the protester side of

7  that line, right?

8  A.   Correct, and then the people that were following behind

9  her would not have access to her or the other officer.

03:21  10  Q.   So you dropped back from where you were in the line to

11  assist with this arrest, right?

12  A.   Correct.

13  Q.   And when you approached her, she was on her back.

14  A.   Correct.

03:21  15  Q.   And then someone told you to flip her over, right?

16  A.   I don't know if anybody told me to flip her over, but she

17  was rolled onto her stomach so we could get to her hands.

18  Q.   Do you remember someone yelling to flip her over?

19  A.   They may have.  I don't recall it in my memory.

03:21  20  Q.   Would looking at your report --

21  A.   Yeah, I'd need my report.

22       MS. ARMOUR:  I'm approaching again, if I may, Your

23  Honor, with Jones -- Defendant's Exhibit Jones 1.

24  Q.   (MS. ARMOUR CONTINUING)  And so we can expedite this, I'm

03:22  25  going to direct your attention to the second page of the report

1   and the second full paragraph at the top of the page.  Did you

2   have a chance to review your report?

3   **A.**   I'm reading it right now.

4   **Q.**   All right.

03:22   5   **A.**   I don't see anything in that second paragraph about being

6   flipped over.

7   **Q.**   "I remember the suspect being on her back and someone

8   yelling to turn her over."  Do you see that there?

9   **A.**   Oh, you're in the third paragraph.

03:22   10   **Q.**   Yeah, the second full paragraph.  I'm sorry.

11   **A.**   Okay.  Yeah, someone yelled to turn her over.

12   **Q.**   And this is your report, right?

13   **A.**   Correct.

14   **Q.**   Okay.  So someone yelled to turn her over, right?

03:22   15   **A.**   Correct.

16   **Q.**   And so you and the other officers who were with her

17   flipped her onto her stomach facedown, correct?

18   **A.**   Correct.

19   **Q.**   And at that time her mask was still on her face, right?

03:23   20   **A.**   I wasn't up by her head.  I'm not sure.

21   **Q.**   Okay.  And that's because you were helping her at that

22   time -- helping to handcuff her with the flexi-cuffs, right?

23   **A.**   Correct.

24   **Q.**   And you had trouble getting the flexi-cuffs on because her

03:23   25   fingers kept getting caught in the loop, is that right?

1   **A.**   Correct.

2   **Q.**   So you put your body on her body, right?

3   **A.**   On her legs.

4   **Q.**   Okay.  So you were on top of her legs?

03:23   5   **A.**   Correct.

6   **Q.**   And there was an officer to your upper right, correct?

7   **A.**   Correct.

8   **Q.**   How many other officers were on her, do you remember?

9   **A.**   I don't remember.

03:23   10          MS. ARMOUR:  Your Honor, may I approach with

11   Defendant's Exhibit Jones 2?

12          THE COURT:  You may.

13   **Q.**   (MS. ARMOUR CONTINUING)  And this is another body diagram,

14   and we're not -- I'm going to show you here -- I'll give you my

03:24   15   pen.

16   **A.**   Okay.

17   **Q.**   And I want you to treat this like this is the back of her,

18   and I want you to write on here and circle where you were on

19   her body.

03:24   20   **A.**   (Indicating.)

21   **Q.**   And I want you to initial that clearly for me.

22   **A.**   Okay.

23   **Q.**   And I want you to mark where the officer on the

24   upper-right side was that you recall.

03:24   25   **A.**   (Indicating.)

211

1   Q.   And just so we know what that circle means, can you write

2   "upper-right officer"?

3   A.   Okay.

4   Q.   Is there anything else we need to write on here to make

5   this diagram complete?

6   A.   I don't know.

7   Q.   Do you remember anybody else on any part of her body?

8   A.   No.  I mean, there were -- there were other people, but I

9   don't know who was where.

10  Q.   Okay.  So this is, to the best of your recollection, what

11  you can recall.

12  A.   Yes.

13  Q.   Okay.  I'm going to come up and take that from you, okay?

14  And I'll take all of the things.  Thank you.  And I'm actually

15  going to put this on the Elmo real quick and I'm going to show

16  the government.  Okay.  And this is your initials right here?

17  A.   Yes.

18  Q.   And this is where you are on her body, right?

19  A.   Correct.

20  Q.   And her face is down --

21  A.   Correct.

22  Q.   -- right?

23  A.   Yep.

24  Q.   And this is another officer on the upper-right part of her

25  legs?

212

1    **A.**    Correct.

2    **Q.**    Okay.  And while this was happening, suddenly you felt the

3    percussion of three shots going off, right?

4    **A.**    Correct.

03:26    5    **Q.**    And at first you thought this might be the sound of some

6    less lethal rounds, right?

7    **A.**    I did.  I was confused and disoriented, yes.

8    **Q.**    So you were confused, right?

9    **A.**    Correct.

03:26    10    **Q.**    And you were disoriented at the time, right?

11    **A.**    From the percussion, yeah, I didn't know where it was

12    coming from.

13    **Q.**    And you saw something explode on the ground a couple feet

14    away, right?

03:26    15    **A.**    Correct.

16    **Q.**    It happened very fast, right?

17    **A.**    Yes.

18    **Q.**    You don't remember moving away from her, do you?

19    **A.**    I remember standing up.  I remember I was -- I remember

03:26    20    just kind of backing up and standing up as I drew my weapon.

21    **Q.**    And you took your weapon out, right?

22    **A.**    Correct.

23    **Q.**    And someone said -- and you -- and you pointed that weapon

24    at her, right?

03:27    25    **A.**    I did not.

213

1    **Q.**    Okay.  Someone said they had the gun, right?

2    **A.**    Correct.

3    **Q.**    And then you moved back in after that and helped secure

4    her, right?

03:27    5    **A.**    Correct.

6    **Q.**    And you had difficulty because the cuffs were not

7    tightening, right?

8    **A.**    Correct.  Both her hands were then in flex cuffs, and

9    nobody could get them to tighten down, and eventually they did

03:27    10    tighten down.

11    **Q.**    Okay.  And she was laying down on the ground at that time,

12    right?

13    **A.**    She was resisting on the ground, yeah.

14    **Q.**    She was resisting on the ground?  How was she resisting?

03:27    15    **A.**    Just squirming and being noncompliant and not -- not just

16    laying there and letting us handcuff her.  We had to forcefully

17    handcuff her.

18    **Q.**    Well, you then moved to her head, right?

19    **A.**    Correct.

03:27    20    **Q.**    And you did that to make sure she was breathing.

21    **A.**    Correct.

22    **Q.**    Because you thought she had been shot, right?

23    **A.**    I did not know if she had been shot, and also because

24    everybody was on her, I wanted to make sure she could still

03:27    25    breathe with that many bodies and people on top of her.

1    **Q.**   Okay.  So there's so many people on her that you're

2    worried as a trooper that she might not be breathing, right?

3    **A.**   Yes.

4    **Q.**   When you submitted your report, you disclosed that you had

03:28   5    used physical force in this arrest, correct?

6    **A.**   Correct.

7            MS. ARMOUR:  I have no further questions.

8            THE COURT:  All right.  Thank you, Officer.  You may

9    step down.  You may call your next witness.

03:28   10           MR. HAGLER:  Your Honor, our next witness is Stark

11   County Deputy Dan Kensinger.

12           MR. DELORME:  Your Honor, could this individual be

13   released from his subpoena?

14           THE COURT:  Any objections?

03:28   15           MS. ARMOUR:  No objections.

16           THE COURT:  You are released, sir.  You're free to

17   stay or free to leave.

18           MR. DELORME:  Also, Your Honor, there was a diagram.

19   I don't know if it was -- I don't recall not -- us not

03:28   20   objecting to it if it was going to be offered.

21           MS. ARMOUR:  We thank counsel.  We would move for its

22   admission.

23           MR. DELORME:  No objection, Your Honor.

24           THE COURT:  What's the exhibit number again?

03:28   25           MS. ARMOUR:  It is Defendant's Exhibit Jones 2.

215

1          THE COURT:  Jones 2 will be received.

2                    DEPUTY DAN KENSINGER,

3     having been first duly sworn, was examined and testified as

4     follows:

03:29     5                    DIRECT EXAMINATION

6     BY MR. HAGLER:

7     Q.   All right.  Can you please identify yourself?

8     A.   Deputy Dan Kensinger with Stark County Sheriff's

9     Department.

03:29    10     Q.   Dan, how long have you been with Stark County Sheriff's

11     Office?

12     A.   Just about six years.

13     Q.   Are you a licensed peace officer in North Dakota?

14     A.   Yes, I am.

03:30    15     Q.   Deputy Kensinger, were you in Morton County on October 27,

16     2016, working some of the DAPL protests?

17     A.   Yes, I was.

18     Q.   On -- did you work days prior to October 27th?

19     A.   Yes, I did.

03:30    20     Q.   Okay.  We're going to talk about the 27th of October,

21     2016, leading up to the particular shooting incident that you

22     were in proximity to, all right?

23     A.   Okay.

24     Q.   So that day when did you first go out to the area to work?

03:30    25     A.   I believe they had us assemble earlier in the day, and

216

1    then in the afternoon we actually proceeded down to the

2    location of the north camp.

3    **Q.**   Were you bussed to Highway 1806?

4    **A.**   I was.

5    **Q.**   Your recollection, that you may have arrived out in that

6    area around noon that day?

7    **A.**   I would say that's fairly accurate.

8    **Q.**   And then as you say, you were involved initially in going

9    through the north camp?

10   **A.**   Correct.

11   **Q.**   The shooting incident that's the subject of this hearing,

12   Deputy Kensinger, occurred just shortly before 6:00 p.m.   Is

13   that your recollection?

14   **A.**   I would say that's a good approximate time, yes.

15   **Q.**   And so, again, let's talk about just a few minutes leading

16   up to the actual shooting incident.   Do you recall where you

17   were?

18   **A.**   I was towards the -- when the actual shooting incident

19   occurred?

20   **Q.**   Five minutes before.   Let's kind of --

21   **A.**   Okay.

22   **Q.**   -- lead up to that.

23   **A.**   They had moved the majority of the personnel back behind

24   the armored vehicles, and we are all kind of congregating back

25   there.

1    **Q.**   Do you remember a white car coming into that area?

2    **A.**   Yes, I did observe a white vehicle drive up and park in

3    front of the armored vehicle, the MRAP.

4            MR. HAGLER:  Let's actually show Government's

5    Exhibit 14, please.  This is the drone video.  We can go to

6    approximately the 11-minute mark.  All right.  We're showing

7    11:10 here on the video, 11:12.

8    **Q.**   (MR. HAGLER CONTINUING)  Deputy Kensinger, do you see the

9    white car that we were just talking about there in the video?

10   **A.**   Yes.

11   **Q.**   And so where do you approximate that you are at this

12   point?

13   **A.**   At this point I am probably close to the front of the

14   BearCat, the armored vehicle on the right.

15   **Q.**   The darker vehicle?

16   **A.**   Correct.  Probably in between the -- the BearCat and the

17   MRAP, somewhere up in there.

18   **Q.**   All right.  So what did you observe when the white car

19   pulled up?

20   **A.**   I observed a female get out of the white car and approach

21   some of the SWAT members that were in front of the BearCat and

22   the MRAP.

23   **Q.**   Could you hear what she was saying?

24   **A.**   I could not hear what she was saying.

25   **Q.**   Now, I believe you had just testified that prior to this

1  happening, the officers had been moved back behind the

2  vehicles, is that correct?

3  **A.**   That is correct.

4  **Q.**   And why was that?

03:33   5  **A.**   I believe it was that they had heard gunshots further off

6  in the distance, possible gunshots.

7  **Q.**   And then so what happened now after this white car pulled

8  up?

9  **A.**   The white car pulled up.  They were engaged in

03:34   10  conversation.  I was just kind of standing in front by the

11  BearCat and the other armored vehicle, and that's -- shortly

12  after that is when I had heard the gunshots go off.

13  **Q.**   All right.  When -- when the white car pulled up, what

14  happened as far as protester activity at that point?

03:34   15  **A.**   They had come back up towards the actual armored vehicles

16  itself and kind of formed a -- like a long line in front of

17  where the officers were located.

18  **Q.**   Did you see the defendant, Redfawn Fallis, prior to

19  hearing the shots?

03:35   20  **A.**   No, I did not.

21  **Q.**   All right.  So describe for us again -- first of all,

22  where approximately do you think you were by looking at the

23  video that we have depicted at 11:23 when the actual shots were

24  fired?

03:35   25  **A.**   I would have been directly in front of -- probably in the

1    area of the MRAP, armored vehicle on the left on the roadway.

