UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,        )
                                 )
                 Plaintiff,      )
                                 )
        vs.                      )        File No. 1:17-cr-16
                                 )
Redfawn Fallis,                  )
                                 )
                 Defendant.      )


TRANSCRIPT OF SUPPRESSION HEARING
VOLUME II
Pages 295-403




Taken at
United States Courthouse
Bismarck, North Dakota
December 11, 2017




BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

APPEARANCES

MR. DAVID D. HAGLER
MR. GARY DELORME
U.S. Attorney's Office
220 E. Rosser Ave.
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES

- - - - - - - - - -

MR. BRUCE HENRY ELLISON
Attorney at Law
P. O. Box 2508
Rapid City, South Dakota 57709

AND

MS. JESSIE A. COOK
Attorney at Law
400 Wabash Avenue, Suite 212
Terre Haute, Indiana 47807

AND

MS. MOLLY ARMOUR
Attorney at Law
4050 North Lincoln Avenue
Chicago, Illinois 60618

FOR THE DEFENDANT

- - - - - - - - - -

GOVERNMENT WITNESSES

                                                              Page No.

Trooper Bennett Bitz
   Continued Cross-Examination by Ms. Armour                    298


Daniel Heidbreder
   Direct Examination by Mr. Hagler                             312
   Cross-Examination by Mr. Ellison                             320


                     - - - - - - - - - -



                        DEFENSE WITNESS


Dennis Martinez, Junior
   Direct Examination by Mr. Ellison                            335
   Cross-Examination by Mr. Delorme                             363
   Examination by The Court                                     384
   Redirect Examination by Mr. Ellison                          386


                     - - - - - - - - - -



Certificate of Court Reporter - Page 403


                     - - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Daniel L. Hovland, United States District Court

3     Judge, presiding, commencing at 8:30 a.m., Monday, December 11,

4     2017, in the United States Courthouse, Bismarck, North Dakota.

5     The following proceedings were had and made of record in open

6     court with counsel and the defendant present.)

7                    - - - - - - - - - - -

8          THE COURT:  We'll open the record in the case of

9     *United States of America versus Redfawn Fallis*.  All parties

08:30  10    are present, along with the defendant.  We'll continue with the

11    questioning of Officer Bitz, I believe, who's on the stand.

12    And, Officer Bitz, I'll simply remind you that you're still

13    under oath.  We won't have you sworn in again.

14         THE WITNESS:  Yes, sir.

08:31  15    THE COURT:  As soon as he gets comfortable, you may

16    continue with the questioning.

17         MS. ARMOUR:  Just one second, Your Honor.

18                        TROOPER BENNETT BITZ,

19    having been previously sworn, was examined and testified

08:31  20    further as follows:

21    **Q.**   (MS. ARMOUR CONTINUING)  Good morning.

22    **A.**   Morning.

23    **Q.**   Trooper Bitz, how are you?

24    **A.**   Good.

08:31  25    **Q.**   When we last left you, it was Friday afternoon?

1    **A.**    Yes.

2    **Q.**    Have you spoken with anyone about your testimony --

3    **A.**    No.

4    **Q.**    -- since I last saw you?

08:32    5    **A.**    No.

6          MS. ARMOUR:  So I believe we were reviewing the video

7    together and looking at Exhibit A, and I believe we lost --

8    last left off at 2:02.  Can we see the timestamp there?  And I

9    believe what we were discussing was -- we were looking at this

08:32    10   to see if you were witnessing or hearing any commands from law

11   enforcement at the time, and we're going to proceed with that,

12   okay?  Let's go.  If we could just pause this and look at the

13   timestamp, so we're at 2:20.

14   **Q.**    (MS. ARMOUR CONTINUING)  Have you seen any commands or

08:33    15   heard any commands from law enforcement on the line?

16   **A.**    No.

17   **Q.**    Thank you.  And let's look at the timestamp, and we're at

18   2:37.  Have you heard or have you witnessed any law enforcement

19   commands at this time?

08:33    20   **A.**    No.

21          MS. ARMOUR:  Okay.  Let's go on.  Can you pause for a

22   moment and take it just back a second?

23   **Q.**    (MS. ARMOUR CONTINUING)  And I can't recall if we talked

24   about this before, but do you see the gentleman in the upper

08:34    25   left-hand corner with the dark brown shirt on?

1   **A.**   With the helmet on?

2   **Q.**   Yes.

3   **A.**   Yes.

4   **Q.**   Do you recognize that person?

5   **A.**   Yes, I do.

6   **Q.**   Who is that?

7   **A.**   Captain Bryan Niewind.

8          MS. ARMOUR:  Okay.  Let's go ahead.  Pause.

9   **Q.**   (MS. ARMOUR CONTINUING)  What time is it?  Do you see that

10  timestamp on your screen?

11  **A.**   Yes.

12  **Q.**   What is it?

13  **A.**   Two minutes, 53 seconds.

14  **Q.**   Okay.  And who do you see on the screen right there in the

15  middle?

16  **A.**   I see an officer in the middle.

17  **Q.**   Mm-hmm.  And do you see Ms. Fallis there?

18  **A.**   I see someone on the other side of the officer.

19  **Q.**   You see someone being taken down, correct?  Would you like

20  to go forward so you can see what happened?

21  **A.**   Yes, please.

22  **Q.**   Okay.  Let's do so.  Do you -- do you now know who that

23  is?

24  **A.**   Yes.

25  **Q.**   And so what you saw here was you saw Ms. Fallis being

1    taken down, correct?

2    **A.**   Correct.

3    **Q.**   And what we're looking at on the screen right here at

4    3:56 (sic) is the immediate aftermath, correct?

08:35    5    **A.**   2:56.

6    **Q.**   2:56.   Thank you.   Correct?

7    **A.**   2:56, correct.

8    **Q.**   Yep.   And you have not seen throughout this time at the --

9    through the end of the hearing yesterday and the beginning of

08:35    10   this morning, any law enforcement commands or heard any law

11   enforcement commands on this video, have you?

12   **A.**   No.

13   **Q.**   Okay.   Now, the female that you saw be pulled through the

14   line and arrested, it's Ms. Fallis, right?

08:35    15   **A.**   Yes.

16   **Q.**   And you had never seen her before that moment, had you?

17   **A.**   Correct.

18   **Q.**   You assisted in her arrest, correct?

19   **A.**   Correct.

08:36    20   **Q.**   But you had not seen her earlier that day, right?

21   **A.**   No.

22   **Q.**   And you had not seen her before that moment, right?

23   **A.**   Right.

24          MS. ARMOUR:   Let's go forward for a little bit.

08:36    25   **Q.**   (MS. ARMOUR CONTINUING)   At 3:02, when you were assisting

301

1   this arrest, you held her legs, correct?

2   **A.**   Correct.

3   **Q.**   Who else was assisting you?

4   **A.**   I know there was another North Dakota state trooper, and

08:36   5   there was multiple other officers right around me as well.  I

6   don't know exactly who.

7   **Q.**   Do you -- you don't know the names of any of the people

8   who are assisting?

9   **A.**   I know Trooper Jeremy Buehre --

08:36   10   **Q.**   Okay.

11   **A.**   -- if that's how you say his last name.

12   **Q.**   And do you know where he was positioned?

13   **A.**   He would have been on the left arm, left side, left of the

14   body.

08:37   15           MS. ARMOUR:   Okay.  I'd like to approach with what I

16   am marking as Defendant's Exhibit Bitz 1.  May I approach, Your

17   Honor?

18           THE COURT:   You may.

19   **Q.**   (MS. ARMOUR CONTINUING)  Do you see that diagram there?

08:37   20   **A.**   I do.

21   **Q.**   Do you have a pen with you?  Take mine.  What I would like

22   for you to do is I'd like for you to mark on there -- circle

23   where you were at.

24   **A.**   Okay.

08:37   25   **Q.**   And put your initials.

1    **A.**    Okay.

2    **Q.**    And then I would like for you to mark where you remember

3    Officer Buehre to be --

4    **A.**    Okay.

08:37    5    **Q.**    -- on there, and I'd like you to put his name so we know

6    that that's what you're marking.

7    **A.**    This person is facing down?

8    **Q.**    Yes, this person is facing down because that's where she

9    was at the time --

08:37    10    **A.**    Correct.

11    **Q.**    -- when you were assisting, right?

12    **A.**    Correct.

13    **Q.**    Her face was down on the ground.

14    **A.**    Correct.

08:38    15    **Q.**    Thank you.  And you were only covering her left foot?

16    **A.**    Yes.

17    **Q.**    Okay.  So you were only holding that part of her leg?

18    **A.**    The left foot.  The left leg.

19    **Q.**    The left leg.  The left leg or the left foot?

08:38    20    **A.**    The ankle.

21    **Q.**    Okay.  The ankle area.

22    **A.**    Yes.

23        MS. ARMOUR:  And I'm going to show the government and

24    would move this into evidence, Your Honor.

08:38    25        MR. DELORME:  No objection, Your Honor.

1        THE COURT:  Defendant's Exhibit Bitz 1 will be

2   received.

3        MS. ARMOUR:  And I have tendered today to the

4   government and to the Court, an amended exhibit list that

08:38    5   hopefully reflects all of these exhibits that we used yesterday

6   (sic), and I'm happy to hand out to the Court another copy.  Do

7   you have that there, Your Honor?

8        THE COURT:  I've got it in front of me, yep.

9        MS. ARMOUR:  Thank you.

08:39   10   Q.   (MS. ARMOUR CONTINUING)  So I'm just going to publish

11   this.  Do you see that, Defendant's Exhibit Bitz 1 on your

12   screen?

13   A.   Yes.

14   Q.   Okay.  And this is what you just did, correct?

08:39   15   A.   Correct.

16   Q.   And so what we see here is you are at -- on her left leg,

17   by her ankle, correct?

18   A.   Correct.

19   Q.   And you remember Trooper Buehre being in this area of her

08:39   20   body, correct?

21   A.   Correct.

22   Q.   But there were many other people around, right?

23   A.   Yes.

24   Q.   But you just don't know who they are.

08:39   25   A.   Correct.

1    **Q.**   So we didn't have you mark that, right?

2    **A.**   Correct.

3    **Q.**   But this is just who you recall.

4    **A.**   Yes.

08:40   5    **Q.**   Correct?

6    **A.**   Yes.

7    **Q.**   Okay.  And you never saw the gun.  You never saw Ms.

8    Fallis with the gun, correct?

9    **A.**   Not in her hand, no.

08:40   10   **Q.**   Well, you never saw her with a gun at all, correct?

11   **A.**   Correct.

12   **Q.**   You testified that she was laughing, that she was yelling

13   obscenities, and that she was screaming, correct?

14   **A.**   Correct.

08:40   15   **Q.**   And you specifically said that one of the things that she

16   was screaming was "Oglala," correct?

17   **A.**   Correct.

18         MS. ARMOUR:  And I want to go forward and I want to

19   watch this video with you.  Can I see what's the timestamp

08:40   20   we're at now?  We're at 3:02, and I'd like to go up to 6:45.

21   It's going to take a couple minutes, and I want you to listen

22   as you did and watch as you did before and tell me where you

23   hear her screaming.  Let's go ahead.  Stop right there and look

24   at the timestamp.

08:41   25   **Q.**   (MS. ARMOUR CONTINUING)  And this is at 3:28, correct?

1    **A.**    Yes.

2    **Q.**    And you've just heard three loud pops, correct?

3    **A.**    Correct.

4           MS. ARMOUR:  And let's go forward.  Stop right there.

08:42    5    Do you see -- and take it back just a tish.

6    **Q.**    (MS. ARMOUR CONTINUING)  And we were at 3 minutes and

7    40 seconds, right?

8    **A.**    Yes.

9    **Q.**    Do you see that fence there along the side?

08:42    10    **A.**    Yes.

11    **Q.**    All right.  The rest of the area wasn't fenced in just to

12    the -- to the east of the curtilage, correct, to the east of

13    the ditch?

14    **A.**    Correct.

08:42    15           MS. ARMOUR:  Okay.  Let's go forward.  Would you just

16    take it back one second there?  A little bit farther.  Play.

17    Pause.

18    **Q.**    (MS. ARMOUR CONTINUING)  Did you just see that person with

19    a mask on the back of their head pass through the frame?

08:42    20    **A.**    Yes.

21    **Q.**    Okay.  And that was at 3:42?

22    **A.**    Yes.

23           MS. ARMOUR:  Okay.  Let's go forward.  Let's pause

24    there, and this is at 4:02.

08:43    25    **Q.**    (MS. ARMOUR CONTINUING)  And you are on Ms. Fallis at this

1   point, right?

2   **A.**   Yes.

3   **Q.**   And you're holding her right ankle -- left ankle?

4   **A.**   Left.

08:43   5   **Q.**   Left ankle.  And you haven't heard her screaming on this

6   video, have you?

7   **A.**   No.

8          MS. ARMOUR:  Okay.  Let's keep going.  Pause right

9   there.

08:43   10   **Q.**   (MS. ARMOUR CONTINUING)  Could you see Ms. Fallis's body

11   there on the ground --

12   **A.**   Yes.

13   **Q.**   -- at 4:24?

14   **A.**   Yes.

08:43   15   **Q.**   And we see that she is lying facedown, right?

16   **A.**   Correct.

17   **Q.**   Okay.  And you haven't heard her on this video say

18   anything?

19   **A.**   No.

08:44   20          MS. ARMOUR:  Let's keep going.  Let's pause right

21   here.

22   **Q.**   (MS. ARMOUR CONTINUING)  And we see through this

23   perspective at 4:37 that there's a number of law enforcement

24   officers that are on her right now, right?

08:44   25   **A.**   Correct.

307

1   **Q.**   Do you see yourself here?

2   **A.**   Yes.

3   **Q.**   Who are you in this frame?

4   **A.**   The two people kneeling down, I would be on the -- the one

08:44   5   on the right.

6   **Q.**   You're the person on the right.  And who's to the left of

7   you?

8   **A.**   I do not know.

9          MS. ARMOUR:   Okay.  Let's keep going.  Can we see

08:45   10   what timestamp we're at now?  And this is 5:01.

11   **Q.**   (MS. ARMOUR CONTINUING)   Have you heard any screaming --

12   **A.**   No.

13   **Q.**   -- from her?

14          MS. ARMOUR:   Okay.  Let's keep going.  I want to

08:45   15   pause right there.

16   **Q.**   (MS. ARMOUR CONTINUING)   Did you hear the security -- the

17   water protector security say something right there on the video

18   and move his hands?

19   **A.**   Yes.

08:45   20   **Q.**   And what did he say?

21   **A.**   I heard him say, "Give them some room."  I couldn't tell

22   what he said before that, though.

23   **Q.**   Okay.  So he was directing the bystanders there, give them

24   some room, right?

08:46   25   **A.**   Yes.

308

1          MS. ARMOUR:  Okay.  And we are at 5:29.  Let's keep

2   going.  Pause.

3   Q.   (MS. ARMOUR CONTINUING)  And did you see Ms. Fallis there

4   on the ground --

08:46   5   A.   Yes.

6   Q.   -- just a couple frames before where we're at, at 5:46?

7   A.   Yes.

8   Q.   And she had -- was now cuffed, correct?

9   A.   Yes.

08:46   10   Q.   And was kind of rolled onto her side a little bit there,

11   correct?

12   A.   Yes.

13          MS. ARMOUR:  Okay.  Let's keep going.

14   Q.   (MS. ARMOUR CONTINUING)  And we see that gas mask from one

08:46   15   of the protesters, correct?

16   A.   Yes.

17   Q.   What did you hear -- you're hearing someone say, "No

18   swearing; keep prayer in your heart," right?

19   A.   Yes.

08:47   20   Q.   And we are at 6:17, and you haven't heard Ms. Fallis

21   scream, have you?

