## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:17-cr-016 |
| Plaintiff, | |
| v. | **UNITED STATES' SENTENCING MEMORANDUM** |
| RED FAWN FALLIS, a/k/a<br>REDFAWN JANIS, a/k/a<br>REDFAWN X. MARTIN, | |
| Defendant. | |

The United States of America, by Christopher C. Myers, United States Attorney for the District of North Dakota, and David D. Hagler, Assistant U.S. Attorney, hereby files the following sentencing memorandum in support of the sentencing recommendation to be made in this matter. Defendant pled guilty to Civil Disorder, in violation of 18 U.S.C. §§ 231(a)(3) and 2, and Possession of a Firearm and Ammunition by a Convicted Felon, in violation of 18 U.S.C §§ 922(g)(1) and 924(a)(2).

The United States does not have any objections to the Presentence Investigation Report, but advocates for upward departures and variances based on USSG § 4A1.3 (under-representation of criminal history); USSG § 5K2.6 (use of a dangerous weapon during the commission of the offense); USSG § 5K2.21(seriousness of the offense) as well as other 18 U.S.C. § 3553 factors as set forth herein.

FACTS[1]

This Court made the following factual findings in its "Order Denying Defendant's

Motions to Suppress":

In mid-2016, construction began on the Dakota Access Pipeline in North Dakota. The pipeline was designed to transport oil from the Bakken oil fields in North Dakota to a storage hub in southern Illinois. During the summer of 2016, several hundred anti-pipeline protestors began demonstrating and protesting at the pipeline's construction site in Morton County, North Dakota.

On October 27, 2016, law enforcement officers began attempting to move a group of protestors from an encampment known as the "North Camp" as the camp's occupants were on private land and were blocking Highway 1806. See Docket Nos. 118-1, p. 2 and 118-2, p. 1. Around 6:00 p.m. that day, Pennington County Sheriff's Department deputies Rusty Schmidt and Thadius Schmit were assisting with moving protestors south on Highway 1806 as part of an "arrest team." See Docket No. 118-2 p. 2. The arrest team's responsibility was to stay behind the line, identify "agitators," and arrest them if it was deemed safe to do so. See Docket No. 118-2, p. 2.

At that time, there were over 50 protestors and approximately 100 law enforcement officials from multiple agencies, both within and outside of North Dakota, present on scene. See Docket Nos. 98 and 117-12. Around 6:00 p.m., Fallis arrived at the scene of the protest on an ATV, parked the ATV near the highway, and walked toward law enforcement officers. Deputy Thadius Schmit testified at the suppression hearing that Fallis was wearing a gas mask, a puffy coat, and a backpack. Jacob Jones from the North Dakota Highway Patrol testified at the suppression hearing that he observed Fallis wearing a gas mask and carrying a backpack with a fire extinguisher attached. Deputy Thadius Schmit testified he saw Fallis screaming in the face of a law enforcement officer. Deputy Thadius Schmit also testified he saw a Hennepin County officer push towards Fallis with his baton, Fallis did not get back or listen to the officer's commands, he could hear alarm in the officer's voice, and Fallis continued to scream, yell, and point at officers. Due to Fallis' behavior, Deputy Thadius Schmit identified Fallis as a person who could be arrested. See Docket No. 118-1, p. 3.

Deputy Thadius Schmit testified Fallis began walking down the ditch embankment, parallel with the officers' skirmish line, and continued to yell and scream at law enforcement officers. At that point, Deputy Thadius Schmit testified that he

---

[1] Additional facts are based on testimony and exhibits from the December 8 and 11, 2017 suppression hearing (transcripts of the suppression hearing are part of the Court record at DCD 191 and 192) and the December 15, 2016 detention hearing (transcript of is part of the court record at DCD 35) as noted.

approached Fallis from behind and attempted to pull her behind the skirmish line to effectuate an arrest. Other officers moved past them to form a barrier around them and the other protestors. See Docket No. 118-1, p. 4. Although law enforcement officers told Fallis to stop resisting, she continued to struggle and resist the officers' arrest attempt. Deputy Thadius Schmit testified that at one point, Fallis wrapped both of her legs around one of Deputy Rusty Schmidt's legs while resisting, and she also spread her fingers to make it difficult to handcuff her.

During the arrest attempt, Fallis' left arm was pinned underneath her, and Deputy Thadius Schmit attempted to grab her left elbow in order to place her arm behind her back so he could handcuff her. See Docket No. 118-1, p. 4. When Deputy Thadius Schmit stopped pulling on her left arm so the other officer could handcuff her right hand, he heard two or three popping sounds. See Docket No. 118-1, p. 4. Deputy Rusty Schmidt also heard two to three gunshots at that time and saw one of the rounds hit the ground next to his leg. See Docket Nos. 118-1, p. 2; 118-2, p. 3; and 118-4, pp. 1-2. Deputy Rusty Schmidt observed what appeared to be a revolver underneath Fallis' stomach and yelled "Gun." See Docket Nos. 118-1, p. 2 and 118-2, p. 3. Deputy Rusty Schmidt told Deputy Thadius Schmit to get his gun on Fallis because he was concerned she would be able to continue shooting. See Docket No. 118-1, pp. 2, 4. Deputy Thadius Schmit put his gun on Fallis' upper back and told her to drop the gun or he was going to shoot her. See Docket No. 118-2, p. 3. Fallis continued to struggle with law enforcement officers and refused to release her grip on the gun; however, Deputy Rusty Schmidt was eventually able to seize the gun from Fallis. See Docket Nos. 118-1, pp. 2, 4 and 118-2, p. 3.