2         MR. HAGLER:  All right.  Please move the video ahead

3    to 13 minutes and play it, please.  Actually, let's back up to

4    12:50, please.

03:36   5  **Q.**  (MR. HAGLER CONTINUING)  All right.  Deputy Kensinger, you

6    see there the line forming and then some person walking out

7    into the ditch area?  Do you see that?

8    **A.**  Yes, I do.

9    **Q.**  And then you see the person being taken down?

03:36  10  **A.**  Yes, I see that.

11   **Q.**  Okay.  Did you observe any of that?

12   **A.**  I did not see any of that, no.

13        MR. HAGLER:  Okay.  Keep playing, please.  Okay.

14   Stop it, please.

03:36  15  **Q.**  (MR. HAGLER CONTINUING)  All right.  Did you see the law

16   enforcement line on the left kind of scatter at that point?

17   **A.**  Yes.

18   **Q.**  Okay.  And we're looking at 13:35 on the video with

19   testimony that that's basically when the shots rang out, Deputy

03:37  20   Kensinger.  So again, and your testimony is you believe you're

21   over still by the armored vehicles at this point?

22   **A.**  I believe so.  What drew my attention to that general area

23   was the actual gunshots itself.

24   **Q.**  So then after those gunshots rang out, what did you do?

03:37  25  **A.**  I approached the general area of where I heard them come

220

1     from, and that's when I observed fellow law enforcement

2     officers with their firearms out at the low-ready position.

3     **Q.**   And they were doing what?

4     **A.**   I heard them yelling.  I believe it was "gun," numerous

5     people stating "gun" and "drop the gun" as well.

6     **Q.**   And did you see someone on the ground?

7     **A.**   I did.

8     **Q.**   And who did you come to find out that was?

9     **A.**   I come to find out that was Redfawn Fallis.

10    **Q.**   So when you observed that, the law enforcement officer

11    with her on the ground, what did you do?

12    **A.**   I went and joined them.  I basically kind of put myself in

13    a position to assist the officers with detaining Ms. Fallis.

14    **Q.**   And exactly what did you do?

15    **A.**   I observed she had an arm underneath her body, and I could

16    still hear other officers telling to drop the gun.  So it was

17    under my impression at that point she still had the firearm

18    positioned underneath her body at that time.

19    **Q.**   Did you -- were you in a position to be able to see a gun?

20    **A.**   I did not see one at that time.  Just the way her arm was

21    positioned under her body, I could see about to the elbow.

22    **Q.**   What did you do?

23    **A.**   I didn't want to pull the arm out without it properly

24    secured because I believed that she still possessed the

25    firearm.  It would still pose a threat to fellow officers on

221

1    the ground.  So I tried to get my arm further underneath her

2    body, closer to the gun, maybe if not grab the gun itself.  And

3    I was able to get pretty close to the wrist or like the forearm

4    area, and I was struggling to pull her arm out from under her

03:39   5    body.

6    Q.    Did -- were you saying anything to her at that point?

7    A.    We, I believe, had also said, "Drop the gun.  Drop the

8    gun."

9    Q.    Was she complying with your directives?

03:39   10   A.    At that time, no.  With her not providing her arm to be

11   restrained, I would say no.

12   Q.    All right.  So continue to tell us what happened.

13   A.    Eventually pulled her arm out from under her body.  In my

14   peripheral vision I saw the gun slide by me.  It was a small

03:39   15   black handgun.

16   Q.    And then what happened?

17   A.    At that point we started to flex -- or put the flexi-cuffs

18   on behind her back.

19   Q.    And was she compliant at that point?

03:40   20   A.    Once she was detained, there was numerous comments that

21   she had made to us on the ground.

22   Q.    And what were those comments?

23   A.    I believe once she was actually handcuffed, she was

24   laughing and calling us fucking pigs.

03:40   25   Q.    So after she was ultimately secured, what did you do?

**A.**   I observed she had a backpack on.  I retrieved my
pocketknife from my pocket and actually cut the backpack off.
Due to her being restrained, we would not be able to slide it
off, so I cut the straps and passed the backpack off to another
officer.

        MR. HAGLER:  Can you display Government's Exhibit
Number 1, please?

**Q.**   (MR. HAGLER CONTINUING)  Do you recognize that, Deputy
Kensinger?

**A.**   That appears to be the backpack, yes.

**Q.**   And as you said, you then handed it to another officer?

**A.**   That is correct.

**Q.**   Did you further search the defendant?

**A.**   Yes, I did.

**Q.**   What did you do?

**A.**   We searched her person, and in her jacket -- front left
jacket pocket I found a small soft pistol case.

        MR. HAGLER:  Can you display Government's Exhibit
Number 9, please?

**Q.**   (MR. HAGLER CONTINUING)  Does this look familiar?

**A.**   That would be the soft case, yes.

**Q.**   What did you do with it after you found it on her, in her
pocket?

**A.**   I passed that also off to another officer that was
standing by.

223

1    **Q.**   Do you know who that officer was?

2    **A.**   I do not.

3    **Q.**   And so what did you do after you completed searching her?

4    **A.**   We stood her up, and myself and another trooper escorted

5    her to the rearmost of our position, which was kind of standard

6    procedure at that point of anyone that you detained.

7    **Q.**   And then what was done with her?

8    **A.**   We gave her -- passed her off to the transport personnel

9    that would take the people that were detained.

10   **Q.**   Okay.  And did you have anything else to do with her that

11   day?

12   **A.**   That day, no.

13   **Q.**   Any other day?

14   **A.**   No.

15   **Q.**   Did you do anything else at the scene, secure any other

16   evidence?

17   **A.**   I did not.

18   **Q.**   And what exactly did you do at that point?

19   **A.**   Once we passed her off, I returned back to where the

20   fellow officers were back in front of the armored vehicles.

21   **Q.**   And just resumed some duties then?

22   **A.**   Correct.  Yep, resumed the duties that we had been

23   performing to that point.

24           MR. HAGLER:  That's all the questions I have, Your

25   Honor.

1      THE COURT:  You may inquire.

2                 CROSS-EXAMINATION

3  BY MS. COOK:

4  Q.   Officer Kensinger, was your experience in October of 2016

03:43

5  the first time that you had been sent to work at a political or

6  social demonstration?

7  A.   I had been up to Morton County previously for the DAPL

8  activities, working.

9  Q.   Had you received any training in dealing with protesters

03:44

10  or protest activity before October 27th of 2016?

11  A.   I believe they put us through a brief training the day

12  prior to that incident on location.

13  Q.   And who is "they"?

14  A.   I believe it was the North Dakota Highway Patrol, from the

03:44

15  best I can recollect.

16  Q.   Did you receive any written materials during that

17  training?

18  A.   I did not.

19  Q.   Do you know whether, during the course of that training,

03:44

20  any of the people who were providing information to law

21  enforcement were DAPL security or agents or employees of the

22  DAPL corporation?

23  A.   I do not know.

24  Q.   On October 27th of 2016, what team were you assigned to

03:45

25  work with?

1  **A.**   I was assigned with the -- it was the Grand Forks mobile

2  field force, I believe.

3  **Q.**   What did you understand the goal to be on October 27th?

4  **A.**   From what I understood, it was to clear people from the

03:45  5  north camp area.

6  **Q.**   And you began working on October 27th early in the

7  morning?

8  **A.**   From what I can recollect, yes, and then they bussed us

9  out later in the afternoon.

03:45  10  **Q.**   What do you mean, they bussed you out later in the

11  afternoon?

12  **A.**   They sent us out on a bus.

13  **Q.**   Where?  To where?

14  **A.**   A couple miles north of the north camp.

03:45  15  **Q.**   And what did you do at that site?

16  **A.**   At that site we basically just stood by on the bus until

17  we were needed at the actual north camp, itself.

18  **Q.**   But you had spent some time at the north camp on

19  October 27th?

03:46  20  **A.**   Yes.

21  **Q.**   And participated in some arrests at that site?

22  **A.**   Yes.

23  **Q.**   During the course of seeing individuals arrested at the

24  north camp, did you observe protesters who were wearing gas

03:46  25  masks?

1  **A.**   Yes, I did.

2  **Q.**   And police officers who were wearing masks as well?

3  **A.**   Yes, I did.

4  **Q.**   And did you receive an injury when you were working at the

5  north camp that day?

6  **A.**   I did.

7  **Q.**   What was the source of that injury?

8  **A.**   I was struck with a U-shaped bike -- bicycle lock, a metal

9  bike lock.

10  **Q.**   And that -- that would have been a traumatic incident?

11  **A.**   It wasn't -- I would not say traumatic.  It hit me in the

12  arm and it kind of stunned me briefly, but it wasn't anything I

13  would say traumatic.

14  **Q.**   You didn't stop working that day.

15  **A.**   No, I was still capable of working my duties.

16  **Q.**   And later in the afternoon you went to the site where Ms.

17  Fallis was eventually arrested.

18  **A.**   Yes.

19  **Q.**   When you arrived at that site, would it have been

20  somewhere around 5:30 or later in the day?

21  **A.**   I would say that would be an approximate time.

22  **Q.**   And there was already a BearCat and an armored Humvee and

23  maybe another vehicle parked across 1806 at the time you

24  arrived?

25  **A.**   Yes.

227

1   **Q.**   Those vehicles had created a roadblock so that cars

2   couldn't pass.

3   **A.**   And they were also there for our protection as well.

4   **Q.**   Okay.  But cars couldn't pass further on 1806.

03:47   5   **A.**   On the actual roadway?

6   **Q.**   Yes.

7   **A.**   Probably not.

8   **Q.**   And you were aware, were you not, that police had erected

9   a barricade of sorts on 1806 to prevent traffic from moving

03:47   10   back and forth generally on that highway.

11   **A.**   At the north --

12   **Q.**   At a different site.

13   **A.**   Yes.

14   **Q.**   When you arrived at the area of where Ms. Fallis was

03:48   15   eventually arrested, the scene was pretty calm?

16   **A.**   We had been progressively moving, so it wasn't like we

17   just showed up there.  We had actually progressed to that

18   position, and at that relative time it would be calm.

19   **Q.**   There were a group of protesters who were there.

03:48   20   **A.**   Yes.

21   **Q.**   They were maintaining a distance from the law enforcement

22   officers?

23   **A.**   From the best I can recollect, yeah.

24   **Q.**   And many of them were praying and chanting?

03:48   25   **A.**   That had been common practice throughout the day, yes.

**Q.**   In other words, the group of people at the site were not throwing objects or threatening violence?

**A.**   At that time, no.

**Q.**   And while you were at the site there came a time when someone said that gunshots had been heard.

**A.**   That is correct.

**Q.**   And you were told to go back behind the armored vehicles?

**A.**   That is correct.

**Q.**   You never learned whether there really were any gunshots at that time.

**A.**   No.

**Q.**   And after you went back behind the vehicles, officers stayed there for a period of time and had a break.

**A.**   Yes.

**Q.**   While you were behind the vehicles, you didn't hear any commotion out front?

**A.**   While I was behind the armored vehicles?

**Q.**   Yes.

**A.**   No.

**Q.**   When you finished the break, did you then go to the front of the line?

**A.**   Yes.

**Q.**   And were you just moving out toward the front because your break was over and --

**A.**   I had moved up to the front once I saw the white car pull

1   up and when I heard the SWAT members engaging in some sort of

2   conversation.  That's when I had progressed up to that -- the

3   front of the line.

4   Q.   Where did you stop when you went to the front of the line?

5   A.   I would say it's probably at -- when I first went up

6   there, it was a majority of the SWAT operators.  I stopped

7   probably right around the front of the BearCat, maybe a little

8   bit behind it.

9   Q.   And you saw the white car that had parked kind of in the

10  center of the roadway?

11  A.   I did.

12  Q.   Did you see the woman who had driven the car there?

13  A.   I saw her briefly, yes.

14  Q.   Do you know who she is, or --

15  A.   No, I do not.

16  Q.   Did you observe that she was a Native American woman with

17  long dark hair?

18  A.   From the best I can recollect, yes.

19  Q.   And wearing a blue top?

20  A.   That, I'm unsure of.  I don't recall what she was wearing.

21  Q.   Would you recognize her if you saw her again?

22  A.   I doubt it.

23  Q.   You could hear her yelling?

24  A.   Yes, I could hear -- I could not hear what exactly was

25  being said, though.

230

1   Q.   So you don't know why she was yelling or why she was

2   upset.

3   A.   No, I do not.

4   Q.   And you did hear some of the SWAT team members talking

03:50   5   back to her?