22   A.   No.

23   Q.   Okay.  We saw her face there for a moment.

24   A.   Yes.

08:47   25   Q.   Did you hear that's on there?

309

1   **A.**   I did.

2   **Q.**   Did you hear Ms. Fallis?

3   **A.**   I don't know who it was.

4   **Q.**   But you heard a sound?

08:47   5   **A.**   Yes.

6   **Q.**   Okay.  But you don't know whether that was Ms. Fallis?

7   **A.**   Correct.

8        MS. ARMOUR:  Okay.  Let's keep going.  What timestamp

9   are we at?  We're at 6:42.

08:48   10   **Q.**   (MS. ARMOUR CONTINUING)  And we're seeing Ms. Fallis be

11   led away, right?

12   **A.**   Yes.

13   **Q.**   And do you see yourself in the frame here?

14   **A.**   I do not.

08:48   15   **Q.**   Okay.  We're -- we're going to go ahead and move forward.

16   We see someone pick something up from the ground, correct?

17   **A.**   Yes.

18        MS. ARMOUR:  All right.  We're going to pause for a

19   moment, and I'm going to move this forward a little bit towards

08:48   20   the end of this video.

21   **Q.**   (MS. ARMOUR CONTINUING)  That's at 7:20, correct?

22   **A.**   Yes.

23        MS. ARMOUR:  I want you to pause there.

24   **Q.**   (MS. ARMOUR CONTINUING)  We're at 7:39, right?

08:49   25   **A.**   Yes.

1  **Q.**  And did you hear that command from law enforcement,

2  "move"?

3  **A.**  Yes.

4  **Q.**  That was coming from law enforcement, right?

5  **A.**  Yes.

6  MS. ARMOUR:  All right.  Let's keep going.  Stop

7  right there.

8  **Q.**  (MS. ARMOUR CONTINUING)  That's what a command sounds

9  like, right?

10  **A.**  Yes.

11  MS. ARMOUR:  No further questions.

12  THE COURT:  Thank you, Officer.  You may step down.

13  THE WITNESS:  Thank you.

14  MR. DELORME:  Your Honor, may he be released from his

15  subpoena?

16  MS. ARMOUR:  We have no objection.

17  THE COURT:  You are excused from these proceedings,

18  sir.  Thank you.

19  THE WITNESS:  Thank you.

20  THE COURT:  You may call your next witness.

21  MR. HAGLER:  Your Honor, our next witness is a North

22  Dakota state parole and probation officer, Dan Heidbreder.

23  THE COURT:  How do you spell that, Mr. Hagler?

24  MR. HAGLER:  H-e-i-d-b-r-e-d-e-r.

25  ///

311

<u>DANIEL HEIDBREDER</u>,

2  having been first duly sworn, was examined and testified as

3  follows:

<u>DIRECT EXAMINATION</u>

08:50  5  <u>BY MR. HAGLER:</u>

6  **Q.**  Please state your name.

7  **A.**  Daniel Heidbreder.

8  **Q.**  And with whom are you employed?

9  **A.**  I'm employed by the North Dakota Department of Corrections

08:50  10  and Rehabilitation.

11  **Q.**  In what position?

12  **A.**  As a parole officer.

13  **Q.**  How long have you been in that position with North Dakota

14  Department of Corrections?

08:50  15  **A.**  Since 2005.

16  **Q.**  Are you a licensed peace officer in North Dakota?

17  **A.**  Yes, I am.

18  **Q.**  Since when?

19  **A.**  Since 2005.

08:51  20  **Q.**  So, Officer Heidbreder, were you in Morton County on

21  October 27, 2016, working at the site where there's some DAPL

22  protest going on?

23  **A.**  Yes, I was.

24  **Q.**  And you're -- you subsequently became familiar -- well,

08:51  25  what were you doing that particular day?

312

1  A.    So my role -- I guess mine and my colleagues' role was to

2  take custody of those who were arrested, get those individuals

3  to an area that was set up where deputies would be processing

4  those arrestees.  And other colleagues' of mine then

08:51  5  responsibility was to get them from that area to jails or

6  detention centers.

7  Q.    And on October 27, 2016, when did you start doing that

8  that day?

9  A.    It was in the morning hours.  I don't recall exactly what

08:52  10  time, but in the morning hours.

11  Q.    Do you have an estimate as to the number of people that

12  you processed in this -- what you described in this process?

13  A.    I would say me personally, I probably -- maybe 20, 25

14  would be a guess.

08:52  15  Q.    Throughout that day?

16  A.    Yes.

17  Q.    Did you become familiar with a woman who was identified as

18  Redfawn Fallis?

19  A.    Yes, I did.

08:52  20  Q.    Do you recall approximately what time of the day it was

21  when you came into contact with her?

22  A.    I would say around 6 o'clock in the evening, maybe a

23  little before, a little after.

24  Q.    So what did you first learn regarding Ms. Fallis?

08:53  25  A.    My -- the first contact I had with Ms. Fallis was when I

313

1   was performing the duties I described before.  I was basically

2   flagged down by three North Dakota Highway Patrol troopers or

3   three officers who basically told me that this person had been

4   arrested and needed to be taken to this area -- this processing

08:53   5   area to be processed for being taken to the jail -- or to a

6   jail.

7   Q.   Were you informed as to what her conduct was that led to

8   her arrest?

9   A.   Yes.  So basically the information that I had to get and

08:53   10   other individuals doing my duties were who the arresting

11   officer was and then what charges this person was facing.  The

12   troopers told me that Ms. Fallis was being arrested for

13   attempted murder of a police officer.

14   Q.   You came to find out then that there had been some shots

08:54   15   fired, correct?

16   A.   Yes.

17   Q.   Where were you in relation to where that particular

18   incident occurred?

19   A.   So I was standing on the north side of a line of police

08:54   20   officers, as well as some vehicles, basically standing right in

21   the middle of the road of Highway 1806, so I was -- this

22   occurred probably a hundred feet to the east of me.

23   Q.   Did you hear the gunshots?

24   A.   I did hear three loud bangs.  At that time I couldn't

08:54   25   definitively say what they were.

314

1   Q.   All right.  So when these officers turned this woman over

2   to you, what did you do?

3   A.   Basically took custody of her, ensured that -- everyone

4   was being handcuffed using -- they're called zip cuffs, so

5   basically kind of large zip ties.  I ensured that they were

6   properly put on.  There were some throughout this whole

7   operation that were either too loose, too tight, weren't

8   properly put on.  I ensured that they were properly put on.

9        And then basically due to the severity of these

10  alleged charges, I tried to formulate a plan of how do we get

11  this person from where we were to this processing area, which

12  was maybe a mile to the north.

13  Q.   So with the individuals that day that you were essentially

14  processing, what information were you getting from them?  What

15  was your process?

16  A.   We would get a name, an address.  And then like I said, we

17  would have the information from the officers as to what the

18  charges were.

19  Q.   And so then what -- what contact, what conversations did

20  you have with the woman at that time?

21  A.   Basically asking her what her name was, what her date of

22  birth was, and where she was from.

23  Q.   And who did she identify herself as?

24  A.   As Redfawn Fallis, gave me a date of birth and said she

25  was from Denver, Colorado.

315

1    Q.   What did you do with her at that point?

2    A.   Like I said, with most individuals we had a -- like a UTV,

3    a side-by-side vehicle that we would place those arrestees on

4    and drive them approximately a mile north to this processing

08:57    5    area.   I was contemplating whether or not this is something we

6    were going to do with Ms. Fallis based on these charges.

7         As I was thinking through this, I looked up and saw

8    Special Agent Casey Miller, Special Agent Mike Ness, Special

9    Agent Scott Voeltz of the Bureau of Criminal Investigation and

08:57    10   their vehicle.   Decided it would be a good idea to take Ms.

11   Fallis over there where they were.   They were on the opposite

12   side of the road, and then basically further assess how we

13   would -- how we would proceed.

14   Q.   And so what happened?

08:57    15   A.   So I walked Ms. Fallis from where I was over to that

16   location and basically let the special agents know kind of what

17   was going on.

18   Q.   So the people that you were processing that day, did

19   you -- did you search them as a matter of your process?

08:58    20   A.   Yes.

21   Q.   Why?

22   A.   Incident to arrest.

23   Q.   But what was your main purpose of searching them as you

24   were processing them for transportation?

08:58    25   A.   To ensure they didn't have any illegal items on them, any

1    contraband, anything that they shouldn't have.  The process

2    from someone actually being arrested to maybe making it to a

3    correctional center based on the circumstances could have been

4    hours.  It wasn't as if we had the resources to drive someone

08:58   5    directly there, so we wanted to make sure that we had any

6    contraband, any illegal items.

7           And then also if they did have anything, you know,

8    any property that needed special attention, medications, other

9    things, we wanted to make sure we knew where that stuff was and

08:58   10    that it got accounted for.

11    **Q.**    Okay.  So you -- did you search Ms. Fallis?

12    **A.**    Yes.

13    **Q.**    Describe what happened during that process.

14    **A.**    So basically when I had walked her over to this vehicle

08:59   15    that the special agents were in, got her off to the side with

16    the assistance of Special Agent Voeltz, basically just started

17    going through Ms. Fallis's pockets, anything she had on.  Prior

18    to this I did ask her if she had anything on her that would

19    hurt me, anything sharp, anything that would be dangerous that

08:59   20    I needed to know about.

21    **Q.**    And do you recall what she was wearing?

22    **A.**    I know that she had two jackets on.  To describe them, the

23    outer jacket, I believe, was a dark color, but beyond that I

24    really don't recall.

08:59   25    **Q.**    And so, again, describe how you searched her.

1   A.   So basically just started by going through pockets of her

2   jacket.  Like I said, she had two jackets on, so not only did I

3   have to go through the pockets of the outside jacket, but also

4   pockets of the inside jacket, going through pant pockets,

09:00   5   basically any place on her person that I could physically and

6   reasonably check where there could be items.

7   Q.   And what -- were there any items found that were seized?

8   A.   Yes.

9   Q.   What?

09:00   10   A.   There were -- I found ammunition, .38-caliber ammunition.

11   I believe there were 12 rounds.  It was multiple rounds of .38

12   caliber ammunition.  There were three bags containing what I

13   believed to be marijuana.  There were some rolling papers.

14   There was a bandana, and then there was a braid of sweetgrass.

09:00   15          MR. HAGLER:  Can we display Government's Exhibit

16   Number 11, please?

17   Q.   (MR. HAGLER CONTINUING)  Does this look familiar to you,

18   Officer Heidbreder?

19   A.   Yes.

09:00   20   Q.   What are we looking at there?

21   A.   That was the ammunition that was found in Ms. Fallis's

22   pocket.

23   Q.   How many rounds there?

24   A.   Twelve.

09:01   25   Q.   Now, during this process did Ms. Fallis ask you any

1   questions?

2   **A.**   Yes.

3   **Q.**   And describe that conversation for us.

4   **A.**   As I was walking Ms. Fallis from kind of the area where I

09:01   5   first encountered her and took custody of her over to the area

6   where Special Agent Ness, Voeltz and Miller were, Ms. Fallis

7   asked me what she was being arrested for.  I told Ms. Fallis

8   that she was being arrested for attempted murder on a police

9   officer.

09:01   10   **Q.**   And did she respond to that?

11   **A.**   Yes.

12   **Q.**   What did she say?

13   **A.**   She told me that she hadn't tried to kill anyone, that

14   basically she was -- as she was taking her gun out of her

09:01   15   pocket, she was tackled by officers, and that her gun went off

16   during this process, that the officers were lucky that no one

17   got hurt, and that someone could have been hurt.

18   **Q.**   Did you Mirandize her at any point?

19   **A.**   I did not.

09:02   20   **Q.**   Are you aware if anyone else Mirandized her at any point?

21   **A.**   I am not.

22   **Q.**   The conversation that you just described for us, Officer

23   Heidbreder, did you ask her a question in order to elicit a

24   response from her?

09:02   25   **A.**   I did not.

319

1          MR. HAGLER:  That's all the questions I have, Your

2     Honor.

3          THE COURT:  You may inquire.

4          MR. ELLISON:  Just a moment, please, Your Honor.

09:02     5                    CROSS-EXAMINATION

6     BY MR. ELLISON:

7     Q.   Good morning.

8     A.   Good morning.

9     Q.   I've been trying to -- and I apologize, struggling how to

09:03     10     correctly pronounce your name, so if I at any point in my

11     questioning I mispronounce it, my apologies.

12     A.   No problem.

13     Q.   Sir, you mentioned that you were -- on direct examination

14     that you were -- had been a parole officer since 2005, but also

09:04     15     a licensed peace officer since 2005, is that correct?

16     A.   Yes.

17     Q.   Do you have to be a licensed police officer to be a parole

18     officer?

19     A.   In the State of North Dakota, to be a state parole and

09:04     20     probation officer, yes, you do.

21     Q.   Okay.  And on October 27 of 2016, you were a -- operating

22     as a TFO?

23     A.   Well, I'm also assigned -- as a parole officer I'm

24     assigned to a drug task force, which makes me a task force

09:04     25     officer.

                              320

1  **Q.**   Okay.  So while you're a parole officer, you also are a

2  drug -- a drug officer?

3  **A.**   Yes.

4  **Q.**   Doesn't that create a conflict in your work?

09:04  5  **A.**   No.

6  **Q.**   I think you said on direct examination that your role that

7  day was to take custody of people who had been arrested,

8  correct?

9  **A.**   Yes.

09:05  10  **Q.**   And to take them to processing.

11  **A.**   Correct.

12  **Q.**   It seems like you did processing yourself in this case,

13  though, does it not?

14  **A.**   No.

09:05  15  **Q.**   You mentioned, sir, on your direct examination that you

16  were flagged by troopers and that they soon told you after they

17  brought Ms. Fallis to you that they had a person arrested who

18  needed to be taken for processing.

19  **A.**   Correct.

09:06  20  **Q.**   And did you search every one of the people that you -- the

21  20 to 25 other people that you had arrested that day?

22  **A.**   Yes, I did.

23  **Q.**   Okay.  Who was the arresting officer?

24  **A.**   I do not know.

09:06  25  **Q.**   But you said, though, that there were three BCI agents who

321

1    were -- you're eventually bringing Ms. Fallis to?

2    A.   Correct.

3    Q.   But let me back up for just a moment.  When you were --

4    you had somewhat of an observation after hearing the bangs or

09:06    5    even perhaps before.  Was it before you saw a commotion and

6    were observing things?

7    A.   It was after.  That's kind of what drew my attention to

8    that area, were these three loud bangs.

9    Q.   So you didn't see an officer pull the person you came to

09:07   10    know as Ms. Fallis behind the lines and being placed on the

11    ground.

12    A.   I did not.

13    Q.   Okay.  Did you see the person who brought her to the

14    ground?

09:07   15    A.   I did not.

16    Q.   Now, you've described the BCI agents as three individuals,

17    Casey Miller, Scott Voeltz, and Mike Ness --

18    A.   Correct.

19    Q.   -- is that correct?

09:07   20    A.   Correct.

21         MR. ELLISON:  Your Honor, for purposes of the record,

22    I would like to state that we have never received a report from

23    Casey Miller regarding his arrest of -- or his processing of

24    Ms. Fallis.  We have received another report from Casey Miller,

09:08   25    but I just wanted to make a record of that.

322

1          THE COURT:  So noted.

2    **Q.**   (MR. ELLISON CONTINUING)  Now, you describe Ms. Fallis as

3    -- you asked her to identify herself, and she gave you her

4    name.

09:08    5    **A.**   Correct.

6    **Q.**   You asked her to provide a date of birth, and she gave

7    that to you.

8    **A.**   Yes.

9    **Q.**   You asked her where she was from, living at that time, and

09:08    10   she said Denver, correct?

11   **A.**   Yes.

12   **Q.**   So it would be fair to say that at least with response to

13   your queries, she was being very cooperative.

14   **A.**   She was providing information that I asked, yes.