After she was disarmed, Deputy Thadius Schmit testified he was frustrated and approached Fallis and asked "Was all this worth it? Was it worth getting an attempted murder on law enforcement charge?" See Docket No. 118-1, p. 4. Deputy Thadius Schmit testified that Fallis responded by laughing. Deputy Thadius Schmit testified he did not ask those questions intending to get a response from Fallis.

Trooper Jeremy Buehre of the North Dakota Highway Patrol also testified at the suppression hearing on December 8, 2017. Trooper Buehre was part of the "arrest team" on October 27, 2016, who was attempting to move protestors south toward the protest camp located on federal lands off of Highway 1806. Trooper Buehre was one of several officers who was trying to get Fallis' arms out from underneath her. Buehre was located on the left side of Fallis when she was struggling on the ground; he was trying to pull her left arm from underneath her when he felt the concussion from the gun and three (3) shots. Following the shooting and subsequent search of Fallis, Trooper Buehre testified Fallis made several comments, namely:

- "What's the big deal? Anybody can carry a gun;"
- "If I wanted to kill an officer I could have done it and they would be dead;" and

- "All pigs deserve to die."

Trooper Jacob Jones testified he heard Fallis make a war whoop and also said she was an "Oglala."

Trooper Bennett Bitz of the North Dakota Highway Patrol testified at the suppression hearing and said he also heard shots fired while he was standing in the east ditch on Highway 1806. Trooper Bitz testified he observed Fallis being taken to the ground and saw her kicking her legs. Trooper Bitz testified that when Fallis stated, "If I wanted to kill you, I would have shot you in the head" or words to that effect, her comments were not in response to any questioning.

Upon her arrest, Fallis was searched by law enforcement officials to determine if she possessed any other dangerous items; Captain Bryan Niewind of the North Dakota Highway Patrol testified that a black holster was discovered in Fallis' front left pocket.

Fallis was then turned over to North Dakota Parole Officer Dan Heidbreder. Upon getting her ready for transport, Officer Heidbreder testified at the suppression hearing that Fallis was more thoroughly searched to determine if she had any dangerous items or contraband on her person. Officer Heidbreder testified Fallis was wearing two jackets and inside the inner jacket, he found 12 rounds of live .38 caliber ammunition1 in two speed strips and three baggies of marijuana and rolling papers.

Officer Heidbreder testified that during the search, Fallis asked him what she was being arrested for, and he responded that she was being arrested for attempted murder of a law enforcement officer. Officer Heidbreder testified that Fallis said she had not tried to kill anyone, but rather was taking the gun out of her pocket when officers tackled her, and the gun went off during the process. Officer Heidbreder testified Fallis also said the officers were lucky no one was hurt and that someone could have been hurt.

Law enforcement officials also searched Fallis' backpack to determine whether there were any dangerous items inside, as well as to inventory the items. Officials found road flares, a can of Raid wasp and hornet spray, a can of pepper spray, metal brass knuckles, and two fixed blade boot knives. See Docket Nos. 22-1; 22-2; and 22-3. Officials also seized a gas mask, the Ruger .38 caliber handgun, and from inside the handgun – two live .38 caliber rounds and three spent .38 caliber rounds. See Docket Nos. 16-3; 16-4; and 118-1, pp. 2, 4.

DCD 146, pp. 2-5.

As North Dakota Highway Patrol Captain Bryan Niewind testified, individuals present were violating multiple North Dakota statutes (Supp. Hrg. TR., Vol. I, 24:15−20) and over 100 protesters were arrested throughout the day for various offenses (Supp. Hrg. TR., Vol. I, 32:23−25).  As law enforcement advanced south on Highway 1806, protesters were throwing projectiles at law enforcement, including feces, bottles and wood.  (Supp. Hrg. TR., Vol. I, 32:8−22).  Protesters continued throwing objects at the mobile field forces and set vehicles and other items on fire as officers continued moving protesters south to the Cannonball Bridge.  (Supp. Hrg. TR., Vol. I, 29:25−30:2; 67:13−15; 190:25−191:10).

At approximately 6:00 p.m. (Supp. Hrg. TR., Vol. I, 102:2−3), Pennington County (SD) Sheriff's Department Deputy Thad Schmit was assisting with moving protesters south on Highway 1806.  Due to the report of possible gunshots to the south, law enforcement had temporarily ceased their efforts to move the protesters in that direction and  there was a relative lull in activity from both the protesters and law enforcement.  (Supp. Hrg. TR., Vol. I, 34:11−19; 35:3−6).

Shortly after the arrival of the defendant and a woman in a white car, the danger escalated and law enforcement redeveloped the skirmish line on Highway 1806.  (Supp. Hrg. TR., Vol. I, 142:15−22).  At the skirmish line, the defendant was wearing a gas mask and a backpack.  (Supp. Hrg. TR., Vol. I, 105:23−106:6). Dep. T. Schmit testified that he observed a mobile field force member yelling at the defendant to get back and was holding his baton across his body trying to force her to keep her distance.  (Supp. Hrg. TR., Vol. I, 104:23−105:19).  Despite his warnings, she did not retreat and she refused to comply with law enforcement directives to refrain from specified activities in the immediate vicinity of the riotous protest activity.  (Supp. Hrg. TR., Vol. I, 105:20−24).  The evidence clearly

establishes that civil disorder conditions existed throughout the day and specifically at the

time that the defendant engaged with law enforcement officers.  In fact, the defendant pled

guilty to the federal felony offense of aiding and abetting civil disorder (Count One of the

Superseding Indictment) and in the plea agreement acknowledged:

> (b) On October 27, 2016, law enforcement officers were deployed to remove numerous individuals from a location where protesters had erected a protest camp and to remove them from Highway 1806.