6   A.   Yes.

7   Q.   You didn't hear anyone come over the loudspeaker and tell

8   her to move back or be quiet, or anything?

9   A.   I don't recall.

03:51   10   Q.   And even after you had heard this exchange between the

11   woman who drove the white car and the officers who were on the

12   line, you didn't see anyone moving toward arresting her.

13   A.   No.

14   Q.   And, in fact, as far -- in fact, as far as you know, she

03:51   15   was never arrested.

16   A.   Yes, I don't -- I don't know if she was arrested or not.

17   Q.   Okay.  Meanwhile there were other protesters who were in

18   the immediate area, around and behind her?

19   A.   Yes.

03:51   20   Q.   And many of them were chanting and singing?

21   A.   I could say that would probably be fairly accurate.

22   Q.   And, once again, you didn't hear anyone over the

23   loudspeaker telling people to move back or take any particular

24   action at that point in time.

03:51   25   A.   I don't -- I don't recall.

231

1   Q.   You didn't hear any yelling from the police side toward

2   the protesters.

3   A.   I don't believe so.

4   Q.   And where were you standing when you heard the gunshots?

03:52   5   A.   I was standing somewhere in front of the armored vehicles,

6   positioned somewhere in front of those.

7   Q.   So you would be in front of the armored vehicle facing the

8   protesters.

9   A.   I'm not sure exactly what direction I was facing, but that

03:52   10   would be where I was standing.

11   Q.   And the protesters would have been ahead of you.  You may

12   have been looking to the side, but --

13   A.   Correct.

14   Q.   -- they would've been --

03:52   15   A.   They would've been located to our south.

16   Q.   Right.

17   A.   Right.

18   Q.   In the direction of that white car.

19   A.   Correct.

03:52   20   Q.   And there were men who were working as security for the

21   water protectors in the area as well?

22   A.   I believe they were off in -- on the east -- to the west

23   of us, from what I can recall.

24   Q.   Would those individuals have been standing between the law

03:53   25   enforcement officers and the protesters?

232

1  **A.**   Are you talking -- which -- security?  Could you rephrase

2  the question?  I'm sorry.

3  **Q.**   Yes.  Men who were working as security for the water

4  protectors.

03:53   5  **A.**   Okay.

6  **Q.**   You saw some of them in the area.

7  **A.**   I did see some of them, yes.

8  **Q.**   Okay.  And their job was basically to kind of keep peace?

9  **A.**   From what I could determine, yes.  I would say that's

03:53   10  accurate.

11  **Q.**   Okay.  And they would stand between the officers and the

12  protesters?

13  **A.**   For the most part.

14  **Q.**   So at the time that you heard the gunshots, up to that

03:53   15  point you hadn't heard any directives or commands being given

16  over the loudspeakers?

17  **A.**   At that particular time, no.

18  **Q.**   You hadn't heard any of the SWAT team officers yelling?

19  **A.**   I did not personally, no.

03:53   20  **Q.**   And at that point you had not seen Ms. Fallis anywhere.

21  **A.**   No.

22  **Q.**   Did you, in fact, believe that you heard four gunshots?

23  **A.**   I believe that's what I put in my report, yes.

24  **Q.**   Okay.  That you -- you thought you heard two and then two

03:54   25  more.

**A.**   I believe that's what I documented, yeah.

**Q.**   And you thought initially that what you were hearing was the discharge of less lethal rounds.

**A.**   It sounded muffled.

03:54 **Q.**   Okay.  And when you thought they were less lethal rounds, you thought that they had been deployed by the officers.

**A.**   Yes.

**Q.**   You didn't see the shots being fired.

**A.**   No, I did not.

03:54 **Q.**   You didn't see who fired the shots.

**A.**   No, I did not.

**Q.**   Was the first indication that you had that the sounds you heard did not come from officers firing less lethal rounds when you heard an officer yelling "gun"?

03:54 **A.**   I'm sorry.  Can you ask that again?

**Q.**   Yes.  When you heard an officer yell "gun," was that the first indication you had that the sounds were not coming from less lethal rounds fired by officers?

**A.**   I would say that would be accurate, yes.

03:55 **Q.**   And after you heard someone yell "gun," what did you do?

**A.**   That's when I looked over and went and approached the group that was standing around Ms. Fallis.

**Q.**   How far away from you was that group?

**A.**   I'd say approximately 15 feet, maybe.

03:55 **Q.**   What did you observe as you approached the group?

234

1  **A.**   I observed someone on the ground, and I observed fellow

2  law enforcement officers, some with their side-arms out of

3  their holster.

4  **Q.**   Did you see a female lying on the ground?

03:55   5  **A.**   At first I could not determine if it was male or female,

6  but then come to find out that it was Ms. Fallis.

7  **Q.**   And was she lying facedown on the ground?

8  **A.**   Yes, she was.

9  **Q.**   With her arms beneath her?

03:56  10  **A.**   One of her arms was beneath her.

11  **Q.**   And did you observe officers on top of her?

12  **A.**   There was quite a few people that were around us.  I don't

13  think anyone was directly on top of her, from what I can

14  recall.

03:56  15  **Q.**   Do you recall having authored -- or having attended a

16  meeting with Special Agent Arenz on November 27th of this year?

17  **A.**   Yes.

18  **Q.**   And providing a statement to him?

19  **A.**   Yes.

03:56  20  **Q.**   And did you have an opportunity to read over the

21  statement?

22  **A.**   No, I did not.

23  **Q.**   Do you recall telling Special Agent Arenz that you saw Ms.

24  Fallis facedown on the ground with officers on top of and

03:56  25  around her?

1   A.   If that's what's in the statement, then that's what it

2   said, yes.

3   Q.   And when you observed her, you saw multiple officers

4   around her.

03:57   5   A.   That's correct.

6   Q.   You saw officers who were leaning on her body?

7   A.   Yes.

8   Q.   And officers who were leaning on her legs?

9   A.   I really couldn't see her legs.  I was mainly focused on

03:57   10   her arm that was underneath her body.

11   Q.   And was that her right arm or her left arm that you

12   focused on?

13   A.   I believe I documented it was her right.

14   Q.   So you went over to where she was laying on the ground?

03:57   15   A.   Correct.

16   Q.   And you tried to pull her right arm out from under her

17   body.

18   A.   I believe that's what I had documented, yeah.

19   Q.   Okay.  And you were trying to pull it out because the

03:57   20   right arm was underneath the body at that point.

21   A.   Yes, one of her arms was under her body.

22   Q.   Do you know whether there was another officer who at the

23   same time was trying to hold onto her left arm?

24   A.   I don't recall.  Like I said, I didn't really -- I was

03:57   25   mainly focused just on the one arm.

1    **Q.**   And were you able to pull the arm out from underneath her?

2    **A.**   Eventually, yes, we were able to do that.

3    **Q.**   And as you pulled the arm out from underneath her, by

4    pulling on her arm, you raised her body up slightly.

03:58    5    **A.**   I believe so, yes, to allow the gun to slide out.

6    **Q.**   And when you say "to allow the gun to slide out," the

7    first time you saw the gun was after you had pulled on her

8    right arm and raised her body up somewhat.

9    **A.**   When I pulled the arm, yes, that's when I had seen the

03:58    10    actual firearm for the first time.

11    **Q.**   And I believe you described in your report the gun kind of

12    sliding out from under the body.

13    **A.**   Yes.

14    **Q.**   You believed it had been kind of trapped where it had been

03:58    15    before you pulled her up by the weight of her body.

16    **A.**   That would be possible.

17    **Q.**   Yeah, and there were officers who had been pushing down on

18    her back prior to the time you raised up her right side.

19    **A.**   I couldn't see everyone that was standing around her.

03:59    20    There was quite a commotion surrounding her, so I was mainly

21    focused on, I guess, my job or task at hand at that time.

22    **Q.**   Okay.  But the first sight that you had of the gun was

23    after you pulled on her right arm, pulling her body up off the

24    ground a bit.

03:59    25    **A.**   That would be when I saw the gun, when --

237

1   **Q.**   Okay.

2   **A.**   Yes, pulled on her arm.

3   **Q.**   And the gun kind of slid out on its own accord.

4   **A.**   That is correct.

03:59   5   **Q.**   You did not see the gun in Ms. Fallis's hand.

6   **A.**   No, I did not.

7   **Q.**   In fact, you never saw it in her hand.

8   **A.**   No, I did not.

9   **Q.**   Or in anyone's hands until another officer removed the

03:59   10   gun.

11   **A.**   Correct.

12   **Q.**   You didn't take the gun in your own hand to remove it, did

13   you?

14   **A.**   No, I did not.

03:59   15   **Q.**   Do you know who did touch the gun and remove it from that

16   area?

17   **A.**   I do not.

18   **Q.**   Do you know whether it was a North Dakota trooper?

19   **A.**   I believe it was, but like I said, there was a pretty big

04:00   20   commotion going on.  I remember seeing many troopers standing

21   around her, and I believe it to be a trooper that actually had

22   collected it.

23   **Q.**   Do you know what happened to it after that point?

24   **A.**   No, I don't.

04:00   25   **Q.**   You didn't have any other contact with the gun at all.

1    **A.**    No.

2    **Q.**    Just to be clear, you didn't have any contact with the gun

3    at any point.

4    **A.**    That is correct.

04:00    5    **Q.**    Now, after the trooper had recovered the gun, did you cut

6    the backpack off Ms. Fallis?

7    **A.**    Yes.

8    **Q.**    Did you see the fire extinguisher, the red canister in the

9    area there?

04:00    10    **A.**    I never saw a fire extinguisher, no.

11    **Q.**    And why did you make the decision to cut the backpack off

12    of her body?

13    **A.**    Once she was secured in cuffs, we would not be able to

14    just pull it off of her back, off of her shoulders.

04:01    15    **Q.**    So you cut it off, and after cutting it off, did you

16    search it?

17    **A.**    No, I handed it off --

18    **Q.**    To whom?

19    **A.**    -- to another officer.   I'm sorry?

04:01    20    **Q.**    Do you know to whom you handed it?

21    **A.**    I do not.

22    **Q.**    And you had nothing further to do with the backpack.

23    **A.**    When we escorted her back to the rearmost position, we had

24    carried it after it had been searched.

04:01    25    **Q.**    Did you watch another officer search it?

1  **A.**   I believe I was busy searching her while someone else was

2  searching the actual backpack.

3  **Q.**   How did it come about that you were the officer who was

4  assigned to search Ms. Fallis?

04:01   5  **A.**   I think I -- well, I think a couple of us searched her,

6  but I was immediate -- in the immediate area of her, so I just

7  took the task of searching her.

8  **Q.**   And you were the officer who searched her first.

9  **A.**   Someone else was also searching her with me.

04:01   10  **Q.**   And when we talk about searching, are you talking about

11  doing a pat search?

12  **A.**   I'm -- well, we were actually searching her for weapons or

13  any contraband or whatever that might be.

14  **Q.**   And how do you go about doing that?

04:02   15  **A.**   You do it standard head to toe, going down through their

16  person, checking all the pockets, check around for loose

17  jewelry, anything like that, check, you know, around the ankle

18  area, and basically a thorough pat search and then searching of

19  the pockets itself.

04:02   20  **Q.**   And do you recall who the other officer was that was

21  searching with you?

22  **A.**   I do not.

23  **Q.**   Was Ms. Fallis already handcuffed when you searched her?

24  **A.**   Yes.

04:02   25  **Q.**   So just so that I understand it, when you talk about doing

1   the kind of search that you do, you begin presumably at the

2   shoulders, or something, and work down?

3   **A.**   Whatever the situation presents, but that's standard

4   procedure.

04:02   5   **Q.**   She was wearing two jackets?

6   **A.**   I recall her wearing at least one jacket.

7   **Q.**   And the jacket that you recall, was that a bulky jacket?

8   **A.**   I cannot say for certain one way or the other.

9        MS. COOK:   This is Defendant's Niewind Exhibit 3.

04:03   10   Has this been moved into evidence?

11        MR. ELLISON:   Yes.

12   **Q.**   (MS. COOK CONTINUING)   It was a demonstrative exhibit, so,

13   Officer, I'm showing you Defendant's Exhibit Niewind 3.   Does

14   that appear to you to be the jacket that Ms. Fallis was wearing

04:03   15   at the time of her arrest?

16   **A.**   It's been a year since the incident.   I couldn't say 100

17   percent if it was or was not.

18   **Q.**   Okay.   Fair enough.   If that were the outer jacket that

19   she was wearing, would you then have searched the pockets of

04:04   20   that jacket?

21   **A.**   Yes.

22   **Q.**   Both inside and outside?

23   **A.**   Yes.