09:08    15   **Q.**   And that's not always the case when people are arrested,

16   isn't that right?

17   **A.**   There were many that day that did not.

18   **Q.**   Now, the statements that you attributed to Ms. Fallis,

19   could you describe again, please, sir, when it was that you

09:09    20   recall those statements having been made.  I mean, where were

21   you?  What were you doing?

22   **A.**   So it was between when Ms. Fallis was handed over to me by

23   the troopers who brought -- who had brought her back behind the

24   -- and this was a couple hundred yards behind the line, so this

09:09    25   was kind of away from where a lot of things were going on.  In

323

1   between there and as I was walking her to the other side of the

2   road where the special agents were, so as we were moving across

3   the road.

4   **Q.**   Okay.   When you took Ms. Fallis across the road, what kind

09:09   5   of distance are we talking about?

6   **A.**   Thirty feet.

7   **Q.**   Okay.   Was there anybody accompanying you and Ms. Fallis

8   when you walked across the road?

9   **A.**   There was not.

09:10   10   **Q.**   Okay.   So initially there was a concern because of what

11   the nature of the charges were, serious charges, correct?

12   **A.**   Yes.

13   **Q.**   But you took her alone across the street, correct?

14   **A.**   Correct.

09:10   15   **Q.**   You didn't have to drag her?

16   **A.**   No.

17   **Q.**   She walked with you?

18   **A.**   Yes.

19   **Q.**   You weren't -- didn't have to pull her?

09:10   20   **A.**   No.

21   **Q.**   She didn't try and sit down?

22   **A.**   She did not.

23   **Q.**   She was cooperative as she walked across the street.

24   **A.**   She walked across the street on her own, yes.

09:10   25   **Q.**   Now I'm going to jump ahead for just a moment in time.

324

1  Later or was it at that time that you had communication with

2  Agent Michael Ness about pointing out the area where the

3  incident had occurred?

4  **A.**   That would have happened after I walked across and made

5  contact with the special agent.

6  **Q.**   Was there a gathering of officers at a particular location

7  where the incident was said to have taken place at that time?

8  **A.**   I don't know.

9  **Q.**   Well, did you see anybody else there when you were

10  pointing this area out?

11  **A.**   There were literally -- I mean, there were people

12  everywhere, people from -- all the way across the road there

13  were officers.

14  **Q.**   How much time would you say had elapsed from the time that

15  you first came in contact with Ms. Fallis and when you were

16  pointing this out to Agent Ness?

17  **A.**   Maybe a minute or two.

18  **Q.**   Okay.  So Ms. Fallis had not been removed from the scene

19  at that point or -- is that right?

20  **A.**   No, she had.  We were -- like I said, we were probably a

21  couple hundred yards behind kind of the lines where there was a

22  line of officers, and then on the opposite side were a line of

23  protesters.

24  **Q.**   Do you -- so you pointed to Agent Ness where the incident

25  as -- the little that you observed it, from a couple hundred

09:10 (line 5)
09:11 (line 10)
09:11 (line 15)
09:11 (line 20)
09:12 (line 25)

1  yards?

2  **A.**   Yes.

3  **Q.**   It was kind of like somewhere over there?

4  **A.**   Well, I mean, like I said, it occurred on the east side of

5  Highway 1806, in the bottom of the ditch.

6  **Q.**   So you really didn't take him over and show him any

7  specific location.

8  **A.**   I did not.

9  **Q.**   Okay.  Now, were you aware prior to or when the -- when

10  the highway patrol officers brought Ms. Fallis to you

11  initially, were you aware that she had already been searched?

12  **A.**   I was not.

13  **Q.**   Wasn't one of the purposes of your transportation of

14  Ms. Fallis to the BCI agents was so that she would be searched?

15  **A.**   Well, I had intended on doing it regardless of where I

16  brought her to, so I had -- I had intended on searching her.

17  **Q.**   Okay.  So you took her to an area where there were BCI

18  agents, and is that where you searched her?

19  **A.**   Yes.

20  **Q.**   Okay.  Now, you are a licensed police officer, but you're

21  not a criminal investigator, are you?

22  **A.**   Yes, I am.

23  **Q.**   Hmm.  Okay.  And when you -- is there a reason why you

24  searched Ms. Fallis as opposed to the BCI agent?

25  **A.**   No.  I mean, the reason would be because I -- she was

326

1    turned over to my custody and that was part of my

2    responsibility.  Everyone who was turned over to me was my

3    responsibility to search.

4    Q.    And that was based upon what?  Did you assume that

09:14   5    responsibility, or was that given to you?

6    A.    That was given to us.  Prior to taking anyone who was

7    arrested to this processing area, we were to -- myself and

8    everyone else performing the duties I was performing were to

9    ensure that everyone was searched.

09:14   10   Q.    And who gave you those instructions, sir?

11   A.    That would have came from a colleague of mine, Parole

12   Officer Corey Schlinger, who was somewhat the officer -- parole

13   officer in charge of the rest of us performing these duties.

14   Q.    When you searched Ms. Fallis, you've described how you

09:14   15   were looking for various items, contraband, anything that might

16   be dangerous, correct?

17   A.    Correct.

18   Q.    Were you wearing gloves?

19   A.    Yes.

09:15   20   Q.    And what was the purpose of wearing gloves?

21   A.    Just basically to ensure if I did come into contact with

22   something that could harm me, at least I had something between

23   me and whatever those items were.

24   Q.    What about preserving evidence?  Was that taken -- that

09:15   25   doesn't sound like that was taken into consideration at all,

1    was it?

2    A.    At that point, no.

3          MR. ELLISON:  Excuse me, Your Honor.  Just a moment,

4    please.

09:15    5    Q.    (MR. ELLISON CONTINUING)  All right, sir.  Showing you

6    what's been marked as Government's Exhibit 11, those are the

7    speed strips that you say you found on Ms. Fallis?  A nice,

8    smooth surface on those casings?

9    A.    Yes.

09:16    10   Q.    Something that potentially have fingerprints on it?

11   A.    Potentially.

12   Q.    When a person loads those speed strips, they actually

13   individually, what, slide or place the round into the speed

14   strip?

09:16    15   A.    I guess I'm personally not familiar with how that occurs.

16   Q.    Okay.  Well, it has to get there somehow, right?

17   A.    I believe so.

18   Q.    Okay.  I mean, that's not how you buy ammunition, is it?

19   A.    I don't believe so.

09:16    20   Q.    Are you familiar with micro forensic evidence?

21   A.    Not really, no.

22   Q.    What kind of training did you have to -- in the

23   preservation of evidence?

24   A.    That if collecting evidence, you want to wear gloves, you

09:17    25   want to handle things as little as possible, they want to be

1    placed in a bag or something that isn't going to damage any

2    evidence that could be on an item.

3    **Q.**    On or in or around?

4    **A.**    Mm-hmm.

09:17    5    **Q.**    Okay.  And these speed strips are rubber, are they not, or

6    plastic?

7    **A.**    They appear to be plastic to me, but I can't say for sure.

8    **Q.**    So after -- you testified you removed these two speed

9    strips.  What did you do with them?

09:17    10    **A.**    They were placed into evidence bags.

11    **Q.**    By yourself?

12    **A.**    Yes.

13    **Q.**    And did you sign the chain of custody for those speed

14    strips?

09:18    15    **A.**    No.

16    **Q.**    Did you seal that bag, yourself?

17    **A.**    I did not.

18    **Q.**    Did you sign that bag as the person who seized and placed

19    them in there?

09:18    20    **A.**    I did not sign the bag, no.

21    **Q.**    Did the BCI agents who were present during this search --

22    they were present, isn't that correct?

23    **A.**    Correct.

24    **Q.**    Okay.  Did they give you -- I mean, they're trained

09:18    25    investigators as well.  That's mainly their job.

329

1  A.   Correct.

2  Q.   And did they talk to you at all about being careful to

3  preserve any fingerprint, micro forensic evidence, anything

4  like that?

09:18  5  A.   We didn't talk about anything like that, no.

6  Q.   I mean, you -- Ms. Fallis is charged with a really serious

7  crime at that point, is that right?

8  A.   Correct.

9  Q.   So how come there wasn't really careful effort on your

09:19  10  part to make sure that any evidence that might be on these

11  items was not preserved in the best possible fashion?

12  A.   It was.

13        MR. ELLISON:  Can I have just a moment, Your Honor?

14  Thank you.

09:19  15  Q.   (MR. ELLISON CONTINUING)  So basically it's your testimony

16  that while you're conducting this search of Ms. Fallis, the BCI

17  agents are just kind of hanging around.

18  A.   No.

19  Q.   What were they doing?

09:20  20  A.   They were assisting me in conducting the search.

21  Q.   Oh, how -- how so, sir?

22  A.   Well, they had an evidence kit in their vehicle, so that

23  was grabbed, gloves, evidence bags.  Special Agent Voeltz was

24  standing literally right next to me.  As I was removing

09:20  25  evidence, he would have evidence bags that I would place them

330

1    into, so he was assisting me that way in the search.

2    **Q.**   Who was taking notes?

3    **A.**   At that time I don't know who was taking notes.

4    **Q.**   You're aware that an evidence inventory sheet was

5    prepared, sir?

6    **A.**   Yes.

7    **Q.**   And it was done in such a manner so that there was a

8    listing of the items that were ostensibly found on Ms. Fallis

9    or her backpack, correct?

10   **A.**   Yes.

11   **Q.**   Did you actually prepare that form?

12   **A.**   I did not.

13   **Q.**   Do you know who did, sir?

14   **A.**   I do not.

15   **Q.**   Did they consult with you?  Did anybody consult with you

16   about exactly what it is that you had found for that evidence

17   list?

18   **A.**   Yeah, that was occurring as we were -- as we were going

19   through the process.  I guess Special Agent Voeltz was standing

20   literally within a foot of me as this was occurring.

21   **Q.**   Okay.  So he was writing something down?

22   **A.**   I don't know if he was writing something down.

23   **Q.**   I mean, there were quite a few items, isn't that correct?

24   **A.**   I believe there were six items that were taken off Ms.

25   Fallis.

09:20
09:21
09:21
09:21
09:21

331

1    **Q.**   Okay.

2    **A.**   Off her person.

3    **Q.**   And were you there when her backpack was searched?

4    **A.**   I was not.

09:22    5          MR. ELLISON:  So I'm going to show you a part, sir,

6    of Government's Exhibit 14.  It's a -- it's a video, and I

7    wondered if you would just watch it with us, please.  Can you

8    -- okay.  Pause it for a second.

9    **Q.**   (MR. ELLISON CONTINUING)  Can you see this person here

09:23   10    (indicating), who's walking away from everybody?  You can look

11    at --

12          MR. ELLISON:  Maybe move it ahead a little bit

13    forward so you -- we can see that, in fact, that is the person

14    who gets arrested.

09:23   15    **Q.**   (MR. ELLISON CONTINUING)  Okay.  Did you see what she was

16    doing as she was -- right before she was arrested or seized in

17    this case?

18    **A.**   If you could play it again, maybe I --

19    **Q.**   Sure.  Absolutely.

09:23   20    **A.**   I was looking between both screens.  Sorry.

21          MR. ELLISON:  Pause for a second, please.

22    **Q.**   (MR. ELLISON CONTINUING)  The timestamp, what does it say?

23    Is that 12:53?  Is that accurate, sir?  Not timestamp, but time

24    from --

09:23   25    **A.**   It says 12:53.  Yes, I see that.

332

1          MR. ELLISON:  Okay.  Thank you.  Continue, please.

2  **Q.**   (MR. ELLISON CONTINUING)  That person is waving their arm,

3  right?

4  **A.**   That's the person we're talking about?  Yes.

5  **Q.**   Yes.

6  **A.**   Okay.

7  **Q.**   And I think you testified that you did not Mirandize

8  Ms. Fallis?

9  **A.**   I did not.

10  **Q.**   Did you hear anybody Mirandize her?

11  **A.**   I did not.

12          MR. ELLISON:  Thank you, sir.  I have no further

13  questions at this time.

14          THE COURT:  All right.  Thank you, sir.  You may step

15  down.

16          THE WITNESS:  Thank you.

17          MR. HAGLER:  May he be excused from his subpoena,

18  Your Honor?

19          MR. ELLISON:  Yes.

20          THE COURT:  You are excused from these proceedings.

21          THE WITNESS:  Thank you.

22          THE COURT:  Mr. Hagler.

23          MR. HAGLER:  Your Honor, we have no additional

24  witnesses.

25          The parties have discussed a short stipulation that I

333

1    discussed with Mr. Ellison, Your Honor.

2          MR. ELLISON:  I'm sorry.  Yes, we do have a

3    stipulation.

4          MR. HAGLER:  Your Honor, the United States has

09:25    5    presented to the Court 16 exhibits, and 1 through 13 are all

6    photographs of the particular items of evidence that are really

7    the subject of the suppression hearing.  And so our stipulation

8    is simply that for the purposes of this suppression hearing,

9    Your Honor, the items depicted in Government's Exhibit Numbers

09:26   10    2 through 8 were seized during the search of the backpack,

11    which is Government's Exhibit 1.  And that was subsequent to

12    the defendant's arrest.

13          THE COURT:  Very well.  Mr. Ellison, you're in

14    agreement?

09:26   15          MR. ELLISON:  Yes, sir.  For purposes of this hearing

16    only, we are in agreement.

17          THE COURT:  So noted.  The government's concluded

18    their presentation, Mr. Hagler?

19          MR. ELLISON:  Your Honor, we would like to call a

09:26   20    witness.

21          THE COURT:  Sure.

22          MR. HAGLER:  Yes, Your Honor.

23          MR. ELLISON:  Oh, I'm sorry.

24          MR. HAGLER:  Yes, Your Honor, we have.  There was one

09:26   25    other stipulation that we had discussed.  I don't know if Ms.

1    Armour wants to go forward at this time and put it on the

2    record.

3         MS. ARMOUR:  I will, Your Honor.  We have reached a

4    stipulation with the government in two parts; first, that

09:27    5    Redfawn Fallis arrived at the scene on a red ATV; and secondly,

6    that Ms. Fallis got off of that ATV at timestamp 10:03 as

7    depicted in Government's Exhibit 14, which is the drone video.

8    So stipulated?

9         MR. HAGLER:  That is correct, Your Honor.

09:27    10         THE COURT:  Very well.  Stipulation will be made a

11    part of the record here.  Anything else, Mr. Hagler?

12         MR. HAGLER:  No, Your Honor.  Thank you.

13         THE COURT:  Mr. Ellison.

14         MR. ELLISON:  Thank you, Your Honor.  We -- we intend

09:27    15    to call a single witness.  We would like to call Dennis

16    Martinez.

17                    DENNIS MARTINEZ, JUNIOR,

18    having been first duly sworn, was examined and testified as

19    follows:

09:28    20         THE WITNESS:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22                    DIRECT EXAMINATION

23    BY MR. ELLISON:

24    **Q.**   Good morning, Mr. Martinez.

09:28    25    **A.**   Good morning.

335

1    **Q.**   Sir, would you please state your name for the record?

2    **A.**   My name is Dennis Martinez, Junior.

3    **Q.**   And where do you live, sir?

4    **A.**   I live in Oglala, South Dakota, on the Pine Ridge

5    Reservation.

6    **Q.**   And if you could, please try and talk into that microphone

7    so we can all hear.  You're kind of soft-spoken like I am.

8    **A.**   Okay.

9    **Q.**   Thank you.  How long have you lived on the Pine Ridge

10   Reservation?

11   **A.**   I've lived in Pine Ridge all my life.  I was born there,

12   and I still live there.

13   **Q.**   And are you an enrolled member of the tribe?

14   **A.**   Yes.

15   **Q.**   And what tribe is that?

16   **A.**   The Oglala Sioux Tribe.

17   **Q.**   And are you employed, sir?

18   **A.**   Yes.