> (c) During that operation, some individuals within the camp committed acts of civil disorder as defined in 18 USC § 232(1), in that three or more persons, acting in concert, committed acts of violence that caused an immediate danger of damage to the property of other individuals and, by doing so, their conduct delayed the construction of the Pipeline.

> (d) The Defendant became aware of the conduct of the protesters and the law enforcement officers. She knowingly went to the protest site on October 27, 2016.  She acted to interfere with the actions of the law enforcement officers.

> (e) The Defendant acknowledges that her conduct satisfies all the elements of 18 U.S.C. §§ 231(a)(3) and 2.

(DCD 217 at ¶ 6).  She also admitted knowingly possessing the handgun on October 27,

2016, while she was a prohibited person.  Id.

As the circumstances surrounding the defendant's arrest unfolded, it became clear that

she had come to the scene of the civil disorder with a deadly weapon,[2] and as she proved

through her conduct, was willing to use it.  As the officers testified at the suppression

hearing, and as the video (Supp. Hrg. Gov. Exh. 15) showed, the defendant resisted their

efforts to secure her.  (Supp. Hrg. TR., Vol. I, 112:14−19; 169:6−9; 187:1−15).  She had her

---

[2] In the Plea Agreement, Defendant acknowledged that "On or about October 27, 2016, Defendant knowingly possessed one Ruger, model LCR, .38 Special revolver, bearing serial number 543-47899, and Federal brand .38 caliber ammunition in Morton County, North Dakota."  (DCD 217 at ¶ 6).

6

hands tucked under her body and was lying face down on the ground.  (Supp. Hrg. TR., Vol. I, 170:10−21).  Deputy R. Schmidt was kneeling on the ground near her right shoulder and they were able to get her right arm behind her back.  (Supp. Hrg. TR., Vol. I, 170:18−21). She kept her left arm tucked under her body.  (Supp. Hrg. TR., Vol. I, 172:24−173:5).  She had her fingers spread in an effort to avoid being cuffed.  (Supp. Hrg. TR., Vol. I, 110:22− 111:1).  During this entire encounter, law enforcement was instructing her to stop resisting. (Supp. Hrg. TR., Vol. I, 249:18−21).  She never gave up or voluntarily ceased.

As Dep. T. Schmit briefly stopped pulling on her left arm to make it easier for him to place her right hand into a flex handcuff, the defendant fired two gunshots.  (Supp. Hrg. TR., Vol. I, 110:11−111:4; 174:8−175:16).  A third shot rang out two seconds later.  Officers testified they saw or felt the concussion from the gunshots. (Supp. Hrg. TR., Vol. I, 90:5−12; 93:6−10; 250:1−13).  As the video in Suppression Hearing Gov. Exh. 15 shows, one of the officers checked his leg to see if he was hit.  Deputy R. Schmidt also thought he may have been shot.  (Supp. Hrg. TR., Vol. I, 112:9−13).  Even after she fired the shots, the defendant would not let go of the handgun in her possession  (Supp. Hrg. TR., Vol. I, 188:25−189:1) and continued to resist.  (Supp. Hrg. TR., Vol. I, 273:12−15).  She was laughing and yelling obscenities at the officers during and after the struggle.  (Supp. Hrg. TR., Vol. I, 222:23−24; Vol. II, 305:12−14).  After being secured, she said: she didn't know what the big deal was, that anybody can carry a gun or have a gun; that if she wanted to kill an officer, she could have done it; and that all pigs deserve to die.  (Supp. Hrg. TR., Vol. I, 252:4−10).

After she was secured, officers found a small black handgun holster in her front left jacket pocket (Supp. Hrg. TR., Vol. I, 223:16-21; Supp. Hrg. Gov. Exh. 9), and 12 rounds of live .38 caliber ammunition in two speed strips in her pocket. (Supp. Hrg. TR., Vol. II,

318:1-24; Supp. Hrg. Gov. Exh. 11).  Officers also seized brass knuckles, a can of Raid wasp

and hornet spray, and a knife (Det. Hrg. TR., 19:17−20:9; Det Hrg. Exhs. 5-7).

SENTENCING GUIDELINE RANGE

**Count One** (Civil Disorder – 18 U.S.C. § 231(a)(3))

The United States Sentencing Guidelines Manual does not assign a specific guideline

section for a violation of this statue, thus the most analogous section should be applied.

USSG § 2X5.1.  Elements of civil disorder include:

- one or more law enforcement officers were lawfully engaged in the lawful performance of their official duties incident to and during the commission of such civil disorder; and

- the defendant willfully and knowingly committed or attempted to commit any act for the intended purpose of obstructing, impeding, or interfering, either by herself or with someone else, in a violent manner, with such law enforcement officer or officers.

United States v. Red Feather, 392 F. Supp. 916, 918–19 (D.S.D. 1975).  As the defendant

admitted in the plea agreement, "[s]he acted to interfere with the actions of the law

enforcement officers."  (DCD 217 at ¶ 6).  Therefore, it appears that sentencing guideline

analysis under USSG § 2A2.4 (Obstructing or Impeding Officers) is the most analogous.