24   **Q.**   And in your search of the pockets of that jacket, it's my

04:04   25   understanding that you've testified that you found the cloth

1   holster in one of those jacket pockets?

2   **A.**   Yes.

3   **Q.**   And did you find, when you were searching the jacket

4   pockets, that these were kind of deep pockets?

04:04   5   **A.**   You know, like I said, it's been a year since I -- you

6   know, and it was a very quick search, so I -- you know, I can't

7   say for certain if they were deep pockets.  I'm assuming if it

8   was that jacket, that would be probably pretty standard with

9   that style of jacket.

04:04   10   **Q.**   All right.  So you would have had to go into the pockets

11   in order to retrieve this --

12   **A.**   Correct.

13   **Q.**   -- item.  And other than the soft holster that you found

14   in one of the pockets, you didn't find anything else of

04:05   15   significance in the jacket.

16   **A.**   Correct.

17   **Q.**   And you would have then -- if she was wearing a second

18   jacket underneath the bulky one that was depicted on the

19   screen, would you have searched that interior jacket as well?

04:05   20   **A.**   Myself or the other individual would have, yes.

21   **Q.**   That would have been your practice.

22   **A.**   That would have been standard procedure, yes.

23   **Q.**   And you don't recall having found anything of any

24   significance in the pockets of that interior jacket.

04:05   25   **A.**   I don't believe so, no.

242

1  **Q.**  Do you recall that Ms. Fallis was wearing jeans?

2  **A.**  I believe she was wearing blue jeans, yes.

3  **Q.**  And did you search the jeans as well?

4  **A.**  Yes.

04:05  5  **Q.**  So you would have patted down the jeans pockets and made

6  sure that there weren't any lower pockets or back pockets, or

7  something?

8  **A.**  Correct.

9  **Q.**  And after your search of the jeans, you didn't find

04:06  10  anything of any significance.

11  **A.**  No, I did not.

12        MS. COOK:  May I approach the witness, Your Honor?

13        THE COURT:  You may.

14  **Q.**  (MS. COOK CONTINUING)  Officer Kensinger, I'm going to

04:06  15  show you what I've marked as Defendant's Exhibit Kensinger 1,

16  which purports to be an outline of a female figure, and ask

17  that you assume that it depicts a female figure laying facedown

18  on the ground.

19  **A.**  Okay.

04:06  20  **Q.**  And I'm going to ask you to put a circle there where you

21  believe you were with respect to Ms. Fallis's body when you

22  approached.

23  **A.**  When she was on the ground --

24  **Q.**  Yes.

04:06  25  **A.**  -- from what I can recall?

243

1    **Q.**   Yes.

2    **A.**   I would probably say this general area (indicating).

3    **Q.**   And would you put your initials there?

4    **A.**   (Indicating.)

04:07   5    **Q.**   Do you remember any of the other officers who were in the

6    immediate vicinity with hands on Ms. Fallis at that time?

7    **A.**   That I could identify?

8    **Q.**   Yes.

9    **A.**   No.

04:07   10   **Q.**   Do you remember where those other officers were stationed

11   with respect -- I don't mean stationed, but where they were

12   with respect to your position on her right shoulder, right arm?

13   **A.**   I couldn't say for certain.  I mean, they -- they were

14   pretty much -- I know there was at least one by her feet, I

04:07   15   believe, one or two by her feet and a couple other officers on

16   that side, but I don't know if I could say for certain where

17   they were positioned.

18   **Q.**   And "that side" being her left side.

19   **A.**   Yes.

04:07   20   **Q.**   Thank you.

21   **A.**   And there's actually another couple officers on this side

22   as well, on the right side, but like I said, I couldn't --

23   **Q.**   So here would have been a couple other officers on the

24   right-hand side, kind of lower on the body than you were?

04:07   25   **A.**   Mm-hmm.

244

1   **Q.**   And two officers on the right-hand side.

2   **A.**   I believe --

3   **Q.**   Or the left-hand side.  I'm sorry.

4   **A.**   To the best I can recollect.  Like I said, it's been over

04:08   5   a year, so there were numerous officers out there.

6   **Q.**   And they were participating in holding her down.

7   **A.**   They were participating in, yes, trying to control Ms.

8   Fallis.

9          MS. COOK:  I'd move the admission of Defendant's

04:08   10   Hearing Exhibit Kensinger 1, Your Honor.

11          MR. HAGLER:  No objection.

12          THE COURT:  Receive Kensinger Exhibit 1.

13          MS. COOK:  Can I have just a minute, Your Honor?  I

14   have no further questions, Your Honor.

04:08   15          THE COURT:  Very well.  Thank you, sir.  You may step

16   down.  Any objection to him being -- this witness being

17   excused?

18          MS. COOK:  No.

19          MR. HAGLER:  No, Your Honor.

04:08   20          THE COURT:  So you're excused from these proceedings,

21   sir.  Thank you.  Mr. Hagler or Mr. Delorme?

22          MR. DELORME:  Your Honor, the United States would

23   call Trooper Jeremy Buehre.

24          THE COURT:  How do you spell that last name?

04:09   25          MR. DELORME:  B-u-e-h-r-e.

1                    <u>TROOPER JEREMY BUEHRE</u>,

2     having been first duly sworn, was examined and testified as

3     follows:

4                    <u>DIRECT EXAMINATION</u>

04:09   5     <u>BY MR. DELORME:</u>

6     Q.    All right.  Trooper Buehre, you're with the North Dakota

7     Highway Patrol, correct?

8     A.    That's correct.

9     Q.    And how long have you been with them?

04:10   10    A.    Just about 13-and-a-half years.

11    Q.    What are your normal duties with the highway patrol?

12    A.    Normal duties are traffic patrol, doing traffic citations,

13    investigating crashes, arresting impaired drivers, that type of

14    activity.

04:10   15    Q.    Were you involved in the matter involving protesters in

16    south Morton County last year on October 27, 2016?

17    A.    Yes.

18    Q.    What were your duties on that particular day?

19    A.    On that particular day we were going down to clear

04:11   20    trespassers that were on private property.

21    Q.    And when you say "we," what are you talking about?

22    A.    A group of officers, a large contingent of officers were

23    going down there.

24    Q.    That consist of North Dakota Highway Patrol and many other

04:11   25    agencies as well?

1   **A.**   Yes.

2   **Q.**   And to effectuate this clearing of this property, are you

3   also talking about 1806 as well?

4   **A.**   Yeah, it was on Highway 1806.

04:11   5   **Q.**   To effectuate this, what were your, I guess, operational

6   plans as a group of law enforcement to -- to clear the area?

7   **A.**   Well, I was with one of the arrest teams, and my main duty

8   was to arrest people, effect an arrest of agitators as the line

9   -- front line pulled them through.

04:11   10   **Q.**   And what is your understanding of "agitators"?

11   **A.**   People that were not complying with orders to move to the

12   south, go back to the other camp.

13   **Q.**   And were you part of the operation all day when it -- when

14   the operation kicked off?

04:12   15   **A.**   Yes.

16   **Q.**   And approximately when did the operation kick off?

17   **A.**   It was in the morning.  I don't know exactly what time it

18   was.

19   **Q.**   Late morning, maybe noon?

04:12   20   **A.**   Maybe before noon.

21   **Q.**   Now I want to go ahead and just bump you ahead in time

22   because we've heard a lot about north camp and the blockades on

23   the north part of 1806.  Were you involved in an incident where

24   there was a protester discharging a firearm?

04:12   25   **A.**   Yes.

247

**Q.**   Let me bump you back five minutes before that incident

occurred.  Tell us what you're doing as part of your duties on

the -- with law enforcement that day?

**A.**   Just before that incident occurred, I had -- we had

stopped the line and we were rotating back to take breaks.  And

I was back at one of the buses having a drink, and I came --

then I came back up to the line.

**Q.**   And after you came back up to the line, how much time

expired before this incident occurred?

**A.**   It was immediate.

**Q.**   And where were you in relation to where this incident

occurred?

**A.**   I was walking right up to the line when the line surged

forward and I saw two officers wrestling with a young Native

American female.

**Q.**   And so I understand this then, the line has already

formed, moving forward, and you see the two officers with the

female on the ground.

**A.**   Yes.

**Q.**   What did you do after you saw this?

**A.**   I went over there to assist them.

**Q.**   And what -- what did you do to assist?

**A.**   At first one of -- they were struggling with the female.

She -- they started rolling down the hill in the ditch, and so

I was holding onto one of the officers so they didn't fall

1   over.  And then once they -- once the rolling stopped, then I

2   assisted in trying to get the female's arms out from underneath

3   her.

4   **Q.**   So you identified this individual as a Native American

5   female?

6   **A.**   Yes.

7   **Q.**   So there's two officers on her at that point, and you're

8   trying to assist by keeping them from falling off, correct,

9   originally?

10  **A.**   At first, yes.

11  **Q.**   But then you would join in and try to assist to take -- to

12  help take control of this individual?

13  **A.**   Yes.

14  **Q.**   Was this individual resistant?

15  **A.**   Yes.

16  **Q.**   And by "resistant," just describe for us what she was

17  doing.

18  **A.**   She wasn't complying with verbal commands.  We were

19  telling her to get her arms out from underneath her and put

20  them behind her back, and she wasn't complying with that.  She

21  was wrestling.

22  **Q.**   And at some point something else occurred, correct?

23  **A.**   Yes.

24  **Q.**   Explain that for us.  Describe it.

25  **A.**   I was on her left side, up -- I had my left knee on her --

249

1  what would be her left shoulder.  I was trying to pull out her

2  left arm.  Then an officer -- or shots rang out and an officer

3  called "gun."  I could feel the concussion from the gun.  The

4  bullets went between her legs, I would assume, or down towards

04:15  5  her lower extremities.  And then somebody eventually wrestled

6  the gun from her.

7  **Q.**  Do you know how many shots, or do you recall how many

8  shots were fired?

9  **A.**  There were three shots.

04:15  10  **Q.**  And by "concussion," what do you mean by that?

11  **A.**  When a gun goes off, there's a concussive blast.

12  **Q.**  So air kind of rushing at you or around the area?

13  **A.**  Yeah, air sound.

14  **Q.**  And at the time this firearm goes off, you know, you're

04:16  15  still trying to assist in taking control of this individual?

16  **A.**  Yes.

17  **Q.**  The other officers still there?

18  **A.**  Yeah.  To my recollection, I know there were two officers

19  to my left and two officers to my right.  There could have been

04:16  20  more, and then myself.

21  **Q.**  So roughly five of you guys at that point just before the

22  firearm goes off?

23  **A.**  Yes.

24  **Q.**  Is this individual still resisting at that point?

04:16  25  **A.**  Yes.

250

1  **Q.**   And after the firearm is wrestled away from this

2  individual, what happens?

3       MS. COOK:  Objection, Your Honor.  I think that

4  misstates the evidence.  There's no testimony that anybody

04:16   5  wrestled a firearm from her.

6       THE COURT:  Overruled.

7  **Q.**   (MR. DELORME CONTINUING)  You can go ahead and answer.

8  **A.**   What was the question again?

9  **Q.**   After the firearm was wrestled away from this individual,

04:16   10  what happened?

11  **A.**   After that I pulled her left arm out and we did put flex

12  cuffs on her.  She had a backpack on.  We cut the backpack off.

13  And then I assisted in searching her persons for any further

14  weapons.

04:17   15  **Q.**   Okay.  So you searched her as well?

16  **A.**   Yes.

17  **Q.**   Did you find anything of interest?

18  **A.**   No.

19  **Q.**   And by "search," are you talking about a full-body search,

04:17   20  pat down?

21  **A.**   It was a pat-down search, searching her pockets.  I mean,

22  it was --

23  **Q.**   Were others involved in this as well?

24  **A.**   Yeah.  I don't know how many officers there were.

04:17   25  **Q.**   Now, throughout this whole event and thereafter, after the

251

1   shooting, is Ms. Fallis or the individual making any comments?

2   A.   Yeah, she made several comments.

3   Q.   Could you tell us what she said?

4   A.   When I was escorting her back from the line to hand her

5   over to BCI agents or the parole and probation, she was making

6   several comments.  One comment she said, she didn't know what

7   the big deal was, that anybody can carry a gun or have a gun.

8   She said that if she wanted to kill an officer, that she could

9   have done it and we'd be dead.  Then she said that all pigs

10  deserve to die.

11  Q.   Were you asking her any questions at this time?

12  A.   I wasn't asking her any questions.

13  Q.   So she's just making these comments as you're escorting

14  her.