19   **Q.**   And how are you employed?

20   **A.**   Through Sioux Funeral Home.

21   **Q.**   And your mom, does he -- does she have any kind of a

22   related --

23   **A.**   She has been the county coroner since 2005.

24   **Q.**   And how long have you been working with the funeral home?

25   **A.**   I'd say about three years communitively (ph), but there's

336

1  time I've taken off, especially my time at Standing Rock, but I

2  was welcomed back.

3  **Q.**   When you -- did you ever work with your mom as the county

4  coroner?

09:30   5  **A.**   Yes.  At the age of 16 I started helping her with her jobs

6  because she complained that the officers and the EMTs were too

7  lazy to help her.

8  **Q.**   Okay.

9  **A.**   So I figured, well, I could help and lift because it's

09:30   10  heavy lifting.

11  **Q.**   Have you ever testified before, sir?

12  **A.**   No.

13  **Q.**   Okay.  It's important that you try and talk as -- a little

14  slower.  The court reporter has to take down every word that

09:30   15  you're saying, and we want to make sure that the Judge is able

16  to hear every word that you're saying, okay?

17  **A.**   Okay.

18  **Q.**   Thank you.  What is the nature of your work at the funeral

19  home?

09:30   20  **A.**   Just about everything.  The official title -- the title is

21  laborer, but I do everything my boss asks me.  I help embalm.

22  I clean them.  I dress them.  I transport them.  I do their

23  services.  I help console the families and help them pick out

24  caskets.  I handle autopsy cases after they -- after they're

09:31   25  done at the medical examiner.

337

1    **Q.**    Now, today, sir, as you appear in court, are you here

2    pursuant to a subpoena?

3    **A.**    Yeah.

4    **Q.**    Do you have that subpoena with you?

09:31    5    **A.**    Yes, I do have a copy of it.

6    **Q.**    When did you first arrive in North Dakota in relationship

7    to the protests regarding the Dakota Access Pipeline?

8    **A.**    The approximate date was August 17th, I believe, but our

9    tribe sent up buses, so they'd have a record of that.

09:31    10    **Q.**    And is that how you came --

11    **A.**    Yes.

12    **Q.**    -- by bus?  And about how many members of the Oglala Sioux

13    Tribe came with you on those buses at that time?

14    **A.**    Estimated amount of people was around 300 via five buses,

09:31    15    I believe.

16    **Q.**    And when you first got to the area, was there any

17    particular camp that you became part of?

18    **A.**    Whenever I first arrived, I camped with my Tokala brother

19    on the Sacred Stone Campsite.

09:32    20    **Q.**    And what is a Tokala brother?

21    **A.**    He's a member of our -- one of our societies of our

22    tribes.  The official title is T-o-k-a-l-a.

23    **Q.**    And you said it's one of the societies.  Is that a -- is

24    that a recent society, or how long has that society been

09:32    25    around?

338

**A.**   It's one of our oldest societies.  They're the protectors

of our people, and they carry themselves in a humble way, and

they help the elders and the youth and just overall protect the

camp.

09:32  **Q.**   Now, you mentioned, sir, you first were at Sacred Stone

Camp.  Did you at some point switch camps?

**A.**   Yes.

**Q.**   And where did you go then?

**A.**   We went over to the -- what is now called the Oceti Camp,

09:33  O-c-e-t-i.

**Q.**   And was that the larger camp --

**A.**   Yes.

**Q.**   -- of protesters?

**A.**   Yes, it was mostly referred to as Main Camp.

09:33  **Q.**   And after you arrived, what kind of things did you do?

**A.**   Initially on my first arrival I was a caregiver for our

council lodge, and up until the dog attacks in September, that

was my job, and then -- until September 3rd, I believe.  I

don't know the exact date.  I'm sorry.

09:33  **Q.**   Before you go on, what's the council lodge?

**A.**   The council lodge is one of our more important structures.

It's like three tepees together, and it's -- it only comes up

in significant times.  The last time it was erected was the

Little Big Horn, I believe.

09:33  **Q.**   Back in --

339

1   **A.**   -- 1876.

2   **Q.**   And what purpose did it serve at this time?

3   **A.**   At this time it was for our elders.  The Oceti Sakowin,

4   O-c-e-t-i, S-a-k-o-w-i-n, the tribes came together, our eight

09:34   5   different bands.  And every time they come together, the --

6   they come together like that, the council lodge is erected so

7   everyone can fit and voice their opinions.

8   **Q.**   So it really had been about a hundred years since this had

9   previously happened.

09:34   10   **A.**   Yes.

11   **Q.**   And when you say the tribes come together, is it mostly

12   elders?

13   **A.**   Yes.

14   **Q.**   So this is like their meeting place where the elders --

09:34   15   what are the -- what's the importance of elders in these

16   meeting places?  I mean, what are -- what do they do?

17   **A.**   We believe our elders have experienced life and they have

18   the most wisdom and knowledge and they walk a spiritual road,

19   so they have a higher connection, and we just seek their

09:35   20   counsel.

21   **Q.**   And what did you do to -- you said you maintained the

22   council lodge.  What did -- did you do?

23   **A.**   I cut firewood.  I maintained the sacred fire.  It wasn't

24   to be put out at all.  And I made sure the council lodge was

09:35   25   clean.  I made sure the flaps didn't blow away.  During the

1   meetings I'd run water around or I'd just sit and if anything

2   needed to be carried, I'd help them with -- that way.

3   **Q.**   Now, you mentioned your responsibilities or the tasks that

4   you had assumed changed after the dog attacks?

09:35   5   **A.**   Yes.

6   **Q.**   Is that when one of the private security companies had

7   dogs and used them on protesters?

8   **A.**   Yes.

9   **Q.**   Okay.  What did you do after that?

09:35   10   **A.**   After that I was a part of security.  They call themselves

11   the Akicita Society, A-k-i-c-i-t-a, Society.

12   **Q.**   And what was the purpose?  You know, what did you do as an

13   Akicita member?

14   **A.**   Overall it's just to protect the camp, like a Tokala, but

09:36   15   we did it in a peaceful way.  We didn't have any weapons or

16   anything like that.  We just tried to make sure everyone was

17   safe and accounted for.

18   **Q.**   Were there different things that were done at different

19   places in the camp that you did at different times?

09:36   20   **A.**   Yes, during the nighttimes we'd do wellness checks.

21   During the daytimes we'd man the north gate or south gate.

22   We'd patrol and make sure no drugs or alcohol were in the

23   vicinity -- in the camp.  I'm sorry.  And, yeah, that was about

24   it.  And then also haul water and stuff for elders.

09:36   25   **Q.**   Okay.  So when you're at the security gate, so to speak,

341

1   what did that involve for people who were coming in?  What did

2   -- what did you do?  Most people drove in, is that right?

3   **A.**   Yeah.

4   **Q.**   Okay.  What would you do in relationship --

09:36   5   **A.**   We'd just have one guy meet them at the window, and if it

6   was -- we'd just have them greet them, and then he asks them

7   for any -- if there are any drugs or alcohol.  And in the

8   meantime we're walking -- other individuals are walking around

9   and we're just glancing in and making sure and -- make sure

09:37   10   that none of that got in the camp or any other weapons as well.

11   **Q.**   Now, directing your attention, sir, to the morning of

12   October 27th, and do you remember that day by the date, or do

13   you remember it in connection with something that happened

14   that's involved in this case?

09:37   15   **A.**   I remember it by the date.

16   **Q.**   Okay.  And on October 27th there were pretty much protests

17   going on all day.

18   **A.**   Mm-hmm.

19   **Q.**   And what was your role beginning that day?

09:37   20   **A.**   Just to hold the line, make sure protesters remain

21   peaceful and nothing too bad happened despite what had

22   happened.

23   **Q.**   Would -- were you aware of whether or not the -- I mean,

24   you were -- you had already been there for a number of months.

09:38   25   **A.**   Yes.

342

1   **Q.**   And were you aware about a police roadblock on 1806?

2   **A.**   Yes.

3   **Q.**   And was that there prior to October 27th?

4   **A.**   Yes.

09:38   5   **Q.**   And in relationship to -- I can't pronounce it right --

6   Oceti Sakowin, what direction was that police roadblock?

7   **A.**   Oceti Sakowin was south on 1806.

8   **Q.**   Okay.  I think you said it was -- that the camp was south

9   of the roadblock?

09:38   10   **A.**   Yes.

11   **Q.**   Okay.  Do you know how far north the police roadblock was?

12   **A.**   Not exactly, no.  Probably around 20, 15 miles.

13   **Q.**   Did that change over the course of leading up to

14   October 27th in terms of where it was?

09:39   15   **A.**   Yes.

16   **Q.**   How so, to your knowledge?

17   **A.**   It seems like they moved it back more and more north.

18   **Q.**   When you say "back," in what direction?

19   **A.**   North.  They moved north.

09:39   20   **Q.**   They moved further away --

21   **A.**   Yes.

22   **Q.**   -- to the camp -- further away from the camp?

23   **A.**   Away from the camp.

24   **Q.**   And did you understand that travel was restricted through

09:39   25   that roadblock?

343

1  **A.**    Yes.  I never tried it myself.  I always went around 6 and

2  through Solen and up -- up -- coming up to Mandan.

3  **Q.**    So there was another way, but were you aware about whether

4  travel -- you could travel north or south through that

5  roadblock?

6  **A.**    No.

7  **Q.**    No what?

8  **A.**    No, we couldn't travel through the roadblock.

9  **Q.**    Okay.  Not that you weren't aware of it, just that there

10  was no travel.

11  **A.**    Yeah.

12  **Q.**    Now, on October 27th there was a camp that was along the

13  pipeline construction route, was there not?

14  **A.**    Yes.

15  **Q.**    And did that camp have a name?

16  **A.**    It was -- we referred to as Treaty Camp of 1851.

17  **Q.**    And did -- were you at that camp during any time during

18  the day?

19  **A.**    Yes.

20  **Q.**    And what was going on at that camp when you were there?

21  **A.**    People were praying and protesting, and then the police

22  came and they pushed us south on 1806.

23  **Q.**    So did they clear the camp?

24  **A.**    Yes.

25  **Q.**    And you witnessed that?

344

1   A.   Yes.

2   Q.   And would push people from that area onto the highway?

3   A.   Yes.

4   Q.   Okay.  And what was your role during the police action at

5   the north camp?

6   A.   Just to hold the line and make sure no one got violent,

7   make sure no one got hurt, the best we could.

8   Q.   And you, yourself -- well, let me hand you what's been

9   marked as F-16.  Oh, that's a 10.  I'm sorry.  I don't have my

10   glasses on.  Do you recognize that gentleman?

11   A.   Yes.

12   Q.   And who is that?

13   A.   That is me.

14   Q.   Now, I notice --

15            THE COURT:  Well, let me just interrupt.  I'm sorry,

16   but I have the defendant's amended exhibit list.  I don't see

17   any defendant's F-16 on here.

18            MR. ELLISON:  No, it's F-10, Your Honor.  I misspoke

19   earlier.

20            THE COURT:  All right.

21            MR. ELLISON:  Thank you, Your Honor.

22   Q.   (MR. ELLISON CONTINUING)  I notice that you're wearing --

23   what do you have on your eyes?

24   A.   I have safety goggles commonly used in construction sites.

25   Q.   And what do you have over your face?

345

1  **A.**   A bandana, and beneath that I have an air filter you can

2  buy at Walmart, one of those white masks.

3  **Q.**   And why were you wearing such things?

4  **A.**   Just for my own protection.  The police would administer

09:42  5  mace and pepper spray, tear gas sometimes, so just to help me

6  do my job to help people that didn't have anything like that,

7  so I can help get them out of there, some leverage.  Still felt

8  the effects, but it wasn't drastic.

9  **Q.**   From what you had observed of police activities earlier in

09:43  10  the day, had gas been used on that day?

11  **A.**   I believe it was just a concussion grenade and pepper

12  spray.

13  **Q.**   Okay.  But you were wearing that just in case gas was

14  used.

09:43  15  **A.**   Yes, and it also helped against the pepper spray too.

16  **Q.**   Oh, I see.  Okay.  Now, I mean, essentially your role was,

17  you were a peacekeeper.

18  **A.**   Yes.

19  **Q.**   And how many months were you at -- in this protest as a

09:43  20  peacekeeper?

21  **A.**   Overall, or --

22  **Q.**   Yes, overall.

23  **A.**   I'd say the whole time at camp, the whole seven months I

24  was there.

09:43  25  **Q.**   Were you ever arrested?

346

1  **A.**   No.

2  **Q.**   Were you injured?

3  **A.**   Yes.

4  **Q.**   How were you injured?

09:43  5  **A.**   I've -- I've been burned from their pepper spray, their

6  big cans.  I guess they have a little -- they're compressed.

7  They kind of -- it comes out fast enough and it breaks your

8  skin, right there.  Just like covered my eyes and it got right

9  there (indicating).

09:44  10  **Q.**   Now, you are pointing to your left wrist area?

11  **A.**   Yeah.

12  **Q.**   What do you have there?

13  **A.**   It's a -- it's not significant, but it's a burn mark.

14  It's visible in the light.

09:44  15  **Q.**   Now, a year later.

16  **A.**   Yes.

17  **Q.**   Okay.  Any other injuries you suffered?

18  **A.**   I've been shot, and I felt -- I've had a concussion

19  grenade off within two feet of me.  I've been disoriented by

09:44  20  those.  I've been shot by most of the ammunitions.  They're big

21  sponge rounds.  They're little pellets that they have in those

22  semiautomatic rifles, and they're -- they're shotgun beanbags

23  as well.

24  **Q.**   And had this occurred up through October 27th?

09:44  25  **A.**   No, I didn't get shot until the Blackwater (sic) Bridge on

347

1   November 20th.

2   **Q.**   Okay.  But the other munitions that had -- you'd been hit

3   by, that --

4   **A.**   Yeah.

09:45   5   **Q.**   -- happened by that point.

6   **A.**   Yeah.

7   **Q.**   And all you were were the peacekeeper.  Did you ever do

8   anything else?

9   **A.**   No.

09:45   10   **Q.**   Now, directing your attention to -- well, did there come a

11   time when you witnessed a commotion that involved a person you

12   learned was Redfawn Fallis?

13   **A.**   No.

14   **Q.**   Did -- on October 27th, at some point in the late

09:45   15   afternoon or early evening, where were you?

16   **A.**   I was on the line most of the day.  I was up to the -- to

17   our very own barricade we made, but we let vehicles through

18   that.  And then they pushed us all the way back south to the

19   camp.

09:45   20   **Q.**   Okay.  Is this photograph that's been marked as

21   Defendant's Exhibit F-10, is that about that time period?

22   **A.**   Yes.

23   **Q.**   And what was going on with regard to protesters and police

24   actions at that point?

09:46   25   **A.**   At that point it was pretty much died down and calm.  The

1   police officers, they moved their line behind their Bearcat

2   vehicles and Humvees.  Our people kind of backed off, and it

3   was -- it was -- they were -- they were dispersing back to

4   camp, our people were.  And then we were just -- I was just

09:46   5   trying to make sure nobody else stayed behind.

6   Q.   And the police at that point, were they holding the line?

7   A.   No, they were behind their vehicles, but they were on

8   standby, I believe.

9   Q.   Were the vehicles moving forward?

09:46   10   A.   No, they were parked.

11   Q.   Were the police moving forward at that time?

12   A.   No.

13   Q.   So there had been a period of calm.

14   A.   Mm-hmm.

09:46   15   Q.   No effort to push further south at that moment --

16   A.   No.

17   Q.   -- by the police.  Now I want to ask you, do you know a

18   person, sir, by the name of Phyllis Young?

19   A.   As a public figure, yes, not personally.

09:47   20   Q.   And how -- how do you know her?  You said not personally,

21   but what was --

22   A.   I just --

23   Q.   What was her role?

24   A.   I just seen her around camp.  She did some speaking.  She

09:47   25   was an elder, so I would say got her face and her name

349

1  together.  I kept that in mind so I'd know how to address her.