Aggravated Assault Cross Reference

Defendant's intent to obstruct law enforcement officials did not cease upon her

seizure.  She continued to engage in conduct that not only obstructed, but also endangered

law enforcement.  She committed aggravated assault under North Dakota state law, which in

pertinent part includes: "a person is guilty of a class C felony[3] if that person . . . [f]ires a

---

[3] The offense is a class B felony if the defendant knows the victim is a peace officer acting in an official capacity.  NDCC § 12.1-17-02(2)(b).

firearm . . . at another human being."  NDCC § 12.1-17-02(1)(d).  Since the statute does not

specify a culpability level, North Dakota law establishes the culpability level as willfully,[4]

which is defined as "intentionally, knowingly, or recklessly."  NDCC § 12.1-02-02(1)(e).

Since the defendant committed aggravated assault, USSG § 2A2.4(c)(1) calls for a cross

reference to § 2A2.2.

      In United States v. Huff, 630 F.App'x 471, 474 (6th Cir. 2015) (unreported), Huff

was convicted of transporting a firearm in commerce with the intent that it be used

unlawfully in furtherance of a civil disorder, in violation of 18 U.S.C. § 231(a)(2).  One of

the issues on appeal was whether the district court had properly applied a cross-reference to

USSG § 2A2.2 (aggravated assault).  The court analyzed the Tennessee aggravated assault

statute,[5] which included the "use or display of a deadly weapon" and found that "Huff

intended to use his firearm ('use or display a deadly weapon') to effectuate citizen's arrests

of government officials ('intentionally or knowingly cause physical contact with another'

that 'a reasonable person would regard as ... extremely offensive or provocative,' or

'intentionally or knowingly cause another to reasonably fear imminent bodily injury')."  Id.

at 494.  Because application of that section resulted in a higher offense level than application

of § 2K2.1, the court applied the higher offense level and further applied an enhancement

pursuant to USSG § 3A1.2(b) because the victims were government officials.  Id. at 493.

      USSG § 2A2.2 Note 1 defines "aggravated assault" as "a felonious assault that

involved (A) a dangerous weapon with intent to cause bodily injury...or (D) an intent to

commit another felony."  The facts that this Court heard at the suppression hearing establish

---

[4] NDCC § 12.1-02-02(2).
[5] Tenn. Code Ann. § 39-13-102(a)(1).

the same by the requisite finding of preponderance of the evidence.[6]  In the Eighth Circuit, it is settled that even "[a]cquitted conduct may be used for sentencing purposes if proved by a preponderance of the evidence."  United States v. No Neck, 472 F.3d 1048, 1055 (8th Cir. 2007) (citing United States v. Whatley, 133 F.3d 601, 606 (8th Cir. 1998)).

In United States v. Street, 66 F.3d 969, 972 (8th Cir. 1995), the defendant was convicted of assault on a federal officer, in violation of 18 USC § 111.  He argued that the district court improperly classified his offense as an aggravated assault and erroneously applied USSG § 2A2.4.  Id. at 978.  The Eighth Circuit held that the court could rely upon "relevant conduct" to determine whether the cross reference applied.  Id. at 979.  It also affirmed the district court's finding that he committed aggravated assault despite Street's assertion that he only intended to scare the victim.  Id. at 980.

In the case at hand, the facts support a finding that the defendant fired a handgun three separate times while resisting the efforts of law enforcement officers engaged in her arrest.  Thus, it was "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury. . . ," triggering the USSG § 2A2.2 cross reference.

Facts that support a finding that she intended to cause bodily injury include that she possessed, brandished, and fired the firearm in proximity to several people during her encounter with law enforcement.  At the detention hearing in this matter, Magistrate Judge Charles S. Miller, Jr. asked Pennington County Deputy Rusty Schmidt whether he had formed an opinion as to whether the defendant had fired the gun accidentally or purposefully.

---

[6] At sentencing, the government has the burden of proof on disputed facts, and generally must satisfy a preponderance of the evidence standard.  United States v. Russell, 234 F.3d 404, 408 (8th Cir. 2000).

Dep. R. Schmidt testified, "Oh, I have no doubt, Your Honor, that it was intentional, and especially after I saw the gun and was able to try to – I had to struggle with her for a long period of time.  She wouldn't let go of it."  (Det. Hrg. TR., 16:16−19).

In United States v. Valdez-Torres, 108 F.3d 385 (D.C. Cir. 1997), the defendant narrowly missed hitting an INS Agent with a motor vehicle and pled guilty to an unarmed assault in violation of 18 U.S.C. § 111(a).  On appeal, he argued that the court erroneously applied the aggravated assault section, rather than the obstruction section found in the Guidelines.  Id. at 387.  Valdez-Torres argued that he intended only to escape or, at worst, to frighten the agent, not to injure him and attacked the reliance on the agent's opinion evidence regarding his intent.  Id. at 388.  The Court held:

> There are (at least) two problems with Valdez-Torres's argument. First, under Federal Rule of Evidence 701, an eyewitness may express an informed opinion that would help resolve a fact in issue, here, Valdez-Torres's intent. See, e.g., Virgin Islands v. Knight, 989 F.2d 619, 629-30 (3d Cir.) (lay witness to shooting with "firsthand knowledge of the factual predicates that form the basis for the opinion" may express opinion whether shooting was intentional or accidental), cert. denied, 510 U.S. 994, 114 S.Ct. 556, 126 L.Ed.2d 457 (1993); United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir.1988) (victim may offer opinion of assailant's intent). Second, Valdez-Torres's accelerating despite Mangiulli's warning that the car was about to hit him supports the conclusion that Valdez-Torres intended to do him bodily harm. Given the evidence before the district court, its finding that Valdez-Torres intended to injure Mangiulli is not clearly erroneous.