15  A.   She was making these comments and laughing and giggling.

16  Q.   Laughing and giggling as she's making them?

17  A.   Yes.

18  Q.   And what did you -- where did you escort her to?

19  A.   I escorted her to the rear, behind the lines where parole

20  and probation and BCI agents were waiting to take her.

21  Q.   And did you have any further contact with this individual

22  after handing her off to other officers?

23  A.   No.

24          MR. DELORME:  No further questions, Your Honor.

25          THE COURT:  You may inquire.

252

1                          CROSS-EXAMINATION

2     BY MS. COOK:

3     Q.    Officer Buehre, when you first learned that Ms. Fallis had

4     been tackled from behind or seized by another officer, that was

04:19   5     when you were walking back toward the front line?

6     A.    I didn't actually see her seized.

7     Q.    When you saw that there was a commotion and you later

8     learned that that commotion was her seizure, was that as you

9     were walking back to the front line?

04:19   10    A.    Yes.

11    Q.    And you had been on break for a period of time?

12    A.    Yes.

13    Q.    During the period of time that you were on break, you

14    hadn't heard any commotion out in front of the armored

04:19   15    vehicles.

16    A.    When I was back on break, no.

17    Q.    You hadn't heard anything that would have indicated to you

18    that there was any problem out front.

19    A.    Well, there were problems out front.

04:20   20    Q.    There wasn't any fighting out front?

21    A.    There was still people shouting out front.

22    Q.    And that -- you would agree with me that those people have

23    a Constitutional right to articulate their grievances, right?

24    A.    That's correct.

04:20   25    Q.    And they can do it in a loud manner.

253

1   **A.**   Yes.

2   **Q.**   And they can direct those loud -- that loud language

3   toward law enforcement officers if they wish.

4   **A.**   That's correct.

04:20   5   **Q.**   So what you heard was nothing out of the ordinary.

6   **A.**   For that day.

7   **Q.**   Okay.  Nothing that would indicate to you that there was

8   an arrest that was imminent.

9   **A.**   Yes.

04:20   10   **Q.**   You didn't hear any law enforcement officers yelling.

11   **A.**   No.

12   **Q.**   You didn't hear any law enforcement officers giving

13   commands.

14   **A.**   No.

04:21   15   **Q.**   Didn't hear anyone over the loudspeaker telling people to

16   back up or move away or be quiet or anything else at that

17   point?

18   **A.**   There were still people on the loudspeaker.  I don't know

19   what they were saying.

04:21   20   **Q.**   Nothing that alerted you to any problem.

21   **A.**   Yes.

22   **Q.**   Is that correct?

23   **A.**   That's correct.

24   **Q.**   So you saw that the front line had kind of surged forward

04:21   25   ahead of you?

1  **A.**   Yes.

2  **Q.**   And that that line was engulfing a number of people,

3  including a person that you later learned was Ms. Fallis.

4  **A.**   That's correct.

04:21   5  **Q.**   And having the line move forward was a tactic that

6  officers had learned in order to protect the officers in the

7  front who were conducting the arrest.

8  **A.**   That's correct.

9  **Q.**   When you looked at the line, you saw a female on the

04:21   10  ground?

11  **A.**   Yes.

12  **Q.**   And you've described her in your reports as a small

13  female.

14  **A.**   Yes.

04:21   15  **Q.**   You had not seen her in the area before.

16  **A.**   No, I had never seen her before.

17  **Q.**   And when you saw her, she had hit the ground and landed on

18  her stomach with her arms underneath her.

19  **A.**   That's correct.

04:22   20  **Q.**   You went to help the officers?

21  **A.**   Yes.

22  **Q.**   And I believe you indicated that you approached Ms. Fallis

23  from her left side.

24  **A.**   Yeah, I was up on her left side and her head area, yes.

04:22   25  **Q.**   Okay.  Was there a reason that you thought you needed to

1  help those officers at that point in time?

2  **A.**   Because she was not complying with them.  She was

3  wrestling with them.

4  **Q.**   There were multiple officers with hands on her when you

04:22   5  arrived.

6  **A.**   Yes.

7  **Q.**   And when you arrived, you positioned yourself on her left

8  side?

9  **A.**   Correct.

04:22   10  **Q.**   You put your knee on her upper back, near her neck.

11  **A.**   Yes.

12  **Q.**   And you applied pressure to that knee as you tried to get

13  her left arm out from under her body.

14  **A.**   Yes.

04:23   15  **Q.**   You thought that she was trying to keep her arm underneath

16  her.

17  **A.**   Yes.

18  **Q.**   And, in fact, her arm was underneath her, and you were

19  applying pressure to her upper back.

04:23   20  **A.**   Yes.

21  **Q.**   And her neck area.

22  **A.**   Yep.

23  **Q.**   And you weren't the only officer who was applying pressure

24  to her body at that time.

04:23   25  **A.**   I suppose not.

1   **Q.**   Well, you saw another officer to your left side who had

2   his knee on her back.

3   **A.**   Yes.

4   **Q.**   And that officer appeared to you, or so you reported

04:23   5   later, to be trying to get her right arm out from underneath

6   her.

7   **A.**   Yes.

8   **Q.**   You reported that at the time you had your knee on her

9   back, near her neck, there was a third officer who was near her

04:23   10   torso.

11   **A.**   Yes.

12   **Q.**   And you reported that at the same time there were a fourth

13   and a fifth officer who were holding her legs down.

14   **A.**   Yes.

04:24   15   **Q.**   You recognize some of those other officers?

16   **A.**   At the time I knew one of them.  I didn't know the other

17   ones.

18   **Q.**   And was the one that you knew Trooper Ryan Mugan?

19   **A.**   Mugan, yes.

04:24   20   **Q.**   Mugan.  And he was one of the officers that was down by

21   Ms. Fallis's legs.

22   **A.**   That's correct.

23   **Q.**   Kneeling on one of her legs.

24   **A.**   I don't know if he was kneeling on her leg.  I don't know.

04:24   25   **Q.**   But you saw him applying pressure to that part of the

1    body.

2    **A.**    He was down by her legs.  I don't know if he was applying

3    pressure or not.

4    **Q.**    You testified that she was squirming around?

04:24    5    **A.**    Yes.

6    **Q.**    Okay.  And she was squirming around at a point in time

7    when you were kneeling with your left knee on her upper back,

8    by her neck?

9    **A.**    Yes.

04:25    10    **Q.**    When another officer was kneeling with his knee on her

11    back?

12    **A.**    Yes.

13    **Q.**    When you were pulling on her left arm?

14    **A.**    Yes.

04:25    15    **Q.**    And another officer was pulling on her right arm?

16    **A.**    Yeah.

17    **Q.**    Someone was applying pressure around the torso area.

18    **A.**    Yes.

19    **Q.**    And there were two officers at her legs --

04:25    20    **A.**    That's correct.

21    **Q.**    -- correct?  And during this period of time you didn't

22    personally give her any commands.

23    **A.**    No, I didn't.

24    **Q.**    And the only command that you indicated in your report

04:25    25    that you remember another officer giving her was to put her

258

1   hands behind her back.

2   **A.**   That's correct.

3   **Q.**   And that would be at a time when both hands were

4   underneath her torso.

04:25   5   **A.**   Yes.

6   **Q.**   And at least two officers were applying pressure to her

7   back.

8   **A.**   That's correct.

9   **Q.**   Now, where were you when you heard or felt the shots?

04:26   10   **A.**   I had my knee on her back and I was trying to pull her

11   left arm out.

12   **Q.**   You didn't see the gun at the time the shots were fired.

13   **A.**   That's correct.

14   **Q.**   You didn't see anyone who had their hand on the gun.

04:26   15   **A.**   That's correct.

16   **Q.**   You didn't see the direction in which the gun was

17   pointing.

18   **A.**   That's correct.

19   **Q.**   It was your conclusion that the officer who was to your

04:26   20   left was the officer who eventually retrieved the gun.

21   **A.**   It was one of the officers to my left, yes.

22   **Q.**   But you don't know which officer that was.

23   **A.**   No.

24   **Q.**   And when the officer retrieved the gun, you weren't

04:26   25   watching at the time he pulled the gun out from underneath Ms.

1    Fallis.

2    **A.**    I wasn't watching him, no.

3    **Q.**    Okay.  And since you weren't watching him, you weren't

4    watching the gun as it came out either.

04:27    5    **A.**    That's correct.

6    **Q.**    You never had hands on the gun.

7    **A.**    That's correct.

8    **Q.**    And you never saw it in anybody's hand other than in the

9    hand of the officer who retrieved it.

04:27    10    **A.**    I don't recall ever seeing the gun.

11    **Q.**    Okay.  Thank you.  After the gun was retrieved, did you

12    and the other officers pick Ms. Fallis up from the ground?

13    **A.**    Yes.

14    **Q.**    And someone of the -- one of the officers who was present

04:27    15    then cut the backpack off of her?

16    **A.**    She was still on the ground when the backpack was cut off.

17    **Q.**    So the backpack was cut off.  Did you have any role in

18    searching that backpack?

19    **A.**    No.

04:27    20    **Q.**    You never touched the backpack.

21    **A.**    Just when I was on her back; otherwise, after that, no.

22    **Q.**    But when -- once she was stood up on her feet, then you

23    participated in searching her person.

24    **A.**    She was still on the ground when we searched her person.

04:28    25    **Q.**    Was she searched after she was stood up as well?

1  **A.**   I didn't.  I don't know if she was.

2  **Q.**   Did you and another officer search her while she was on

3  the ground, or were you alone in searching her at that point?

4  **A.**   I searched her while she was on the ground.  I know at

5  least one other officer did.

6  **Q.**   Were the two of you searching the same areas?  In other

7  words, did you pat her down and then the other officer patted

8  her down just to kind of double-check your work, or how did

9  that work?

10  **A.**   No, I believe I searched her upper torso.  I'm not sure

11  what the other officer searched.

12  **Q.**   When you say that you searched her upper torso, she had a

13  jacket on?

14  **A.**   That's correct.

15  **Q.**   Did she, in fact, have two jackets on?

16  **A.**   She may have.  I don't recall.

17  **Q.**   How did you go about searching her upper torso?

18  **A.**   I went through her pockets.  I patted down her sleeves,

19  patted down her neck area.

20  **Q.**   In patting down her torso area, I think you said you

21  searched the pockets.

22  **A.**   That's correct.

23  **Q.**   So you would have opened the jacket?

24  **A.**   Yes.

25  **Q.**   So that you could make sure that if there were any inside

1   pockets, those were searched as well?

2   **A.**   Yes.

3   **Q.**   And you did that?

4   **A.**   Yes.

04:29  5   **Q.**   And did you physically put your hands into the pockets to

6   make sure there was nothing in there?

7   **A.**   Yes.

8   **Q.**   And you didn't find anything in the pockets of the jacket?

9   **A.**   I did not find anything.

04:29  10   **Q.**   And you didn't find anything in any interior pockets?

11   **A.**   That's correct.

12   **Q.**   You would have patted her down around her belt line or her

13   waistline just to make sure that there wasn't anything in that

14   area as well?

04:29  15   **A.**   I don't believe I patted her waistline.  I didn't search

16   her waistline.

17   **Q.**   She was wearing jeans?

18   **A.**   Yes.

19   **Q.**   And did you search the jeans as well to make sure there

04:30  20   was nothing in the pockets of the jeans?

21   **A.**   I did not.

22   **Q.**   Did the other officer do that?

23   **A.**   He may have.  I don't know.

24   **Q.**   Would that have been standard protocol, that someone would

04:30  25   have done that?

262

1 **A.** Yes.

2 **Q.** Particularly after what you believe to have been a

3 shooting.

4 **A.** Yes.

04:30  5 **Q.** And did you see the other officer retrieve anything from

6 any of her pockets?

7 **A.** I don't recall if he found anything.

8 **Q.** You didn't see anything else that was significant to you.

9 **A.** That's correct.

04:30  10 **Q.** Now, on October the 27th, when you saw Ms. Fallon (sic)

11 for the first time -- Ms. Fallis for the first time laying on

12 the ground, that was the first time you had ever encountered

13 her.

14 **A.** To my knowledge, yes.

04:30  15 **Q.** You don't recall having ever seen her before.

16 **A.** That's correct.

17 **Q.** Or ever having met her before.

18 **A.** That's correct.

19 **Q.** So you knew nothing at all about her demeanor.

04:30  20 **A.** That's correct.

21 **Q.** About how she would react in a traumatic situation.

22 **A.** That's correct.

23 **Q.** How she would react to stress.

24 **A.** That's correct.

04:31  25 **Q.** Or pain?

263

1    **A.**    Yes.

2    **Q.**    And you would agree with me that people react differently

3    in those situations.