2  **Q.**   Was she considered a respected elder?

3  **A.**   Yes.

4  **Q.**   And at this time did you -- I think you said you didn't

5  know Redfawn Fallis?

6  **A.**   No.

7  **Q.**   Had you seen her before?

8  **A.**   I didn't know her name, but she did have a conversation

9  with me and my Tokala brother days before the 27th about

10  putting up her tepee for her.

11  **Q.**   And what were you doing while this conversation took

12  place?

13  **A.**   We were walking north to 1851 Treaty Camp, but this was

14  days before the 27th.

15  **Q.**   So you were just having conversation, but it was an

16  introduction.

17  **A.**   Yeah.  Yeah, it was mainly her and his conversation, my

18  Tokala brother, Ike, I-k-e.

19  **Q.**   Now, directing your attention again to the late

20  afternoon -- well, let me back up just a moment.  When you were

21  at the north camp both prior to and then when the police were

22  moving people out of that camp, did you see the person you

23  later came to know as Redfawn Fallis at that location?

24  **A.**   No, not that I remember.  She didn't stand out to me until

25  she pulled up on the ATV.

350

1  **Q.**   And at some point did you see Phyllis Young that day?

2  **A.**   She was there in the morning, yes, and then she went back

3  to camp like other people, and then she came back up in her

4  car.

09:49   5        MR. ELLISON:  Can we show Exhibit A, please?  Stop

6  for a moment.

7  **Q.**   (MR. ELLISON CONTINUING)  Who is the woman in blue?

8  **A.**   That is Phyllis Young.

9        MR. ELLISON:  I'm going to show you, sir -- it may

09:49   10  take a second to queue it up -- Government's Exhibit 14.  Okay.

11  Could you pause it for a second?

12  **Q.**   (MR. ELLISON CONTINUING)  When -- when Ms. Young came

13  later in the day, what was the first thing that you saw in

14  relationship to her arrival?

09:50   15  **A.**   In her initial arrival she got out of -- got out of her

16  vehicle, and she --

17  **Q.**   But what vehicle was that?

18  **A.**   The white Dodge Avenger right in front of the tan Bearcat.

19  **Q.**   Okay.  Is that -- is that this white vehicle here

09:50   20  (indicating)?

21  **A.**   Yeah.

22        MR. ELLISON:  Okay.  And, actually, could you run

23  that from the -- a little bit back before so we can show the

24  arrival of that vehicle, please?  Okay.  And pause.

09:51   25  **Q.**   (MR. ELLISON CONTINUING)  Okay.  We are at -- what does it

351

1    say, 9:20?

2  **A.** 9:22.

3         MR. ELLISON: 9:22. Okay. Go ahead, please.

4  **Q.** (MR. ELLISON CONTINUING) It looks like everybody is just

5  kind of standing around?

6  **A.** Yes.

7  **Q.** And what do you see arriving?

8  **A.** I see Phyllis Young arriving in the white vehicle, the

9  white car.

10 **Q.** And do you see another vehicle arriving?

11 **A.** I see the red ATV.

12        MR. ELLISON: Pause, please.

13 **Q.** (MR. ELLISON CONTINUING) What is the timestamp?

14 **A.** 9:46.

15 **Q.** Okay. Did you observe that ATV arrive as well?

16 **A.** Yes.

17 **Q.** And did you know who was on that vehicle --

18 **A.** No.

19 **Q.** -- when it -- when it arrived? Did you learn who was on

20 that vehicle?

21 **A.** Yes.

22 **Q.** And how did you learn who was on that vehicle?

23 **A.** My Tokala brother, Ike, told me.

24 **Q.** Okay. And --

25 **A.** "Oh, hey, it's Redfawn." "Okay."

1   **Q.**   Okay.  And did that name mean anything to you at that

2   time?

3   **A.**   No, just that we might have to put up her tepees.

4   **Q.**   I'm sorry?

09:52   5   **A.**   Just that we might have to put up her tepees, but other

6   than that, no.

7           MR. ELLISON:  Okay.  Go ahead, please.  Keep going.

8   Pause.

9   **Q.**   (MR. ELLISON CONTINUING)  And what is that timestamp then?

09:52   10   **A.**   10:04.

11   **Q.**   Okay.  Did someone get off that ATV?

12   **A.**   Redfawn got off her ATV.

13          MR. ELLISON:  And go ahead, please.  Keep playing.

14   Pause.  Stop.

09:52   15   **Q.**   (MR. ELLISON CONTINUING)  And what is the timestamp?

16   **A.**   10:08.

17   **Q.**   And that person who got off the ATV, where did they walk?

18   **A.**   They walked towards the crowd, towards the line.

19   **Q.**   Okay.  Anything in relationship to the white vehicle?

09:53   20   **A.**   The passenger's side of the vehicle.

21          MR. ELLISON:  At this time I'd like to switch videos,

22   if I may, to Government's Exhibit A, I believe.  And we're not

23   going to -- well, we're going to start it from the beginning.

24   I'm sorry, Defendant's Exhibit A.  Thank you, counsel.  Go

09:53   25   ahead.  Keep going.  Stop it.  Back up just a little bit.  Stop

353

1   it.

2   **Q.**   (MR. ELLISON CONTINUING)   Do you see this person here

3   (indicating) with a mask on?

4   **A.**   Yes.

09:54   5   **Q.**   And is that the person, to your knowledge, that got off

6   the ATV?

7   **A.**   No.

8         MR. ELLISON:   Go ahead.

9         THE WITNESS:   Now I see her.

09:54   10   **Q.**   (MR. ELLISON CONTINUING)   I'm sorry?

11   **A.**   Now I see her.

12   **Q.**   Okay.   And you are already -- you described how on the

13   other video the person who got off the ATV walked by the

14   passenger's side of the white vehicle.

09:54   15   **A.**   Yes.

16   **Q.**   And you're already positioned in front of the military

17   vehicle that's there, the brown one?

18   **A.**   Yes.

19   **Q.**   And at this point where were most of the police formed up?

09:55   20   **A.**   They were formed behind the vehicles.

21   **Q.**   Okay.   And was there a concentration on one side or the

22   other?

23   **A.**   No.

24         MR. ELLISON:   Okay.   Continue, please.   Pause it.

09:55   25   **Q.**   (MR. ELLISON CONTINUING)   What's the time of this?

354

1   A.   Around 30 seconds.

2   Q.   Okay.  And the woman in blue again?

3   A.   That's Phyllis Young.

4   Q.   Okay.

09:55   5   A.   And then at this time you can also notice the police.

6   They're starting to form up the line again.  They're coming up

7   from behind the vehicles.

8        MR. ELLISON:  Okay.  Continue.  Stop.

9   Q.   (MR. ELLISON CONTINUING)  What's the timestamp there?

09:56   10   A.   Forty-eight seconds.

11   Q.   Now do you see the person you later came to know as

12   Redfawn Fallis in that?

13   A.   Yes.

14   Q.   Okay.  Was -- what was she doing?

09:56   15   A.   She was expressing her feelings to the officers, but she

16   wasn't being too aggressive.  She was just voicing herself, as

17   other people do.

18   Q.   Okay.  Was there anything unusual about her behavior at

19   that time compared to the other protesters?

09:56   20   A.   No, just reminded her to stay in prayer, to stay peaceful,

21   as I did others that were shouting over my shoulder.

22   Q.   Okay.  She was angry?

23   A.   Yes.

24   Q.   Did she ever try and get through you to get to the police?

09:56   25   A.   No, she never pushed into me.

355

1    **Q.**   Did you ever -- I mean, it looks like she walked from the

2    ATV and came right in front of you and stayed there.

3    **A.**   Yes.

4    **Q.**   And did an officer with a baton ever push you out of the

09:57    5    way to push her back?

6    **A.**   No.

7    **Q.**   Did you ever hear any officer tell her to move back?

8    **A.**   No.

9    **Q.**   Did she ever get closer than the front of you to any of

09:57    10   the police officers before she was taken down?

11   **A.**   No.

12          MR. ELLISON:  Continue, please.  Stop.

13   **Q.**   (MR. ELLISON CONTINUING)  What's the time on this?

14   **A.**   A minute and 20 seconds.

09:58    15   **Q.**   Now, did you see something red in relationship to the

16   person you came to know as Redfawn Fallis?

17   **A.**   No.

18          MR. ELLISON:  If you could back it up just a little

19   bit.

09:58    20   **Q.**   (MR. ELLISON CONTINUING)  See something red?

21   **A.**   Oh, a fire extinguisher.

22   **Q.**   And did you ever see that in her hand?

23   **A.**   No.

24          MR. ELLISON:  Okay.  Go ahead.  Continue.  Stop.

09:58    25   **Q.**   (MR. ELLISON CONTINUING)  And what's the timestamp on

1  this?

2  **A.**    1:21.

3  **Q.**    Now, it looks like the police officers at least that are

4  depicted here, they're not even paying attention to her.

09:58   5  **A.**    No.

6           MR. ELLISON:  Go ahead.  Continue.  Stop, please.

7  **Q.**    (MR. ELLISON CONTINUING)  And timestamp?

8  **A.**    1:33.

9  **Q.**    What are -- what are people doing?  We hear some --

09:59   10  something from the protesters.  What are they doing?

11  **A.**    They're singing prayer songs.

12           MR. ELLISON:  Go ahead.  Continue.  Pause, please.

13  **Q.**    (MR. ELLISON CONTINUING)  What's the timestamp on that,

14  sir?

10:00   15  **A.**    Two minutes and 50 seconds.

16  **Q.**    You just heard Ms. Young say something.

17  **A.**    She was upset because one of our youth got shot off his --

18  his horse, 14-year-old.

19  **Q.**    Did you witness that?

10:00   20  **A.**    Yes.  That was earlier in the day.

21  **Q.**    Who shot him off his horse?

22  **A.**    The police officers.

23  **Q.**    And did anything happen to that horse?

24  **A.**    The horse was hurt pretty bad.  We had to -- they had to

10:01   25  put it down.

1   **Q.**   And how was that horse, sir?

2   **A.**   I believe it took -- it was shot so many times, it just

3   couldn't -- I don't know.  Initially I didn't -- I just heard

4   hearsay that it was shot multiple times and they just put it

10:01   5   down, or our people put it down.

6   **Q.**   Now, when we have seen you in this film and also in the

7   still photograph that we showed, your arms are like this

8   (indicating).

9   **A.**   Yes.

10:01   10   **Q.**   Was that a unique thing that you were doing at that

11   particular moment?

12   **A.**   No, I was doing that all day just to make sure people

13   stayed back.  If they tried to push into me, I'd push my arm

14   back or I'd use my body.  I'd push -- walk into them or I'd

10:01   15   push them back.

16   **Q.**   Did you ever have to push the person you came to know as

17   Ms. Fallis back?

18   **A.**   No.

19   **Q.**   Did she ever even touch you?

10:01   20   **A.**   No.

21   **Q.**   And when I -- I put my arms -- how would you describe how

22   my arms are now?

23   **A.**   Outwards, extended.

24   **Q.**   Okay.  And as shown in the still, you standing there, you

10:02   25   would stand in between the police lines and the protesters and

1   your arms would be stretched out?

2   A.   Yes.

3   Q.   Okay.  As depicted in Defendant's Exhibit F-10 --

4   A.   Yes.

10:02   5   Q.   -- is that right?  So what you were doing was what you

6   were doing all day?

7   A.   Yes.

8   Q.   And what you've been doing previous days?

9   A.   Yes.

10:02   10   Q.   And what you did afterwards.

11   A.   Yes.

12   Q.   So was there anything about Ms. Fallis that was

13   specifically causing you to do that?

14   A.   No.

10:03   15        MR. ELLISON:  When -- well, continue, please.  Stop.

16   Q.   (MR. ELLISON CONTINUING)  What is the timestamp?

17   A.   2:54.

18   Q.   Did you actually see Ms. Fallis taken to the ground?

19   A.   I didn't see the initial grab, but I did -- when I looked

10:03   20   back to her, she was being taken down from behind probably

21   around this time that -- it was maybe a second -- maybe a

22   second earlier.

23   Q.   What -- do you see yourself in that frame?

24   A.   Yes, I see my shirt from the back, my Crazy Horse shirt.

10:04   25   Q.   What is the timestamp, please?

1  **A.**    2:58.

2  **Q.**    Okay.  And this is like seconds before she's taken down.

3  What made you -- was there anything that made you notice what

4  was going on?

10:04      5  **A.**    I just heard a commotion, "hey, hey, hey," and then I

6  looked to my left, because initially before that I was looking

7  to my right to hear what Phyllis was saying.  And then I heard

8  a commotion behind me, so I looked, and then the officer was

9  taking down Redfawn.

10:04     10             MR. ELLISON:  Go ahead.  Continue.  Stop, please.

11  **Q.**    (MR. ELLISON CONTINUING)  Okay.  And what's the timestamp

12  here?

13  **A.**    3:06.

14  **Q.**    Okay.  It doesn't look like the protesters suddenly tried

10:05     15  to rush into these officers, does it?

16  **A.**    No.

17             MR. ELLISON:  Go ahead.  Continue.  Stop.

18  **Q.**    (MR. ELLISON CONTINUING)  What were you able to see

19  once -- once you were -- saw Ms. Fallis being grabbed, were you

10:05     20  able to clearly see what happened after that?

21  **A.**    No, there was officers that got in the way.

22  **Q.**    Okay.  Could you describe for us what, though, you were

23  able to see?

24  **A.**    Through what I was able to see, I seen that they had

10:05     25  Redfawn's arms subdued and they had their knees on her legs and

1    they pretty much had her subdued before the shots went off.

2    Q.    When you say "subdued," could you describe for us as best

3    you can the officers in her immediate vicinity, any number of

4    officers or just what you saw?

10:06    5    A.    From what I saw, it was about three to four officers

6    restraining her.

7    Q.    And where was she?

8    A.    She was on the ground, laying on her stomach --

9    Q.    And where were they?

10:06    10    A.    -- side.  They were on top of her.

11    Q.    And was this before you heard the pops?

12    A.    Yes.

13        MR. ELLISON:  Continue, please.  And, again, we're

14    talking about Defendant's Exhibit A.  Stop.

10:07    15    Q.    (MR. ELLISON CONTINUING)  What is the timestamp here?

16    A.    3:31.

17    Q.    Do you recognize that red canister that's depicted at this

18    time?

19    A.    The officers have?

10:07    20    Q.    Yes.

21    A.    Pepper spray.

22        MR. ELLISON:  Okay.  Continue, please.  Stop a

23    second, please.

24    Q.    (MR. ELLISON CONTINUING)  What is the timestamp there?

10:09    25    A.    5:15.

1  **Q.**   Do you recognize the woman in blue?

2  **A.**   That's Phyllis.

3          MR. ELLISON:  Okay.  Go ahead.  Stop.

4  **Q.**   (MR. ELLISON CONTINUING)  Do you see -- someone looks like

10:10   5  they have a camera.

6  **A.**   Yes.

7  **Q.**   Do you know who that officer is?

8  **A.**   No.

9  **Q.**   What does it look like they're filming?

10:10   10  **A.**   Redfawn's arrest.

11  **Q.**   And the timestamp again was what?

12  **A.**   6:15.

13          MR. ELLISON:  Continue, please.  Stop.

14  **Q.**   (MR. ELLISON CONTINUING)  What's the timestamp on this?

10:11   15  **A.**   6:31.

16  **Q.**   Now, what's that sound that we just heard?

17  **A.**   It was a lele.

18  **Q.**   And what is a lele?

19  **A.**   It's a way a Lakota woman would express herself.

10:11   20  **Q.**   And what did you interpret that lele to be at that time?