Id.  The court also affirmed a sentencing enhancement for "official victim" pursuant to USSG § 3A1.2 and rejected a "double-counting" argument.  Id. at 390.

In this case, under Federal Rule of Evidence 701, the Court can rely upon the opinion testimony of Dep. R. Schmidt to help resolve a fact in issue - the defendant's intent. Additionally, the defendant's failure to surrender the gun after firing the shots supports the conclusion that she intended to do bodily harm.  As the court also heard during the

suppression hearing, Dep. R. Schmidt testified (at the detention hearing) that the defendant

fired three shots, and that one shot impacted the ground right next to his knee.  (Det. Hrg.

TR., 8:6−9).  The gun was pointed at another one of the officers during the struggle.  (Det.

Hrg. TR., 8:16−22).

The defendant has attempted to present evidence through her own PSR statement that

she may not have intended to do bodily harm.[7]  In practical terms, two scenarios have been

presented to this Court:  1) that the defendant knowingly possessed a firearm, extracted the

firearm, and discharged that firearm three separate times in a crowd of people in resistance to

her own arrest; or  2) that the defendant, while she may or may not have been unconscious,

inadvertently extracted the firearm, and unintentionally put her finger in a position on the

firearm, and through involuntary muscle contraction, applied the necessary pressure to fire a

double action firearm three separate times.

The evidence before the Court clearly supports the first scenario and this Court can

find by a preponderance of the evidence that the defendant intended to cause bodily injury

and apply the aggravated assault cross reference.

If the Court does not find that the defendant had an intent to cause bodily injury, the

Court can still apply the cross reference upon a finding that she committed a felonious

assault (fired a firearm at another) with "an intent to commit another felony."  USSG § 2A2.2

Note 1(D); see United States v. Robles, 557 F. App'x 355, 357 (5th Cir. 2014) (unpublished)

---

[7] The defendant will also apparently attempt to present such evidence through expert opinion.
On June 12, 2018, the United States received a letter from counsel for the defendant indicating
that they intended to present expert testimony at the sentencing hearing through a psychologist
and a professor in the Department of Integrative Physiology at the University of Colorado
Boulder.  The United States has not been provided with any expert reports or evaluations.

(the district court's determination that Robles's conduct evidenced an intent to commit another felony during the course of felonious assault is a factual finding).

There are three felonies the Court can find that the defendant intended to commit. She fired the firearm:  (1) in furtherance of her commission of the federal felony civil disorder; (2) with the intent to commit aggravated assault (as analyzed above) under N.D. state law; and (3) with the intent to commit reckless endangerment under N.D. state law.

In pertinent part, North Dakota law defines reckless endangerment as:

> creates a substantial risk of serious bodily injury or death to another. The offense is a class C felony if the circumstances manifest his extreme indifference to the value of human life. . . There is risk within the meaning of this section if the potential for harm exists, whether or not a particular person's safety is actually jeopardized.

NDCC § 12.1-17-03.  N.D. Pattern Jury Instruction K-8.20 identifies recklessly as the culpability requirement for reckless endangerment.

Therefore, the Court can apply the aggravated assault cross reference found in USSG § 2A2.4(c)(1), if the Court finds one or more of the following:

(1) she committed a felonious assault that involved a dangerous weapon with intent to cause bodily injury;

(2) she committed a felonious assault that involved an intent to commit another felony (civil disorder under federal law, aggravated assault under North Dakota state law, or reckless endangerment under North Dakota state law).

Application of the aggravated assault cross reference results in the following analysis:

| 14 | USSG § 2A2.2(a) | Base Offense Level |
| +5 | USSG § 2A2.2(b)(2)A) | firearm was discharged |
| +6 | USSG § 3A1.2(c)(1) | official victim |
| -3 | USSG § 3E1.1 | acceptance of responsibility |
| 22 | Total offense level | |

(PSR ¶¶ 19−28).  With a total offense level 22 and criminal history category III, the

sentencing guideline range is 51-63 months.  (PSR ¶ 81).

A six-level enhancement applies for "official victim":

If, in a manner creating a substantial risk of serious bodily injury, the
defendant or a person for whose conduct the defendant is otherwise
accountable—
(1)     knowing or having reasonable cause to believe that a person was
        a law enforcement officer, assaulted such officer during the course
        of the offense or immediate flight therefrom…

USSG § 3A1.2(c)(1).  See United States v. Street, 66 F.3d 969, 978 (8th Cir. 1995) (court

applied government victim enhancement upon application of aggravated assault cross

reference when sentencing upon conviction for assaulting a federal official); United States v.

Lee, 199 F.3d 16 (1st Cir. 1999) (upward sentence adjustment for assaulting a law

enforcement officer was warranted by defendant's act of reaching for his gun while

attempting to flee from officers, which created apprehension on part of officers and

substantial risk of injury, where, even if defendant did not intend to shoot police officers or

cause them fear, he had knowledge that fear would be consequence of his actions); United

States v. Albarran-Flores, No. 17-4695, 2018 WL 2435429, at *1 (4th Cir. May 30, 2018)

(unreported) (Defendant's attempt to point a firearm at a law enforcement officer is a

sufficient basis to apply the six-level official victim enhancement).