4    **A.**    That's correct.

04:31    5    **Q.**    Sometimes people cry in those situations.

6    **A.**    Yes.

7    **Q.**    Sometimes they become hysterical.

8    **A.**    Yes.

9    **Q.**    And when you describe her as laughing, you don't know

04:31    10    whether she was laughing because she perceived something to be

11    funny or because she was becoming hysterical.

12    **A.**    Correct.

13          MS. COOK:   Now, may I approach, Your Honor?

14          THE COURT:   You may.

04:31    15    **Q.**    (MS. COOK CONTINUING)   Officer Buehre, I'm going to hand

16    you what I've marked as Defendant's Exhibit Buehre 1 and ask

17    you to take a look at that.   It's a diagram of a female

18    individual, and ask you to assume that she's laying facedown.

19    **A.**    Okay.

04:31    20    **Q.**    And I would ask you to show me on that diagram by drawing

21    a circle, the area where you believe you were when you had

22    hands on Ms. Fallis on the ground.

23    **A.**    If she's lying facedown here, I was positioned right up

24    here (indicating).

04:32    25    **Q.**    Would you put your initials there?

264

1   **A.**   (Indicating.)

2   **Q.**   And I believe you indicated that you did recognize one

3   other law enforcement officer.

4   **A.**   That's correct.

5   **Q.**   And who was that?

6   **A.**   Trooper Ryan Mugan.

7   **Q.**   Could you show me on the diagram where he was as well,

8   please?

9   **A.**   He was down here somewhere.  I don't exactly know where.

10   I believe he was right over here (indicating).

11   **Q.**   And could you just draw a circle and put his initials

12   there?

13   **A.**   His initials?

14   **Q.**   Yes, and we'll know from the exhibit sticker that you're

15   the one who affixed those initials.  Thank you.

16          MS. COOK:  I'd move the admission of Defendant's

17   Hearing Exhibit Buehre 1, Your Honor.

18          MR. DELORME:  No objection, Your Honor.

19          THE COURT:  It will be received.

20          MS. COOK:  I Actually have another exhibit that

21   didn't make its way to the exhibit box.

22          I have no further questions.

23          THE COURT:  Very well.  Thank you, Officer.  You may

24   step down.

25          MR. DELORME:  Your Honor, I'd ask to relieve him from

265

1    his subpoena at this time too.

2              MS. COOK:  No objection.

3              THE COURT:  So you are excused from these

4    proceedings, sir.

04:33    5              MR. DELORME:  Your Honor want to go one more witness,

6    or --

7              THE COURT:  We're going to plug along until

8    5 o'clock.

9              MR. DELORME:  United States would call to the stand

04:33   10    Trooper Bennett Bitz.

11              THE COURT:  Is this your last witness?

12              MR. HAGLER:  Two more, Your Honor, Mr. Bitz and

13    Mr. Heidbreder.

14              MR. ELLISON:  Your Honor, can we raise a question?

04:34   15    We have a witness who has traveled from the Pine Ridge

16    Reservation to testify.  If we're not going to get done by

17    5:00, which seems extremely unlikely, I was wondering if we

18    might be able to call him out of order.  And if this would be

19    an appropriate time to have a discussion, a brief one, if we're

04:34   20    going to have to come back -- I don't know what the Court is

21    thinking, tomorrow, Monday.

22              THE COURT:  Well, it's not going to be tomorrow.

23              MR. ELLISON:  Okay.  I guess what -- and I appreciate

24    that.  Because now we have identified some of the officers that

04:34   25    have cameras, and as we raised in the beginning, that, you

1    know, we had -- we hoped that the -- any film, recordings that

2    they have would be found and then disclosed, and that as the

3    Court mentioned, we might have to come back if needed.  If we

4    were to call the gentleman out of order today, give the

04:35    5    government some time to find these films, come back in a few

6    weeks to finish with the remaining two officers --

7        THE COURT:  It's not going to be in a few weeks.

8    I've got 15-plus trials on my criminal calendar every week.

9        MR. ELLISON:  Whenever the Court would have us back,

04:35    10    to give the government a little time to find those, the

11    cameras, just to -- it might mean we don't have to come back a

12    third time if, in fact, that's how --

13        MR. HAGLER:  Your Honor, as far as them calling their

14    witness today, we would have no objection to that.  As

04:35    15    indicated, we have two additional witnesses to present, and so

16    it's clear we're not going to get through our two witnesses and

17    their witness today by 5 o'clock.  So, again, if it's a matter

18    of conveniencing them to call their witness and try and get

19    through him today, we're fine with that, and then obviously

04:36    20    reconvene at the Court's pleasure.

21        THE COURT:  Direct and cross-examination are going to

22    have to be done by 5 o'clock, so whoever is conducting the

23    direct examination, if they were planning on going half-hour,

24    45 minutes, it's not going to happen, so you tell me how long

04:36    25    it's going to take.

267

1          MS. COOK:  We'll make it prompt, Your Honor.

2          THE COURT:  What does that mean?

3          MS. COOK:  I'll talk very quickly.

4          THE COURT:  All right.

04:36    5          MR. HAGLER:  And we've been provided no witness --

6          THE COURT:  Well, I've got -- we've got security

7    concerns having proceedings going on after 5 o'clock in this

8    building, so -- plus I've got a court reporter that's been

9    sitting here since 9 o'clock this morning.

04:36    10         Go ahead, Mr. Hagler.

11         MR. HAGLER:  We've been provided no witness

12   statements, so I have no idea what type of cross-examination we

13   will have, Your Honor.

14         THE COURT:  Well, we'll --

04:37    15         MS. COOK:  We'll bring our witness back.

16         THE COURT:  You may call him out of order, and we'll

17   plod ahead until 5 o'clock.

18         Where are these two government witnesses from, Mr.

19   Hagler?  They're both Bismarck-based?

04:37    20         MR. HAGLER:  No, Mr. Heidbreder is from Fargo, and --

21   I'm sorry.  I don't recall where Trooper Bitz is from.

22         THE COURT:  All right.

23         MS. ARMOUR:  Your Honor, at this stage I think it

24   makes the most sense for the government to proceed with their

04:38    25   witnesses.  It seems that we'll have to come back regardless.

1    I think it's unlikely that Mr. Martinez will be on and off the

2    stand today.  And I understand there's one of -- at least the

3    government's witness is also from out of the area, so I think

4    it's best if we just proceed in the order, and we'll just have

04:38    5    to accommodate our witness's travel at the next time we're

6    before you.

7              THE COURT:  Well, the witness who was going to

8    testify left the courtroom, so --

9              MR. DELORME:  I think Mr. Hagler has gone to get him

04:38    10    back, Your Honor.

11              MR. ELLISON:  And may I leave the courtroom, Your

12    Honor, to talk to our witness?

13              THE COURT:  Sure.

14              MR. ELLISON:  Thank you.

04:39    15                   TROOPER BENNETT BITZ,

16    having been first duly sworn, was examined and testified as

17    follows:

18                   DIRECT EXAMINATION

19    BY MR. DELORME:

04:39    20    Q.   Trooper Bitz, you're a member of the North Dakota Highway

21    Patrol, correct?

22    A.   Correct.

23    Q.   How long have you been with the highway patrol?

24    A.   About three years.

04:39    25    Q.   And your normal duties in highway patrol?

1    **A.**    A traffic trooper.

2    **Q.**    And what does a traffic trooper do?

3    **A.**    Just regular everyday patrol on -- day-to-day public

4    safety through patrol.

04:40    5    **Q.**    As a member of the highway patrol, were you on duty with

6    the highway patrol in the vicinity of south Morton County on

7    October 27, 2016?

8    **A.**    Yes.

9    **Q.**    What were your duties on that particular day?

04:40    10    **A.**    That day I was assigned to an arrest team.  It'd be a part

11    of the arrest team for the mobile field force line.  My duties

12    were, anybody that may be brought through the line, that'd be

13    either assist other officers in placing them under arrest or

14    place them under arrest myself.

04:40    15    **Q.**    And how long -- approximately what time did you arrive

16    down in south Morton County that day?

17    **A.**    I don't know the exact time we got down there.  I know I

18    started my day at about 7 o'clock that morning.  I know we took

19    a bus down to southern Morton County that day.  I don't

04:40    20    remember the time we got there.

21    **Q.**    Okay.  So you took a bus down.  So if the other officers

22    testified that it's about 11:30, 12 o'clock, you'd agree with

23    that?

24    **A.**    I'd agree with that.

04:41    25    **Q.**    And were you a part of the -- an arrest team all day that

1  day?

2  **A.**    Not all day.  I was assigned to an arrest team all day,

3  but as the day progressed, I stood on the front line myself as

4  a mobile field force line.  And then as the day continued to

5  progress, later in the afternoon I moved back to an arrest team

6  position.

7  **Q.**    So you'd just swap out a little bit here and there just to

8  kind of help out?

9  **A.**    Yes.

10  **Q.**    Were you involved -- or did you observe a shooting that

11  occurred later in the afternoon on the 27th?

12  **A.**    Yes.

13  **Q.**    So I want to take you to a timeframe just prior to that

14  maybe four or five minutes.  What were you doing prior to the

15  shooting occurring?

16  **A.**    I was standing in the ditch behind the mobile field force

17  line, just standing there along with other law enforcement

18  personnel.

19  **Q.**    Okay.  So that was on the east -- east ditch of 1806?

20  **A.**    That'd be the east ditch, yes.

21  **Q.**    And what were you doing at that point in time, just

22  standing there, or --

23  **A.**    Just standing there.

24  **Q.**    What was the line doing at that time?

25  **A.**    They were standing in front of me telling people to keep

271

1   moving to the south.

2   **Q.**   Now, at some point just prior to that there was a little

3   break or a lull in the action, wasn't there?

4   **A.**   I don't recall.

04:42   5   **Q.**   Let's jump up to when, I guess, you first observed this

6   individual involved in a shooting.  When was that?

7   **A.**   Well, I saw an individual be brought through the mobile

8   field force line and taken to the ground by other officers to

9   be arrested.

04:42   10   **Q.**   And describe this individual for us.

11   **A.**   At that time I observed dark clothing, maybe a mask.

12   Other than that, I didn't really have a good visual of the

13   person at that time.

14   **Q.**   Were you able to later identify this individual as Redfawn

04:42   15   Fallis?

16   **A.**   I was told that's who it was, yes.

17   **Q.**   So you seen her brought through the line.  What do you do

18   when you see this?

19   **A.**   I'm just observing the other officers.  They appeared to

04:43   20   be struggling with the subject as the subject's arms appeared

21   to be underneath her body as the subject was in a prone

22   position, laying on the ground on -- on their belly.  They

23   appeared to be struggling as the subject's arms weren't coming

24   out from underneath the body.  I just kept observing them at

04:43   25   that time.

1   **Q.**   And how many officers were involved in this trying to take

2   control of this individual?

3   **A.**   I don't know the exact number.  There was a couple on top

4   of the subject, at least.

04:43   5   **Q.**   And how close were you to this -- I guess this -- this

6   activity?

7   **A.**   I'd say maybe -- maybe the distance from me to this --

8   your table there away.

9   **Q.**   Okay.  So some 20, 25 feet?

04:43   10   **A.**   Approximately, yeah.

11   **Q.**   At any point in time did you then move in to assist?

12   **A.**   After I heard what sounded like three gunshots, I then

13   moved towards the subject and went around to the subject's feet

14   and attempted to gain control of the legs as they were kicking

04:44   15   around, and I secured the legs of the subject on the ground.

16   **Q.**   Okay.  Initially you said "attempted."  Is there a reason

17   why you said "attempted"?

18   **A.**   No.

19   **Q.**   So you were able to eventually get a hold of the legs?

04:44   20   **A.**   Yes.

21   **Q.**   So by the time you got into the fray, the gunshots had

22   already went off?

23   **A.**   Yes.

24   **Q.**   What was everyone else doing, I guess, as you approach and

04:44   25   try to take control of the legs?

1  **A.**  As I approach, what I observed, other officers were still

2  trying to gain control of the -- where the weapon was and tried

3  to gain control of the weapon and the arms to put flex cuffs on

4  the subject.

04:44  5  **Q.**  Okay.  Had the gun been taken from the individual by the

6  time you got there and tried take control of the legs?

7  **A.**  Not until after I got control of the legs.

8  **Q.**  Okay.  So you got on the ground, grabbed the legs, and

9  somebody gets control of the gun.

04:44  10  **A.**  Yes.

11  **Q.**  How do you know that happens?

12  **A.**  I see the gun being passed -- I don't know who had it --

13  being passed from one officer to another as I'm holding the

14  subject's legs.