21  **A.**   Once I heard Redfawn's lele, I knew that she was okay.  I

22  knew that they didn't hurt her, she wasn't shot or hurt or

23  anything like that.

24  **Q.**   Was that a concern of yours prior to hearing that?

10:11   25  **A.**   Yes, I thought it was the officers that shot her, or

362

1    something.  I thought the arrest went bad.

2    **Q.**   From the time that the person you came to know as Redfawn

3    Fallis arrived in front of you prior to these events a few

4    moments later, was she in front of you the whole time until she

10:12    5    walked away?

6    **A.**   Yes.

7    **Q.**   And did you at any time feel or see or -- well, feel that

8    she was a threat?

9    **A.**   No.

10:12    10    MR. ELLISON:  Thank you, Your Honor.  No further

11    questions.

12    THE COURT:  Any cross?

13    MR. DELORME:  Yes, Your Honor.

14    CROSS-EXAMINATION

10:12    15    BY MR. DELORME:

16    **Q.**   Mr. Martinez, how you doing this morning?

17    **A.**   I'm good.  Thank you.

18    THE COURT:  Hold on one second, Mr. Delorme.  How

19    long do you expect to last?  I need to give my court reporter a

20    break here.

21    MR. DELORME:  About 45 minutes.

22    THE COURT:  Forty-five minutes?

23    MR. DELORME:  Yes, sir.

24    THE COURT:  Well, then we're going to take a break

10:12    25    for 15 minutes.  We'll recess until approximately 10:30.  Then

363

1     we'll reconvene with the questioning of Mr. Martinez.

2            (A recess was taken from 10:13 a.m. to 10:32 a.m.,

3     the same day.)

4            THE COURT:  Welcome back.  We are back on the record.

10:32   5     We'll continue with the questioning of Dennis Martinez.  As

6     soon as he gets comfortable up there, Mr. Delorme, you may

7     inquire of him.

8     Q.   (MR. DELORME CONTINUING)  All right.  Mr. Martinez, you

9     testified on direct examination that you were employed at the

10:33  10     Sioux Funeral Home?

11     A.   Yes.

12     Q.   Down in Pine Ridge, correct?

13     A.   Yes.

14     Q.   But I think it was August of 2016 you took some time off

10:33  15     to go to Morton County to engage in the protest?

16     A.   Yes.

17     Q.   And you took, I think you said, seven months off?

18     A.   Yes.

19     Q.   And when you got there, your first job was keeper of the

10:33  20     council tent, correct?

21     A.   Yes.

22     Q.   And the sacred fire?

23     A.   Yes.

24     Q.   And you did that from August into September, but sometime

10:33  25     in September your job switched to security.

364

1  A.    Yes.

2  Q.    When your job switched to security, was that something

3  that was -- you just decided to become security, or did

4  somebody appoint you as security?

10:34  5  A.    It was a bit of both.  My Tokala brother, Ike, vouched for

6  me.  Our society is well respected within our tribes, so we --

7  he spoke up for me.  And then the elders spoke up for me and

8  they put me on security.

9  Q.    Okay.  Mr. Martinez, help me out a little bit here.  You

10:34  10  keep talking about Ike as one of your brothers, right, from the

11  Sacred Society?

12  A.    Yes.

13  Q.    What's his last name?

14  A.    Weston.

10:34  15  Q.    Can you spell that?

16  A.    W-e-s-t-o-n.

17  Q.    Ike Weston?

18  A.    Yes.

19  Q.    And he must be also too then a member of the Oglala Sioux

10:34  20  Band?

21  A.    Yes.

22  Q.    Now, was this a position that you got paid for?

23  A.    No.

24  Q.    So it's kind of a free thing.  You're acting as camp

10:35  25  security with some of your -- your brothers from the Oglala

1    Band.

2    **A.**    Yes.

3    **Q.**    Now, I know we watched the video this morning.  It was

4    Defense Exhibit A.  You saw yourself in that video, correct?

10:35    5    **A.**    Yes.

6    **Q.**    And you said, I believe, on direct examination that that

7    day you saw yourself as camp security, trying to buffer

8    protesters from coming in too close or contact with the law

9    enforcement line.  Does that sound right?

10:35    10    **A.**    Yes.

11    **Q.**    So you're trying to keep people from getting themselves in

12    more trouble, or is it that you're trying to keep people from

13    getting arrested or both?

14    **A.**    A bit of both.  If they were -- if they wanted to be an

10:35    15    arrestable, then they would tell me so and I would let them go

16    through.  They would either sit down or they would stand there,

17    and I would go by them.

18    **Q.**    So "arrestable," what do you mean by that?

19    **A.**    Someone who is -- who is willing to get arrested for the

10:35    20    cause.

21    **Q.**    Okay.  So I noticed that in that video -- and we'll kind

22    of stop it, you know, just to verify, but you had a phone

23    number written on your arm, didn't you?

24    **A.**    Yes.

10:36    25    **Q.**    What was that phone number?

1   A.    That was the phone number to our -- to the attorneys in

2   camp, lawyers.

3   Q.    And what was the need for that phone number to be written

4   on your body?

10:36   5   A.    If we got arrested, then we'd call them and no one else.

6   Q.    Okay.  So pretty much everybody involved in the protest

7   had that number written somewhere on them?

8   A.    Yes, it was -- it was advice given.  Some people -- not

9   everyone did it, but I did it.

10:36   10   Q.    And you weren't arrestable, right?  You didn't want to

11   become arrested?

12   A.    No, I was there in peace and in prayer just to protect the

13   people.

14   Q.    So you only had it there just in case you were going to be

10:36   15   arrested and you had to call for help.

16   A.    Yes.

17   Q.    But some people were identified as arrestable.  They chose

18   to do something to get arrested.

19   A.    Yes.

10:36   20   Q.    And they had that number for -- for them to call for help.

21   A.    Yes.

22   Q.    Now, I see, you know, in the video we watched, you had

23   your arms out.  You're kind of focusing on people that are

24   agitated.

10:36   25   A.    Mm-hmm.

367

1    Q.   Does that sound right?

2    A.   Yes.

3    Q.   You're not focusing on everybody that's just simply

4    voicing their opinions, right?

10:37    5    A.   Mm-hmm.

6    Q.   People are getting a little bit worked up.  They're

7    swinging their arms around.  They're getting a little too close

8    to the officers, getting in their face.  You kind of focus on

9    them, right?

10:37    10    A.   Mm-hmm.

11        THE COURT:  You'll have to answer --

12        THE WITNESS:  Yes.

13    Q.   (MR. DELORME CONTINUING)  Okay.  And I see in the video

14    there's another individual there that tends to be working

10:37    15    security as well.  He's got a blue tank top on?

16    A.   Yes.

17    Q.   Do you know who that individual is?

18    A.   No, I do not.

19    Q.   But he is working some sort of security as well.

10:37    20    A.   Yes.

21    Q.   And he helps you out at times on the line keeping people

22    buffered back?

23    A.   Yes.

24    Q.   In fact, most of that video, it appears that your focus

10:37    25    and this guy with the blue tank top is on Redfawn Fallis, isn't

1    it?

2    **A.**   No, my focus wasn't on Redfawn.

3    **Q.**   Your focus was on Redfawn.

4    **A.**   It wasn't.

10:37    5    **Q.**   It wasn't?

6    **A.**   Was not.

7    **Q.**   But you're standing right in front of her.

8    **A.**   Yes.

9    **Q.**   With your arms out.

10:38    10    **A.**   Yes.

11    **Q.**   And she's getting irate.  She's yelling at things.  She's

12    swinging her arms at the law enforcement.

13    **A.**   Yes.

14    **Q.**   And you're -- you weren't focusing on her.

10:38    15    **A.**   No.

16    **Q.**   You didn't go any place else.

17    **A.**   I just stood there.  There were other people on the line.

18    **Q.**   Okay.  But the only other person we see is the guy with

19    the blue tank top.  You guys both have your arms extended, and

10:38    20    you're right in front of Redfawn Fallis.

21    **A.**   Mm-hmm.  Yes.

22    **Q.**   So is it kind of safe to say that you are kind of focusing

23    on keeping her back?

24    **A.**   No.

10:38    25    **Q.**   Now, as far as security, you said that when people would

369

1 arrive at camp, you would stop their cars, you'd have a little

2 talk with them, ask them if they had any kind of drugs, alcohol

3 or weapons?

4 **A.**   Yes.

10:38   5 **Q.**   Did you take their word for it, or did you search them?

6 **A.**   We did a small search, just glance over the vehicle, but

7 we took their word for it.

8 **Q.**   Now, you are aware by this time, right, that on

9 October 27th, during this event, that Redfawn Fallis had a

10:39   10 handgun on her and marijuana, correct?

11 **A.**   No, I was not aware.

12 **Q.**   So if I tell you that that's what she had taken from her

13 person, you wouldn't have any reason to deny that or -- would

14 you?

10:39   15 **A.**   No.

16 **Q.**   So she wouldn't have been searched prior to coming up to

17 the line to protest that day.

18 **A.**   No.

19 **Q.**   So we're going to go ahead and just take another quick

10:39   20 glance at the video that defense has showed you this morning as

21 Defense Exhibit A.

22 **A.**   Mm-hmm.

23       MR. DELORME:  We'll start it from the beginning.

24 We'll just take a look at what's going on.  Go ahead and play

10:39   25 it.  Stop right here.

1   **Q.**   (MR. DELORME CONTINUING)   What timestamp do we have on the

2   video?

3   **A.**   Twenty-three seconds.

4   **Q.**   Twenty-three seconds in.  We already saw you, right, and

10:40   5   you're right in front of Redfawn Fallis?

6   **A.**   Yes.

7   **Q.**   This whole group to the left, there doesn't appear to be

8   any kind of security in front of them, buffering them, is

9   there?

10:40   10   **A.**   No.

11         MR. DELORME:  Go ahead and play.  Stop there.

12   **Q.**   (MR. DELORME CONTINUING)   What timestamp are we looking

13   at?

14   **A.**   Fifty seconds, 5-0.

10:41   15   **Q.**   And right there we see Redfawn's pretty worked up, isn't

16   she?

17   **A.**   Yes.

18   **Q.**   She's yelling at the officers?

19   **A.**   Yes.

10:41   20   **Q.**   She's yelling some pretty harsh things at the officers,

21   isn't she?

22   **A.**   No.  I had earplugs in.  I didn't hear anything, any

23   profanity.

24   **Q.**   You didn't hear any profanity?

10:41   25   **A.**   No.

371

1         MR. DELORME:  Let's go ahead and play.  Stop there.

2    **Q.**  (MR. DELORME CONTINUING)   You were listening to the video?

3    **A.**  Yes.

4    **Q.**  You didn't hear what she just said to law enforcement?

10:41   5    **A.**  I heard the F word, sir.

6    **Q.**  Okay.  Followed by the word, I believe, "maggots"?

7    **A.**  I don't know.  I didn't hear that part.

8    **Q.**  But she did use some profanity that day.

9    **A.**  Yes.

10:42   10   **Q.**  And what timestamp are we at?

11   **A.**  1:13.

12        MR. DELORME:  Let's continue on.  Stop there.

13   **Q.**  (MR. DELORME CONTINUING)   What timestamp we on?

14   **A.**  1:29.

10:42   15   **Q.**  So we got a lot of people here that are protesting that

16   day, and they're really close to law enforcement, aren't they?

17   **A.**  Yes.

18   **Q.**  I don't see any security in that shot, do you?

19   **A.**  I do.

10:42   20   **Q.**  Which one?

21   **A.**  One of our security members, Frank.  I can't remember his

22   last name.  His call sign was --

23   **Q.**  Archambault?

24   **A.**  Yeah, Frank Archambault.  You can see --

10:42   25   **Q.**  Which one is he?

**A.**   -- a camouflage hat in between the girl with the scarf on her head and the man with a black hat.  That's him.

**Q.**   The man with a black hat right here, closest to us?

**A.**   No, in the camouflage hat.  You can only see the hat.

10:43

**Q.**   Oh, just in front of him.

**A.**   Yeah.

**Q.**   And that person is facing law enforcement.

**A.**   He is -- he is walking west, walking along the line it looks like.

10:43

**Q.**   He doesn't have his arms out, though, does he?

**A.**   No.

        MR. DELORME:  Let's continue on.  Stop here.

**Q.**   (MR. DELORME CONTINUING)  And what's the timestamp here?

**A.**   1:32.

10:43

**Q.**   In the few seconds there we didn't see him with his arms out trying to push anybody back?

**A.**   No.

        MR. DELORME:  Continue on.  Stop right here.

**Q.**   (MR. DELORME CONTINUING)  What's the timestamp?

10:44

**A.**   2:11.

**Q.**   Do you see those officers in the back?

**A.**   Yes.

**Q.**   They appear to be -- their attention appears to be drawn away to something else, and they walk towards the east side of

10:44

the ditch, correct?

1   **A.**   Yes.

2        MR. DELORME:  Let's continue on.  Stop again.

3   **Q.**   (MR. DELORME CONTINUING)   What's the timestamp?

4   **A.**   2:15.

10:44   5   **Q.**   Now, Phyllis Young appears to be voicing her opinion to

6   law enforcement in this particular few-second scene, correct?

7   **A.**   Yes.

8   **Q.**   There's nobody from security in front of her, is there?

9   **A.**   No.

10:44   10   **Q.**   Nobody has got their arms out trying to hold her back?

11   **A.**   No.

12        MR. DELORME:  Continue on.  Stop right there.

13   **Q.**   (MR. DELORME CONTINUING)   What's the timestamp?

14   **A.**   2:34.

10:45   15   **Q.**   Okay.  Now, we saw Phyllis Young and probably four other

16   individuals all relatively close to law enforcement.

17   **A.**   Mm-hmm.

18   **Q.**   She's yelling things at them, talking to them.  Law

19   enforcement don't have their weapons up?

10:45   20   **A.**   Mm-hmm.

21   **Q.**   There's no camp security in front of them trying to hold

22   them back, is there?

23   **A.**   No.

24        MR. DELORME:  Let's continue on.  Stop again right

10:49   25   there.

1    Q.   (MR. DELORME CONTINUING)   What timestamp we at?

2    A.   5:57.

3    Q.   Okay.  So I see you again here, and you're starting to

4    have your arms out again, and you're trying to push people

10:49    5    back.  Does that sound right?

6    A.   Yes.

7    Q.   Starting to get a little too close to the line?

8    A.   Yes.

9    Q.   Getting a little too uncomfortable with the -- I guess the

10:49    10    contact with between law enforcement and the protesters?

11    A.   Yes.

12         MR. DELORME:  Continue on.  Let's go ahead and stop

13    there.

14    Q.   (MR. DELORME CONTINUING)   What's the timestamp?

10:50    15    A.   6:33.

16    Q.   And you -- you're just in front of the line at this time

17    still, aren't you?

18    A.   Yes.

19    Q.   And you hear Redfawn when she leles?

10:50    20    A.   Yes.

21    Q.   Did you hear her yell that she was an Oglala?

22    A.   No.

23    Q.   But you heard the leleing.

24    A.   Yes.

10:50    25    Q.   And you knew that to be Redfawn.

1   A.   Yes, I heard it from the north.

2        MR. DELORME:  Can you go back real quick?  Stop.

3   Q.   (MR. DELORME CONTINUING)  Now, from where you were to

4   where she's being arrested, would you agree that's got to be

10:50   5   somewhere more than 15 feet, maybe around 25 feet from your

6   location?

7   A.   Probably about 10, 15 feet.

8   Q.   About 10 or 15 feet?

9   A.   Yes.

10:52   10       MR. DELORME:  Let's stop right there.

11  Q.   (MR. DELORME CONTINUING)  So about 11:09 on the timer to

12  the right, you recognized this when you testified on direct as

13  the location or close to the location where the shooting takes

14  place, correct?

10:52   15  A.   Yes.