The parties disagree as to whether the aggravated assault cross reference applies to

determine the sentencing guideline range.  Where appellate courts have addressed such a

situation, it is clear that even if the district court "erroneously" calculates the sentencing

guideline range, "[w]hen the district court makes 'a clear record that the judge intended to

impose the same sentence,' and where the court 'tak[es] into account the potential impact of

14

the specific error alleged,' it is appropriate to treat the alleged error as harmless.'" <u>United States v. Jackson</u>, 594 F.3d 1027, 1030 (8th Cir. 2010) (internal citation omitted) (quoting <u>United States v. Henson</u>, 550 F.3d 739, 741−42 (8th Cir. 2008); <u>see</u> <u>also</u> <u>United States v. LaRoche</u>, 700 F.3d 363, 365 (8th Cir. 2012) (misapplication of Guidelines is harmless error if district court would have imposed same sentence); <u>United States v. Ortiz</u>, 636 F.3d 389, 395 (8th Cir. 2011) (under the circumstances of this case, there is no doubt the district court would have imposed the same sentence, and for the same reasons, regardless of any procedural error it may have made . . . ).

Therefore, if this Court applies the aggravated assault cross reference and/or applies any guideline range sentencing enhancements to which the defendant objects, the United States respectfully requests that the Court make a record of whether it would have imposed the same sentence based on the 3553(a) factors or whether it would have imposed a lower sentence if such guideline findings are found to be erroneous.

If the Court does not apply the aggravated assault cross reference, the guideline analysis under USSG § 2A2.4 is as follows:

| | | |
|---|---|---|
| 10 | USSG § 2A2.4(a) | Base Offense Level |
| +3 | USSG § 2A2.2(b)(1) | physical contact or threat with dangerous weapon |
| +2 | USSG § 3C1.2 | reckless endangerment during flight |
| -2 | acceptance | |
| 13 | Total Offense Level | |

With a total offense level 13 and criminal history category III, the sentencing guideline range is 18-24 months.

**Count Three** (Possession of a Firearm and Ammunition by a Convicted Felon)

The Sentencing Guidelines Manual identifies USSG § 2K2.1 as the applicable section to determine the guideline range.  Application would result in the following analysis:

| | | |
|---|---|---|
| 14 | USSG § 2K2.1 (a)(6)(A) | Base Offense Level - Prohibited person |
| +4 | USSG § 2K2.1(b)(6)(B) | possessed firearm in connection with another felony offense (aggravated assault/reckless endangerment/civil disorder) |
| +6 | USSG § 3A1.2(c)(1) | official victim |
| -3 | USSG § 3E1.1 | acceptance of responsibility |
| 21 | Total offense level | |

Victim Enhancement

The Eighth Circuit has found that the official victim enhancement in USSG § 3A1.2(c)(1) can apply upon a violation of 18 U.S.C. § 922(g).  See United States v. Olson, 646 F.3d 569, 574 (8th Cir. 2011).  Officers attempted to apprehend Olson for a criminal offense and he fled.  Id. at 571.  He was found hiding and holding a gun, but refused to drop the gun when ordered to do so.  Even though he never fired the gun, officers felt endangered and ultimately shot Olson.  Id.  He was convicted of violating 18 USC § 922(g) and objected to the six-level official victim enhancement, arguing that he did not commit an assault.  Id. at 572.  The Eighth Circuit joined the other circuits that analyzed the issue based on whether the circumstances constituted a common law assault.  Id.  The Circuit affirmed the district's finding that the enhancement was warranted because Olson "was making an effort to protect himself against apprehension [by] the officers by use of his weapon" and held:

> Considering the circumstances—that Olson had many opportunities to drop his gun but did not, that Olson decided (at least initially) to hold the gun in his hands while he was hiding in the creek bed, that he did not respond to the officers' repeated orders to drop it, but that he instead "brought the gun up from between his knees" - we cannot conclude that this finding was clearly erroneous.

This finding, derived from and combined with the officers' testimony, provides sufficient basis for application of the enhancement. At a minimum, the district court's statement that "[Olson] was making an effort to protect himself against apprehension ... by use of his weapon," meant that Olson intended to frighten the officers, satisfying the intent element of the common-law definition of "menacing" assault. Furthermore, the officers testified that Olson's movements put them in fear of losing their lives. See Sentencing Tr. at 15:15, 28:10–15. Such fear was reasonable when faced with a fleeing suspect, holding a gun, who had refused to relinquish it and began to raise it as they closed in around him. Accord United States v. Easter, 553 F.3d 519, 524 (7th Cir.2009) ("[S]imply reaching for a loaded gun is enough to create a substantial risk of serious bodily injury to another person."). Olson therefore committed, at minimum, a menacing assault on the officers.

Additionally, there is a less charitable reading of the finding that "[Olson] was making an effort to protect himself against apprehension ... by use of his weapon," which is, of course, that it meant that Olson intended to escape by firing his weapon at the officers. That too would constitute common-law assault, in that case by way of attempted battery. We therefore conclude that sufficient evidence supported the district court's decision to apply the enhancement.

Id. at 574.  See also United States v. Lee, 199 F.3d 16 (1st Cir. 1999) (official victim enhancement properly applied to 922(g) conviction even though court made no finding that the defendant intended to shoot at officers - efforts to reach for his gun sufficient to create apprehension and a substantial risk of such an injury constituting common law assault).

These circumstances are similar to the case at hand.  And even if this Court concludes that the defendant did not intend to fire the gun at the officers, she clearly used it an effort to protect herself from apprehension and she did not respond to the commands to release the gun.  Thus, the six-level enhancement is applicable.