04:45  15  **Q.**  After the gun is passed to another officer, what happens

16  with the -- with the individual?

17  **A.**  She's searched by other people and transported.

18  **Q.**  Did you get involved in that?

19  **A.**  No.

04:45  20  **Q.**  Was this individual saying anything, you know, throughout

21  this time period that you're down grabbing ahold of her legs?

22  **A.**  There was obscenities being said.  At one point I know I

23  specifically heard "Oglala."  And then at one point the subject

24  said, "If I wanted to" -- let me refer to my report here for

04:45  25  the exact wording.  "If I wanted to kill you, I would have shot

1    you in the head."

2    Q.    What was her demeanor throughout this time period?

3    A.    Yelling.  I didn't really get involved after she was

4    transported or up to her -- moved up to her feet and moved

04:46    5    away.

6    Q.    Okay.  And as she's yelling, is she directing that at

7    anybody?

8    A.    I was taking it towards law enforcement.

9    Q.    Now, what you heard her say, you know, "If I wanted to

04:46    10    shoot you guys or kill somebody, I would have shot you in the

11    head," was that in response to any kind of questions being

12    posed to her?

13    A.    Not that I heard.

14    Q.    You didn't hear anybody asking her any questions?

04:46    15    A.    No.

16    Q.    You didn't ask her any questions, did you?

17    A.    I did not.

18    Q.    Now, after she's controlled, is she -- is she picked up

19    off the ground?

04:46    20    A.    Yes.

21    Q.    Is she then turned over to anybody else at that point?

22    A.    At that point I don't know who she was turned over to or

23    where she went from there.

24    Q.    Okay.  So you didn't assist in bringing her back behind

04:46    25    the line further?

1    A.    No.

2    Q.    Had you ever seen this person before that event?

3    A.    No.

4    Q.    Had you ever seen her after?

5    A.    Just a picture.

6          MR. DELORME:  No further questions, Your Honor.

7          THE COURT:  Just one question, Officer Bitz.  Where

8    is your home station?

9          THE WITNESS:  My --

10         THE COURT:  Based in Fargo, or --

11         THE WITNESS:  Jamestown.

12         THE COURT:  Okay.  All right.  Defense may inquire.

13         MS. ARMOUR:  Thank you.

14                        CROSS-EXAMINATION

15   BY MS. ARMOUR:

16   Q.    Good afternoon.

17   A.    Good afternoon.

18   Q.    Your badge number is Number 235, is that correct?

19   A.    Correct.

20   Q.    And you were working a special detail for the Dakota

21   Access Pipeline protests, correct?

22   A.    Correct.

23         THE COURT:  Do you have a mike on you, by the way?

24   Q.    (MS. ARMOUR CONTINUING)  How long were you on duty that

25   day?

A.   I believe I started my shift around 7 o'clock that
morning.

Q.   And did you receive a briefing that morning?

A.   Yes, we received a briefing that morning.

Q.   And where was that briefing?

A.   I believe that was at the Mandan Airport.

Q.   And who -- who gave you that briefing?

A.   There was multiple command staff that spoke that morning.
I know one commander was Captain Jahner, and another one -- I
believe Sheriff Laney as well spoke.

Q.   And when you were at this briefing, did you -- did anyone
present any information on undercover officers who would be out
in the field that day?

A.   Not that I recall.

Q.   Did you receive any briefing materials --

A.   Not that I recall.

Q.   -- to take with you?  And was there any PowerPoint
presentation that was given?

A.   There was a PowerPoint.  I don't remember if it was that
day or the previous day.

Q.   How many briefings did you attend, if you can recall?

A.   From what timeframe?

Q.   How long were you on this special detail?

A.   I was on and off for months at a time, multiple briefings.

Q.   When was the first time that you came out to this detail?

1   **A.**   I don't remember the first time.

2   **Q.**   In August?

3   **A.**   I don't even remember the first day I came down to Morton

4   County to assist, honestly.

04:49   5   **Q.**   Do you remember what season it was?

6   **A.**   It was fall.

7   **Q.**   Okay.  So on -- we're turning our attention to this day,

8   October 27th, okay?

9   **A.**   Yep.

04:49   10   **Q.**   Earlier in the day you had observed people throwing

11   things --

12   **A.**   Yes.

13   **Q.**   -- correct?

14   **A.**   Yes.

04:49   15   **Q.**   And that was near an entrance to north camp, correct?

16   **A.**   Correct.

17   **Q.**   And by this point in the day, which is around 5:40 in the

18   afternoon, is that correct?

19   **A.**   That's what I'm told.

04:49   20   **Q.**   Okay.  By this point in the day north camp had already

21   been cleared, is that right?

22   **A.**   Yes, we're still moving to the south from the north camp.

23   **Q.**   And you were on 1806?

24   **A.**   Yes.

04:50   25   **Q.**   Okay.  I'd like to show you some still photographs from

278

1   the drone video that was out there that day, okay?

2   **A.**   Okay.

3   **Q.**   Okay.  I'm showing first what has been marked Defendant's

4   Exhibit E-1.  Do you see that there?

04:50  5   **A.**   Yes.

6   **Q.**   And that depicts the scene that we're here discussing

7   today, correct?

8   **A.**   Okay.

9   **Q.**   Do you -- do you know that?

04:50  10   **A.**   Yes.

11   **Q.**   Okay.  So what we see here is this is kind of a long shot,

12   correct?

13   **A.**   Yes.

14   **Q.**   And the south is represented -- the direction of the south

04:50  15   is the larger expanse of road that lays out to the right of the

16   photograph, correct?

17   **A.**   Correct.

18   **Q.**   And the north is at the bottom of the photograph, correct?

19   **A.**   Correct.

04:51  20   **Q.**   And -- and you're moving with the team southward, correct?

21   **A.**   Correct.

22   **Q.**   But at this moment you're not actually moving, right?

23   **A.**   I don't know.

24   **Q.**   You were taking a break back behind the lines.  Do you

04:51  25   remember that?

1   **A.**   I do not remember.

2   **Q.**   Okay.  But looking at this photograph right here, we don't

3   see here any roadblocks put up by protesters, correct?

4   **A.**   Not in this picture, no.

04:51   5   **Q.**   You don't see any teepees erected in the middle of the

6   road, do you?

7   **A.**   Nope.

8   **Q.**   You don't see any tents, right?

9   **A.**   Nope.

04:51   10   **Q.**   You just see a line of bodies, right?

11   **A.**   Yes.

12   **Q.**   And you see this on the road and on the curtilage on

13   either side of the road, is that right?

14   **A.**   Yes.

04:51   15   **Q.**   Okay.  I'm going to show you Defendant's Exhibit E-2.  Can

16   you see that on your screen?

17   **A.**   Yep.

18   **Q.**   All right.  And what is this depicting?

19   **A.**   It would be the mobile field force line and subjects

04:52   20   standing on the roadway, law enforcement.

21   **Q.**   Do you see a white car approaching here?

22   **A.**   I see it there, yes.

23   **Q.**   And the line is behind these armored vehicles, correct?

24   **A.**   Correct.

04:52   25   **Q.**   They're not out in front where the protesters are, is that

1   right?

2   **A.**   Correct.

3   **Q.**   So does this help you remember that at this moment of this

4   photograph, that you were -- that the mobile field force and

04:52   5   the arrest team and everyone that was out there as part of the

6   law enforcement effort was behind the line, correct?

7   **A.**   Yes.

8   **Q.**   I'm going to show you Defendant's Exhibit E-3.  Do you see

9   that there?

04:52   10   **A.**   Yes.

11   **Q.**   And what do we see in this photograph?

12   **A.**   Our mobile field force line had moved to the front of the

13   armored vehicles.

14   **Q.**   Do you see an individual kind of offset from this line --

04:53   15   **A.**   I do.

16   **Q.**   -- that I'm circling right there?

17   **A.**   Yes.

18   **Q.**   And this person, just so we can identify for the record,

19   is on the left side of the photograph and is positioned kind of

04:53   20   above that armored Humvee on the left-hand side of the road.

21   Do you see that?

22   **A.**   Correct.

23   **Q.**   Okay.  When you saw -- you saw this female pull through

24   the line and arrested, right?

04:53   25   **A.**   Yes.

1   **Q.**   But at that time, and I just want to clarify what you

2   testified to, there weren't commands being given by the mobile

3   field force to the protesters, correct?

4   **A.**   Yes, there was.

04:54   5   **Q.**   There were commands being given.

6   **A.**   Yes.

7   **Q.**   And what were those commands?

8   **A.**   To move to the south.

9   **Q.**   And how were those commands being given?

04:54   10   **A.**   Verbally.

11   **Q.**   Was that -- would that be over the MRAP, or would that be

12   -- were you given those commands?

13   **A.**   I wasn't personally, no.

14   **Q.**   How were those commands being announced?

04:54   15   **A.**   Multiple officers.

16   **Q.**   Okay.  Well, I would like to then play Defendant's Exhibit

17   A.  Yes, we'll start from the beginning.  We'll try and find

18   the point -- we'll try and hear the commands on this video, and

19   I want you to watch this video and let me know when you hear

04:54   20   these commands being given by law enforcement, okay?

21          MS. ARMOUR:  I just want to pause right here.

22   **Q.**   (MS. ARMOUR CONTINUING)  Do you see any law enforcement

23   officers in front of these protesters forming a large line at

24   this moment in this video, which is at 09?

04:55   25   **A.**   It's hard to see.

1       MS. ARMOUR:  Okay.  Let's keep playing.  Let's stop.

2   **Q.**   (MS. ARMOUR CONTINUING)   There you can see a clump of

3   officers in front of this -- I believe it's the BearCat, is

4   that correct?

04:55   5   **A.**   Which one are you pointing to?

6   **Q.**   On the left-hand side of the photograph, the dark armored

7   vehicle with a person at the top.

8   **A.**   Yes.

9   **Q.**   Okay.  And you can see a number of officers with helmets

04:55   10  on, correct?

11  **A.**   Correct.

12  **Q.**   And you don't see any officers on the right-hand side

13  where -- in the -- from the lane where the Dodge -- white Dodge

14  is, all the way off to the right, right?

04:55   15  **A.**   Correct.

16  **Q.**   You don't see any law enforcement there, correct?

17  **A.**   I see one right in front of the Dodge car.

18  **Q.**   Correct, and -- but you haven't heard so far any commands

19  being given by law enforcement.

04:56   20  **A.**   No.

21      MS. ARMOUR:  Okay.  Let's keep playing.  Let's pause

22  right there.

23  **Q.**   (MS. ARMOUR CONTINUING)   Do you see that woman with that

24  baseball cap there?

04:56   25  **A.**   Yes.

283

1  **Q.**   With the red fire extinguisher in the backpack?

2  **A.**   Yes, I see her.

3  **Q.**   And you now know that to be Redfawn Fallis?

4  **A.**   I do now.

04:56   5  **Q.**   Okay.  And there's an officer right in front of her

6  holding a baton, correct?

7  **A.**   Correct.

8       MS. ARMOUR:  All right.  Let's keep going.  Let's

9  stop.  Go back for a second.  Stop.

04:56   10  **Q.**   (MS. ARMOUR CONTINUING)  And that officer is pointing.  Do

11  you see the officer in the far right side of the screen?

12  **A.**   Yes.

13  **Q.**   And that officer is behind a water protector who's doing

14  security.  Do you see that there?

04:57   15  **A.**   Yes.

16  **Q.**   And that officer is pointing in what direction?

17  **A.**   To the south.

18  **Q.**   To the south.  Is he pointing directly at Ms. Fallis?

19  **A.**   It looks like a general direction to the south.

04:57   20      MS. ARMOUR:  Okay.  Let's keep going.  Let's pause

21  right there.

22  **Q.**   (MS. ARMOUR CONTINUING)  You see the law enforcement that

23  this video is now focused on at timestamp 25 -- 25 seconds?  Do

24  you see any of them or hear any of them giving any commands to

04:57   25  the protesters?

1    **A.**   Not at this time.

2          MS. ARMOUR:   Okay.   Let's keep going.   Let's stop.

3    **Q.**   (MS. ARMOUR CONTINUING)   Anything happening here?   Any

4    commands being given?

04:57   5    **A.**   No.

6    **Q.**   It seems that these officers are just kind of standing

7    about, remerging the line and coming out perhaps from the back

8    of the vehicles, correct?

9    **A.**   It appears so, yes.

04:57   10         MS. ARMOUR:   Okay.   Let's keep going.   Let's stop

11    here.

12    **Q.**   (MS. ARMOUR CONTINUING)   Are you -- you can hear some

13    songs and some chants, correct?