16  Q.   You got the white car that pulls up.  We already know that

17  belongs to Phyllis Young?

18  A.   Yes.

19  Q.   And we kind of know already that you're off to the left,

10:52   20  right in front of that big tan vehicle that's on 1806.

21  A.   Yes.

22       MR. DELORME:  Go ahead and play it.  Go ahead and

23  stop.

24  Q.   (MR. DELORME CONTINUING)  Can you make out the guy with

10:52   25  the blue tank top that's just off to the left corner of the big

376

1  tan vehicle?

2  **A.**  Yes.

3  **Q.**  So correlating this with the video we watched, that would

4  be the guy that would be standing next to you with the arms

10:53  5  out.

6  **A.**  Yes.

7  **Q.**  And Redfawn Fallis is directly in front of you guys at

8  that point.

9  **A.**  Yes.

10:53  10  **Q.**  There's not a lot of other people in front of you besides

11  Redfawn at that point, is there?

12  **A.**  There was two other males, a male with a brown tannish

13  shirt, cut sleeves and a mask, and another male with a gray

14  sweater and blue sleeves.

10:53  15  **Q.**  Besides those two, then it's just Redfawn.

16  **A.**  Yeah.

17  **Q.**  And there's two of you with your hands out, correct?

18  **A.**  Yes.

19      MR. DELORME:  Go ahead and play.  Stop.

10:55  20  **Q.**  (MR. DELORME CONTINUING)  What's the timestamp?

21  **A.**  12:55.

22  **Q.**  Okay.  So you were watching the video the whole time,

23  right?

24  **A.**  Yes.

10:55  25  **Q.**  Keeping an eye on the area where you were located?

1   A.   Yes.

2   Q.   So a minute-and-a-half -- maybe just a little shy of a

3   minute-and-a-half you and this other individual with the blue

4   tank top stay directly in front of Redfawn Fallis in that area

10:55   5   just to the front left of that big tan military vehicle,

6   correct?

7   A.   Yes.

8        MR. DELORME:  Let's go ahead and play again.  Stop.

9   Q.   (MR. DELORME CONTINUING)  Time?

10:55   10   A.   Thirteen minutes.

11   Q.   And we see here Redfawn is actually moved off to the left

12   and she's being arrested.

13   A.   Yes.

14   Q.   Now, again, throughout that entire time when Redfawn pulls

10:56   15   up on the ATV, comes to the front, you're saying that you -- at

16   least you and possibly this person with the blue tank top kept

17   your attention directly in that area right in front of where

18   Redfawn was the entire time.

19   A.   Yeah.

10:56   20   Q.   Until she slipped away and got arrested.

21   A.   Yes.  I was on that side the whole day.

22   Q.   What was that?

23   A.   I was on that side the whole day, from the morning to --

24   up to then.

10:56   25   Q.   And when she's right in front of you, she's got a gas mask

378

1  on?

2  **A.**   Yes.

3  **Q.**   She's got a backpack on?

4  **A.**   Yes.

10:56  5  **Q.**   She's got a fire extinguisher that's off -- on the side of

6  the -- mounted on the side of the backpack?

7  **A.**   Yes.

8  **Q.**   Which fire extinguisher sure could have been used as a

9  weapon, correct?

10:57  10  **A.**   Maybe.  No.

11  **Q.**   Didn't see anybody else throughout the videos that we

12  watched with a fire extinguisher attached to any backpack on

13  her back, did we?

14  **A.**   There were fire extinguishers -- fire extinguishers on the

10:57  15  line, but they weren't strapped to their backpacks, not that I

16  noticed.

17  **Q.**   And you were on 1806 almost the entire day from when law

18  enforcement moved in, weren't you?

19  **A.**   Yes.

10:57  20  **Q.**   You talked about -- I think you talked about, you know,

21  seeing some shooting that took place?

22  **A.**   Yes.

23  **Q.**   And that was some 14-year-old on a horse?

24  **A.**   Yes.

10:57  25  **Q.**   When you say "shooting," you're talking about less lethal

1   ammunition, correct?

2   **A.**   Yes.

3   **Q.**   You're not talking about somebody pulled out a rifle, shot

4   a kid and then shot a horse multiple times.

10:58   5   **A.**   No.

6   **Q.**   So less -- less lethal rounds hit somebody on a horseback

7   and a horse?

8   **A.**   Mm-hmm.

9   **Q.**   You also said something about a concussion grenade as

10:58   10   well, right?

11   **A.**   I believe so, yes.  Yes, I did.

12   **Q.**   Okay.  You don't have any military experience, do you?

13   **A.**   No.

14   **Q.**   You don't have any law enforcement experience?

10:58   15   **A.**   No.

16   **Q.**   You wouldn't know the difference then between a concussion

17   grenade and a flash grenade, would you?

18   **A.**   No.

19   **Q.**   And when you're on 1806, is it your job the entire day to

10:58   20   try to prevent any kind of violence or anything like that?

21   **A.**   Yes.

22   **Q.**   Trying to keep protesters separated unless they wanted to

23   be arrested.

24   **A.**   Yes.

10:58   25   **Q.**   I'm going to show you what's been marked as Government's

380

Exhibit 17.  Do you recognize this particular image?

**A.**   Yes.

**Q.**   What is it an image of?

**A.**   It is of me on the front lines earlier in the day, in the morning.

**Q.**   And would you recognize this as coming from your Facebook account?

**A.**   Yes.

**Q.**   And you posted a lot of images on your Facebook account?

**A.**   Yes.

**Q.**   This image would have been -- well, let me actually put it up on the big screen, okay?

**A.**   Okay.

THE COURT:  Is this one of the stipulated exhibits?

MR. DELORME:  It's not a stipulated one, Your Honor.

THE COURT:  Well, before it --

MR. DELORME:  I'm going to move --

THE COURT:  -- goes up on the screen -- well, before it goes up on the screen, is somebody going to offer it?

MR. DELORME:  I said I'm going to move to admit Government's Exhibit 17.  He said, "No objection," Your Honor.

MR. ELLISON:  No objection.

THE COURT:  Oh, I didn't hear any of that.  Exhibit 17 will --

MR. DELORME:  Sorry.  I wasn't by a microphone, Your

1   Honor, 17.

2        MR. ELLISON:  Your Honor, did the Court hear that we

3   had no objection?

4        THE COURT:  Right, I received it, but I didn't hear

10:59   5   what was going on between the two of you, but I'll receive

6   Exhibit 17.

7   Q.   (MR. DELORME CONTINUING)  All right.  Mr. Martinez, this

8   is the image that I just showed you up on the stand, correct?

9   A.   Yes.

11:00   10   Q.   And this is an image of yourself?

11   A.   Yes.

12   Q.   On 1806?

13   A.   Yes.

14   Q.   And this would have been farther north of where the

11:00   15   shooting took place, correct?

16   A.   Yes.

17   Q.   This would have been right around where I guess you would

18   call the Treaty Camp or just north of the entrance to the

19   Treaty Camp?

11:00   20   A.   Yes.

21   Q.   Okay.  And what do we see in this particular image?

22   A.   Me standing on the front lines.

23   Q.   And what's in front of you?

24   A.   The police officers.

11:01   25   Q.   And what is all the stuff that's in between you and the

1   police officers?

2   **A.**   The molest vehicles designed as a roadblock.

3   **Q.**   Okay.  And how did those get there?

4   **A.**   Protesters put them there, agitators.  There was -- there

5   was a mix of information upfront.  We were -- they were saying

6   we were to remain in prayer.  Some were saying we're -- we're

7   to resist.  It was chaotic.

8   **Q.**   So protesters or agitators put all that stuff there?

9   **A.**   Yep.

10   **Q.**   And it was your job, though, to kind of prevent that kind

11   of thing, wasn't it?

12   **A.**   Yes.

13   **Q.**   And you guys didn't do a very good job at that particular

14   timeframe, did you?

15   **A.**   No.

16   **Q.**   A lot of people got arrested that day, didn't there?

17   **A.**   Yes, over a hundred, I believe.

18   **Q.**   Over a hundred?

19   **A.**   Yes.

20   **Q.**   Somewhere between 140 and 170?

21   **A.**   Somewhere around there.

22   **Q.**   Now, one of the things you'd indicated to Mr. Ellison is

23   that part of your job was to hold the line that day?

24   **A.**   Yes.

25   **Q.**   What did you mean by that?

383

1  A.    Just to make sure nobody would come between us, just act

2  as a buffer zone.

3  Q.    Okay.  So you meant from your position, hold the line was

4  a buffer between protesters and law enforcement.

11:02    5  A.    Yes.

6        MR. DELORME:  That's all the questions I have, Your

7  Honor.

8                        <u>EXAMINATION</u>

9  <u>BY THE COURT</u>:

11:03    10  Q.    I just have a few questions, Mr. Martinez.

11  A.    Yes.

12  Q.    You mentioned earlier in your testimony that -- would

13  there be certain people that were protesting that would tell

14  you that they wanted to be, quote, arrestable, end of quote?

11:03    15  A.    Yes.

16  Q.    What does that mean?

17  A.    They were willing to get arrested.

18  Q.    So then how would you respond to those people that told

19  you that?

11:03    20  A.    Then I would let them through.  I wouldn't -- I would just

21  walk by them like a river around a rock.

22  Q.    You would let those people walk by you towards the -- a

23  line of officers?

24  A.    Yeah.

11:03    25  Q.    Okay.

1  **A.**   If they -- if they were willing to.  If they said, "I'm an

2  arrestable," and then they have their number on their arm, then

3  I'd let them go.

4  **Q.**   What does a number on the arm mean?

11:04  5  **A.**   To the lawyers.  Whenever they get arrested, they call the

6  attorneys or the lawyers at the camp.

7  **Q.**   So do they have a number on their arm before they tell you

8  that they're -- they want to be arrestable?

9  **A.**   Yes.

11:04  10  **Q.**   And on October 27, 2016, were there a number of such

11  individuals that approached you that day on the highway?

12  **A.**   Yes.

13  **Q.**   Any idea how many?

14  **A.**   Personally, I experienced seven or six.

11:04  15  **Q.**   All right.  So what was the council's position on such

16  persons?

17  **A.**   Our -- our elders?

18  **Q.**   Yeah.

19  **A.**   They thought it was a necessary sacrifice.  If they're

11:04  20  willing to do it, then they'd let them go ahead with it.

21       THE COURT:  All right.  If either counsel wish to ask

22  any other questions related to my question, I'll give both

23  sides an opportunity to.  Mr. Ellison, do you have any more

24  questions?  I don't think you have your mike on there, sir.

11:05  25       MR. ELLISON:  Thank you, Your Honor.  Can I use this

1   microphone?  Would that be all right?

2         THE COURT:  Yes.

3                    REDIRECT EXAMINATION

4   BY MR. ELLISON:

11:05   5   Q.  Mr. Martinez, when a person said they wanted to be

6   arrested, if you had an idea that that person was going to

7   engage in violence, would you have let them go through?

8   A.   No.

9         MR. ELLISON:  That's all the questions I have, Your

11:05   10  Honor.

11        THE COURT:  Any other questions?

12        MR. DELORME:  No, Your Honor.

13        THE COURT:  All right.  Thank you, sir.  You may step

14  down.  You are excused.

11:06   15        MR. ELLISON:  May Mr. Martinez be excused, Your

16  Honor?

17        THE COURT:  I'm sure that he is.

18        MR. DELORME:  No objection.

19        THE COURT:  You're excused from these proceedings.

11:06   20  Thank you.

21        THE WITNESS:  Thank you.

22        THE COURT:  Mr. Ellison, any other witnesses?

23        MR. ELLISON:  No other witnesses, sir.  We do have a

24  -- and I know the Court wanted us to finish by 11:00, so I just

11:06   25  have a --

386

1          THE COURT:  Well, I'm not going to finish by 11:00,

2    so I've moved my 11:00 sentencing to 1 o'clock.

3          MR. ELLISON:  I just wanted to raise a procedural

4    scheduling question for the Court if I might.

11:06    5          THE COURT:  Sure.

6          MR. ELLISON:  On behalf of Ms. Fallis, we would like

7    to request a week to submit a post-hearing brief on the

8    suppression issue.

9          THE COURT:  By "week," you mean a week from today?

11:06    10          MS. ARMOUR:  That's correct, Your Honor.  And I've

11   spoken with the government about the timing for that, and I

12   understand there's no objection.

13          MR. HAGLER:  If the Court is wanting to entertain

14   post-hearing briefs --

11:07    15          THE COURT:  I'm open to that, sure.

16          MR. HAGLER:  Simultaneous briefs next Monday, Your

17   Honor, close of business?

18          THE COURT:  All right.  Then with the consent of all

19   counsel, I will order that any party that wishes to submit any

11:07    20   post-hearing legal brief of any sort would need to do so by on

21   or before Monday, December 17th, by the end of the workday.

22   I'll order that any such briefs be simultaneous.  In other

23   words, I'm not going to allow reply briefs from either side of

24   those.

11:07    25          MR. ELLISON:  Your Honor, just a couple of other

387

1    brief scheduling issues.  Under the current -- under the

2    Court's current order, the Court has set December 29th for

3    filing of any remaining motions.  And the Court also in a

4    January scheduling order, if I have the date correct, set the

11:08    5    requirement for motions in limine to be within -- and that

6    would be about eight days from now.  And I guess I'm requesting

7    that the motion in limine deadline be extended at least until

8    the 29th.  I'm going to let my co-counsel --

9              THE COURT:  All right.

11:08    10             MS. ARMOUR:  Your Honor, we anticipate filing a

11   motion to compel discovery, which we hope to be on file today,

12   but no later than tomorrow.  There --

13             THE COURT:  Concerning the 17 items that we talked

14   about last Friday or something more than that?

11:08    15             MS. ARMOUR:  Concerning far more than that.

16             THE COURT:  All right.

17             MS. ARMOUR:  And Your Honor already has one of -- two

18   of our discovery letters to the government, one such letter

19   summarizing prior requests of the government, and that is at

11:09    20   Discovery Exhibit 15 and Discovery Exhibit 16.  We -- and

21   through the course of the hearing I think it has become clear

22   to us that there is a substantial amount of outstanding

23   discovery, so I think it's very difficult to envision how we

24   could be ready on motions in limine without actually having

11:09    25   reviewed the material evidence that we've been requesting since

388

1    the outset of this case.

2           So I appreciate my co-counsel's enthusiasm for the

3    December 29th date, but I think we're going to need more time

4    than that.  And, you know, I'm open to what the briefing

11:09    5    schedule on the motion to compel would be, but it is our

6    position that there is a substantial amount of outstanding

7    discovery, and we will bring that to the attention of the

8    Court.

9           THE COURT:  Mr. Hagler or Mr. Delorme?

11:10   10           MR. HAGLER:  Your Honor, we disagree that there's a

11   substantial amount of outstanding discovery.  As I indicated at

12   the outset of the hearing on Friday, we have turned over

13   everything that we have been able to obtain, and it's thousands

14   of -- hundreds of pages and thousands of pictures, videos,

11:10   15   etcetera, Your Honor.

16           As far as the deadlines for these motions, we would

17   leave it to the Court's discretion as to setting those

18   deadlines, and we will respond accordingly.

19           THE COURT:  All right.  Well, with respect to the

11:10   20   discovery challenges, I don't have anything in front of me

21   other than the 17 discovery disputes that defense counsel

22   presented to me on Friday, so there's not a whole lot I can do

23   about that right now other than I've already ordered the

24   government to respond to those 17 discovery challenges by

11:11   25   December 15, 2017, at the end of the workday.

1     I'll also order the government to undertake its best

2 good-faith efforts to identify, locate and disclose any other

3 photographs, videotapes taken by law enforcement officers on

4 October 27, 2016.  The reality is that there were probably

11:11    5 dozens of people on both sides of this line that were taking

6 photos, taking still shots, shooting video, using cameras to

7 shoot video.  And it would be nice to have all of that

8 information, but identifying all such persons from both sides'

9 perspective is going to be difficult simply because there were

11:11   10 a lot of people that were not easy to identify in those videos

11 that we've seen to date.  People on both sides were wearing

12 goggles, wearing masks, wearing bandanas, wearing headgear.