Firearm Possessed in Connection With Another Felony Enhancement

The defendant's use of the firearm under these circumstances also constitutes felony conduct under North Dakota state law supporting a 4-level enhancement under USSG § 2K2.1(b)(6)(B).  In pertinent part, North Dakota law defines reckless endangerment as:

creates a substantial risk of serious bodily injury or death to another. The offense is a class C felony if the circumstances manifest his extreme indifference to the value of human life. . . There is risk within the meaning of this section if the potential for harm exists, whether or not a particular person's safety is actually jeopardized.

NDCC § 12.1-17-03.  N.D. Pattern Jury Instruction K-8.20 identifies recklessly as the culpability requirement for reckless endangerment.  Even if the defendant did not intentionally discharge the firearm, her conduct was at the very least reckless.

Defendant's conduct also satisfies the North Dakota aggravated assault statute as outlined above.  And she possessed the firearm while aiding and abetting the civil disorder, as outlined above, and thus possessed the firearm in connection with a felony offense.  A final offense level 21 and criminal history category III results in a range of 46-57 months.

However, if relevant conduct particular to the offense of illegal possession of the firearm is applied to the analysis of the civil disorder crime, as the PSR recommends, the offenses will combine into one group pursuant to USSG § 3D1.2.[8]  If the Court does not apply the aggravated assault cross reference in Count One and the resulting guideline range under Count Three is higher than the resulting range for Count One, the higher range under Count Three will control.

### 18 USC § 3553(a) FACTORS SUPPORT AN UPWARD VARIANCE

In determining the appropriate sentence in a case, the Court must also consider the factors set forth in 18 USC § 3553(a).  The relevant factors in this case are as follows.  They support an upward variance or departure[9] from the sentencing guideline range.

---

[8] If the two counts are not combined into one group, multi-count analysis is necessary pursuant to USSG Chapter 3, Part D.

[9] "Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court

**(1)  The nature and circumstances of the offense.**

The details of the offenses are well chronicled in the PSR, throughout this sentencing memorandum, and from the facts that have been presented to the Court in other hearings. The defendant came to the scene of the civil disorder with dangerous weapons.  She extracted and discharged a handgun three times while engaged with law enforcement officers, placing them at risk of serious bodily injury.  The fact that no one was struck by one of the bullets is remarkable.  Thankfully, while no serious bodily injury occurred, the serious nature of her conduct is self-evident.  The nature and circumstances of the offenses support an upward variance and a lengthy sentence of incarceration.

**The history and characteristics of the defendant**.

The PSR chronicles the history and characteristics of the defendant's criminal conduct throughout her life, beginning as a juvenile.  (PSR ¶ 31).  She has performed poorly on supervision, resulting in multiple revocation proceedings.  (PSR ¶ 31 – revoked twice; PSR ¶ 32 – revoked twice; PSR ¶ 34 – probation terminated unsuccessfully).

Defendant has shown a pattern of violent, assaultive behavior.  (PSR ¶ 32 – felony assault; PSR ¶33 – destruction of public property; PSR ¶ 38 – assault on a pregnant victim). The PSR further reports un-adjudicated violent conduct.[10] (PSR ¶ 47 – assault charge dismissed upon victim's refusal to cooperate; PSR ¶ 54 – harassment; PSR ¶ 58 – assault). Defendant's prohibition from possessing a firearm arose from a 2003 Colorado felony conviction for accessory to a crime (attempted murder).  (Det. Hrg. TR., 18:5−10).

---

must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure." Fed. R. Crim. P. 32(h).

[10] The Court can consider "prior similar adult criminal conduct not resulting in a criminal conviction."  See USSG § 4A1.3(a)(2)(E).

The defendant was on release with pending Morton County (ND) criminal charges when she committed the instant offenses.  (PSR ¶¶ 59−60).  She violated the terms of her pretrial release in the instant offense (DCD 209) and was remanded to custody (DCD 223).  This Court has previously exercised a practice of denying credit for time spent in a halfway house when the defendant has violated terms of release.

The defendant's statement for purposes of the presentence investigation report is found in paragraph 13 of the PSR.  In determining the appropriate sentence in a case, a district court may look to the defendant's conduct after the guilty plea.  See United States v. Jones, 539 F.3d 895, 898 (8th Cir. 2008) (finding district court did not clearly err when it found Jones's denial of association with a witness through his "objections to the presentence investigation report" inconsistent with acceptance of responsibility and denial of relevant conduct by multiple objections to the PSR—including 16 of 23 paragraphs labeled "Offense Conduct," almost every paragraph with information from cooperating witnesses…).  The Booker variance factors in 18 U.S.C. § 3553(a) explicitly allow consideration of "characteristics of the defendant" and the need to "promote respect for the law," both of which are implicated when a defendant is untruthful in a sentencing proceeding.  See United States v. Booker, 543 U.S. 220, 259-60 (2005); United States v. Lochin, 523 F. Supp. 2d 43, 45 (D. Me. 2007).

Defendant contends that she "has no recollection of the officer grabbing her. She may have lost consciousness, but does not know. She does not recall hearing any gunshots."  PSR ¶ 13.  This statement is inconsistent with the evidence that this Court heard and saw (through the videos) and could be characterized as an attempt to minimize the relevant conduct.  As

the officers testified as outlined above, the defendant never gave up on her efforts to resist.[11] And the gun was fired three times, each requiring a separate trigger pull.  Throughout the entire incident while she was resisting, the defendant was yelling, shouting and remained coherent.  While she has admitted aiding and abetting a civil disorder and knowing possession of a firearm and ammunition as a prohibited person, she is attempting to minimize her relevant conduct with arguments that are entirely inconsistent with the factual evidence. Her version of how she came to possess the gun and her selective amnesia at the time she fired the gun are incredible and should be considered by the Court as one of several factors warranting an upward variance.