14    **A.**   Correct.

04:58   15    **Q.**   You don't hear any commands being given, do you?

16    **A.**   I do not.

17         MS. ARMOUR:   Let's get that timestamp.   That's at

18    41 seconds.   Let's keep going.   Let's stop right there.

19    **Q.**   (MS. ARMOUR CONTINUING)   Is anyone giving any commands to

04:58   20    the protesters at this moment, telling them to move south?

21    **A.**   I cannot hear any.

22         MS. ARMOUR:   Okay.   Let's keep going.   Okay.   Let's

23    stop here and get a timestamp.   We're at 1 minute and

24    12 seconds.

04:59   25    **Q.**   (MS. ARMOUR CONTINUING)   Are you hearing any commands

285

1   being given from the law enforcement officers?

2   **A.**   I cannot.

3         MS. ARMOUR:  Let's keep going.  Stop there.

4   **Q.**   (MS. ARMOUR CONTINUING)  We can see some people milling

5   about in -- very close to law enforcement on the left-hand

6   side, correct?

7   **A.**   Correct.

8   **Q.**   And there seems to be some sort of conversations being

9   had, but you can't hear any orders being given, can you?

10  **A.**   I cannot.

11  **Q.**   Does it look like any orders are being given?

12  **A.**   I don't see any right now.

13        MS. ARMOUR:  And what time is that?  At 1:30.  Let's

14  keep going for one more minute.  And we are at 2 minutes and

15  2 seconds.

16  **Q.**   (MS. ARMOUR CONTINUING)  Have you heard any commands thus

17  far?

18  **A.**   I have not.

19        MS. ARMOUR:  Okay.  Your Honor, would you like me to

20  continue?

21        THE COURT:  Not really.  No, I think we'll take our

22  recess for the day.  You may step down, Officer.

23        THE WITNESS:  Thank you.

24        THE COURT:  In terms of where we go from here, the

25  government has one additional witness?

1          MR. HAGLER:  Yes, Your Honor.

2          THE COURT:  And that is -- the name again was what?

3          MR. HAGLER:  It's a parole and probation officer, Dan

4     Heidbreder.

05:01  5          THE COURT:  Okay.  And in terms of witnesses that the

6     defense intends to call, there was one that you had mentioned,

7     but are there others?

8          MS. ARMOUR:  Yeah, you know, we would like to

9     complete our cross of Mr. Bitz.

05:01  10         THE COURT:  Sure.

11         MS. ARMOUR:  And there's Dennis Martinez.

12         THE COURT:  And he lives where?

13         MS. ARMOUR:  He lives in --

14         MR. ELLISON:  He lives on the Pine Ridge Indian

05:01  15    Reservation.

16         THE COURT:  All right.  And he was out there on

17    October 27th?

18         MR. ELLISON:  Yes, sir.  And, in fact, we would

19    disclose as the -- we don't have any statements that would

05:01  20    constitute under Rule 12(h) to provide, but he's the gentleman

21    who is standing there in the picture with his arms out in the

22    black t-shirt with the red bandana across his face.

23         THE COURT:  All right.  So how long do both sides

24    think it would take to complete the testimony of those two

05:02  25    witnesses, direct and cross?

287

1          MR. HAGLER:  Your Honor, I expect the direct of

2     Mr. Heidbreder would be right around the neighborhood of

3     20 minutes.

4          MS. ARMOUR:  And I would anticipate the remaining

05:02   5     cross of Mr. Bitz to last perhaps 15 to 20 minutes.

6          THE COURT:  All right.  And what about cross-

7     examination of the other law enforcement officer, just your

8     best guesstimate?

9          MS. ARMOUR:  Twenty minutes on the outside, Your

05:02   10    Honor.

11         THE COURT:  All right.  And what about with

12    Mr. Martinez?  How long do you envision his direct examination

13    to take?

14         MS. ARMOUR:  The direct examination it's anticipating

05:02   15    at this point to be approximately 30 minutes.

16         THE COURT:  All right.  Well, I'd like to finish

17    these two-and-a-half witnesses up as quickly as possible,

18    preferably within the next week or two.  My trial calendar for

19    next week has cleared off.  I've got hearings virtually every

05:03   20    day, sentencings and change of plea hearings, but I can move

21    some of those around, continue them for a short period of time.

22    But next week we could complete this on Tuesday, December 12th;

23    Thursday, December 14th; or the morning of Friday, December 15.

24    I would guess it would only take a half a day.

05:03   25         If we start talking about weeks later, I can honestly

288

1    tell you that I don't believe I have a day in January up until

2    the time of this trial where I'm not in trial or not spending

3    from 8:30 to 4:30 sentencing and handling change of plea

4    hearings.  Besides my own caseload, I've inherited Judge

05:04    5    Erickson's entire caseload in Fargo, so the wheels of justice

6    are stopping in Fargo for now.

7         But tell me when all of you feel that you could make

8    yourselves available within the next two weeks to take a half a

9    day to finish the testimony.  And I understand there's

05:04    10   holidays, and I don't want to be difficult for people.  I try

11   to respect everybody's busy schedules, but we've really got to

12   finish up the testimony in this case quickly.

13        MR. DELORME:  Your Honor, I think Mr. Hagler and I

14   are -- you know, will be available Wednesday or Thursday of

05:04    15   next week.  On Tuesday I know we've got a change of plea set

16   that's a pretty sensitive one that I'd prefer not moving, and

17   that's one that we set rather quickly, so --

18        THE COURT:  Well, tell me what your availability is

19   the next two weeks.

05:05    20        MR. HAGLER:  Your Honor, we'll make whatever date

21   work the Court -- the Court orders in the next two weeks.

22        THE COURT:  Mr. Ellison, Ms. Cook, Ms. Armour?

23        MR. ELLISON:  We have very, very varying schedules,

24   Your Honor, but what about the possibility -- did the Court say

05:05    25   this coming week is more open, the following week is

1  impossible?  Is that what the Court was saying?  In other

2  words, the week --

3          THE COURT:  The coming week is best for me, but if

4  we've got to find a half a day to finish up this case, then I

05:06   5  will simply have to move other hearings around.

6          MS. ARMOUR:  Your Honor, I believe that you began

7  with Tuesday, the 12th.  Is it conceivable for us to do the

8  11th so that we might stay over and --

9          MR. ELLISON:  Would it be -- would there be any time

05:06  10  the following week, the week of the 18th, Your Honor?  I'm just

11  asking.

12          THE COURT:  Well, I don't have my calendar here, but

13  I'll have somebody here look it up.

14          MR. HAGLER:  Your Honor, our witnesses do have some

05:07  15  conflicts, but we can maybe --

16          THE COURT:  Well, we can go off the record here too

17  while we try to sort this out.

18          (A recess was taken from 5:07 p.m. to 5:13 p.m., the

19  same day.)

05:14  20          THE COURT:  So let's go back on the record.  We're on

21  the record here after having visited informally with all

22  counsel, trying to find a date and time that works for everyone

23  to complete the testimony of all the witnesses that intend to

24  present testimony in this suppression hearing.  I believe the

05:14  25  parties have agreed that we could start on Monday morning, the

1   11th of December, at 8:30 a.m., in an effort to try to complete

2   all the questioning by 11 o'clock that morning.  Is that an

3   accurate summary?

4             MR. HAGLER:  Yes, Your Honor.

05:14   5             MR. ELLISON:  Yes, sir.

6             THE COURT:  All right.  So is there anything else we

7   can take care of here today?

8             MR. HAGLER:  Nothing else, Your Honor.

9             MR. ELLISON:  Your Honor, would the -- Ms. Fallis is

05:15   10   here pursuant to this Court's order.  Would this Court be

11   willing to amend its order?

12             THE COURT:  Yeah.  No problem.  I'll -- you don't

13   know the bus schedule for her to get back on Monday, or would

14   you be driving her back?

05:15   15             MS. ARMOUR:  I do know the bus schedule, and it is

16   the same every day, and it is 2:30 in the morning, which is the

17   only bus from Bismarck to Fargo.

18             THE COURT:  Unless you've got some other alternative

19   arrangements that I could include in an order.

05:15   20             MS. ARMOUR:  I mean, we have some people who would be

21   willing and available to drive Ms. Fallis back, but her counsel

22   would not be able to do that.

23             THE COURT:  No, that's fine.  If we can find

24   somebody -- if you have a name, and then I'll insert that name

05:15   25   in the order, that they'll transfer her back to Centre, Inc.,

291

1    in Fargo by no later than 6 o'clock p.m. on Monday, December

2    11th.

3              MS. ARMOUR:  Yes, Your Honor.  Just one second.  Your

4    Honor, we have a Marcos Cisneros, who has been present here and

05:16   5    lives in Fargo and would be willing and able to take her back.

6              THE COURT:  What's the name?

7              MS. ARMOUR:  Marcos Cisneros, C-i-s-e-r-n-o-s (sic).

8    He's present in the courtroom today if you would like to

9    admonish him or discuss his responsibilities.  Your Honor,

05:17   10   would you like him to approach?

11             THE COURT:  I would like to just talk to him briefly.

12   You can just step forward, please, and if you could just spell

13   your name for the record here, please.

14             MR. CISNEROS:  Last name is C-i-s-n-e-r-o-s.  First

05:17   15   name is Marcos.

16             THE COURT:  And where do you live in Fargo, sir?

17             MR. CISNEROS:  Right now I'm staying in West Fargo.

18             THE COURT:  But what's the address?

19             MR. CISNEROS:  It's -- I'm staying at a Quality Inn.

05:18   20   I can provide the address and all that info once I get it.

21             THE COURT:  Quality Inn in West Fargo?

22             MR. CISNEROS:  Yes.

23             THE COURT:  Is that where you're living?

24             MR. CISNEROS:  Yeah, currently I am.

05:18   25             THE COURT:  For how long have you been there?

1          MR. CISNEROS:  About a month.

2          THE COURT:  Are you working in Fargo, or --

3          MR. CISNEROS:  Yeah, currently looking for work.

4          MS. ARMOUR:  He's a musician.  He travels around and

05:18   5  has many gigs, and then from time to time has regular people

6   employment --

7          MR. CISNEROS:  Yeah.

8          MS. ARMOUR:  -- and is a longstanding friend of Ms.

9   Fallis, her family, so has this relationship connection, has

05:18   10  been here to support her in Fargo, and would do nothing to

11  jeopardize any one of her conditions.

12         THE COURT:  And you could return her to Centre, Inc.,

13  in Fargo by 6 o'clock p.m. on Monday, December 11th?

14         MR. CISNEROS:  Yes, sir.

05:19   15         THE COURT:  All right.  Well, I'll amend my order to

16  reflect that, and we'll immediately contact Centre, Inc., as

17  well and let them know.  The order will be docketed shortly.

18         But I guess I would remind you, Mr. Cisneros and Ms.

19  Fallis, that all of the previous conditions that I ordered in

05:19   20  this case, i.e., no booze, no street drugs, no inhalants, no

21  synthetic drugs, no entering liquor establishments, no

22  firearms, all of those conditions remain in effect, and they

23  apply equally to your mode of transportation, so --

24         THE DEFENDANT:  That's no problem.

05:19   25         THE COURT:  Pardon?

293

1          THE DEFENDANT:  That's no problem.

2          THE COURT:  All right.  Well, I'm --

3          MR. CISNEROS:  Yeah, I don't drink or do drugs.

4          THE COURT:  I hear that from everybody, though, but I

05:20  5   believe you.  I'll trust you.  I'll amend the order to reflect

6    that you're responsible to make sure that she shows up at

7    Centre, Inc., on Monday by 6 o'clock p.m., and if she's not

8    there, her life will be much more complicated.

9          MR. CISNEROS:  She'll be there.

05:20  10         THE COURT:  All right.  I'll trust everybody that

11   they'll adhere to that directive, and I'll get an order out

12   within 15 minutes.

13         MS. ARMOUR:  We very much appreciate it.  And if I

14   may make one additional request, we have a third-year law

05:20  15   student who's been assisting us on this case, Jonathan Sidney,

16   who's been sitting here, if it might be possible for Ms. Fallis

17   to also remain in the custody of Mr. Sidney.  The three of us

18   have done everything we can to keep her with us in obeyance of

19   the Court's order.  It would just helpful to have --

05:20  20         THE COURT:  That's fine.

21         MS. ARMOUR:  -- one more set of hands on deck.

22         THE COURT:  That's fine.  All right.  Thank you.  We

23   will stand adjourned.

24         (A recess was taken from 5:21 p.m., Friday,

05:20  25   December 8, 2017, to 8:30 a.m., Monday, December 11, 2017.)

294