13     Certainly some of the law enforcement officers that

14 were depicted in the video I think can be identified, in

11:12   15 particular a woman that was shooting a -- appeared to be

16 shooting a camera or a video of the arrest incident on

17 October 27, 2016.  But the likelihood of us ever recovering all

18 of the videos and still shots that were taken by everybody on

19 Highway 1806 on October 27th is probably unlikely.

11:12   20     But I'm ordering the government to disclose

21 everything and anything that they have by the end of this week

22 and particularly to make their best effort to identify any law

23 enforcement officers that were shooting video, taking still

24 pictures or images of any sort.

11:13   25     With respect to the motion in limine deadline, I'm

390

1   willing to extend it to December 29th, but the problem that I
2   run into trials like this is that -- and the other side takes
3   the position that in conformance with the local rules, they
4   ought to have 14 days to respond to the motion in limine, which
11:13   5   then puts us very close to the trial date.  And then everybody
6   wants to file reply briefs, and so then I actually get all of
7   the briefing in my hands about two or three days before the
8   trial.  And quite often I'm confronted with 20 or 30 motions in
9   limine that I'm expected to make an evidentiary ruling on days
11:13   10   before a trial.  That's why I set the motion in limine deadline
11   long before the trial, to avoid that.

12   I'll extend the motion in limine deadline for both
13   parties to December 29th.  But I'm also ordering that both
14   parties respond within one week to those motions in limine so
11:14   15   that I at least have a reasonable amount of time to read what
16   everybody is complaining about.  Fair enough?

17   MR. HAGLER:  Yes, Your Honor.

18   MS. ARMOUR:  We understand, Your Honor.  And as we
19   hope we will make clear to the Court, we understand that what
11:14   20   you know about this case is what's been presented to you by the
21   parties.  Unfortunately, the outstanding video that is in the
22   hands of the government agencies that are a part of this case
23   is just one component of that.

24   In this matter we have an undercover FBI informant
11:14   25   who, after becoming an informant, engaged in a romantic and

391

1   physical relationship with our client.  We believe that there

2   are outstanding materials relating to that.

3         And we also believe that there are substantial

4   outstanding materials relating to a relationship between

5   private security and law enforcement.  We anticipate and we

6   believe that counsel in other cases before Your Honor relating

7   to October 27th have begun to brief on some of these

8   interrelated issues.

9         THE COURT:  Criminal cases or civil cases?

10         MS. ARMOUR:  Criminal cases, and I believe

11   specifically the matter of Mr. Giron, which is either Case

12   Number 17-cr-30 or 17-cr-31.  There's substantial issues.

13         And we believe that there were people on the ground

14   relating to private security that perhaps could have been

15   agitators.  We've learned that -- we've learned in this hearing

16   over the past couple days that there were other undercover

17   informants or law enforcement agents -- we don't even know

18   which at this point -- that were briefing the officers before

19   going out there.  And for that -- for all of those reasons, we

20   have been diligently and consistently seeking this information

21   from the government.

22         And I understand that this has not been brought to

23   Your Honor's attention as --

24         THE COURT:  Right.

25         MS. ARMOUR:  -- of yet, and that is because we have

1    been attempting to reach -- or get any response at all from the

2    government on these voluminous requests, and we will bring this

3    to Your Honor's attention.

4           Additionally, I will let you know that there are a

5    number of substantive motions that we anticipate bringing and

6    that we are working on relating to jurisdiction, relating to

7    the *Johnson* case.

8           THE COURT:  The *Johnson* case?

9           MS. ARMOUR:  The Supreme Court case of *Johnson*

10   relating to crime of violence.

11          THE COURT:  Oh, I'm well aware of that.  I've had to

12   resolve about 50 or 60 cases that -- of defendants I had

13   previously sentenced that raised those motions, so I'm well

14   aware of the *Johnson* case.

15          MS. ARMOUR:  And we have this incredibly unique

16   statute, this civil disorder statute which of its own nature

17   has very interesting elements relating to the lawfulness of

18   government conduct.  And so we have been working tirelessly.  I

19   think it's not an overstatement that we're -- counsel is all

20   exhausted with the amount of work that we have been putting

21   together, and we are attempting to bring that all to the Court.

22          I let you know that while we are here, to apprise you

23   of all of the matters that we are attempting to juggle, and we

24   will do our best to meet these deadlines, but we remain deeply

25   concerned about substantial outstanding materials that we think

1  relate to this case and that we need to present and -- to
2  evaluate and to present an effective defense.
3         THE COURT:  Mr. Hagler, anything you wish to say in
4  that regard?
11:17    5         MR. HAGLER:  I'd only be repeating myself, Your
6  Honor, that we have made repeated efforts to gather anything
7  and everything, and everything we have has been turned over.
8         THE COURT:  All right.  With respect to the briefs
9  that the parties are going to submit by next Monday, let me
11:18    10  just outline for you some of the issues that I want both sides
11  to address.  The critical issues in this case really concern an
12  approximate five-minute timeframe during which Ms. Fallis was
13  pulled down in the ditch by Officer Schmit, plus the activities
14  that occurred in the ditch area immediately following that
11:18    15  takedown and/or arrest of Ms. Fallis.
16         In the motion to suppress, the government's response
17  and the reply that I read carefully before this hearing, there
18  wasn't much discussion about Eighth Circuit law, which is the
19  law that I'm bound to uphold.  And I think even more critical
11:19    20  to the issues presented in this case is the events that took
21  place following the arrest, the struggle in the ditch and what
22  went on there between Ms. Fallis and the law enforcement
23  officers.
24         The Eighth Circuit law that I want everybody to
11:19    25  address, to distinguish, tell me how it applies, how it doesn't

394

1    apply is the cases of *United States versus Schmidt, United*
2    *States versus Collins, United States versus Dawdy*, D-a-w-d-y.
3    The current law in the Eighth Circuit essentially holds that
4    even if the initial stop and the arrest of the defendant was
5    invalid, that any active resistance by a person who's been
6    stopped and arrested may provide independent grounds for
7    subsequent search, subsequent arrest.  Nobody really talked
8    about those cases.

9            And I'm interested in everybody's viewpoint about how
10   those cases apply to this factual scenario, whether there are
11   any other Eighth Circuit cases that have addressed similar
12   factual scenarios.  How are the Schmidt, Collins and Dawdy case
13   distinguishable from this factual scenario?  I'm interested in
14   any other Eighth Circuit cases that counsel from both parties
15   are aware of that have addressed the issue of resistance to
16   arrest.

17           I'm not interested in Ninth Circuit case law or
18   Fourth Circuit case law.  I'm interested in the law in the
19   Eighth Circuit, which is the law that I'm bound to apply as a
20   district court judge, but nobody really wanted to talk about
21   those cases.  But I'm interested in everybody's perspective on
22   whether they apply.  If they don't apply, distinguish them from
23   the facts presented in this case.  To me that is the critical
24   threshold issue in this case.  And if the parties wish to
25   discuss the facts that were presented at the hearing, that's

11:19

11:20

11:20

11:20

11:21

1    fine as well.

2           In terms of page limits, I won't put any page limits

3    on the discussion, but I can only read so long, so -- before

4    I've got to start over.

11:21     5           Anything else that we can take care of today?

6           MR. ELLISON:  No, sir.

7           MR. HAGLER:  No, Your Honor.

8           THE COURT:  Let me just tell you one other -- bring

9    up one other matter for your thoughts.  I received a

11:22    10    questionnaire from both parties.  I've read it over carefully.

11    I've narrowed it down somewhat, but not to any great extent.

12    There's still approximately 50-some questions.  The ones that I

13    have weaned out are ones that I would plan on asking the jury

14    during my questioning of the jury panel.

11:22    15           But that questionnaire is going to be mailed out this

16    week to approximately 150 potential jurors.  And I'm requesting

17    that the clerk's office have the prospective jurors return that

18    questionnaire by Friday, December 22nd.  I think that's a

19    Friday.

11:22    20           My plan, but I'm open to suggestions from both sides,

21    is that I would initially review the responses to those

22    questionnaires.  I'm happy to send the responses out to

23    everybody.  But my initial thought was to strike from that list

24    of 150 jurors, any prospective juror whose response clearly

11:23    25    indicates that they've got some bias or prejudice or

396

1    preconceived notions about this case.

2           There's specific questions that both parties proposed

3    to ask them about their preconceived views of this case.  Have

4    they reached conclusions as to -- as to the critical issues in

5    the criminal case?  I don't believe it would be of any -- that

6    it would be wise to bring those people in for questioning at

7    the time of trial who have already revealed their biases or

8    prejudices in response to a questionnaire.

9           So my hope would be that by weaning those prospective

10   jurors out of this case early, that we'd be bringing in for

11   trial people that have at least indicated in their

12   questionnaire that they haven't reached any preconceived

13   notions of this case, have no biases or prejudice toward law

14   enforcement or the defendant.

15          Again, I would provide all of those questionnaire

16   responses to both attorneys, but I guess if somebody wanted to

17   challenge why I struck a particular juror, they would have an

18   opportunity to do that before the trial ever starts.  But my

19   intention would be, if somebody answers the question, do you

20   have a preconceived notion about guilt or innocence or the

21   outcome of this case, and they say yes and then describe what

22   their views are, we shouldn't be wasting our time at trial even

23   bringing those people in for questioning.

24          I'm listening to both sides.  Do you have -- either

25   of you have a problem with my approach to dealing with the

1   questionnaire in that fashion?

2          MR. HAGLER:  Your Honor, I think the whole purpose of

3   that exercise of the juror questionnaire is essentially what

4   the Court has outlined, in addition to the preconceived

5   notions.  And they're related, of course, to the media exposure

6   that the defendant has raised in their motions.  So I think

7   what the Court has outlined is reasonable.

8          Obviously, there's always attempted rehabilitation of

9   particular individuals, Your Honor.  But as you point out, the

10  purpose of this, I think, is to narrow the jury pool and

11  eliminate the people that in response to these questionnaires

12  are clearly biased one way or the other, so we would trust the

13  Court's discretion in doing that.

14         THE COURT:  And my thought is that, sure, we can

15  bring them all in and I can ask questions to attempt to

16  rehabilitate them, as could both of you.  But the reality is if

17  somebody responds on paper that they already have a bias or

18  prejudice about this case, why do we want to waste our time

19  bringing such persons in in an effort to try to -- one side or

20  the other, rehabilitate them?  But I'm listening.

21         MS. ARMOUR:  Thank you, Your Honor.  I would agree

22  that I think that there is some sort of preliminary process

23  that should be engaged in with a trial of this type so that we

24  do not waste time on selecting people.  Nevertheless, part of

25  the process of selecting a jury, it is the defendant's right to

398

1    participate in this process.

2            I have engaged in some very lengthy and complicated

3    trials in -- in the past, and perhaps some of the processes

4    that we've used similar to these questionnaires might be of use

11:27    5    here.  In one such case the parties received the questionnaires

6    and conferred with a court reporter present.  Because we're not

7    there, perhaps we could do this over the phone.  And it's my

8    general feeling that I think that we'd reach a consensus on --

9    that almost all of those should be excused, and then have that

11:27    10    agreement and bring that to the Court.  And that was like a

11    two-and-a-half month RICO case.

12            In a four-month RICO case I did last year, I believe

13    we all looked at the questionnaires together and then, again,

14    tried to reach some consensus on people who clearly should not

11:27    15    waste the Court's time or our client's time in being brought

16    together.  But I do think that there is value in the engagement

17    in that process of the parties.

18            THE COURT:  Oh, I fully agree.

19            MS. ARMOUR:  So perhaps we could propose receiving

11:27    20    scanned copies of such questionnaires, conferring with the

21    government and seeing if we have any disagreement about obvious

22    bias that has been disclosed on those questionnaires, and I

23    wonder Your Honor's amenability to that.

24            THE COURT:  Well, like I said, I'm more than willing

11:28    25    to send the responses of all 150 to all counsel.  And I

399

1    certainly don't intend on making any decisions about

2    arbitrarily striking someone until I've had input from both

3    parties.  But I think that we can all read the questionnaires

4    and probably decide amongst ourselves who should be a

5    prospective juror and who shouldn't be.  But I think we can

6    handle something like that by phone with a court reporter.

7    Videoconference with a court reporter is -- I'm open to that.

8           MS. ARMOUR:  And I'm happy to have a preconference

9    with the government so as to streamline that process so we can

10   go through certain juror numbers and say this is what we think.

11   And Your Honor certainly has his opinion, which I would never

12   think would be arbitrary.

13          With regard to that, I am concerned about not wasting

14   any time and not wasting any juror's time in putting aside the

15   time to complete a questionnaire and to do a two-week trial.

16   That's -- I'm wondering if Your Honor -- relatedly would ask

17   the Court to respond to our motion to compel also by Friday so

18   that we might know whether or not we believe we must seek a

19   continuance on Ms. Fallis's behalf and file that promptly.

20          I would hate for such questionnaires to go out and

21   for us then to seek a continuance because we think we're

22   Constitutionally obligated to do so and have all of that energy

23   from the clerk's office and from staff's -- from the staff's

24   perspective ill used.  I think we would be in a position to see

25   the government's responses to the forthcoming nature of such

400

1    discovery upon reading their response and would offer our

2    thoughts on whether it's tenable to proceed in light of their

3    response shortly thereafter.

4         THE COURT:  All right.  Well, the questionnaires are

11:30    5    ready to go.  I could have them sent out today if I wished.

6    They've all been -- already prepared by the clerk's office with

7    cover letters and return envelopes from prospective jurors, so

8    -- but you expect to file that motion to compel by when?

9         MS. ARMOUR:  We've been drafting it this weekend, and

11:30   10    I had hoped to get it on file today.  I was hoping maybe we can

11    get until tomorrow, but I would like to do it tight turnaround

12    so that the government has sufficient time to respond to that

13    because I think that really will clarify to us our position

14    with regard to our obligation to Ms. Fallis.

11:30   15         THE COURT:  All right.  It doesn't sound like there's

16    much more that I can do today, but -- but again, if the

17    questionnaires go out today, everybody will receive copies of

18    those responses.  And I guess I would respectfully request that

19    both counsel first consult and see if you can agree on which

11:31   20    persons should be struck from the panel.  But I think at the

21    end of the day we'll probably all agree on that based on the

22    responses.

23         But I'll wait receipt of the defendant's motion to

24    compel.  And the government will file a response by when?

11:31   25    You're not sure because you haven't seen the --

401

1          MR. HAGLER:  Well, I think I know the majority of the

2     nature of it, Your Honor.  I guess I would ask for a week.

3          THE COURT:  That's fine.  A week from receiving --

4          MR. HAGLER:  Whenever we -- whenever we're served

11:32   5     with it, Your Honor.

6          THE COURT:  Anything else for the good of the order?

7          MR. ELLISON:  No, Your Honor.

8          THE COURT:  Well, I appreciate the briefing and the

9     presentation by both parties.  I think that everybody has been

11:32   10    very civil and respectful and has presented evidence as it

11    should be presented in a hearing like that, so with that I will

12    take the matter under advisement.  We'll stand adjourned.

13          (Proceedings concluded at 11:32 a.m., the same day.)

14                    - - - - - - - - - -

15

16

17

18

19

20

21

22

23

24

25

1              <u>CERTIFICATE OF COURT REPORTER</u>

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3    Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5    foregoing proceedings had and made of record at the time and

6    place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8    typewritten pages contain an accurate transcript of my

9    shorthand notes then and there taken.

10         Dated:  January 9, 2018

11

12                          <u>/s/ Sandra E. Ehrmantraut  </u>
                            Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25