**(2)  The need for the sentence imposed:**

**(A)    to reflect the seriousness of the offense, to promote respect for the law**, **and to provide just punishment for the offense**;
**(B)    to afford adequate deterrence to criminal conduct;**
**(C)    to protect the public from further crimes of the defendant**

The seriousness of the offense has been addressed above.  Enforcement of the gun laws is particularly important regarding an individual with a violent criminal history.  The sentences that have previously been imposed have not been sufficient to accomplish the above-referenced goals, nor have they deterred the defendant from continuing to commit criminal acts.  These factors support a lengthy sentence of incarceration.

**(3)  The kinds of sentences available.**

As is outlined in the PSR, the defendant is ineligible for probation if her sentencing guideline range falls within Zone D.  Under the terms of the plea agreement, the Court has

---

[11] This Court issued extensive findings on this issue in its "Order Denying Defendant's Motions to Suppress."  DCD 146, pp. 2-5.

the discretion to impose either upward or downward departures or variances up to ten years of imprisonment.  (DCD 217 at ¶ 8; PSR ¶82).  Defendant's criminal history, specifically her history of performance while on supervision, clearly shows that straight supervision is not warranted.  For all the reasons mentioned herein, the circumstances warrant a lengthy sentence of incarceration, followed by a period of supervised release.

    **(4)   The kinds of sentence and the sentencing range.**

As the United States Supreme Court explained in <u>Rita v. United States</u>, 551 U.S. 338 (2007) and expounded in <u>Gall v. United States</u>, 552 U.S. 38 (2007), "a district court should normally begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however . . . the district judge should then consider all of the § 3553(a) factors . . . "  If this Court does not apply the aggravated assault Guideline section, and thus finds a lower sentencing guideline range, the Court can consider all the circumstances and relevant conduct referenced herein to support an upward departure and/or variance.

    **(5)   Any pertinent policy statement.**

USSG § 4A1.3 indicates that the court may upwardly depart "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes . . . "  As analyzed in the "history and characteristics of the defendant" section above, two factors in this section warrant a finding that her criminal history category is under-represented:

- Whether the defendant was pending trial or sentencing on another charge at the time of the offense.  USSG § 4A1.3(a)(2)(D)

- Prior similar adult criminal conduct not resulting in a criminal conviction.  USSG § 4A1.3(a)(2)(E)

Increasing the defendant's criminal history category by one level (CH IV) results in a sentencing guideline range of 63-78 months.

Additionally, USSG § 5K2.6 indicates:

If a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range.  The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others. The discharge of a firearm might warrant a substantial sentence increase.

All of these factors are present in the case at hand and support an upward variance from the sentencing guideline range.

USSG § 5K2.21 indicates:

The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

The State of North Dakota filed serious charges against the defendant based upon her conduct which were dismissed after she was indicted.  State officials have agreed "they will not reinstate or pursue any charges against the Defendant relating to her conduct in Morton County on October 27, 2016."   (DCD 217 at ¶ 4).  The United States has also agreed to dismiss the 924(c) charge as a part of the plea agreement.  These factors support an upward departure or variance from the sentencing guideline range.

**(6)   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

While many people were prosecuted in Morton County District Court for various state offenses, only seven individuals were charged with federal offenses.  In addition to the defendant, six individuals were charged with civil disorder and use of fire to commit a federal felony offense.  Two of the individuals have pled guilty: Michael Arthur Giron (1:17-cr-31) and Michael Mateo Markus (1:17-cr-30).[12]  The United States entered into plea agreements in both those cases where the parties agreed to recommend a sentence of 36 months of imprisonment.  On May 30, 2018, Giron was sentenced to serve 36 months of imprisonment.  In both of those cases, the defendants pled guilty to a sole count of civil disorder, with a maximum punishment of five years of imprisonment.  And none of the other defendants possessed a firearm.  Thus, the defendant's situation is different wherein she has pled guilty to two offenses and faces a higher potential penalty due to her particular conduct.  Additionally, the discharge of a firearm during the commission of the defendant's offenses distinguishes her from the others and supports imposing a higher sentence.

<u>FORFEITURE ALLEGATION</u>

As reflected in the Plea Agreement, the U.S. will move to dismiss the forfeiture allegation as Defendant claims no interest in the firearm or ammunition.  (DCD 217 at ¶ 4).

<u>SENTENCING RECOMMENDATION</u>

Count One (civil disorder) carries a maximum imprisonment penalty of 5 years (18 U.S.C. § 231(a)) and Count Three (possession of a firearm and ammunition by a convicted

---

[12] Markus's sentencing is scheduled for August 6, 2018.

felon) carries a maximum imprisonment penalty of 10 years (18 U.S.C. § 924(a)(2)).  When counts combine into one group and the guideline range exceeds the statutory maximum for one of the offenses:

> (c)   If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.
>
> (d)   If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

USSG § 5G1.2(c) and (d).

In consideration of all the factors and analysis set forth herein, the United States intends to recommend a total sentence of 84 months of imprisonment - 60 months on Count One and a consecutive 24 months on Count Three - to be followed by supervised release for a period of three years, and a $200 special assessment.

Dated: June 15, 2018

CHRISTOPHER C. MYERS
United States Attorney


By:   /s/ *David D. Hagler*_____
DAVID D. HAGLER
Assistant United States Attorney
P.O. Box 699
Bismarck, ND  58502-0699
(701) 530-2420
ND Bar Board ID No. 04696
David.Hagler@usdoj.gov
Attorney for United States

25